**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| John Doe | |
|    Plaintiff, | |
| v. | CIVIL ACTION NO.: _____ |
| The University of South Alabama; Michael A. Mitchell, individually and in his official capacity as Vice President for Student Affairs and Dean of Students and Deputy Title IX Coordinator for Students; Andrea C. Agnew, individually and in her official capacity as Assistant Dean of Students; Krista Harrell, individually and in her official capacity as Associate Dean of Students & Title IX Coordinator; No.2-20, and fictitious party defendants whose names and identities are otherwise unknown and who will be substituted, | **VERIFIED COMPLAINT**<br>**JURY TRIAL DEMANDED** |
|    Defendants. | |

---

## COMPLAINT

---

### INTRODUCTION

1.  John Doe ("Doe") brings this action for a declaratory judgment, injunctive relief, and violations of due process, Title IX, USA's own policies, procedures, and regulations and other related claims.

2.  This case arises out of the decision of the University of South Alabama ("USA") to impose disciplinary sanctions against Doe in violation of constitutional, statutory, and contractual rights.

1

**PARTIES**

3. Doe is an undergraduate student at USA and on an ROTC scholarship.

    a) Doe is a Mobile County, Alabama resident. Doe has completed six (6) semesters of undergraduate coursework at USA.  He is scheduled to graduate with a Bachelor's Degree in Biological Sciences and a minor in Military Sciences. Doe is also an ARMY ROTC scholarship recipient through the Department of the Army, University of South Alabama, Jaguar Battalion in which he receives a full tuition scholarship and fees, as well as a monthly subsidence check, and a $600 per semester book check.[1] For the 2016-2017 school year, USA assessed a $313.00 per semester hour fee for Doe as an in-state undergraduate resident in the College of Arts and Sciences.[2] Doe was registered and enrolled as a student at USA for the fall semester of 2016 and the spring semester of 2017. Doe is currently enrolled for the fall semester of 2017.

    b) The disclosure of Doe's identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99. This case also involves disclosure of Doe's confidential medical records and conditions which would cause him irreparable harm if his identity is disclosed. Additionally, disclosure of Doe's identity would subject Doe to potential danger, humiliation, and embarrassment.[3]

---

[1] As part of the Plaintiff's contract with the Department of the Army, he is obligated to military service for eight (8) years as either an officer or an enlisted soldier.

2 See USA 2017 - 2018 Tuition and Fee Schedule at https://www.southalabama.edu/departments/financialaffairs/studentaccounting/tuition.html (visited June 5, 2017)

[3] Doe has filed a Motion to proceed anonymously contemporaneous with the filing of this complaint.

c)  At all relevant times to this case, Doe was a full time student at USA.

4.  Defendant University of South Alabama ("Defendant" or "USA") is a public university created by an act of the Alabama State Legislature §16-55-1, *et. seq*., Ala. Code (1975) with its address and principal campus in Mobile County, Alabama.

5.  At all times material hereto, Defendant USA acted through its administrators, supervisors and employees who were agents of the Defendant and were acting within the course and scope of their employment in their official capacity.

6.  Defendant Michael A. Mitchell is the Vice President for Student Affairs and Dean of Students and Deputy Title IX Coordinator for Students.[4]  He has a principal place of business at USA's main campus, Student Center, Room 245 Mobile, AL 36688.

  a)  Mitchell is sued in his official capacity for declaratory and injunctive relief.

  b)  On information and belief, Mitchell has been acting under regulations set forth in the policies, procedures, and practices of USA.

  c)  Mitchell is responsible for administering and operating the USA Student Code of Conduct and Title IX training, education, and administration of the grievance procedure.

7.  Defendant Andrea C. Agnew, is the Assistant Dean of Students.

  a  Agnew is sued in her official capacity for declaratory and injunctive relief.

---

[4] Duties and Responsibilities: Deputy Coordinators are responsible for Title IX training, education, and administration of the grievance procedure for all complaints against individuals in their respective areas. Coordinators will also be responsible for facilitating the referral of complaints with the appropriate office. Available online at https://www.southalabama.edu/departments/studentaffairs/titlenine/index.html (visited August 27, 2017)

    b   On information and belief, Agnew is acting under regulations set forth in the policies, procedures, and practices of USA.

    c   Defendant Agnew serves as Chair of the USA University Disciplinary Committee regarding Title IX and complaints of sexual misconduct.

    d   Agnew participated in the investigation of the allegations against Doe, conducting interviews, participating in, counseling, advising and directing the Student Conduct Administrator Ortiz as well as members of University Disciplinary Committees. Agnew participated in the two disciplinary hearings of Doe. She participated as the Student Conduct Administrator in the second Jane Roe 3 hearing.

8. Defendant Krista Harrell is the Associate Dean of Students & Title IX Coordinator at USA. She has a principal place of business at Student Center, Room 116 Mobile, Alabama 36688. As a Title IX coordinator, she is responsible for Title IX training, education, and administration of the grievance procedure for all complaints against individuals in their respective areas. She is responsible for facilitating the referral of complaints with the appropriate office. In the event a conflict of interest arises with any of the above named coordinators, the subject case will be managed by that coordinator's supervisor, according to the USA Title IX website.[5]

    a.   Harrell is sued in her official capacity for declaratory and injunctive relief.

    b.   On information and belief, Harrell is acting under regulations set forth in the policies, procedures, and practices of USA

---

[5] See https://www.southalabama.edu/departments/studentaffairs/titlenine/index.html (visited August 30, 2017)

    c.   Defendant Harrell has responsibility for administering and operating USA's Title IX compliance and to receive inquiries regarding Title IX and complaints of sexual misconduct.

9.   On information and belief, Defendants USA, Mitchell, Agnew, and Harrell are authorized to grant all of the injunctive relief sought in the Complaint.

## JURISDICTION AND VENUE

10.  This case arises, in part, under the laws of the United States, specifically 42 U.S.C. §1983 and Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq. Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331, 1343 and 28 U.S.C. §1332 as the amount in controversy exceeds $75,000 exclusive of costs and interests.

11.  The injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

12.  This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

13.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because the state law claims are so closely related to the federal claims as to form the same case or controversy under Article III of the United States Constitution.

14.  This Court is authorized to grant Doe's prayer for relief regarding costs, including reasonable attorney fees, under 42 U.S.C. §1988.

**THE USA RESPONSE TO THE ISSUE OF SEXUAL MISCONDUCT ON CAMPUS**

15. Doe repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein. USA has adopted certain policies and procedures for the investigation and adjudication of alleged student sexual misconduct, as required by Title IX. One is entitled *University of South Alabama Sexual Misconduct Policy and Complaint Resolution Procedures*. These policies and procedures are available on USA's website and are attached as Doe's EXHIBIT 1.[6] Another source of student discipline for sexual assault is found in the *USA Student Code of Conduct* detailed in <u>THE LOWDOWN: A Student Handbook</u> (pp.52-65). The *USA Student Code of Conduct and Flow Chart* is available online at and is attached as EXHIBIT 2.[7] A third source is the *University of South Alabama Sexual Harassment, Sexual Assault, Domestic Violence, Dating Violence, and Stalking Policy*.[8] (Exhibit 3)

16. The *USA Code of Student Conduct* governs student behavior and provides sanctions for violations that are non-academic in nature.[9]  In it, USA covenants that students have certain rights and responsibilities:

> The University of South Alabama is a community of scholars in which the ideals of freedom of inquiry, freedom of thought, freedom of expression, and freedom of the individual are sustained. The University is committed to supporting the

---

[6] http://www.southalabama.edu/departments/studentaffairs/titlenine/resources/smp.pdf  (page 18, visited July 11, 2017)

[7] http://www.southalabama.edu/departments/studentaffairs/lowdown/ (visited June 12, 2017)

[8] USA's website notes "The University of South Alabama is committed to promoting an environment in which students, faculty, staff and all guests are free from sexual harassment, including sexual violence, sexual assault, domestic violence, dating violence and stalking. All members of the University community (including faculty, staff, students and visitors) are expected to abide by the University of South Alabama Sexual Harassment, Sexual Assault, Domestic Violence, Dating Violence and Stalking Policy." https://www.southalabama.edu/departments/studentaffairs/titlenine/resources/victimsrightsstatement.pdf (visited August 14, 2017)  A copy of this policy is attached as Exhibit 3.

[9] USA Student Code of Conduct, 3.*Interpretation of Code*.
> The University's Code of Student Conduct is set forth in writing in order to give students a general notice of non-academic prohibited conduct. The Code should be read broadly and is not designed to define nonacademic misconduct in exhaustive terms.

exercise of any right guaranteed to the individuals by the Constitution and the Code of Alabama and to educating students relative to their responsibilities.

17. In practice, a student accused of sexual misconduct under the USA policies faces a system that is biased at every step towards finding the student "responsible" and imposing significant discipline. One of the prime objectives of the disciplinary process is that the alleged victim be believed. Those who file complaints are deemed "survivors." At the beginning of the process, USA often imposes restrictions and punishments—sometimes referred to as "interim measures" based solely on an allegation without allowing for any hearing or conducting any investigation. These interim measures include: "provision of counseling or support services; reasonable changes in academic, living, transportation, or work arrangements; and entry of a 'no contact' order or similar order to ensure separation of the parties."[10] [*USA Sexual Misconduct Policy & Complaint Resolution Procedures, VI. D. Interim Measures-hereinafter USA Policy & Procedures Exhibit 1*] The investigatory process focuses on unsworn hearsay statements and testimony instead of physical evidence and is aimed at finding evidence to support the charges. USA investigators and/or administration officials, have, as is in this case, even suppressed evidence helpful to the accused. USA has created a panel of students and faculty and/or administration officials who serve as an adjudicative body in cases involving accusations of sexual assault. This body, the University Disciplinary Committee (UDC), receives biased training designed to encourage findings against accused students and often seek to pursue an independent political agenda.

18. USA has adopted certain policies and procedures for the investigation and adjudication of alleged violations of Title IX.  These policies and procedures are available on USA's website

---

[10] http://www.southalabama.edu/departments/studentaffairs/titlenine/resources/smp.pdf (page 18,visited July 11, 2017)

and are incorporated as Exhibit 1.[11] These procedures, *USA Sexual Misconduct Policy & Complaint Resolution Procedures, VII. Investigation And Resolution* include the following:

a) In conducting its investigation and resolution under the Complaint Resolution Procedures, USA covenants it will:

   i.   Make reasonable and appropriate efforts to preserve the privacy of the parties involved while recognizing that absolute confidentiality is not possible.

   ii.  **Provide equal information to both parties about the investigation and resolution process**.

   iii. **Conduct a thorough, fair, and impartial investigation** that provides the parties and **equal opportunity to present information** and **equivalent procedural safeguards**.

   iv.  Allow the parties to be accompanied to all meetings and hearings by a support person of their choice.

   v.   Keep the parties apprised of the progress of the investigation and anticipated time to resolution.

   vi.  Provide the parties an equal opportunity to meet with the Investigating Officer and to be present and testify (if applicable) at any hearing required by the Complaint Resolution Procedures, though not during the deliberative process.

   vii. Provide the parties an equal opportunity to comment on the information developed during the investigation.

   viii. **Move promptly to conduct the investigation and complete resolution within sixty (60) days in most circumstances**.

---

[11] https://www.southalabama.edu/departments/studentaffairs/titlenine/resources/sexualmisconductpolicycomplaintresolutionprocedures.pdf (Available on USA website and visited June 5, 2017)

ix. **Avoid conflicts of interest that could call into question the integrity of the process**.

x. Provide simultaneous written notice to the parties of the outcome of a complaint and the outcome of any appeal.

xi. If a complaint of sexual misconduct is substantiated, take appropriate corrective, disciplinary, and remedial action to prevent the recurrence of the conduct and its discriminatory effects. (*emphasis added*)

b) USA follows the United States Department of Education *Office of Civil Rights 2011 Dear Colleague Letter*, and applies the *preponderance of the evidence* or "more likely than not" standard in investigating, adjudicating, and resolving complaints of sex discrimination, including allegations of sexual harassment or violence.[12] Additionally USA does not require unanimous UDC verdicts. All that is required for a finding of "responsible" is a bare majority vote of the UDC panel members by a preponderance of the evidence.

16. USA in its Student Code of Conduct, IX.B. Complainant/Victim/Respondent Rights guarantees the accused or responding student certain rights:

**B. Complainant/Victim/Respondent Rights**
The University of South Alabama recognizes the following rights to each Complainant and Respondent involving allegations of sexual violence while on University premises, or at University related or sponsored activities whether on or off University premises:

a. The right to a **prompt, fair and impartial process** from the initial investigation through the final result.
b. The right to be present during the disciplinary hearing, if one is held. However, if the Complainant/Victim/Respondent fails to appear at the hearing, the hearing may be held in his/her/their absence.

---

[12] https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (page 10, visited July 11, 2017)

    c.  The right to present evidence by witness, **or by affidavit if a witness is unable to attend the hearing**.

    d.  **The right to question all witnesses at the disciplinary hearing**.

    e.  The right to appeal if such right is given to the other party.

    f.  The victim has the right to have sexual history excluded from consideration during the complaint/grievance process.

    g.  The victim has the right to immunity from University discipline charges stemming from the victim's use of a narcotic or intoxicating substance administered with or without the victim's consent at the time of the perpetration of a sexually violent event against the victim.

    h.  The right to have protective orders enforced.

    i.  The right to receive information from the university on how to obtain protective/restraining orders.

    j.  The right to a written explanation of Complainant/Victim rights and options.

    k.  The right to simultaneous written notice of the outcome of any University disciplinary proceedings alleging a sexual offense, the institution's appeal procedures, any change to the results before the results become final, and when the results become final.

    l.  The right to have an adviser accompany him or her during any campus conduct proceedings.

        1.  If the Complainant or the Respondent is a party to a criminal incident out of the same circumstances, each is allowed to have an attorney serve as their advocate, at their own expense.

        2.  Advisers, including attorneys, advocates, or other selected person, are not permitted to speak or participate during the hearing, expect to confer quietly with their advisees.

        3.  Advisers must abide by the rules of strict confidentiality required of all participants.

    m.  The Complainant, Respondent, and other appropriate individuals are given timely and equal access to information used in the course of the formal disciplinary meetings and hearings.

    n.  The information obtained during the process of a disciplinary proceeding will be maintained/managed in a confidential manner consistent with the requirements of FERPA and other applicable laws and regulations (*Emphasis added*)

17. USA covenants with its students that it "offers a variety of educational programming, including primary prevention and awareness training for new students and new employees and ongoing awareness programs for all members of the University Community." (*USA Sexual Misconduct Policy & Complaint Resolution Procedures*, *VIII. Education*, p.20)

18. A number of these provisions of the USA Student Code of Conduct concerning the UDC Hearings for students accused of sexual assault or sexual harassment raise significant due process concerns, including:

   a. USA does not undertake a full, complete and impartial investigation prior to the institution of disciplinary proceedings for allegations of sexual assault or sexual harassment.

   b. USA allows unsworn witness statements to be considered by the UDC panel members despite an express rule providing only for affidavits if a witness is unable to appear at the UDC hearing.

   c. USA employs an "investigating officer" which is typically a student conduct administrator to investigate a particular complaint and administer relevant provisions of the Sexual Misconduct Complaint Resolutions. The "investigating officer" is authorized to prepare a written investigation report summarizing the allegations of sexual misconduct, the scope of the investigation, the information collected, and appending any statements or summaries of statements or interviews provided. The investigating officer is allowed to act as a prosecutor presenting a summary of the scope of the investigation and answer any questions from the UDC regarding the investigation report and appended information. *(USA Sexual Misconduct Policy & Complaint Resolution Procedures, IV.D.4.)*

   d. Formal Rules of evidence do not apply in any of the formal resolution processes. Nonetheless, evidence that is irrelevant or whose prejudicial effect substantially outweighs its probative value may be excluded from consideration. (*USA Sexual Misconduct Policy & Complaint Resolution Procedures, IV.B.*)

e.  The alleged victim is allowed to submit a victim impact statement *prior to* any finding that the accused student is "responsible."

f.  A student is permitted to have an attorney or "adviser" present at the hearing, but the attorney may not actively participate as a spokesperson or vocal advocate in the hearing. (*USA Student Code of Conduct,IX.B.l.2*)

g.  A student may cross-examine witnesses who appear at the UDC Hearing only through the use of questions to the hearing officer. (*USA Sexual Misconduct Policy & Complaint Resolution Procedures*, *IV.D.6.)* However, the Student Conduct Administrator has the right to review and determine which written questions will be asked. This process does not allow for effective cross examination, particularly through the use of follow-up questions and impeachment through prior inconsistent statements, all of which are critical when the credibility of the witness is disputed.

h.  A student does not have the ability to compel other students or USA employees to attend the hearing. When a student does locate a witness who can provide critical evidence on his behalf, USA may deny entry to the hearing and prohibit the witness from testifying.

19.   Students accused of a violation of the USA Student Code of Conduct, including those students like Doe accused of sexual violence, are adjudicated by a University Disciplinary Committee (UDC). The UDC, appointed annually by the University President or his/her designee, is the body that hears and makes recommendations regarding charges of violation of the Code of Student Conduct when the charges are not resolved in the informal process discussed below. This committee of two to five students and a faculty or staff/administrator (except in charges of sexual violence where the UDC will have two to four faculty or

12

staff/administrators)  is chaired by the non-voting Student Conduct Administrator or a designee of the Dean of Students. USA represents that all University officials and members of the UDC receive annual training on issues related to dating violence, domestic violence, sexual assault, stalking, and how to conduct an investigation and hearing process that protects the safety of victims and promotes accountability. (*USA Student Code of Conduct, 8.0 Disciplinary Procedures, Pursuing Charges*)

### THE 2011 DEAR COLLEAGUE LETTER

20.    Doe repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

21.    This case arises amidst a growing national controversy stemming from the Federal Department of Education, Office of Civil Rights' ("OCR") threats to withhold federal education funds to compel colleges and universities to address "sexual violence" on their campuses.

22.    After years of criticism for being too lax on campus sexual assault, at the urging of OCR and other high-ranking officials in the Obama Administration, colleges and universities are relying on Title IX to crackdown on alleged perpetrators. This crackdown has gone too far, as schools are ill-equipped to handle and adjudicate matters of sexual assault.  Problems include: accused students effectively are presumed guilty. Instead of requiring accusers to prove they were assaulted, the accused students have to prove they had consent; and schools apply the very lowest standard of proof — preponderance of the evidence.  The result is that schools treat male students accused of sexual misconduct with a presumption of guilt.

23. On April 11, 2011, OCR sent a "Dear Colleague" letter to colleges and universities.

a)   The "Dear Colleague" Letter advised that, in order to comply with Title IX, colleges and universities must have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct.

b)   The "Dear Colleague" letter encouraged schools to expand the jurisdiction of Title IX investigations beyond the clear and plain language of the text of Title IX. "Schools *may* have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity."[13] (*emphasis added*)

c)   The "Dear Colleague" letter required schools to adopt a relatively low burden of proof—"more likely than not"—in cases involving sexual misconduct, including assault.

d)   The "Dear Colleague" letter states that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

e)   The "Dear Colleague" letter, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy.

24.   The Department of Education determined that this "Dear Colleague Letter" is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices.[14]

25.   The sweeping changes that OCR has imposed upon the nation's colleges, including Defendant USA, and universities—in particular, its sweeping expansion of Title IX

---

[13] 2011 Dear Colleague Letter, p. 4. See
https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (visited July 27, 2017)
[14] See 2011 Dear Colleague Letter, FN 1. Available online at
https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (visited July 27, 2017)

jurisdiction in contravention of the plain language of the Title IX statute, and the requirement that they use a "preponderance of the evidence" standard of proof, the lowest such standard known to the American judicial system—exceed any authority delegated to it to enforce Title IX. And those changes, despite being treated, in both theory and practice, as substantive rules carrying the force of law, were promulgated by OCR and followed by Defendant USA without subjecting them to notice and comment by the public, as required by Administrative Procedure Act, 5 U.S.C. §§ 701–706.

26.  The 2011 "Dear Colleague" Letter was not subjected to notice and comment procedures before it was promulgated. Instead, OCR asked anyone "interested in commenting on this guidance" to "send an email with your comments to OCR@ed.gov" or mail in a letter.[15]

## FACTS

### THE SEPTEMBER 3-4, 2016 THREESOME
### BETWEEN John Doe, Jane Roe 1, and Jane Roe 2

27.     Doe repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

28. Doe, Roe 1, and Roe 2 were at all times relevant to the facts in this action undergraduate students at the University of South Alabama.

---

[15] Litigation as to the legality of Department of Education's 2011 Dear Colleague Letters commands vis-à-vis the Administrative Procedure Act *(5 U.S.C. § § 701 – 708)* is currently pending in , <u>Doe v. Lhamon</u>, No. 1:16-cv-01158-RC (D.D.C. Aug. 15, 2016). In June 2016, a student who had been disciplined after being found responsible for sexual misconduct filed a lawsuit against both the university and the Department of Education alleging in part that requiring institutions to use a preponderance of the evidence standard violates the APA, insofar as it constituted rule-making without notice and an opportunity for public comment, an action taken in excess of statutory authority, and an arbitrary and capricious action. A decision on the Department's motion to dismiss is pending.

29.    Prior to the events made the basis of this action, Doe and Roe 1 were in a long term dating relationship.

30.    Prior to September 3, 2016 Doe ended his relationship with Roe 1, based in part on her increasingly erratic conduct. Roe 1 attempted suicide shortly after their break up.

31. Nonetheless, Doe and Roe 1 remained friends and occasionally engaged in recreational and mutually consensual sexual intercourse with each other, and with Roe 2.

32. Doe also engaged in prior consensual acts of sexual intercourse with Roe 2, a member of his ROTC unit.

33. Doe, Roe 1 and Roe 2 engaged in mutual three-way consensual sexual intercourse on at least two prior occasions before the incident made the basis of their Title IX complaints against Doe.[16]

34. On Saturday, September 3, 2016, Roe 1 and Roe 2 attended an off campus party on Vanderbilt Street in Mobile, Alabama.

35. At the time, Roe 1 and Roe 2 were both in dating relationships with other males.

36. Roe 1 alleged she became intoxicated at this office campus party.

37. Roe 2 alleged she became intoxicated at this off-campus party.

38. Unknown to Doe at the time, both Roe 1 and Roe 2 engaged in consensual three way sexual intercourse with a male air force cadet at the Vanderbilt party.[17]

39. Later in that same evening, Roe 1 contacted Doe for a ride home.

_____

[16] Roe 1 in her statement to the Title IX investigator admitted to one prior instance of a consensual threesome with Roe 2 and Doe during spring break of 2016 that was initiated by Roe 2.

[17] Jane Roe 2 told USA Title IX authorities that she and Jane Roe 1 "Hooked up with a guy" [at the party]. The notes from USA on this interview also noted "neither are bringing sexual violence charges against this individual. Jane Roe 2 stated that she does not feel like her encounter with this man was a 'Predatory situation.'"

40. Doe and his roommate, A.H. picked up both Roe 1 and Roe 2 from the Vanderbilt party. Doe and A.H. dropped Roe 1 and Roe 2 off at their dorm and returned to their dorm room.

41. There was no allegation of any alcohol consumption by either Doe, Roe 1, or Roe 2 after they all returned to campus.

42. Neither Roe 1 nor Roe 2 were incapacitated.

43. Approximately thirty (30) minutes later, Roe 1 contacted Doe and invited him to her dorm room.

44. Doe arrived and Roe 1 invited him in. Roe 2 was still there. All three engaged in a conversation about a "hickey" Roe 2 had visible on her neck from her sexual encounter earlier in the evening at the party on Vanderbilt. Roe 2 was concerned her then boyfriend, Doe's former roommate, would see it. Roe 1 helped Roe 2 cover up the hickey with makeup.

45. According to Roe 2, the three had a conversation about how they previously hooked up last semester and discussed about not doing that again.

46.  After talking a while, Roe 1 and/or Roe 2 suggested all three go "walk around campus."

47. Doe, Roe 1, and Roe 2 then walked around campus during the early morning hours of Sunday, September 5, 2016.

48. Both Roe 1 and Roe 2 traversed the campus unassisted for approximately one hour. At one point, both Roe 1 and Roe 2 went into and splashed in the Moulton Tower university fountain. At no time were Roe 1 or Roe 2 incapacitated.[18]

49. All three eventually returned to Roe 1's dorm room to watch a movie.

---

[18] In her October 31, 2016 interview with Title IX investigator Andrea Agnew, Roe 1 admitted to walking around campus for "10 minutes" but then in a subsequent statement said it was closer to "45 minutes to an hour." Roe 1 "remembered walking by the track and playing in a fountain."

50. Roe 1 said in one of her multiple statements to Title IX investigator Andrea Agnew that she invited Doe "to lie in the bed with her and Roe 2."

51. All three laid in bed together, with Roe 2 on the edge of the bed closest to the television, Roe 1 in the middle, and Doe against the wall.

52. During the movie, Roe 2 initiated sexual contact with Roe 1 by touching her and kissing Roe 1. Roe 1 then turned around and began kissing Doe. Again this was at least the third time the three had engaged in a mutual sexual threesome.

53. The three engaged in consensual sexual intercourse.

54. Roe 1 was simultaneously touching and kissing Roe 2.

55. Doe was never on top of either Roe 1 or Roe 2 the entire time of the event. Never at any time did Roe 1 or Roe 2 ever tell or indicate or communicate to Doe to stop or that his sexual attention to either was unwanted or unconsented to.

56. From the light of the television, Doe watched as Roe 1 reached over Roe 2 and removed a dark-colored vibrator from her bedside drawer. Roe 1 asked Roe 2, "Do you know how to use this?" Roe 1 then turned the vibrator on at which time Roe 2 took it and began to use it.

57. After several minutes, Roe 1 asked Roe 2, "Do you want to switch?" Roe 2 responded, "Yeah." Roe 1 then took the vibrator and switched spots in the bed with Roe 2. Doe never moved from his position. Doe and Roe 2 then engaged in mutual sexual intercourse. Roe 2, like Roe 1, never told Doe "No", or to stop, or gave any indication that she was not consenting. This was a consensual sexual event by all parties, just like the times before.

58. After a few more minutes, Roe 1 put the vibrator away and all three went to sleep together.

59. The next morning, Doe awoke and returned to his dorm room.

60. Later that same morning, Roe 1 came over to Doe's dorm room for breakfast. While there, Roe 1 ate breakfast and hung out with Doe for several hours.

61. After the September 4, 2016 threesome, Roe 2 also visited Doe's dorm room. Roe 2 even came over at Doe's invitation and ate a muffin with Doe in his dorm room

62. In the weeks after without incident Doe saw Roe 1 without incident.

63. On or about September 23, 2016 Roe 1 accompanied Doe and several friends to a fraternity party.

64. A few days after the threesome with Doe, Roe 1 spoke to M.N., a friend and sorority sister of Roe 1. M.N. noticed that Roe 1 seemed "O.K." and that Roe 1 admitted to her that she and Doe had sex but that Roe 1 expressed regret for doing so because she and Doe were no longer dating. Roe 1 did not mention to M.N. that she was assaulted or raped or incapacitated or otherwise did not consent during this conversation.[19]

65. After the threesome, Doe disclosed the threesome to his roommate and soon others in the university community, including members of Roe 1's sorority, became aware of it.

66. Eventually word got back to both Roe 1 and Roe 2 that Doe had disclosed the details of the threesome.

67. Sometime after the threesome but before the filing of their Title IX complaints, Roe 2's boyfriend (Doe's former roommate) ended their relationship.

68. Roe 1 herself was in a dating relationship with another male at the time of her threesome with Roe 2 and Doe and she began to fear her boyfriend would find out. Ultimately, her boyfriend found out and broke up with her.

69. Roe 1 and Roe 2 then told their sexual assault stories to USA's Title IX Defendant Harrell.

---

[19] M.N. disclosed this information to a Title IX investigator. M.N. did not appear for the Title IX hearing.

70. Neither Roe 1 nor Roe 2 exhibited any signs that Doe sexually assaulted or raped them.

71. Neither Roe 1 nor Roe 2 sought medical treatment for their alleged sexual assault.

72. Neither Roe 1 nor Roe 2 sought and medical tests be performed to confirm this alleged sexual assault.

73. Neither Roe 1 nor Roe 2 ever notified USA campus police, Mobile Police department, or any other law enforcement agency to advise that they had been sexually assaulted.

74. Roe 1 had filed a criminal complaint earlier in the year alleging sexual assault against another male student, C.W.  Campus police investigated her complaint and declined to bring forth criminal charges.

75. Roe 1 then filed a Title IX against this same male student, C.W.

76. Ultimately the USA's UDC panel found C.W. NOT RESPONSIBLE after she was caught in at least one instance of outright falsehood at the hearing.

77. On or about September 23, 2016, Roe 1 texted the mother of her alleged rapist wishing her a happy birthday. (Exhibit 4).

78. In late September of 2016, just days before filing her Title IX complaint against Doe, Roe 1 informed Doe, "it just wasn't [Roe 2] who hooked up with the air force guy at the party." Roe 1 disclosed to Doe that both she and Roe 2 had a threesome earlier that evening with the air force cadet. This was the same night of and in close temporal proximity to when Roe 1 and Roe 2 alleged they did not have capacity to consent to sex with Doe.

79. On September 29, 2016, Roe 1 and Roe 2 met with Defendant Dr. Krista Harrell, USA's Associate Dean of Students & Title IX Coordinator.

80. Roe 1 gave incomplete and later conflicting statements about the evening.  In her initial statement, she stated she did not remember much. USA asked Doe to respond. Doe responded

giving details of the evening and all that transpired. Roe 1 came in to review Doe's statement, and then claimed to have remembered the events she originally claimed she could not and wrote a more detailed account of the evening.

81. During the complaint process Roe 1 and/or Roe 2 told USA Title IX Defendants that Doe had previously raped another student by the name of Jane Roe 3, coincidentally, or not, a sorority sister of Roe 1.

82. This prompted USA to initiate another Title IX investigation of Doe in late November of 2016 in Case 2016016401 (Jane Roe 3). Like Roe 1 and Roe 2, Roe 3 never filed any criminal complaint nor Title IX complaint as the allegations occurred before school started in the fall on August 9-10, 2016.

83. Despite this, and upon information and belief, USA defendants and Roe 1 and Roe 2 encouraged Roe 3 to file a TITLE IX complaint against Doe on November 7, 2016. After summoned by the TITLE IX Defendants to come and give a statement, Roe 3 with the encouragement of USA Title IX Defendants filed a Title IX complaint against Doe, approximately three months after the event in question. Doe was notified of the complaint by Defendant USA on November 16, 2016.

84. On October 24, 2016, USA formally charged Doe with a violation of the Student Code of Conduct, 7E. Engaging in Sexual Violence as contained in THE LOWDOWN: A STUDENT HANDBOOK (Exhibit 5) in the Roe 1 and Roe 2 case.

**Case of Jane Roe 1 & Jane Roe 2**
**Case Number: 2016012301**

85. USA Student Code of Conduct defines Sexual Violence and Consent as follows:

**E. Engaging is Sexual Violence**

The term "sexual violence" means any physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent. Lack of consent means that the person who has alleged the occurrence of sexual violence has not said "yes", or otherwise specifically and unambiguously indicated agreement to participate in the act, including instances in which she/he is unable to give informed consent because of her/his youth, temporary or permanent mental or physical incapacity, including, but not limited to, being under the influence of alcohol or drugs. Acts in this category include rape, sexual assault, sexual battery, and sexual coercion.

Sexual contact can include, but is not limited to: unwelcome sexual behavior, including kissing, intentional touching of another person's intimate body parts or the clothing covering these intimate areas, and unwelcomed sexual penetration, which includes sexually intended intrusion, however slight, into any opening of a person's body, by parts of another person's body, or any other object. Sexual violence is a form of sex discrimination.

*Student Code of Conduct, 7.Prohibited Conduct, E. Engaging in Sexual Violence*

86. The USA Sexual Misconduct Policy & Complaint Resolution Procedures, IV. Prohibited Sexual Misconduct, D. Sexual Violence, defines the offense differently.

**D.    Sexual Violence**

1.    Definition of Sexual Violence

Sexual violence is a particularly severe form of sexual harassment that, by its very nature, is likely to create a hostile environment. Sexual violence includes physical sexual acts perpetrated without consent or where a person is incapable of giving consent because of physical, mental, or legal incapacity.

Under this policy, sexual violence also includes sexual exploitation, which consists of prostituting another person, secretly recording the sexual activities of a person without their consent, or viewing the sexual activities of another person without their consent (i.e., "peeping" or engaging in voyeurism).

A number of different criminal acts fall into the category of sexual violence, including conduct commonly referred to as "rape," "sexual assault," "forced sodomy," and "sexual battery." See Section IV.D.3 below for further examples of sexual violence.

2.     Consent

For purposes of this policy, consent is defined as conduct that a reasonable person would understand to indicate agreement to the sexual conduct at issue.    Under this policy, consent must be informed, freely given, and mutually understood.  Lack of consent is a critical factor in determining whether sexual violence has occurred.

Under Alabama law, lack of consent for criminal purposes "results from: (1) [f]orcible compulsion; or (2) [i]ncapacity to consent; . . . or (3) [i]f the offense charged is sexual abuse, any circumstances . . . in which the victim does not expressly or impliedly acquiesce in the actor's conduct." Ala. Code § 13A-6-70(b). "Forcible compulsion" means that physical force was used to overcome resistance or the victim was placed in fear of immediate death or serious physical injury.

Furthermore, under Alabama law, "[a] person is deemed incapable of consent if he [or she] is less than 16 years old; mentally defective; mentally incapacitated; or physically helpless." Ala. Code § 13A-6-70(c).  A person is "mentally defective" if the person suffers from a mental defect or disease.  A person is "mentally incapacitated" if the person lacks the ability to understand the fact, nature, or extent of a sexual situation due to a narcotic or

intoxicating substance administered without their consent.    A person is "physically helpless" if the person is generally unconscious or unable to communicate.

In addition to Alabama law, the following are essential to understanding what constitutes effective consent under the policy:

- If coercion, intimidation, threats, and/or physical force are used, there is no consent.
- If a person is incapacitated by alcohol or drugs such that the person cannot understand the fact, nature, or extent of the sexual situation, there is no consent even if the person self-administered the alcohol or drugs.
- Consent to one form of sexual activity does not imply consent to other forms of sexual activity.
- Consent can be withdrawn by verbal or physical conduct that a reasonable person would understand to indicate a desire to stop or not engage in the sexual conduct at issue.
- While consent can be withdrawn, a withdrawal of consent operates going-forward.  It does not change the consensual nature of sexual activity that has already occurred.
- Being in a romantic relationship with someone does not imply consent to any form of sexual activity.
- Effective consent may not exist when there is a disparity in power between the parties; an example of which is when one is in a supervisory or evaluative role over the other, such as a faculty member who is teaching a student or a director who supervises an employee.

Further discussion of consent may be found in the Frequently Asked Questions.

87. Since the USA Code of Conduct and the USA Sexual Misconduct Policy and Complaint Resolution Procedures are in conflict, the latter control.[20]

88. On or about October 22, 2016, as news spread on campus of Roe 1's and Roe 2's claim of rape, several male friends of both Roe 1 and Roe 2 appeared at Doe's dorm room unannounced and confronted Doe. Doe felt threatened and in reasonable fear for his safety. Doe reported this incident to USA Defendants who failed to take any meaningful corrective or disciplinary action against the offending persons.

**USA's INVESTIGATION OF Doe in Jane Roe 1 and Jane Roe 2 CASE**
**(Case Number: 2016012301)**

89. USA, without conducting any hearing, ordered an interim measure of mutual no contact between the parties.

90. While awaiting his Title IX hearing, Roe 1 violated the no contact order and came into Doe's private dorm room while he was away.

91. Doe and his advocate reported this to USA, but no serious investigation or action was undertaken by USA.

92. Roe 1 posted on Facebook that she had been sexually assaulted by Doe. Friends of Roe 1 posted threats to visit physical harm on Doe. [Exhibit 6]

93. Friends of Roe 1 responded to her post:

---

[20] "All complaints of sexual misconduct will be investigated and resolved pursuant to the Complaint Resolution Procedures, which, along with this policy, are the exclusive means of resolving complaints of sexual misconduct. To the extent this policy and/or the Complaint Resolution Procedures conflict with any other University policy, this policy and/or the Complaint Resolution Procedures, as the case may be, will control. Under the Complaint Resolution Procedures, the party making a complaint is referred to as the "complainant" and the person accused of misconduct is referred to as the "respondent." *USA Sexual Misconduct Policy and Complaint Resolution Procedures, VII., A:Complaint Resolution Procedures.* (Emphasis Added)

> a) **"SET HIM ON FIRE!"**
> b) **"HAVE SOMEONE ELSE SET HIM ON FIRE!"**
> c) **"I COULD DEADPOOL HIS ASS!"**

94. One male friend of Roe 2 and/or Roe 1 posted on Facebook threats to Doe:

> a) **"I've got cash for plane tickets in my back pocket, say the word."**

95. Doe reported his fears to Defendant USA, but USA failed to take responsive remedial action.

96. Doe cooperated fully with USA and gave multiple interviews with hopes that the hearing would be fair and impartial.

97. Kimberly Ortiz was assigned the role of Student Conduct Administrator in the Roe1 and Roe 2 case.

98. However, both Agnew and Ortiz participated in the Title IX investigation of Doe. Both gathered evidence to include text messages, interviewed witnesses, and actively participated in the investigation against Doe.

99. In preparation for his defense, Doe located a critical witness, C.W. who like Doe had been wrongfully accused of a Title IX sexual assault by Roe 1, and arranged for him to be present to testify in person before the UDC.

100.    Neither Agnew nor Ortiz made any effort to interview C.W. after becoming aware of this exculpatory information, and excluded him from the hearing.

101.    Doe specifically requested USA obtain on-campus video recordings from the morning of the incident including the Moulton tower fountain episode as key evidence to rebut Roe 1 and Roe 2 testimony they were incapacitated. However, because of the delayed reporting by Roe 1 and Roe 2, the video was no longer available. (*Exhibit 10, Appeal Denial of Dr. Mitchell dated December 14, 2016*)

102.    Prior to the hearing, Defendant Agnew conducted an investigation and made specific findings of fact in writing to include a timeline of the events on the evening in question. Agnew made conclusions as to disputed questions of fact, and also made conclusions as to the credibility of witnesses in favor of Roe 1 and Roe 2. She had adjudged Doe "responsible" for sexually assaulting Roe 1 and Roe 2. In doing so, Defendant Agnew abandoned her role as a neutral investigator. At the outset of the UDC hearing, Agnew presented her findings and conclusions to the UDC prior to any testimony being submitted at the hearing. Agnew reported to the UDC that Roe 1 and Roe 2's version of events was the more credible than Doe's. Additionally, the findings were so one-sided as to prejudice the ability of Doe to have a fair and full and unbiased hearing.

103.    When Doe and his adviser (the undersigned attorney and advocate Matt Green) learned that Agnew intended to present these findings to the UDC both objected. Doe's adviser requested that her findings at least include additional highly relevant factors that were complete and not so one-sided as Agnew's findings were. Agnew refused to make any changes and submitted her findings to the UDC.

104.    Doe and his advisor again objected prior to the hearing, but Agnew refused to withdraw or alter her written testimony in any way. Agnew had trained and supervised this UDC panel and represented herself as the ultimate authority on Title IX investigations, submitted her written testimony to the UDC panel. Agnew's opinions and findings were of great influence to the UDC because of this. This finding of fact was presented to all members of the UDC at the outset of the hearing. Since this case involved and hinged around the credibility of the witnesses, Agnew's conduct violated Doe's right to a fair and impartial hearing.

105.    Upon information and belief, prior to the hearing as was the case in all USA Title IX

hearings, Agnew conducted an ex-parte "mini training" with the UDC panel members to

brush up on current laws, the code of conduct, and answer any questions of UDC panel

members.[21]

106.    All of this "mini training" was done *ex parte* and outside the presence of Doe and his

advocate. Neither Doe nor his advocate were informed of this prior to the hearing so as to

object to the panel. It is fair to assume based on Agnew's pre-hearing predetermined guilt of

the Doe that such an ex parte "mini training" was highly prejudicial and done without Doe or

his advocate being informed, notified, or present.

**UDC Hearing In Case Of Jane Roe 1 & Jane Roe 2**

107.    USA held Doe's UDC hearing in case of Jane Roe 1 and Jane Roe 2 on November 15,

2016.

108.    Any hopes Doe had that he would receive a fair hearing with impartial arbiters were

dashed when he arrived at the hearing location in a room adjoining the Office of Student

Affairs on USA's campus. Just outside the hearing room, chosen by and under the exclusive

control of the Defendants, TITLE IX advocates hung banners and flyers in the common area

alleging all sex involving alcohol was a TITLE IX violation. This could be seen by all

members of the UDC, Defendants in this case, and Doe (Exhibit 7). Some flyers read "**Using**

**alcohol to get sex is sexual assault**." "**My cup is not my consent.**"[22] The whole scene and

message that any consumption of alcohol and sex are rape bore the imprimatur of USA's

---

[21] This ex-parte training process of UDC panel members by Agnew has been publicly reported.
*See* Alyssa Newton, *Student Believes University treated sexual assault unjustly*, The Vanguard,
July 6, 2015, Volume 57, #2
[22] Some of the flyers bore the stamp and initial in the top right corner of the flyer by a person
designated only by the initials "AG" that it had been approved and was on official USA
letterhead.

27

endorsement of victim advocacy on mere alcohol assumption alone. Upon information and belief Defendants authorized this setting, flyers, and the banners.





109.    USA appointed Kimberly Ortiz as Student Conduct Administrator to preside over the

hearing. Since it was Ortiz's first time to sit as the Student Conduct Administrator, Defendant

Agnew sat in for guidance and counseling. Agnew did much more, as she directed Ortiz in

how to rule on objections and questions made by Doe during the hearing. Agnew, it should be

remembered also investigated the allegations against Doe, authored the investigative report

against Doe, and acted as the real arbiter and ultimate authority in the hearing.[23]

110.    In preparation for his defense, Doe called C.W. and arranged for C.W. to be present to

testify before the UDC.

111.    C.W. appeared at the hearing, but USA defendants refused him entry and refused to allow

him testify.

112.    C.W. was a critical witness for Doe. C.W. was prepared to offer live testimony as to Roe

1's lack of credibility including untruths she told a prior UDC hearing when she accused C.W.

of sexually assaulting her.

113.    Additionally, C.W. was prepared offer testimony about the lack of veracity of Roe 1's

star witness and sorority sister, M.N., who had testified untruthfully in his Title IX hearing.

114.    USA defendants then allowed M.N.'s unsworn testimonial statement against Doe at the

hearing. The statement alleged that Roe 1 and Roe 2 did not consent to sexual intercourse with

Doe.[24]

---

[23] This is corroborated by the audio recording of the University of South Alabama which it has refused to provide plaintiff a copy of. Plaintiff has filed a Motion for Expedited Discovery requesting these materials to submit to the court for its own independent evaluation of the propriety the university defendants.

[24] This statement is in USA's investigative file and is the subject of a Motion for Expedited Discovery filed contemporaneously with the complaint. USA refuses to provide Doe with a copy.

115.     USA defendants then admitted the unsworn written testimony of M.N. against Doe at this
hearing accusing him of sexually assaulting her sorority sister Roe 1.

116.     Since this hearing and evidence was based primarily on the credibility of the parties with
a low preponderance of the evidence standard, C.W.'s testimony was crucial in challenging
the veracity of Roe 1 and Roe 1's witness M.N. who did not appear at the hearing and whom
Doe could not confront or cross-examine.

117.     USA refused to allow C.W. testify at the hearing, instead allowing only a written
unsworn statement to be presented to the UDC. This was in violation of USA's own rules
(*Rule 8.0.A.2 of the Student Code of Conduct*) to admit an unsworn statement of a witness
(Exhibit 8: Unsworn Written Statement of C.W.)

118.     No witness was ever put under oath, and critical items of evidence and testimony,
including the testimonial written statement of M.N., were submitted to the UDC panel.

119.     Roe 1 and Roe 2, with the aid of USA Defendants, presented other unsworn testimonial
statements of witnesses who did not appear in person to testify.

120.     During the UDC hearing, Agnew admonished Doe and corrected him while he testified
and questioned witnesses before the UDC.

121.     Agnew actually overruled Ortiz after she instructed Roe 2 to disclose the identity of the
air force cadet who had a consensual threesome with Roe 1 and Roe 2.

122.     Despite offering her testimonial investigative report of findings of fact and Doe's
perceived lack of credibility to the UDC panel, Agnew was never sworn in as a witness and
never was subject to cross-examination.  Agnew later oversaw and presided over the UDC
deliberations and coached the UDC members outside the presence of Doe.

**Jane Roe 1 and Jane Roe 2 Misconduct at UDC Hearing**

123.    Prior to the UDC hearing, Roe 1 and Roe 2 were specifically instructed by Defendants USA, Agnew, & Ortiz to make no mention of Jane Roe 3 before the UDC in the hearing. Despite this, both Roe 1 and Roe 2 intentionally and repeatedly violated this instruction. At one point during the hearing, Agnew stopped the hearing, claiming she needed a sidebar and escorted both Roe 1 and Roe 2 outside the hearing room. USA claims both Roe 1 and Roe 2 were taken from the hearing and admonished. Agnew escorted Roe 1 and Roe 2 back into the hearing, whereafter Roe 1, despite repeated admonitions and removal from the hearing for repeated violations of rules, made mention of Roe 3 yet again to the UDC panel.

124.    Roe 1 and Roe 2 specifically mentioned Roe 3 on at least five (5) different occasions during the hearing, even after being removed from the hearing for misconduct. Despite the misconduct of both Roe 1 and Roe 2, Agnew, Ortiz, or Mitchell, failed to take remedial action and allowed the hearing to continue.

125.    Reference to Roe 3 and the misconduct of Roe 1 and Roe 2 rendered the hearing and UDC *Finding of Responsible* a travesty of justice and fundamentally unfair.

126.    After all parties completed the presentation of the evidence, they were instructed to leave the hearing so as to allow the UDC to deliberate. After Doe, Roe 1 and Roe 2 left the hearing, upon information and belief, Agnew offered ex-parte testimony and instructed the UDC panel members on how to rule on the evidence and also on the credibility of the witnesses and the findings of fact listed in her report. Agnew acted improperly in offering testimony against Doe that resulted in Doe being found *Responsible* for sexual assault against both Roe 1 and Roe 2. This violated USA's written policy under two university rules.  *See USA Student Code of*

*Conduct Rule 8.0. A.6 privacy requirement;*[25] *see also USA's Sexual Misconduct Policy &*

*Complaint Resolution Procedures, VII. Investigation And Resolution, C.*[26]

127.    USA failed to record an adequate record of Agnew's conduct and instructions to the UDC

panel after Doe's case was submitted and the parties dismissed. [27]

128.     Roe 1 and Roe 2 were allowed to make their recommendation of punishment to the UDC

panel *prior to* any finding by the UDC that Doe was *Responsible* for sexual assault.

129.    Despite Roe 1 and Roe 2's allegations that Doe sexually assaulted them, neither filed any

police report, notified law enforcement, medical provider, or ever attempted to bring criminal

charges against Doe.

130.    Despite Roe 2's accusation that Doe sexually assaulted her, Roe 2 told USA her ideal

resolution would involve Doe's removal from the ROTC program.

131.    Roe 1's recommendation of punishment was for Doe be removed from campus.

---

[25] USA Student Code of Conduct Rule 8.0. A.6.. provides that "After the hearing, the UDC shall meet <u>in private</u> to determine whether the evidence/information presented or received by the UDC during the hearing proved that it is more likely than not that the respondent violated one or more sections of the Code." (*emphasis added*)

[26] USA's Sexual Misconduct Policy & Complaint Resolution Procedures, VII. Investigation and Resolution, C. "to conduct a thorough, fair, and impartial investigation that provides the parties an equal opportunity to present information and equivalent procedural safeguards."

[27] USA recorded the hearing but refused to provide Doe with a copy of the hearing. Instead USA allowed Doe and his advocate an opportunity to listen to the hearing. There was no recording of Agnew's contact with the UDC panel after the case was submitted.

**UDC Finding of "Responsible" in Case Number: 2016012301**

132.    The day after the hearing, USA sent notice to Doe that he was found *Responsible* by the UDC.

133.    Specifically the UDC found: "*Based on the preponderance of evidence, the UDC determined the complainants were more likely than not incapacitated and, therefore, could not give consent*." [Exhibit 9]

134.    Despite the victim's recommendation of punishment, the UDC entered a far harsher punishment than the purported victims' recommendation of punishment. (Exhibit 9):

   a)  Probation for the remainder of Doe's academic career
   b)  Prohibition from visiting University Housing, the Grove, or the Fresh Foods Company Dining Facility for the remainder of Doe's academic career.
   c)  A "mutual No Contact Order" between Doe and Roe 2 and Roe 1…[28]
   d)  100 hours of community service to be completed by Friday, December 1, 2017. Fifty (50) hours must be completed by Monday, May 1, 2017…
   e)  Termination of Doe's housing contract and an order to return his key to the Housing office.
   f)  Additionally, Doe was banned from living in or visiting campus housing for the duration of his probation, which was the reset of his academic career.
   g)  Required to complete an educational module(s) on prevention of sexual violence.

**Doe's Appeal in Roe 1 & Roe 2 (Case Number: 2016012301)**

135.    On November 16, 2016, Doe filed a written appeal of the UDC finding to the Dean of Students, defendant Mitchell.

136.    Doe and his advocate met with Dean Mitchell on November 21, 2016 to discuss the grounds for his appeal.

137.    On December 14, 2016, Dean Mitchell ruled:

   "Though Dr. Agnew's report of her investigation findings were intended to be informational for the committee, her assessment of witness

---

[28] The actual language of the no-contact ruling extends beyond the confines of the university campus and university sponsored or affiliated activities.

> credibility could have had some impact on the committee…Lastly, I find
> that the information presented during this process does support the
> complainants' claims that they were *intoxicated beyond the point of being*
> *able to consent to sex*…[29]Therefore, I am upholding the board's finding of
> responsible in this case. *I am, however, modifying the residential removal*
> *dictated by the board.* [Exhibit 10]

138.   In sustaining the UDC finding Doe *Responsible* for sexually assaulting Roe 1 and Roe 2,

Mitchell arbitrarily changed the definition of consent from one of incapacity to a lower

standard of intoxication.

139.   Defendant Mitchell applied the improper standard of intoxication, rather than incapacity

as the proper test for consent. *See The USA Sexual Misconduct Policy & Complaint*

*Resolution Procedures, IV. Prohibited Sexual Misconduct, D. Sexual Violence. 2. Consent*

### USA's INVESTIGATION OF Jane Roe 3's COMPLAINT

140.   On November 16, 2016, Doe received notice from Defendant USA that Roe 3 had filed

a Title IX complaint against him. (Exhibit 11)

141.   Roe 3 filed a complaint that alleged the incident occurred off-campus in a private

apartment complex on August 9-10, 2016, before the fall semester began, and in no way

implicated any university program or activity.

142.   Roe 3 told USA Title IX investigators that she attended an off campus party with Roe 1

and that Doe was in attendance.

143.   Roe 3 said she attended the party and consumed alcohol despite having a stomach virus.

144.   While at the party, Roe 3 engaged in a drinking game with several students, including

Doe, and Roe 1.

145.    Roe 3 voluntarily consumed alcohol of her own volition and was coherent enough to

sing the lyrics to a Maroon 5 song.

146.    Roe 3 told USA and Title IX defendants that while at the pool area of the apartment

complex she entered a nearby hot tub. After the hot tub, and despite being "very drunk…

wasted, staggering drunk," she later entered the apartment complex swimming pool and

"made out" with the other male student, A.H., at the party.

147.    Unknown to both A.H. and Doe, Roe 3 had a sexually transmittable disease which she

failed to disclose to either.

148.    Roe 3 never informed Doe that she had a sexually transmitted disease. Doe learned of it

later from Roe 1 who informed Doe that he should get tested.

149.     Roe 3 told USA Title IX that later in the evening she became sick and went inside the

apartment complex where she said she vomited. It was undisputed that Roe 3 consumed

alcohol. It was also undisputed that Roe 3 admitted to having a stomach virus at the time as

well unrelated to alcohol consumption.

150.    Doe never saw Roe 3 sick or vomiting but did admit to bringing Roe 3 a glass of water.

151.    Doe later entered the apartment complex where the two engaged in mutual sexual

intercourse and spent the night together. Doe alleged she was too intoxicated and later

incapacitated to consent to sex with Doe that night.

152.    The next morning, when alcohol was not a factor and both were sober, both Roe 3 and

Doe engaged in mutual consensual sexual intercourse two more times. Although not

intoxicated or incapacitated, Doe 3 testified at her second hearing she did not know what to

do, and just "went with it," despite the presence of third parties in the same apartment unit.

She told Title IX defendants that Doe did not ask her permission to have sex the next

morning. Therefore, according to Doe and USA defendants the morning after sex with Doe was without her consent as well.

153.     Roe 3 and Doe had sexual intercourse twice that night, and then twice the next morning. On both occasions, Roe 3 was on top of Doe at times and even assisted Doe in removing articles articles of clothing.

154.     Third parties were in the same apartment unit during these incidents.

155.     In the days after, Roe 3's sorority sisters, including Roe 1, found out about the evening with Doe. Roe 3 did not want her sorority sisters to know that she had sexual intercourse with Doe.

156.     Shortly after his sexual intercourse with Roe 3, Doe tested positive for a sexually transmitted disease.

157.     Roe 3 never reported a sexual assault to any law enforcement agency and never sought medical treatment for any sexual assault.

158.     Roe 3 filed a TITLE IX complaint approximately three months later when Roe 1 and M.N., both sorority sisters of Roe 3, told her that Doe had assaulted her and to tell USA Title IX defendants.

159.     Once Roe 1 informed USA defendants, USA requested Roe 3 come forward and file a Title IX complaint against Doe.

160.     After Doe learned that Roe 3 transmitted a sexual transmitted disease to him, Doe filed a sexual assault Title IX complaint against Roe 3.

161.     Roe 3 admitted to transmitting the disease to Doe but that she did not *knowingly* transmit a sexual disease to Doe.

**USA's Investigation of Doe's Title IX Claim Was Inadequate & Biased**

162.   The University assigned Defendant Krista Harrell to process Doe's Title IX complaint against Roe 3. Krista Harrell had previously recommended Title IX charges be brought against Doe in Roe 3's complaint and also in the prior complaints in Roe 1 and Roe 2 *(Case 2016012301)*. Harrell had also requested a no contact order against Doe based on Roe 3's allegations. [30]

163.   Defendant Harrell expressed doubt that Doe's complaint of sexual assault was covered by Title IX or University policy. It was only after Doe pointed out to Harrell *USA's Sexual Misconduct Policy & Complaint Resolution Procedures D. Sexual Violence 3. Examples of Sexual Violence* that Harrell agreed to process Doe's Title IX complaint.

164.   USA assigned defendant Harrell, the same Title IX coordinator who investigated Doe and who found sufficient cause in the same investigation to charge Doe for sexually assaulting Roe 3. This was a clear conflict of interest.

---

[30] *USA's Sexual Misconduct Policy & Complaint Resolution Procedures, IV. Formal Resolution Process For Complaints Against Students, D.4.* describes the duties USA covenants it will provide Title IX complainants.

> "Once the case is identified for formal resolution, the Investigating Officer will conduct an investigation to gather information and statements from witnesses and other sources for eventual review and consideration at a hearing. The investigation will involve interviews with the complainant, respondent and witnesses and the collection of non-testimonial information and/or materials, such as email, text messages, security camera footage, and the like. Witnesses and information and/or materials may be identified and/or submitted by the parties or independently gathered by the Investigating Officer. The Investigating Officer may decline to interview witnesses or collect information that the Investigating Officer deems irrelevant. The scope of the investigation shall be at the discretion of the Investigating Officer. The Investigating Officer will prepare a written investigation report summarizing the allegations of sexual misconduct, the scope of the investigation, the information collected, and appending any statements or summaries of statements or interviews provided. Throughout the investigation, the parties will have those rights specific in Section VII of the Sexual Misconduct Policy."

165.    USA defendants afforded Roe 3 over five (5) hours of interviews on three separate occasions to help gather evidence and develop her Title IX complaint against Doe.

166.    Prior to the hearing, USA defendants made no attempt to gather medical records of Roe 3 to test the veracity of her statement that she did not "knowingly" transmit a STD to Doe or otherwise seriously investigate Doe's Title IX complaint. [31]

167.    Doe never had any assistance from USA's appointed Title IX advocate in gathering evidence. USA was deliberately indifferent to Doe's Title IX complaint.

168.    Doe was left alone to gather evidence in support of his Title IX complaint.

169.    Additionally, USA assigned Defendant Agnew to investigate Doe's Title IX complaint.

170.    Although he was appointed a Title IX university advocate, that advocate never reached out to him.

171.    On the day of Doe's Title IX complaint, his university appointed advocate did not appear.

172.    Additionally, there was credible evidence and even an admission from Roe 3 that she exposed another student, A.H., to a sexually transmitted disease earlier in the same evening.

173.    The exposed student, A.H., testified live before the UDC. This student admitted he had not been tested. Upon information and belief, USA failed to investigate this Title IX violation once they were made aware of it.

---

[31] USA cited FERPA, but nothing prevented USA from asking Roe 3 to voluntarily provide medical records to determine if Roe 3 had knowledge of her sexually transmitted disease prior to her sexual relations with Doe. Roe 3 later provided medical records to Defendant Mitchell in the appeal phase from after the August 9-10, 2016 event with Doe confirming her diagnosis. However Doe requested medical records pre-dating August 9, 2016 which Defendants refused to provide and/or refused to ask Roe 3 to provide.

### THE DISCIPLINARY PROCEEDINGS AGAINST DOE IN ROE 3's CASE & DOE's Title IX COMPLAINT AGAINST ROE 3[32]

174.     Both Doe and Roe 3's Title IX cross complaints were heard by the same UDC panel.

175.     Prior to the disciplinary hearing, Doe made a written request to Defendants that he be provided with all interim measures provided the complainant, including what benefits, accommodations, and services defendants provided her after she made her complaint.[33]

176.     Such evidence was both probative and material to establish bias on the part of the complainant.

177.     USA defendants denied Doe's request.

178.     Doe was concerned that USA had allowed alleged prior bad acts evidence compromise his opportunity to have a fair and impartial hearing in the Roe 1 and Roe 2 hearing. This prompted Doe and his attorney advisor to send an e-mail to the Defendant Mitchell. [*See attached Exhibit 12 Doe e-mail correspondence with Defendant Mitchell*].

179.     Doe requested "That all witnesses be instructed prior to this afternoon's hearing and outside the presence of the UDC panel members to in no way reference of mention any prior Title IX hearings [Doe] was involved in."

180.     Defendant Mitchell responded: "All witnesses will be instructed that they should refrain from mentioning any prior Title IX hearings involving you.  This will be done before they enter the hearing and outside of the presence of the UDC."

---

[32] The Title IX case against John Doe was assigned Case Number: 2016016401. The Title IX case against Jane Roe 3 was assigned Case Number 2016030901

[33] *USA Sexual Misconduct Policy & Complaint Resolution Procedures, VI.D. Interim Measures* authorizes USA to provide for counseling or support services; reasonable changes in academic, living, transportation, or work arrangements; and entry of a "no contact" order or similar order to ensure separation of the parties.

181.    Doe requested Agnew recuse herself because of her blended roles and her conflict of interest.

182.    Defendant Agnew recused. [Exhibit 13]

183.    The hearing was held on March 27, 2017.

184.    One of the UDC panel members, K.I., was friends with Defendant Mitchell. Despite their friendship, neither Mitchell nor K.I. ever disclosed this fact to Doe (see Exhibit 19).

185.    At the hearing, Roe 3 violated the instruction and mentioned details and allegations involving the prior complaints and/or hearing.

186.    Kim Ortiz, the Student Conduct Administrator, stopped the hearing and escorted Roe 3 outside hearing room.

187.    Doe requested the panel be dismissed immediately and the case be dismissed.

188.    Ortiz ordered a recess and while on break phoned Defendant Mitchell who ordered the hearing to continue. According to Ortiz, Defendant Mitchell ordered the hearing to proceed and he would consider the misconduct on the appeal.

189.    While on break, and outside the presence of the parties, members the UDC could be heard deliberating on the audio recording of the hearing. One UDC panel member even acknowledged that they probably should not be deliberating.

190.    Despite Doe's objections to continuing with the tainted UDC panel, Ortiz and Defendant Mitchell allowed the hearing to proceed.

191.    During the hearing, Roe 3's Title IX advocate did not like a question Doe posed to Ortiz and breached the rules of the hearing. Roe 3's Title IX advocate, an adult in a position of Title IX power and authority, raised her voice at and directly addressed Doe in a hostile and unprofessional manner in front of the UDC panel.

192.    USA defendants allowed this, and failed to address this misconduct at the hearing.

193.    On March 28, 2017, the UDC panel found Doe *Responsible* for "engaging in sexual violence" in Case Number 2016016401.[Exhibit 14]

194.    The UDC panel found Roe 3 *Not Responsible* for "engaging in sexual violence" in Case Number 2016030901.[Exhibit 15]

195.    K.I., the UDC panel member who is friends with Defendant Mitchell and listed as the Ad Hoc Chief Justice, read a recorded statement of the panel's finding that Doe was Responsible for sexually assaulting Roe 3 due to lack of explicit and unambiguous consent. This student UDC panel member issued the recommendation of punishment:

> "Doe may finish this semester but is suspended for summer 2017 and the fall of 2018 and may return in the spring of 2018. Doe (the respondent) will be on academic probation until they [*sic*] graduate. Respondent is required to serve twenty hours of community service, *for example Boys and Girls Club*[34] and lastly the respondent is required to attend an educational class face to face for a total of twelve hours."[35](*emphasis added*)

196.    Doe appealed the rulings.

197.    Defendant Mitchell reversed the finding of Responsible in Case number 2016016401 (Roe 3's Title IX complaint against Doe) and ordered a new hearing.[Exhibit 16]

---

[34] Boys & Girls Clubs of America had its beginnings in 1860 with three women in Hartford, Connecticut - Mary Goodwin, Alice Goodwin and Elizabeth Hammersley. Believing that boys who roamed the streets should have a positive alternative, they organized the first Club.  With character development as the cornerstone of the experience, the Club focused on capturing boys interests, improving their behavior and increasing their personal expectations and goals. Its mission is to enable all young people, especially those who need us most, to reach their full potential as productive, caring, responsible citizens. (Available online at https://www.bgca.org/) (visited August 13, 2017).
[35] The Ad Hoc Chief Justice student UDC panel member's recommendation of punishment offers a unique insight into just how insignificant UDC panel members treat and consider a finding of responsibility in a sexual assault student disciplinary hearing. Also it indicates that despite having found Doe responsible for sexual violence, he poses no danger to the public or other students, or even children.

198.   Defendant Mitchell affirmed Case number 2016030901 finding Roe 3 Not Responsible for sexually assaulting Doe. [Exhibit 16]

## THE 2nd DISCIPLINARY PROCEEDING
### Against Doe in Jane Roe 3's Case

199.   After Doe's first disciplinary hearing involving Roe 3's allegations, Defendants USA, Mitchell, and/or Agnew removed Ortiz from the case;

200.   Upon information and belief a human resource complaint was filed against Ortiz;

201.   Defendant Mitchell, despite Agnew's prior recusal in Roe 3's case, requested Agnew reinsert herself into the investigation.

202.   Defendant Agnew obliged.

203.   Doe, along with his advisor, in person and in e-mail correspondence with Defendant Mitchell repeatedly objected to Agnew's continued involvement, because of her admitted conflict of interest as evidenced by her prior recusal.

204.   Doe's request for an impartial hearing and impartial arbiter was denied.

205.   Over the summer of 2017, Defendant Agnew "trained" members of the UDC panel that would ultimately decide Doe's fate.[36]

206.   USA waited until July of 2017 to attempt to schedule a new hearing in Roe 3's complaint.

207.   Prior to the second Jane Roe 3 hearing, Doe requested USA provide him:

   a)   A list of services, benefits, or accommodations defendants provided Roe 3 as a result of her making a Title IX complaint against Doe, for purposes of impeachment and to

---

[36] What exactly this training consisted of and what facts of the particulars of Doe's case with Roe 3 were discussed will be the subject of discovery.

gather evidence of potential bias and in cases like Doe's where his fate hung on the credibility of witness, such evidence was essential for due process.[37]

b) A list of witnesses who would not be testifying in person, but rather through unsworn testimonial statements.

c) A more specific allegation of the charge against Doe other than its charge of violating *Student Code of Conduct 07e. Engaging in Sexual Violence.* This was based in part upon Roe's inconsistent testimony on consent, intoxication, and incapacity at the prior hearing. Additionally, there were two instances of sexual relations between Doe and Roe 3: the night of and the next morning. One instance involved alcohol and the other did not. Doe requested Defendants provide him and place him on notice of which instance Roe 3 was alleging Doe sexually assaulted her.

d) To allow Doe's advocate to to bring an associate to review the defendants investigative file prior to the hearing, since USA denied Doe the right to a copy of the investigative file including witness statements, and a diagram of the apartment unit where the event occurred.[38]

208.    Defendants denied each of these requests.

209.    Doe's hearing was conducted on August 15, 2017.

---

[37] USA's denied the request citing The Family Educational Rights and Privacy Act of 1974 (*FERPA*). However, the FERPA statute and regulations enacted by the Department of Education clearly permit disclosure to the investigator and Hearing Panel under two separate provisions. In both 99 CFR §99.31 and 28 U.S.C. §1232(g)(b)(1)(a), disclosure of student records is permitted to other school officials who have a legitimate interest in access to the records. And, directly on point is 99 CFR 99.31(a)(14)(i). This provision of the regulations provides that disclosure of education records, without the consent of the student, is permissible "in connection with a disciplinary proceeding at an institution of postsecondary education."

[38] USA denied this request on grounds their policy only authorized one advisor. However, the rules did not prohibit an assistant to accompany an accused's adviser. Again, USA acted in accordance with their Title IX policy of making it as difficult as possible on an accused student to get fair and impartial hearing and verdict and to prepare a defense.

210.    Before Doe and Roe 3 entered the hearing room, Defendant Agnew engaged in ex-parte communications with the UDC panel members providing each panel member with a folder of unsworn testimonial witness statements.

211.    The UDC reviewed these records prior to Doe being allowed to enter the hearing room and issue an objection.

212.    When Doe was escorted in by a University of South Alabama Campus police officer, UDC panel members were already reviewing the witness statements.

213.    Doe objected, but Agnew demanded Doe and his advocate step outside the room and outside the presence of the UDC to address his concern.

214.    Doe, along with his advisor, requested any statements of witnesses who would not be testifying in person be removed and the UDC panel instructed to ignore them.

215.    Doe and his advisor, requested Agnew address her comments on the recorded hearing audio and in the presence of the UDC.

216.    Doe specifically cited defendant Agnew to The Student Code of Conduct, Rule 8.0, A. Formal Hearing Procedures, 2.

> The hearing shall be conducted by the Student Conduct Administrator, be informal in nature, and legal rules of evidence shall not apply. The hearing shall be closed to everyone except the Student Conduct Administrator, members of the UDC, the respondent, and the complainant and/or victim and advisors to the respondent and the complainant and/or victim. Witnesses will be present only during their own testimony. The complainant/victim and the respondent, have the right to:
>> 2) Present evidence by witness <u>or by affidavit if a witness is unable to attend the hearing</u>. It is the responsibility of the respondent and the complainant/victim to notify their witnesses of the date, time and place of the hearing. If witnesses fail to appear, the hearing shall be held in their absence. (*Emphasis added*)

217.    Agnew, Doe, and Doe's advisor returned to the hearing.

218.     Doe renewed his objection in front of the UDC panel to Agnew admitting the statements of the witnesses who failed to appear. Doe specifically requested Agnew inform him which witnesses were deemed "*unable*" to attend. Agnew only listed one student, whom Doe believes was his own witness, who was "*unable*' to attend. Doe renewed his objection citing the specific and Agnew overruled the objection and allowed the unsworn testimony and evidence to be considered by the panel.

219.     Additionally, the USA rule authorizes evidence by affidavit only if a witness is unable to attend.

220.     The hearing ensued with defendant Agnew acting as both prosecutor and judge.

221.     The UDC panel was allowed to consider the unsworn written statement of student J.A., the ex-boyfriend of Roe 2. Despite the clear bias of J.A., Doe could not cross-examine J.A. or his unsworn testimonial statement. J.A.'s statement included multiple layers of hearsay. J.A. in his statement alleged that Roe 3 was drunk at the pool, and that "we didn't take [Doe] for that kind of person." J.A. in his statement to the UDC alleged he confronted Doe about sex with Roe 3 and that Doe admitted to him that Doe was responsible for sexual assault and that Doe deflected. All of this was allowed to be considered by the UDC in rendering its verdict, without any opportunity of Doe to confront the witness or his statement.The UDC panel was allowed to consider the unsworn statement of Roe 1 who failed to appear at the Jane Roe 3 hearing. Roe 1 was instrumental in encouraging Roe 3 to bring a Title IX charge against Doe, and was Doe's ex-girlfriend, and who had filed the wrongful Title IX complaint against C.W. Roe 1 offered testimony by written statement that she felt Doe treated her like a possession that he could trade. Doe was powerless to rebut this by the greatest engine for truth, cross-examination. Additionally, Roe 1 told the panel in her unsworn testimonial written statement that what Doe did was an assault.

222.    Also present was Roe 3's Title IX advocate who despite her misconduct at the prior Doe 3 hearing was allowed to participate in the proceedings.

223.    After the case was presented, Agnew informed both Doe and Roe 3 to leave the hearing, whereafter Agnew held *ex parte communications* with UDC panel.

224.    Doe received official word that the UDC panel found him responsible for sexual violence the next day. [Exhibit 17]

225.    Doe timely appealed the ruling to Defendant Mitchell on August 22, 2017.

226.    Defendant Mitchell DENIED the appeal and the decision was made final on August 28, 2017. [Exhibit 18]

## COUNT I
## (DECLARATORY JUDGMENT – VIOLATION OF DUE PROCESS PROVISIONS OF UNITED STATES AND ALABAMA CONSTITUTIONS)

227.    Doe repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

228.    This Count is brought against the Individual Defendants in their official capacity.

229.    The Fifth Amendment to the United States Constitution, made applicable to the State of Alabama by the Fourteenth Amendment, provides that no person shall "be deprived of life, liberty, or property, without due process of law."

230.    The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

231.    Article I, Section 13, Alabama Constitution, guarantees that "all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay."

232.   The Due Process Clauses of the Alabama and United States Constitutions are implicated by higher education disciplinary decisions, including the disciplinary decisions under the USA Code of Student Conduct.

233.   USA has a constitutional obligation to provide a fundamentally fair and reliable hearing process.

234.   USA has an additional obligation to provide a hearing process that is consistent with the customs of a free society, which includes recognition of the basic due process rights of students.

235.   John Doe is entitled under the Constitutions of Alabama and the United States, as well as under the University's own rules and guidelines, to the opportunity to be heard in a meaningful manner at each of his UDC Hearings.

236.   John Doe's interests in the results of the UDC Hearings are significant.

   a)   Suspension and other sanctions from USA would deny him the benefits of education at his chosen school.

   b)   Suspension and other sanctions would also damage John Doe's academic and professional reputation.

   c)   Suspension and other sanctions are likely to affect the John Doe's ability to enroll at other institutions of higher education and to pursue a career.

   d)   Suspension and other sanctions could result in Doe forfeiting his ROTC scholarship and stipends and in having to repay benefits received to date.

237.   The Defendants have violated John Doe's due process rights.

238.   JOHN Doe and the individual Defendants acting in their official capacity have a dispute about whether the *USA Student Code of Conduct* and *USA's Sexual Misconduct Policy, & Complaint Resolutions Procedures*, as applied to Doe, violates the Due Process Clauses of the United States Constitution and the Alabama Constitution.

239.    By reason of the foregoing, Doe requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by USA at Doe's two hearings finding him responsible be reversed; (ii) Doe's immediate restoration into the ROTC program; (iii) Doe's reputation be restored; (iv) Doe's disciplinary record be expunged; (v) the record of Doe's suspension  and all discipline from USA be removed from his education file; (vi) any record of Doe's hearings and identity be permanently destroyed; and (vii) USA's rules, regulations and guidelines particularly as to consent and incapacity and USA's policy of allowing the admission of unsworn testimonial witness statements offered against accused students in Title IX hearings are unconstitutional as applied.

240.    Pursuant to 42 U.S.C. §1988, Doe is entitled to his attorney's fees incurred in bringing this action.

## COUNT II
### (42 U.S.C. §1983 -- VIOLATION OF DUE PROCESS PROVISIONS OF UNITED STATES CONSTITUTION)

241.    Doe repeats and incorporate all of the allegations of this Complaint, as if fully set forth herein.

242.    This count is brought against the Individual Defendants in their official capacity for injunctive relief, and against the individual defendants in their individual capacity for damages.

243.    The Due Process Clauses of the Alabama and United States Constitutions are implicated by higher education disciplinary decisions, including the disciplinary decisions under the USA Code of Student Conduct and USA Sexual Misconduct Policy & Complaint Resolution Procedures.

244.   USA has a constitutional obligation to provide a fundamentally fair and reliable hearing process and recognition of the basic due process rights of students.

245.   Doe is entitled under the Constitutions of Alabama and the United States to the opportunity to be heard in a meaningful manner at the UDC Hearing.

246.   The Defendants have acted under color of law in violating the Doe's rights under the Fifth and Fourteenth Amendments to the United States Constitutions.

247.   The Defendants have acted intentionally and with callous disregard for the Doe's clearly established constitutional rights.

248.   Defendants sought compliance at all time relevant to these proceedings with the 2011 DCL and edicts of the OCR of Department of Education, rather than in seeking the truth.

249.   As a direct and proximate result of the Defendants' violations of the Doe's constitutional rights, John Doe, in the absence of injunctive relief will suffer severe and substantial damages. These damages include lost education assistance, plus interest, equal to the entire amount of financial assistance (to include tuition, educational fees, books, laboratory expenses, and supplies) paid by the United States; Doe is required to repay the United States his advanced education from the commencement of his contractual agreement, September 2, 2015, to the date of his disenrollment by reason of USA's actions; additionally John Doe is entitled to diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress, and other compensatory damages, in an amount to be determined by a jury and the Court.

250.   The Defendants continued actions against the Doe under the USA Code of Student Conduct and USA Sexual Misconduct Policy & Complaint Resolution Procedures are causing substantial, immediate, and continuing damage to Doe.

49

251.    Pursuant to 42 U.S.C. §1983, the Doe is entitled to an Injunction from this Court prohibiting the imposition of, or reporting of, any disciplinary actions under the USA Code of Student Conduct and/or USA Code of Student Conduct and USA Sexual Misconduct Policy & Complaint Resolution Procedures against Doe.

252.    Pursuant to 42 U.S.C. §1988, Doe is entitled to his attorney's fees incurred in bringing this action.

### A.  Lack of Fairness of the Tribunal & Lack of an Impartial Decision Maker
### U.S. Const. am. 5, 14.; Ala. Const. art. 1, §§ 6, 13

253.    Doe repeats and incorporate all of the allegations of this Complaint, as if fully set forth herein.

254.    An impartial decision-maker is an essential guarantee of due process. *Withrow v. Larkin,* 421 U.S. 35, 46–47, 95 S.Ct. 1456, 1463–1465, 43 L.Ed.2d 712 (1975).

255.    USA defendants selected and trained a biased group of UDC panel members to find Doe responsible in the case of Jane Roe 3.

256.    Specifically, in Roe 3's second hearing, two male UDC panel members, C.L. and Z.F., were friends with Roe 3. These two UDC panel members are friends on Facebook with Roe 3, yet sat in judgment of Doe based on the allegations Roe 3 said she was sexually assaulted by Doe. [Exhibit 20]

257.    Defendant Agnew's conduct in prejudging Doe's guilt, in presenting findings of fact to the same UDC panel she trained, along with conclusions as to the credibility of the witnesses violated fundamental fairness and denied Doe an impartial decision-maker, as recognized by Defendant Mitchell on the appeal in Roe 1 and Roe 2. Agnew usurped the role of the UDC and was not authorized to make a determination in this matter. Agnew acted without the

proper authority and usurped a function reserved to the UDC under USA's own rules, regulations, and procedures. This also was a violation of due process.

258.    Defendant Agnew's blended roles in the cases of Jane Roe 1, Jane Roe 2, and Jane Roe 3 was an inherent conflict of interest and deprived him fair hearings and an impartial decision maker. Agnew's official Title IX position placed her in the multiple, and inherently conflicting, roles of *advocating* for the female students, *investigating* the events, *prosecuting* Doe, *offering testimony* at the hearing, and *training* and *advising* the disciplinary hearing panels.

259.    Defendant Mitchell requested Defendant Agnew enter the process again despite Agnew's prior recusal in the first Jane Roe 3 hearing.

260.    Defendant Agnew's excluding exculpatory evidence in the case of Jane Roe 1 & Jane Roe 2 in prohibiting the live testimony of Doe's witness C.W. violated due process. Agnew denied both Doe and the UDC panel members the opportunity to question C.W. as to the content of his written statement and query into the critical and material matter in question, Jane Roe 1's credibility and Jane Roe 1's critical witness M.N.'s credibility.

261.    Defendant Agnew's initial recusal from the Jane Roe 3 case, and then her subsequent reassertion into Roe 3's case is proof of her bias, and Defendant Mitchell's bias, and deprived Doe of due process of law;

262.    Defendant Agnew's allowing Jane Roe 1 and Jane Roe 2 to repeatedly violate the hearing rules by referencing Roe 3 deprived Doe of a fair hearing, tribunal, and an impartial decision-maker;

263.    The setting of the hearing involving Roe 1 and Roe 2 itself was rife with prejudice as just outside the hearing room USA allowed and approved Title IX victim advocacy banners to be

displayed in full view of the UDC panel touching upon and rebutting the very heart of Doe's

defense, and deprived Doe of a fair hearing, tribunal, and an impartial decision-maker.

264.    Defendant Mitchell, who was friends with the UDC student ad hoc chief justice K.I. who

found Doe *Responsible* in the first hearing involving Roe 3 epitomizes fundamental due

process flaws in Defendant USA's Title IX hearings. Defendant Mitchell failed to disclose the

relationship, failed to disclose why or how his friend K.I. was chosen for this UDC panel, or

better yet why K.I. was allowed to render the judgment finding Roe 3 not responsible for

sexually assaulting Doe. And Defendant Mitchell sustained a finding against Doe made by his

friend K.I. in the Title IX complaint against Roe 3.

265.    Defendant Mitchell, failed to disclose that he is also friends on Facebook with Roe 3's

boyfriend, J.L.K., a popular student athlete at the University of South Alabama. Such a

relationship operated to deprive Doe of a fair and impartial decision maker, and constitutes a

clear conflict of interest under USA's rules, regulations, and procedures, and denied Doe a fair

hearing, tribunal, and impartial decision maker.

266.    Defendant Mitchell failed to disclose that he is also friends on Facebook friends with

UDC Panel Member, A.M.J, who found Doe responsible for sexual assault in Jane Roe 3's

second hearing. Such a relationship operated to deprive Doe of a fair and impartial decision

maker, and constitutes a clear conflict of interest under USA's rules, regulations, and

procedures, and denied Doe a fair hearing, tribunal, and impartial decision maker.

267.    Defendant Mitchell failed to disclose that he is also Facebook friends with UDC Panel

Member, T.D., who found Doe responsible for sexual assault in Jane Roe 3's second hearing.

Such a relationship operated to deprive Doe of a fair and impartial decision maker, and

constitutes a clear conflict of interest under USA's rules, regulations, and procedures, and

denied Doe a fair hearing, tribunal, and impartial decision maker.

268.    In total, Defendant Mitchell had a prior relationship with at least three of the six UDC panel members in Doe's second hearing with Jane Roe 3. Mitchell sat in judgment of their decision in the appeal, despite the conflict of interest. Defendant Mitchell never disclosed his relationship with the panel members to either Doe or his adviser.

269.    The failure of Agnew and Mitchell to provide adequate notice as to specifically which conduct of Doe violated other than "violation of Student Code of Conduct 07e. Engaging in Sexual Violence" failed to place Doe on notice of what conduct was in question. In Roe 3's case, such evidence was critical based on Roe 3's prior inconsistent testimony in her first hearing and because of the conduct that night involving alcohol and conduct the next morning not involving alcohol. At a minimum, when a school charges a student with a disciplinary violation, it must provide "notice and an opportunity for hearing appropriate to the nature of the case." *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

270.    The refusal of Defendant Agnew and later Defendant Mitchell to require disclosure of the identity of the air force cadet who had consensual three way sex earlier that evening with both Roe 1 and Roe 2 denied Doe a fair hearing. The identity of the air force cadet was crucial, material and highly relevant evidence to corroborate Doe's testimony and rebut Roe 1 and Roe 2's testimony on the issue of intoxication/incapacity; the failure to allow questioning in this regard violated due process and prevented Doe from having a fair hearing and a meaningful opportunity to be heard.

271.    USA's evidentiary standard, preponderance of the evidence, when coupled with a non-unanimous simple majority vote is both unfair and insufficient for the criminal-like charges and potential sanctions.[39]

---

[39] USA's Sexual Misconduct Policy & Complaint Resolution Procedures, [IV, D,2: Consent] specifically cites Alabama's Criminal Code  Ala. Code § 13A-6-70(b) in defining consent.

272.     The Defendants' continued actions against Doe are causing substantial, immediate, and continuing damages. The sanctions USA has taken against Doe will cause Doe to be denied the benefits of education at his chosen school, damaged his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career.

273.     The sanctions USA has taken against Doe will cause additional harm in his pursuit of a career in the military. The terms and condition of his Agreement of Scholarship Cadet Contracting in the Senior ROTC program provided that if Doe is disenrolled from the ROTC program, Doe must reimburse the United States Government all advanced education assistance, plus interest, equal to the entire amount of financial assistance (to include tuition, educational fees, books, laboratory expenses, and supplies) paid by the United States. Doe is required to repay the United States his advanced education from the commencement of his contractual agreement, September 2, 2015, to the date of his disenrollment or refusal to accept a commission. Doe's contract with the United States Government expires on May 15, 2018.

274.     Additionally, the cumulative impact of all of these due process violations made denied Doe of a fair and impartial decision.

### B.     Lack of Cross- Examination and Confrontation
### U.S. Const. am, 5, 14.; Ala. Const. art. 1, §§ 6, 13

275.     The USA Hearing Panel relied on multiple unsworn testimonial witness statements and evidence they offered on behalf of Roe 1, Roe 2, and Roe 3. The witnesses did not appear in person to testify so neither Doe nor members of the UDC panel could question, or cross-examine, or confront the witnesses or their unsworn statements. Doe's constitutional rights

---

Interestingly, USA's Sexual Misconduct Policy & Complaint Resolution manual incorrectly cites and misquotes the Alabama criminal code definition of consent. The University also quotes from the Alabama criminal code in defining stalking [IV, E, 3] Ala. Code § 13A-6-90 to 13A-6-94.

were violated because neither he nor the UDC Panel had the opportunity to cross-examine or question the persons who provided those witness statements or the documentary evidence these witnesses provided. *See Nokesv. Miami University, et.al.*, Civil Action No.1:17-cv-482 (S.D. Ohio Western Division August 25, 2017) granting student's preliminary injunction enjoining his suspension and finding sufficient likelihood of student success where University deprived student of the right to confront adverse witnesses through cross-examination where the complainant submitted three witnesses statements who did not appear at the hearing." [40]

276.    Defendant USA's refusal to apprise Doe of what benefits and services USA  afforded Jane Roe 1, Jane Roe 2, and Jane Roe 3 for filing a Title IX complaint  were probative of bias and critical where the cases hinged largely upon the credibility of the complainants. Denial of this information deprived Doe of his ability to effectively cross-examine and confront his accusers and deprived him of a fair and impartial hearing.  *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645 (S.D.Ohio 2016).

---

[40] This ruling we just issued on Friday August 25, 2017. A copy of the TRO order and preliminary injunction order are both attached as exhibits to Doe's TRO filed contemporaneously with this complaint.

## COUNT III
## BREACH OF CONTRACT

277.    Doe repeats and incorporates all of the allegations of this Complaint, as if fully set forth

herein.

278.    USA covenants with each student via <u>THE LOWDOWN</u> it that will abide by and enforce

the provisions of the USA Student Code of Conduct.

279.    USA also covenants with each student that it will abide by and follow the USA Sexual

Misconduct Policy and Complaint Resolutions Procedures.

280.    Doe enrolled, paid tuition, and provided valuable consideration to Defendants and at all

times relied on the covenants of Defendant USA.

281.    USA breached its covenants with Doe in the cases of Jane Roe 1, Jane Roe 2, and Jane

Roe 3.

282.    As a member of the USA community, the codes afford Doe certain rights that are

contractual in nature.

283.    Defendants including Agnew and Mitchell violated The Student Code of Conduct, Rule

8.0, A. Formal Hearing Procedures, 2 which provides:

> *The hearing shall be conducted by the Student Conduct Administrator, be informal in nature, and legal rules of evidence shall not apply. The hearing shall be closed to everyone except the Student Conduct Administrator, members of the UDC, the respondent, and the complainant and/or victim and advisors to the respondent and the complainant and/or victim. Witnesses will be present only during their own testimony. The complainant/victim and the respondent, have the right to:*
>
> > *2) Present evidence by witness <u>or by affidavit if a witness is unable to attend the hearing</u>. It is the responsibility of the respondent and the complainant/victim to notify their witnesses of the date, time and place of the hearing. If witnesses fail to appear, the hearing shall be held in their absence. (Emphasis added)*

Defendant breached this rule by considering and allowing the UDC to consider unsworn witness testimony and evidence in finding Doe responsible.

284.    USA breached its contract with Doe by disciplining him for conduct it had no jurisdiction to discipline him for as the conduct alleged in the Roe 3 case because the conduct did not occur on campus nor did it implicate any "University- sponsored activity."  Also the conduct was not "inititated, aided, authorized, or supervised by the University…"

285.     USA covenanted with Doe in its own policies, rules, regulations, and procedures that it would discipline only for conduct it had jurisdiction over. USA breached this covenant.

286.    Defendant Agnew as an agent of Defendant USA breached the *USA Student Code of Conduct, Rule 8.0. A.6.* by having *ex parte* communications with the UDC in all three of Doe's hearings. Rule 8.0 A.6. provides that "After the hearing, the UDC shall meet <u>in private</u> to determine whether the evidence/information presented or received by the UDC during the hearing proved that it is more likely than not that the respondent violated one or more sections of the Code." (*Emphasis added*) Agnew violated this rule by communicating with and discussing the cases after each of Doe's hearings with the UDC panels.

287.    Defendant Agnew violated and breached the *USA Student Code of Conduct* as well as the *USA Sexual Misconduct Policy and Complaint Resolution Procedures* when she provided the UDC panel in Roe 1 and Roe 2 with findings of fact and determinations of witness credibility. Nowhere is the Agnew as Chair of the USA University Disciplinary Committee authorized to make findings of fact and determinations of witness credibility. That function is reserved for the UDC panel. Defendant Agnew and Defendant Mitchell, in upholding the UDC finding of *Responsibility* breached these rules.

288.   USA breached its contract with Doe by implementing a Title IX regime that encourages allegations of misconduct, offers accusers robust support and vigorously prosecutes complaints, while affording scant resources to the accused, little or no male perspective on adjudicatory panels, and no avenue for meaningful review of panel decisions.

289.   USA's incomplete and arbitrary actions breached the codes, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

290.   USA's punishment of Doe will preclude him from completing his undergraduate degree in a timely fashion.

291.   USA breached its contract with Doe by refusing him the right to call C.W. as a witness and to question witnesses in Roe 1 and Roe 2 case, as guaranteed him by the *Student Code of Conduct 8.0 Disciplinary Procedures*—right to call witnesses and "question all witnesses presented."

292.   USA breached its contract with Doe by failing to provide "promptness, fairness, and impartiality" as to Roe 3's second hearing and as is provided for in *USA Sexual Misconduct Complaint Resolution Procedures, I.C. Promptness, Fairness, an Impartiality.*

293.   Additionally, USA covenants with its students that it has a policy "ensuring a fair and neutral process for all parties." (*USA Student Code  of Conduct*, Title IX Coordinator, p.81) USA breached this promise to Doe in the Roe 1, Roe 2, and Roe 3 hearings.

294.   USA covenanted with Doe that the sexual misconduct complaint resolution procedures provide for "prompt, fair, and impartial investigations and resolutions." (USA Student Code of Conduct, IX, B.(a), p.86) USA breached this covenant with Doe in the Roe 1, Roe 2, and Roe 3 hearings.

295.   USA covenanted with Doe that all University employees involved in the investigation and resolution process would "discharge their obligations under theses Complaint Procedures

fairly and impartially." (USA Sexual Misconduct Complaint and Resolution Procedures, I.,C., p.22) USA breached this covenant with Doe in the Roe 1, Roe 2, and Roe 3 hearings.

296.    USA defendants covenanted with Doe that if a University employee, like Defendants Agnew and Mitchell, determines that he or she cannot apply these procedures fairly and impartially because of the identity of a complainant, respondent, or witness, or due to any other conflict of interest, another suitable individual will be designated by the Title IX Coordinator to fill the role. USA defendants breached this covenant with Doe. (USA Sexual Misconduct Complaint and Resolution Procedures, I.,C., p.22)

297.    As a direct and proximate result of the foregoing events of breach, Doe faces imminent irreparable harm to his education and professional career goals, as well as emotional and reputational harm for which no adequate legal remedy exists.  USA defendants breached this covenant with Doe.

WHEREFORE, the Plaintiff, John Doe, requests that the Court:

a) Restrain and enjoin the Defendant, USA, from implementing Doe's suspension;

b) Restrain and enjoin the Defendant, USA, from denying Doe the opportunities and benefits afforded undergraduate students;

c) Restrain and enjoin the Defendant, USA, from further adjudicating Title IX complaints under the current process; and

d) Award Doe damages for breach of contract in an amount exceeding $75,000, to be proven at trial.

**COUNT IV**
**TITLE IX**
**DISCRIMINATION ON THE BASIS OF GENDER IN VIOLATION OF 20 U.S.C. § 1681**
**DOE's TITLE IX COMPLAINT AGAINST ROE 3**

298.   Doe's repeat and incorporate all of the allegations of this Complaint, as if fully set forth herein.

299.   This count is brought against defendant USA.

300.   Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Title IX provides in pertinent part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

301.   Defendant USA is an education program or activity operated by recipients of Federal financial assistance.

302.   The acts and failures to act perpetrated against Doe amounted to unlawful sexual harassment and discrimination on the basis of gender. The harassment and discrimination was sufficiently severe and pervasive to create an abusive educational environment for Doe.

303.   Defendant Harrell, an agent and employee of Defendant USA, engaged in impermissible bias against Doe because he was a male student.

304.   Defendant Harrell's bias against male Title IX respondents like Doe and her advocacy on behalf of females who allege sexual assault with emphasis on complainants being believed at the expense of the truth was the result of bias;

305.   Harrell's assignment to process John Doe's Title IX complaint was especially troublesome because Harrell had already determined in Roe 1, Roe 2, and Roe 3 that all were survivors of sexual assault and approved Doe be prosecuted under Title IX by USA. Harrell

participated in a finding that the university "proceed forward with an investigation" of Doe based on the identical facts and circumstances Doe alleged that Roe 3 assaulted him.

306.    Also, when Doe met with Defendant Harrell to file his Title IX complaint, she had already requested a no contact order be issued against him based on the allegations of Roe 3.

307.    Additionally, USA failed to take any meaningful action against other students who threatened Doe, failed to make any meaningful investigation to several students who showed up at Doe's on-campus dorm room and threatened him; failed to take any meaningful action against Roe 1 for violating the no contact order after she showed up at Doe's dorm room in violation of the mutual no contact order; failed to afford Doe adequateTitle IX assistance; failed to take any meaningful action against Roe 1 and others who incited other USA students and friends of Roe 1 to visit physical harm upon Doe (as is evidenced by social media postings in Exhibit 6).

308.    The Department of Education in its 2011 "Dear Colleague" letter, that Defendant USA claims to follow, commands USA to "take steps to protect a student" like Doe who is a victim of sexual assault.

> For example, if a student alleges that he or she was sexually assaulted by another student off school grounds, and that upon returning to school he or she was taunted and harassed by other students who are the alleged perpetrator's friends, the school should take the earlier sexual assault into account in determining whether there is a sexually hostile environment. The school also should take steps to protect a student who was assaulted off campus from further sexual harassment or retaliation from the perpetrator and his or her associates. [2011 Dear Colleague Letter, p.4]

309.    USA denied Doe a fair and impartial hearing in his Title IX complaint against Roe 3 by assigning his case to be handled by Defendant Harrell. Dr. Harrell played an instrumental role in helping Roe 3 bring forth her Title IX complaint against Doe. Also, Defendant Harrell played a critical role in Doe's previous Title IX hearing as she assisted Roe 1 and Roe 2 bring forth sexual assault charges against Doe. The fact that Roe 3 failed to disclose her assault

upon Doe in her Title IX complaint was a critical fact in the UDC evaluating Roe 3's credibility. USA had other Title IX coordinators who could have fairly and impartially heard Doe's Title IX complaint and actively help present his claim and gather evidence as USA does for female complainants like Roe 3, Roe 1 and Roe 2. If USA was truly committed to "avoid conflicts of interest that could call into question the integrity of the process" it would have reassigned Doe's case to different Title IX coordinator so he could get a fair, neutral, and impartial hearing. (p.20 of *USA Sexual Misconduct Policy & Complaint Resolution Procedures*)

310.    Upon information and belief, USA treated Doe differently from Roe 3 in determining whether he satisfied the requirements and conditions for the provision of benefits and services available to him when Doe filed his Title IX complaint.

311.    Upon information and belief USA denied Doe similar benefits, aid, and services that female Title IX complainants are and were offered; additionally USA otherwise limited Doe in the enjoyment of rights, privileges, advantages or opportunities USA afforded Roe 3 and other female Title IX complainants.

312.    Those failures amounted to deliberate indifference toward the unlawful sexual conduct of Roe 3 who transmitted a sexual communicable disease to Doe.

313.    As a result, Doe was subject to continuing harassment and a loss of educational opportunity to include poor grades, depression, anxiety, and loss of ROTC scholarship money and related stipends.

314.    Additionally, and/or in the alternative, Defendants failed to enact and/or disseminate and/or implement proper or adequate procedures to discover, prohibit or remedy the kind of discrimination that Doe suffered. This failure included, without limitation, non-existent or inadequate customs, policies or procedures for the recognition, reporting, investigation and

correction of unlawful discrimination by female offenders. Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or was likely to occur. As a result, Doe was subject to continuing harassment and a loss of educational opportunity.

315.   USA has deprived Plaintiff, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of USA's guidelines and regulations

316.   As a result of Defendants' deliberate indifference, Doe suffered loss of educational opportunities and/or benefits and has and will continue to incur attorney fees and costs of litigation.

317.   Additionally, Doe has suffered embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life. Doe will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

**DISCRIMINATION ON THE BASIS OF GENDER IN VIOLATION OF
20 U.S.C. § 1681 (TITLE IX) ROE 1/ROE 2 TITLE IX COMPLAINT AGAINST DOE**

318.   Doe's repeat and incorporate all of the allegations of this Complaint, as if fully set forth herein.

319.   USA committed impermissible gender bias against Doe in the investigation and adjudication of Roe 1, Roe 2, and Roe 3's Title IX complaints against Doe.

320.   Agnew's involvement and USA's refusal to remove her from Doe's hearing despite her initial recusal from Doe's hearing in Roe 3's case, and her conduct in Roe 1 and Roe 2 case evidence a clear bias on part of Defendants against Doe.

321.   Defendants USA and Mitchell had actual notice of Agnew's bias, tampering with members of the UDC, victim advocacy, lack of impartiality, and her prior recusal, yet

allowed, encouraged, and sanctioned her participation in Doe's disciplinary hearing in Jane Roe 3's case.

322.    Defendants USA, Mitchell, Agnew, and Harrell had the authority to take corrective action to end the discrimination and did not.

323.    Defendant Mitchell's refusal to remove Agnew from Doe's disciplinary hearings despite Doe's request in writing constituted deliberate indifference if not intentional bias against Doe;

324.    Defendant Agnew's refusal to remove herself from Doe's disciplinary hearings despite Doe's request in writing constituted deliberate indifference against Doe's right to fair and impartial decision maker;

325.    In the second UDC panel in the case of Roe 3, Defendants Agnew and Mitchell selected, trained, and placed or allowed to be placed two UDC panel members, C.L. and Z.F., to serve in Roe 3's case who were friends with Roe 3 with a purpose to find Doe responsible for sexual assault. Both UDC panel members are friends on Facebook with Roe 3, yet sat in judgment of Doe based on the allegations Roe 3 said she was sexually assaulted by Doe.

326.    In the second UDC panel, Defendants selected and allowed A.M.J. to serve in Doe's hearing. Defendant Mitchell is friends on Facebook with A.M.J. (Exhibit 19)

327.    In the second UDC panel, defendants selected and allowed student T.D. to serve in Doe's hearing. Defendant Mitchell and T.D. are friends (Exhibit 19)

328.    At no time did any USA Defendant or UDC panel members disclose these conflicts or relationships to Doe or his advisor.

329.    The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *accord[] due process to both parties involved...*"[41]

330.    Defendants failed to afford Doe due process.

331.    As a result of Defendants' deliberate indifference, Doe suffered loss of educational opportunities and/or benefits and has and will continue to incur attorney fees and costs of litigation

332.    USA is liable to Doe for his damages.

## SELECTIVE ENFORCEMENT DISCRIMINATION

333.    Doe's repeat and incorporate all of the allegations of this Complaint, as if fully set forth herein.

334.    Particular circumstances suggest that selective enforcement and gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon Doe.

    a)    A general atmosphere at USA where women who lodge a complaint of sexual assault are immediately treated as "survivors."

    b)    Training of UDC Hearing Panels from victims' advocates in an inappropriate manner.

    c)    The failure of USA in certain instances to conduct full and fair investigations, including the failure to include significant evidence that tended to exonerate accused students.

---

[41] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 22 (*emphasis added*).

d)    The failure of the UDC Hearing Panel to afford accused to effectively cross-examine their female accusers under the auspices of "protecting" victims.

e)    The failure of USA to require the presence of key witnesses or the accuser at the UDC Hearing.

f)    The failure of USA to inform UDC hearing panels that accused students are innocent until proven guilty and to require that the party seeking to impose discipline bear the burden of proof.

g)    USA's Title IX victim advocacy created and fostered an atmosphere of hate, ridicule, and oppression for males accused of sexual violence. USA's conduct has inspired and emboldened accusers to incite violence against students wrongfully accused because they are presumed guilty.

335.    Specific circumstances in this case include:

a)    In the case of Roe 1 Roe 2 (Case Number 2016012301), USA and the UDC disciplined Doe for Title IX sexual violence charges by finding that both Roe 1 and Roe 2 were incapacitated to give Doe consent, but failed to take any action against either Roe 1 or Roe 2 for their sexual relations with each other during the same incident. It was undisputed that Roe 1 and Roe 2 engaged in sexual relations with each other at the same time as with Doe. If Roe 1 and Roe 2 were incapacitated and incapable of consent as to Doe, they were incapable of consent as to one another.

b)    The UDC applied the incorrect standard of consent because it was trained by USA defendants that mere intoxication is sufficient to obviate consent. This was evident from the banners and flyers USA defendants prominently displayed in the

immediate hearing area in the case of Roe 1 and Roe 2.  The UDC, with the encouragement and support of USA defendants, applied the definition of CONSENT as defined by *USA Student Code of Conduct 7.E.* This definition of *consent* differs from the *USA Sexual Misconduct Policy & Complaint Resolution Procedures, IV, D, 2: CONSENT*.  Since the University Code of Conduct Consent Definition is in conflict with the USA Sexual Misconduct Policy Resolution Procedures definition, the latter controls (*See  USA Sexual Misconduct Policy and Complaint Resolution Procedures, VII., A:Complaint Resolution Procedures*)

c) USA allowed Roe 3 to introduce the sexual history of Doe in Roe 3's first hearing to the UDC but specifically prohibited Doe from introducing exculpatory sexual history of Roe 1, Roe 2, and Roe 3. USA treated Doe differently based on his gender.

d) USA defendants offered unsworn witness testimony and evidence against Doe in all three hearings.

e) USA defendants refused to allow C.W. to testify before the UDC panel in Roe 1 and Roe 2 case, while at the same time allowing Roe 1 and Roe 2 witnesses to testify live before the UDC panel.

f) USA defendants refused Doe the opportunity to question his accusers, Roe 1 and Roe 2 as, to the identity of the male air force cadet who had sexual relations with both Roe 1 and Roe 2 earlier that same evening. This witness was a critical eyewitness to the alleged intoxication of both Roe 1 and Roe 2.

g) During Roe 3's first UDC hearing, USA defendants allowed Roe 3's Title IX advocate to directly address and rebuke Doe, at one point instructing Doe to

answer a question asked by Roe 3. Conversely, Doe's advocate was strictly prohibited from speaking to the Title IX complainant and UDC, and was advised he would be removed from the hearing if he did. This misconduct was clearly inappropriate and prejudiced Doe in front of the UDC panel and resulted in the UDC panel finding Roe 3 not responsible for sexually assaulting Doe. USA took no corrective action against Roe 3's Title IX advocate and allowed this same Title IX advocate to participate in Roe 3's second Title IX hearing against Doe. Such conduct prejudiced Doe in the eyes of the UDC and specifically violated USA's Sexual Misconduct Policy & Complaint Resolution Procedures and the Code of Student Conduct. Again, this is evidence of USA's bias against male students making Title IX complaints.

h)  USA also failed to provide protection from retaliation from friends of Roe 1 and Roe 2 who threatened Doe. USA's Title IX victim advocacy fostered an atmosphere of hate, ridicule, and oppression on a mere accusation alone. USA's conduct in Doe's case inspired and emboldened accusers to incite violence against respondents like Doe who have been wrongfully accused and are presumed guilty by defendant USA.

336.   USA committed impermissible gender bias against John Doe in the investigation and adjudication of the complainants' accusations.

337.   The investigator, the panel, and the reviewing administrators reached conclusions that were incorrect and contrary to the weight of the evidence and contrary to Alabama statutory law as cited in finding Doe *Responsible* in Roe 1 and Roe 2.

338.   USA officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. The imposition of discipline on John Doe is the result of a flawed and biased hearing process. This resulted in a deprivation of access to educational opportunities at USA.

339.   The decisions of the hearing processes and the appeal processes for Doe were erroneous outcomes which were the direct result of a flawed and biased proceedings.

340.   In a fair and unbiased system, whether someone is a "victim" is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning.  USA has reversed this process and assumed that John Doe was guilty because he was a male accused of sexual assault rather than evaluating the case on its own merits.

341.   Additionally, USA selectively enforces its student conduct and Title IX jurisdiction in an arbitrary and capricious matter. Roe 1 and Roe 2 both alleged facts to USA Title IX authorities involving similar conduct of the male air force cadet. This was the same conduct that involved the same complainants earlier in the evening that USA disciplined Doe for. Under its own rules, regulations, and procedures, USA was required to conduct an investigation as it did in Doe's case, but did not. In fact, USA defendants refused to allow him to ask Roe 1 or Roe 2 the identity of the air force cadet.

342.   This discrimination is intentional and is a substantial or motivating factor for USA's actions in this case.

343.   USA has deprived Doe, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of USA's guidelines and regulations.

344.   USA is liable to John Doe for his damages.

345.     As a direct and proximate result of USA's violations of John Doe's rights under Title IX, John Doe has suffered severe and substantial damages. These damages include diminished earnings, capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court. Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees incurred in bringing this action.

## COUNT V

## NEGLIGENCE

346.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

347.     USA owed duties of care to Doe. Such duties included, without limitation, a duty of reasonable care in the conduct and investigation of the allegations of sexual misconduct against him.

348.     USA negligently trained, supervised, and retained Defendants Mitchell, Agnew, and Harrell in conducting Title IX investigations.

349.     USA defendants and Defendant Harrell were negligent in training and educating Doe on sexual misconduct, consent, incapacity, and intoxication before disciplining him for violating the policy.[42]

---

[42] Defendant Harrell told USA's student newspaper The Vanguard:
   "USA has had ongoing sexual violence prevention and training efforts for years through the Violence Prevention Alliance, Mobile Rape Crisis Center, Penelope House, and the Title IX team. South Alabama is working towards a comprehensive violence prevention model which will include all incoming students completing an online module on sexual assault prevention as well as the strengthening and development of strategic and varied-methods of programming and education to reach our diverse community. National evidence-based and

350.   The conflicting definitions of consent under the competing multiple rules and regulations are a trap for the unwary student like Doe who was provided no training or education as to the multiple and conflicting definitions of consent and incapacitation and even the university's jurisdiction.

351.   USA was negligent in finding Doe culpable of sexual misconduct, in light of the record of evidence: Roe 1, Roe 2, and Roe 3 were all drinking, but not incapacitated, and all engaged in consensual sexual intercourse with Doe.

352.   USA negligently chose and trained UDC panel members by failing to adequately train panel members on the gravity of a finding of sexual assault, as is evident by the student K.I. ad hoc chief justice recommending Doe, convicted of sexual assault, complete community service at *The Boys and Girls Club*.

353.   USA negligently chose and trained UDC panel members by failing to adequately train and educate panel members on the proper meaning of consent.

354.   USA negligently chose biased UDC panel members who were friends with Roe 3 and Defendant Mitchell.

355.   USA negligently conducted a biased system of adjudicating Title IX complaints.

356.   USA negligently selected, encouraged, and allowed USA students who are ill-equipped intellectually, in life experiences, in ideas of justice, in notions of fairness, and in the gravity

---

researched programs, including a bystander intervention program, a peer education group and community-specific programming are examples of education that will take place as a part of this comprehensive model of violence prevention."

Brackett, Tory. South Alabama implements sexual assault training.  October 5, 2015
   https://thevanguardusa.com/1066/news/south-alabama-implements-sexual-assault-training/
(visited August 14, 2017)

of a finding of sexual assault responsibility, who have either no concept of due process to sit on sexual assault UDC panels.[43]

357.    Students who serve on USA's sexual assault UDC panels, including Doe's, lack the experience and sophistication needed to make decisions that may have lifelong consequences for the accuser and the accused, like Doe who faces suspension and potential removal from the ROTC program.[44]

358.    USA breached its duties owed to Doe.

359.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational opportunities, economic injuries and other direct and consequential damages.

360.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

---

[43] On April 29, 2014, the Office for Civil Rights of the Department of Education issued "Questions and Answers on Title IX and Sexual Violence," a 46-page document offering clarification about the requirements in the April 4, 2011 Dear Colleague Letter and the 2001 Revised Sexual Harassment Guidance. Questions and Answers on Title IX and Sexual Violence, page 30, Footnote 30:

> Although Title IX does not dictate the membership of a hearing board, OCR discourages schools from allowing students to serve on hearing boards in cases involving allegations of sexual violence. (*emphasis added*) Available online at https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (visited August 14, 2017)

[44] Nowhere is this better manifested than in the first Jane Roe 3 hearing where the UDC student ad-hoc chief justice recommended Doe, whom he just found responsible for sexually assaulting a fellow student, perform community service at the Boys and Girls Club.

## PRAYER FOR RELIEF

Doe respectfully requests the following relief:

- A judgment declaring that the USA Code of Conduct and the USA Sexual Misconduct Policy and Complaint Procedures, as applied to John Doe, violate the Due Process Clause of the United States Constitution, the Due Process Clause of the Alabama Constitution. To prohibit students from serving in UDC Panels involving sexual assault investigations.

- A Temporary Restraining Order and Injunction restoring John Doe as a student and placement back into the ROTC program, and prohibiting further disciplinary proceedings in a manner that violates the contract between the parties and expungement of all of the aforementioned cases.

- A judgment in favor of John Doe awarding damages in an amount to be determined at trial;

- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

- A judgment against Defendant USA for violation of Title IX of the Education Amendments of 1972 in favor of Doe for damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages to reputation, past and future economic losses, loss of educational and ROTC opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

- A judgment for  breach of contract for Plaintiff against Defendants and damages in an amount to be determined at trial, including, without limitation, damages to physical well-

being, emotional damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## JURY DEMAND

Doe  hereby demand a trial by jury of all issues so triable.


Dated this 29th day of August, 2017.


                                              /s/ Matt Green(GRE095 A)
                                              _____
                                              Matt Green, Esq. (GRE095 A)


OF COUNSEL:
Matt Green, Esq. (GRE095 A)
The Law Office of Matt Green, LLC
*The Pollock-Altmayer House*
501 Government Street, Suite 1
Mobile, AL 36602
Ph: (251) 434-8500
Facsimile: (251)434-8500
E-mail: mattgreenlaw@comcast.net

## VERIFICATION

I, JOHN Doe, hereby verify that I have read the foregoing Complaint and verify that all of the facts set forth therein are true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated this __29__ day of August, 2017.          *John Doe*
                                                John Doe


_____
[REDACTED] a/k/a John Doe

Signed before me this 29th Day of August 2017.

*Pam Green*  Exp 6/8/20
Notary Public

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 30th day of August 2017, electronically filed the foregoing with the Clerk of the court using the CM/ECF system and will serve the defendants by private process server:

Defendant University of South Alabama
c/o President Tony Waldrop
University of South Alabama
307 University Blvd. N., Rm. 130
Mobile, Alabama 36688

Defendant Michael Mitchell
Vice President for Student Affairs,
Dean of Students, and Deputy Title IX Coordinator for Students
University of South Alabama
Student Center, Room 245
Mobile, AL 36688

Defendant Krista Harrell
Associate Dean of Students & Title IX Coordinator
University of South Alabama
Student Center, Room 116
Mobile, Alabama 36688

Defendant Andrea Agnew
Assistant Dean of Students
University of South Alabama
Student Center, Room 116
Mobile, Alabama 36688