# EXHIBIT A

1        IN THE UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF ALABAMA

3

4

5    * * * * * * * * * * * * * *

6    JOHN DOE,

7            Plaintiff,

8                                    CIVIL ACTION NO.:
     v.
9                                    1:17-CV-00394-CG-C
     MICHAEL A. MITCHELL, et al.,
10           Defendants.

11   * * * * * * * * * * * * * *

12

13

14

15

16

17

18        The deposition of ▮▮▮ John Doe ▮▮▮ ("John Doe"),

19        taken at the law offices of

20        Hand Arendall Harrison Sale, LLC,

21        104 St. Francis Street, Suite 300,

22        Mobile, Alabama, on September 4, 2020,

23        commencing at approximately 9:05 a.m.

1       A.    Yes, ma'am.

2       Q.    Did you move back to Birmingham after you

3  graduated from the university in December 2019?

4       A.    My roommate and I finished up our lease at

5  our apartment.  And I was going to go home and visit

6  my family for about the last little bit of the month

7  and spend some time with them before I was gone for

8  about a year.

9       Q.    All right.  So you graduated from the

10  university in December of 2019?

11      A.    Yes, ma'am.

12      Q.    And you stayed in Mobile for how long?

13      A.    About two to three months.

14      Q.    Okay.  What did you do during that time?

15      A.    Just worked and kind of got prepared for my

16  military obligations, getting physically and mentally

17  ready.

18      Q.    Sure.  Where did you work?

19      A.    The Gift Spot.

20      Q.    How long have you worked at The Gift Spot?

21      A.    I worked there for about a year.

22      Q.    What were the dates of that?

23      A.    Let's see.  I got hired around July of 2018

1      Q.    When you enrolled at the university, were

2  you subject to the Student Code of Conduct?

3      A.    Yes, ma'am, as all students are.

4      Q.    And was the Student Code of Conduct

5  available to students online in the handbook, which is

6  called The Lowdown?

7      A.    Yes, ma'am.

8      Q.    And you attached the Student Code of Conduct

9  as Exhibit 2 to your amended complaint, didn't you?

10     A.    Yes, ma'am.

11     Q.    Were you also subject to the university's

12  sexual misconduct policy?

13     A.    Yes, ma'am, as all students are.

14     Q.    Was that policy also available online?

15     A.    I believe so.

16     Q.    And is the university's sexual misconduct

17  policy that was in effect at the time of the issues in

18  this case attached as Exhibit 1 to your amended

19  complaint?

20     A.    Yes, ma'am.

21     Q.    What was your major at the university?

22     A.    Biology with a minor in military science.

23     Q.    Did that major and minor ever change?

```
 1   December I took it.  I did okay.

 2              My brother went to South for a semester.

 3   College really wasn't his thing.  And he said I was a

 4   little better at school than he was, so I should go to

 5   college, it would be a good fit for me.  And since I

 6   wanted to join the military, I could use ROTC to do

 7   the military route that I wanted but also have my

 8   school paid for and things like that.

 9        Q.   Okay.  How did you pay for your first year

10   of college before you got the contract?

11        A.   Student loans.  I had some financial aid and

12   a Pell Grant and things like that.

13        Q.   If you didn't get on with ROTC, did you have

14   a plan to pay for college?

15        A.   No, ma'am, not really.  I figured I'd just

16   keep taking out loans.

17        Q.   So you signed a contract with the Army in

18   September of 2015, which was the beginning of your

19   sophomore year at the university; right?

20        A.   Yes, ma'am.

21        Q.   And what was the time commitment involved

22   with ROTC?

23        A.    It's four years active, six years in the
```

1   Guard Reserve.  Either way -- so when you commission

2   into the Army -- I commissioned as a National Guard

3   officer.  So I owe six years in the Guard Reserve.

4   But if you go active, it's a four-year obligation.

5   And you can either volunteer to go active or you can

6   elect to go National Guard or you can compete for it.

7   Well, generally you have to compete for the

8   active-duty slots, and they weigh your physical

9   ability, your GPA, extracurriculars, things like that.

10  Then they put you on a national scale, and they see

11  how many active-duty officers they need, and they just

12  cut a line at the bottom there.  If you make it above

13  the line and you wish to go active, you can go.  If

14  not, you're kind of in -- the Guard Reserve is what

15  you're required to do.

16      Q.   Did you know at the outset when you signed

17  the contract in September of 2015 what the competitive

18  nature was of going active?  Like what criteria the

19  military would look at, you know, down the line, if

20  you decided you wanted to compete for an active

21  commission versus going into the Guard or the Reserve?

22      A.   Yes, ma'am, I knew the requirements.  But I

23  guess you'd say the amount of officers that they'll

1    there's more of a time commitment that's required.

2         Q.   Did your participation in ROTC make it

3    difficult for you to attend classes or complete course

4    work in your other academic work?

5         A.   No more than any other class, like any other

6    class that has homework assignments.  Participation in

7    lab, it's like if you take a chemistry class, you have

8    to go to chemistry lab.  It's similar.

9         Q.   I think I asked this or you referred to it.

10   But you graduated from the University of South Alabama

11   in December of 2019; right?

12        A.   Yes, ma'am.

13        Q.   And what degree did you obtain?

14        A.   Biology.

15        Q.   Is that a bachelor's?

16        A.   Yes, ma'am.

17        Q.   And did you attend a graduation ceremony?

18        A.   Yes, ma'am, I did.

19        Q.   What was your college GPA?

20        A.   It was around a 2.3 or 2.4.

21             (EXHIBIT 2 WAS MARKED

22              FOR IDENTIFICATION.)

23   BY MS. BITZER:

1   her know how things go, check in when you can.

2       Q.   Do you have a pretty good support system?

3       A.   Yes, ma'am, I think so.  I'm very fortunate.

4       Q.   Do you now or have you in the past kept a

5   journal or diary?

6       A.   No, ma'am.

7       Q.   Did you ever write anything down about the

8   allegations of sexual misconduct that were made

9   against you and the process that followed kind of

10  contemporaneous in time?

11      A.   No, ma'am.  I never really kept a journal or

12  anything like that of it.

13      Q.   Have you posted to any website or social

14  media anything about your allegations in this case?

15      A.   No, ma'am.

16      Q.   Now, there are three named individuals who

17  are defendants in this case:  Dr. Mike Mitchell,

18  Dr. Andrea Agnew, and Dr. Krista Harrell.  I want to

19  talk about Dr. Krista Harrell for just a minute with

20  you.

21           Did Krista Harrell serve as a decision-maker

22  in your disciplinary process matters at the

23  university?

1      A.    Not that I know of, no, ma'am.

2      Q.    Why have you sued Dr. Harrell?

3      A.    She had a part to play as far as the

4  Title IX handling and proceedings and also she had a

5  connection to Roe 3, `Roe 3`

6      Q.    All right.  What part did Dr. Harrell play

7  in terms of the Title IX handling and proceedings for

8  which you're suing her for?

9      A.    She was the Title IX coordinator.  I know

10  she was involved in training like RAs and members on

11  campus that went through Title IX training and things

12  like that.  She had a part to play, I guess, in

13  educating them on the school's policies and how they

14  handle things.

15      Q.    You also mentioned she had a connection with

16  Roe 3.  Are you suing her because she had a connection

17  to Roe 3?

18      A.    I believe it shows bias, as mentioned in the

19  complaint.  But it shows bias, I believe.

20      Q.    Bias on Dr. Harrell's part?

21      A.    Yes.  Having a connection with one of my

22  plaintiffs at the time against me and with her

23  involvement in the Title IX proceedings.

1      Q.   What involvement did she have in the Title

2  IX proceedings?

3          MR. GREEN:  I'm going to object to the form

4  because he was both a respondent and a complainant.

5          MS. BITZER:  Right.  And I'm just asking

6  what did Dr. Harrell --

7          MR. GREEN:  Are you asking Dr. Harrell's

8  role as him being a respondent or him being --

9          MS. BITZER:  I said in Title IX proceedings.

10  I said:  What involvement did Dr. Harrell have in the

11  Title IX proceedings, of which you were a party?

12          MR. GREEN:  Okay.

13          MS. BITZER:  Whether it was as a complainant

14  or a respondent.

15          MR. GREEN:  And that's in all three, Roe 1,

16  Roe 2 -- all three hearings?

17      A.   As far as like the hearings, she never

18  really sat in on the hearings or anything.  I did file

19  a complaint against Roe 3, and she -- I met with her

20  briefly to discuss that.  But as far as handling --

21  like investigating into the case and hearings and

22  things like that, she didn't really have much

23  involvement in that aspect.

BY MS. BITZER:

    Q.   What has Dr. Harrell done that has caused you harm?

    A.   Um --

    Q.   Let me stop you.  You're flipping through a document, and I'm just asking you questions now.  I'm not asking you about a document, so I'd appreciate it if you'd kind of set the document to the side and just focus on the question that I'm asking you and you responding to it.  Okay?

         MR. GREEN:  He can't refresh his recollection from his interrogatories?

         MS. BITZER:  No.  I'm asking him questions.  This is a deposition.

         MR. GREEN:  Sure, sure.  But I think he was just reviewing his interrogatory answers.

         MS. BITZER:  I'm not sure what he's doing, and that's not typically how a deposition goes.

    Q.   So I'm just asking you questions.  And we can look at those later.

    A.   Absolutely.

    Q.   But I just want to talk to you right now.

         My question was:  What has Dr. Harrell done

1    that has caused you harm?

2         A.   I would say she contributed to the overall

3    loss of my cases, yeah, and in some capacity

4    contributed to the bias and the unfair handling of my

5    cases.

6         Q.   How did she contribute to the overall loss

7    of your cases?

8         A.   One of the big things that was mentioned in

9    the complaint was her connection to one of my

10   complainants, Roe 3.  She had a main connection there.

11   And her knowing Dr. Mitchell and Dr. Agnew.  They had

12   involvement in the case, working together.  So I just

13   believe that that contributed to it.

14        Q.   How did Krista Harrell knowing Roe 3

15   contribute to the loss of your case?

16        A.   I believe it shows bias if she knows her and

17   there's a connection with her.  There was evidence

18   that we showed where she was at multiple events with

19   her.

20             MR. GREEN:  Try not to use pronouns -- he,

21   she, her-- just to make the record cleaner.

22             THE WITNESS:  Yes, sir.

23        A.   Dr. Harrell was at multiple events with

1    Roe 3  showing a personal relationship that I firmly

2    believe.  And having a personal relationship with

3    somebody, especially if they're handling or they have

4    handled the Title IX case itself and you have a

5    personal relationship with them, I believe it makes

6    the ability to have a fair and unbiased hearing a

7    little bit more difficult.

8    BY MS. BITZER:

9         Q.    Dr. Harrell did not participate in any of

10   the hearings, did she?

11        A.    No, ma'am.

12        Q.    And she didn't serve as the investigator for

13   any of the complaints?  She just was the initial

14   intake person; is that right?

15        A.    Yes, ma'am.

16        Q.    She did not serve on the UDC panels, did

17   she?

18        A.    No, ma'am.

19        Q.    Did she hear your appeals?

20        A.    No, ma'am.

21        Q.    Do you believe that Dr. Harrell harbored

22   some personal animosity against you?

23        A.    I believe she was doing her job, but I don't

1    think that she was being entirely fair.  Like I said,

2    when I filed the complaint against Roe 3, there was

3    less, I guess, care and understanding is a way to put

4    it.  It was kind of -- because I'm a student, I'm

5    making a complaint.  But nothing ever really came of

6    it.  Her, I guess, demeanor was less than what I felt

7    it should be.  It was kind of just like she was just,

8    okay, you're here, you're making a complaint, let's

9    get this over with, thank you for your time.  That was

10   about it.

11       Q.   Do you have any evidence that her demeanor

12   with you was different than her demeanor in meetings

13   with other complainants?

14       A.   No, ma'am.  No, I don't.

15       Q.   Dr. Harrell did meet with you about your

16   complaint against Roe 3; right?

17       A.   Yes, ma'am.

18       Q.   And she referred it for an investigation;

19   correct?

20       A.   Yes, ma'am.

21       Q.   And you had a hearing on your complaint; is

22   that right?

23       A.   At the same time as one of the other

1    complaints.  But yes, ma'am, a hearing nonetheless.

2        Q.    And you requested that the hearing on your

3    complaint be at the same time as the complaint that

4    Roe 3 had filed against you; right?

5        A.    No.  I wanted a separate complaint.  They

6    just threw them together -- I'm sorry.  I believe it

7    was Dr. Agnew and Dr. Mitchell just threw them

8    together.

9        Q.    Oh, okay.  You did not want them to be heard

10   together?

11       A.    No, ma'am.

12       Q.    Did Dr. Harrell participate in any of your

13   sanctioning as a result of the UDC's findings of

14   responsibility against you?

15       A.    No, ma'am, not that I recall.  I believe

16   that was Dr. Agnew and Dr. Mitchell and the UDC that

17   were involved in that aspect.

18       Q.    Do you have any evidence that Dr. Harrell

19   selected UDC panel members that heard your cases?

20       A.    No, ma'am, not that I know of.

21       Q.    Do you have any evidence that Dr. Harrell

22   encouraged or influenced any UDC members to find any

23   particular way in your cases?

1    A.    Like I said, other than her involvement in

2  educating them about the Title IX policies and

3  handlings and things like that.  But no, ma'am, I

4  don't have any other than pictures with her and

5  members.  But nothing direct.

6    Q.    Do you have any evidence that Dr. Harrell

7  trained UDC members in such a way that they were

8  biased in favor of Title IX complainants and against

9  respondents?

10    A.    My girlfriend was actually an RA, and

11  Dr. Harrell was over a lot of their handling if they

12  ever got a complaint and things like that.  And she

13  told me that it was more directed towards the

14  plaintiff's rights and handling, not so much the

15  defendant.  The defendant was more just a -- don't

16  really worry about them, it's entirely about the

17  plaintiff; you kind of believe them and get them the

18  help they need.  So it was more directed towards

19  just --

20    Q.    When was your girlfriend trained by

21  Dr. Harrell?

22    A.    She was an RA sophomore year.  So it would

23  have been late 2015, 2016, somewhere in there.

1    Q.    Was she in the same training that UDC

2   members receive from Dr. Harrell?

3    A.    I'm not entirely sure.  I just know she

4   mentioned that Dr. Harrell had kind of come and spoke

5   to them.  They had things that they had to do to be

6   RAs, and that was part of it, if you ever get a

7   Title IX or a complaint entered or anything like that.

8   And she was facilitating that course.

9    Q.    Okay.  And RA is resident assistant?

10   A.    Yes, ma'am.

11   Q.    For on-campus housing?

12   A.    Yes, ma'am.

13   Q.    Does your girlfriend have any -- did she

14  have any documents or recordings or anything of the

15  training that she said she received from Dr. Harrell?

16   A.    No, they didn't really -- there were no

17  documents or recordings.

18   Q.    When did she tell you this about

19  Dr. Harrell's training of her?

20   A.    It was a couple of years ago when we were

21  kind of going through everything when the cases were

22  first handled, the Title IX cases.  Around that time.

23   Q.    Do you have any evidence that any training

1   provided to UDC members, whether by Dr. Harrell or any

2   other source, was designed or presented in a way that

3   caused UDC members to have a bias in favor of one side

4   or another in Title IX cases?

5        A.   Not in the training I don't have anything.

6        Q.   Do you contend that Dr. Harrell had any

7   personal financial interest in your disciplinary

8   outcome?

9        A.   No, not that I know of.

10       Q.   And you met with Dr. Harrell, I think you

11  mentioned, when you were submitting your own Title IX

12  complaint against Roe 3 relating to a contraction of

13  an STD; is that right?

14       A.   Yes, ma'am.

15       Q.   And Dr. Harrell submitted your complaint for

16  further processing?

17       A.   Yes, ma'am.

18       Q.   And was your complaint against Roe 3

19  investigated and subject to a hearing before the UDC?

20       A.   Yes, ma'am.

21       Q.   And was your case against Roe 3 heard by the

22  UDC on March 27, 2017?

23       A.   Yes, ma'am.

1      Q.    Where was that hearing held?

2      A.    That was in -- I think it was the student

3  center, that one.

4      Q.    In March of 2017?

5      A.    There was one in the student center and

6  there was one in the library because we had to redo

7  one of them.

8      Q.    Okay.  You've been through three different

9  UDC hearings?

10      A.    Yes, ma'am.

11      Q.    Let's talk about the location of each of

12  them maybe in order.  That may help clear it up.

13      A.    The first one was Roe 1 and Roe 2.

14      Q.    Which was in November of 2016; right?

15      A.    Yes, ma'am.  It was in the student center.

16            The second was in the student center with

17  Roe 3.

18            And then the last one was in the library

19  with Roe 3.

20      Q.    Just so we have dates associated with those,

21  the first Roe 3 hearing, which was her complaint

22  against you and your complaint against her, was March

23  27, 2017.

1          And then the Roe 3 second hearing, which was

2     a rehearing of her complaint against you --

3          A.    Yes, ma'am.

4          Q.    -- that was in August of 2017; right?

5          A.    Yes, ma'am.

6          Q.    At the time of your first Roe 3 hearing,

7     March 27, 2017, which you said was in the student

8     center, were there any banners or posters hanging up

9     around the student center?

10         A.    Yes, ma'am.  They had them in various

11    locations, fliers and things.  "My cup is not my

12    consent" and just things about like drinking and

13    sexual assault and things of that nature.

14         Q.    Okay.  Had there been -- and we'll go

15    through some pictures later.  But had there been

16    posters or other displays in the student center at the

17    time of your first UDC hearing in November of 2016?

18         A.    I believe so.  They were there for several

19    months around the time -- I'm not entirely sure.  I

20    just know they were there for at least one or two of

21    the hearings.  I'm not sure exactly the time frame

22    that all those pictures were there.  I know they were

23    there for several months.

1    Q.   Were there any banners or signs around the

2  library where you held the August 2017 UDC hearing?

3    A.   Throughout the school actually there were

4  posters, kind of like posters or little plaques, like

5  various students posing, and they said things related

6  to like sexual assault.  One was like a student -- I

7  saw she was drinking and a guy was making a move, so I

8  stepped in.  Things like that.  There's some of those

9  in like the bathrooms and various areas on campus.

10  But the "my cup is not my consent" and like the huge

11  banners and things like that, no, ma'am, I don't

12  recall them being in the library for that one.

13    Q.   Were any of those pictures that you were

14  describing in the library?

15    A.   Yes, ma'am.  They keep them in the

16  bathrooms.  When you open the door, they generally

17  have them somewhere in the bathroom and things like

18  that.

19    Q.   And you saw them in March of 2017 in the

20  library?

21    A.   Yes, ma'am.

22    Q.   I'm sorry.  I meant August 2017.

23    A.   Yes, ma'am.  They're posted throughout

1    which was in March 2017?

2        A.    Yes, ma'am.

3        Q.    Was Dr. Agnew present at all during that

4    hearing?

5        A.    No, I don't believe so.

6        Q.    Do you contend that Kim Ortiz was biased

7    against you?

8        A.    No, ma'am.  She tried to -- I would say she

9    kept everything as fair for both parties, not just

10   myself.  She was very -- let me collect the facts,

11   here's what it is, here's your due process, here's

12   this, and the rest is between the UDC and the

13   plaintiff and the defendant.

14       Q.    Okay.  Did Mr. Green accompany you to all

15   three of your UDC hearings?

16       A.    Yes, ma'am.

17       Q.    Was that your choice to have Mr. Green

18   accompany you to all of those hearings?

19       A.    Yes, ma'am.  You're allowed to have an

20   advisor, whether it be paid or given to you, whoever

21   you want.  So I felt more comfortable having him as an

22   advisor.

23       Q.    On the morning of March 27, 2017, which was

1  that hearing and testify?

2       A.   Yes, ma'am.

3            (EXHIBIT 4 WAS MARKED

4             FOR IDENTIFICATION.)

5  BY MS. BITZER:

6       Q.   I show you what I've marked as Exhibit 4.

7  Do you recognize this as an email from Ms. Ortiz to

8  you confirming the March 2017 hearing?  And she says

9  here that it would be in the library.  Do you see

10 that?

11      A.   Yes, ma'am.

12      Q.   So was that hearing in March 2017 held in

13 the library or the student center?

14      A.   I guess it was in the library.

15      Q.   Do you contend that any members of the UDC

16 panel during your first hearing, which involved Roe 1

17 and Roe 2, were biased against you in their

18 decision-making?

19      A.   The first hearing -- I'm trying to remember

20 all the panel members.  I know in at least one of the

21 hearings -- or several of the hearings students had a

22 connection with Greek life, which is relatively small

23 on campus.   ▇Roe 1▇ and ▇Roe 3▇ were both in the same

```
1    sorority and involved in Greek life, so they had a
2    connection in that aspect.  And then I know one ROTC
3    student that had a connection with myself and Roe --
4    is  Roe 2  Roe 1 or Roe 2?
5         Q.    2.
6         A.    Roe 2.  He served on one.
7         Q.    One panel?
8         A.    Yes, ma'am.  He served on the Roe 1 and Roe
9    2 panel.
10        Q.    An ROTC student did?
11        A.    Yes, ma'am.
12        Q.    Who was that?
13        A.    Student MM
14        Q.    So if you were in ROTC at the time, you knew
15   him; right?
16        A.    Yes, ma'am.  He was about two years over me,
17   maybe a year or two over me.
18        Q.    And Roe 2 was in ROTC?
19        A.    Yes, ma'am.  She was a year over me.
20        Q.    Do you know if they were close personal
21   friends?
22        A.    I know they knew each other.  I don't know
23   if they -- as far as like hung out or anything on
```

1    weekends or anything like that.  I'm not entirely

2    sure.

3        Q.    You said [Student MM] served as a UDC panel

4    member?

5        A.    If I recall, yeah, I believe he was on one.

6        Q.    You said some were in Greek life, speaking

7    of the UDC panel members.  And I'm talking about your

8    first hearing.  Which UDC panel members were involved

9    in Greek life from the first hearing?

10       A.    I'm not actually entirely sure.  I just know

11   throughout -- it's been a little while, so I'm trying

12   to remember specific faces and things.  So it's a

13   little more difficult.  I know at least in one or two

14   of the three hearings one of the students -- or a

15   couple of the students were involved in Greek life, I

16   later found out.  But I don't recall in the first

17   hearing if they were involved in that one or not.  I

18   honestly don't.

19       Q.    Do you know if [UDC 6], UDC 6, was

20   involved in Greek life?

21       A.    I believe she was -- I think she was one of

22   them.

23       Q.    Do you know which sorority she was a member

1  of?

2       A.   No, ma'am, I don't.  I can't recall.

3       Q.   Do you know if ███ UDC 7 ███, UDC 7, was

4  involved in Greek life?

5       A.   I don't think she was.  I think there was

6  one male and one female.  I think the male was a KA,

7  Kappa Alpha, if I remember correctly, and I think one

8  female was in a sorority.  It was a larger guy.

9       Q.   So sitting here today, you can't tell me

10 which UDC members that heard your cases were involved

11 in Greek life?

12      A.   I don't remember off the top of my head at

13 this moment, no, ma'am.  It's been a little while.

14      Q.   What evidence do you have that any UDC

15 members who happened to be involved in Greek life were

16 actually biased against you?

17      A.   Other than just their connection throughout

18 Greek life.  I have no text or anything that said, oh,

19 yeah, here's clear evidence of bias.  No, ma'am, I

20 don't.

21      Q.   Do you have any evidence that any of the UDC

22 panel members during your first hearing prejudged you

23 before considering all the information presented

```
1    during the hearing?
2         A.   In one of the hearings --
3         Q.   That wasn't my question.  I'm asking about
4    the first hearing.
5         A.   No, I have no evidence that they were -- I
6    was prejudged.  No one directly said anything to me.
7         Q.   Do you contend that ████ UDC 6 ████, UDC 6,
8    harbored any actual bias against you when she served
9    on the UDC panel during your first hearing in November
10   of 2016?
11        A.   No.
12        Q.   Let's talk about the Roe 1 and Roe 2 matter
13   just a little bit.  Did your first notice of a pending
14   issue with Roe 1 and Roe 2 come in letters to you from
15   Kim Ortiz, the coordinator of student conduct?
16        A.   Yes, ma'am.  I received emails.
17             (EXHIBIT 5 WAS MARKED
18              FOR IDENTIFICATION.)
19   BY MS. BITZER:
20        Q.   Do you recognize Exhibit 5 as the initial
21   notice letters you received from Ms. Ortiz regarding
22   Roe 1 and Roe 2?
23        A.   Yes, ma'am.
```

```
1              (EXHIBIT 7 WAS MARKED
2               FOR IDENTIFICATION.)
3   BY MS. BITZER:
4       Q.    Is Exhibit 7 a summary of the interview that
5   you gave to Ms. Ortiz?
6       A.    Yes, ma'am.
7       Q.    And does it accurately reflect what you told
8   her during that interview?
9       A.    Yes, ma'am.
10      Q.    Was this interview sheet, Exhibit 7,
11  included in the information provided to the UDC panel
12  that heard the case in November 2016?
13      A.    I believe they were given this.
14      Q.    And during that first hearing, Roe 1 and Roe
15  2 hearing, did Roe 1 or Roe 2 mention a, quote, "Miss
16  Jane Doe," close quote?
17      A.    Yes, ma'am.
18      Q.    And did Ms. Ortiz or Dr. Agnew admonish them
19  for bringing her up?
20      A.    I believe they were instructed to not
21  reference any other Title IX hearings or anything like
22  that.
23      Q.    And the facts about your interaction with
```

1    Roe 3 were not discussed in any detail during that

2    hearing, were they?

3         A.    Not in detail.  Just kind of references.

4         Q.    Did you object during the hearing to their

5    mention of, quote, "Miss Jane Doe," close quote?

6         A.    Yes, ma'am.

7         Q.    And if you made such an objection, would

8    that be reflected in the recording of that hearing?

9         A.    It should.

10        Q.    Do you believe that Roe 1 and Roe 2's

11   mention of a, quote, "Miss Jane Doe," close quote, was

12   improper?

13        A.    Yes, ma'am.

14        Q.    And did you believe that other Title IX

15   issues should be -- strike that.

16             Did you believe that other Title IX issues

17   should not be discussed during that first hearing?

18        A.    I believe it helps create a fair and

19   unbiased atmosphere throughout the hearing, yes,

20   ma'am.

21        Q.    By not referencing other Title IX issues; is

22   that right?

23        A.    Yes, ma'am.

1      Q.   So while you didn't think it was proper for

2  them, Roe 1 and Roe 2, to bring up Miss Jane Doe, you

3  wanted to bring up another Title IX case involving Roe

4  1, didn't you?

5      A.   Yes, ma'am.

6      Q.   And you also wanted to bring up an issue

7  regarding a sexual encounter that Roe 1 and Roe 2 had

8  had earlier in the evening of the date of your

9  interaction with them; right?

10      A.   Yes, ma'am.

11      Q.   Did you want to bring in a student witness

12  against whom Roe 1 had made a Title IX complaint the

13  prior year?

14      A.   Yes, ma'am.

15      Q.   Was that Student 11, Student 11?

16      A.   Yes, ma'am.

17      Q.   Did he have an existing no-contact order

18  with Roe 1?

19      A.   Yes, ma'am.

20      Q.   And did you alert Ms. Ortiz the night before

21  the hearing that you intended to call him as a

22  witness?

23      A.   Yes, ma'am, we notified her.

1   Q.   The night before?

2   A.   I don't recall exactly when she was

3   notified.

4   Q.   Were you told by Ms. Ortiz to have him

5   submit a written statement instead of appearing?

6   A.   Yes, ma'am.

7        (EXHIBIT 8 WAS MARKED

8         FOR IDENTIFICATION.)

9   BY MS. BITZER:

10   Q.   Is Exhibit 8 Ms. Ortiz's email to you

11   notifying you to have Student 11 submit a written

12   statement?

13   A.   Yes, ma'am.

14   Q.   And did Student 11 provide you a written

15   statement?

16   A.   Yes, ma'am.

17   Q.   And was his written statement given to the

18   UDC panel for consideration?

19   A.   Yes, ma'am, I believe so.

20   Q.   And did you also read his statement into the

21   record there in front of the UDC panel members during

22   the hearing?

23   A.   Yes, ma'am, I did.

1    Q.   Were there any facts in Student 11's written

2    statement that talked about the underlying facts of

3    the night that you were with Roe 1 and Roe 2?

4    A.   No, ma'am.

5    Q.   The purpose of your providing that statement

6    of Student 11 was to challenge Roe 1, wasn't it?

7    A.   Her credibility, yes, ma'am.

8    Q.   And the UDC panel received that information;

9    right?

10   A.   Yes, ma'am.

11   Q.   Why do you think that you should be allowed

12   to introduce that evidence while at the same time the

13   mention of Miss Jane Doe by Roe 1 and Roe 2 should not

14   have been admitted?

15   A.   I'm not sure.

16   Q.   Was Roe 3's real name ever used during that

17   first hearing?

18   A.   I don't recall if anyone specifically said

19   her name.  I just know it was brought up, but I can't

20   remember the --

21   Q.   Well, what I see in the transcript is a Miss

22   Jane Doe.  Is that your recollection of how they

23   referred to her during that first hearing?

1      A.    I don't recall.

2      Q.    During that first hearing did you question

3  Roe 1 about her encounter with another male earlier in

4  the evening?

5      A.    Yes, ma'am.

6      Q.    So that information was before the UDC to

7  consider; is that right?

8      A.    Yes, ma'am.

9      Q.    You testified in October of 2017, which was

10  our preliminary injunction hearing, that Ms. Ortiz

11  chaired the first hearing in November of 2016, and you

12  had no objection to her serving as the UDC chair.  Do

13  you remember that?

14      A.    Yes, ma'am.

15      Q.    Did Dr. Agnew do anything during that first

16  hearing that you believed to be biased against you?

17      A.    I tried to call that other student -- not

18  Student 11, the one you just mentioned that they had

19  had an encounter with previously that evening, Jane 1

20  and 2 had an encounter with previously that evening.

21  And Dr. Agnew said it wasn't relevant, which I fully

22  believe it was relevant and established their sobriety

23  and willingness to consent previously that evening.

1  But like I said, she said it was not relevant, so I

2  was not allowed to call him.

3       Q.   So you said that you tried to call the other

4  witness?

5       A.   I wanted to call him, but Dr. Agnew said it

6  was, like I just said, not necessary, not an essential

7  witness, so I didn't need to call him.

8       Q.   Was he there, available to testify?

9       A.   No, no.  I was not even -- I was not allowed

10  to do -- I was not allowed -- I didn't know him

11  directly.  I just knew -- names were mentioned of the

12  guy they had slept with.  I knew he was an Air Force

13  cadet.  Like I said, I did not know him personally.

14       Q.   Did you know who he was?

15       A.   Yes, ma'am.  And then when I wanted to

16  contact him and call him in, they said no.

17       Q.   When did they tell you that?

18       A.   I don't recall the exact day.

19       Q.   Was that prior to the hearing?

20       A.   Yes, ma'am.

21       Q.   Do you have any written documentation about

22  that?

23       A.   Not that I can think of off the top of my

```
1   head.  It probably was verbal.
2        Q.   And was that conversation with Ms. Ortiz?
3        A.   I believe it was both Ms. Ortiz and
4   Dr. Agnew.
5        Q.   Did you meet with Dr. Agnew about that?
6        A.   No, ma'am.  My dealings were directly with
7   Ms. Ortiz.
8        Q.   Had you contacted that Air Force cadet?  Did
9   you call him and ask him to come to the hearing?
10        A.   No, ma'am.
11        Q.   And you did cross-examine and ask Roe 1
12   about her encounter with him earlier that night during
13   the hearing, didn't you?
14        A.   Yes, ma'am.
15        Q.   So my question had been whether Dr. Agnew
16   did anything during that first hearing that you
17   believe exhibited bias against you, and you mentioned
18   not being allowed to call a witness, which we just
19   heard your testimony about.  Is there anything else?
20        A.   I know on at least -- I'm trying to recall
21   which hearing.  I know she submitted facts that were
22   not previously determined to the UDC or findings of
23   fact before they were established.  I know witnesses
```

 1   were not sworn in, no sworn witness statements or

 2   anything like that.

 3        Q.   Were you sworn in when you testified before

 4   the UDC hearing?

 5        A.   There was no swearing in for these.

 6        Q.   Of anybody?

 7        A.   No, ma'am.  It was just give your statement.

 8        Q.   How does that demonstrate bias against you?

 9        A.   I just believe that it establishes a certain

10   understanding as far as -- in general, with the facts

11   of finding (sic), when she submitted those, it

12   creates -- there is no contest to this.  I can't

13   contest anything.  It makes my defense a little more

14   difficult, which I'm not exactly well traversed in the

15   legal field anyway.  And Mr. Green was only allowed to

16   be an advisor, so that made it difficult.

17             And then when I needed to call a key

18   witness, which I firmly believe would have proved my

19   innocence, I was denied that.  And I tried explaining

20   to them the connection and the reasoning behind me

21   having to call this individual.  But I was told he's

22   not important, his testimony is not needed.

23             So I feel like that shows some bias there,

1  especially when I'm fighting for my future and my

2  education and you're going to tell me my key witness

3  is not important and there's no need to call him.  I

4  believe that either shows -- that shows some form of

5  bias.  I can't think of why you would tell someone

6  they can't have a witness.

7      Q.    That key witness that you're talking about,

8  just to make sure I'm on the same page --

9      A.    The Air Force cadet.  I'm sorry.  The Air

10  Force cadet.

11      Q.    Okay.  And again, you didn't have him come

12  to the hearing to testify?

13      A.    No, ma'am, I was not allowed to.  And I

14  didn't push that.

15      Q.    What do you mean you weren't allowed to?

16      A.    I was told I couldn't have him.  I had to

17  follow their rules and how the school, the Title IX --

18  they have a way, I guess, that they conduct the

19  hearings and the manner in which they do things, their

20  procedures.

21      Q.    You could have asked him to come to the

22  hearing, couldn't you have?

23      A.    I didn't know him directly, but I was told

1   he couldn't make a statement.  So I can't tell someone

2   to show up and just have him kick in the door and give

3   testimony.

4        Q.   You knew his name, didn't you?

5        A.   I just knew a last name.  Like I said, I

6   didn't know him directly.  I just heard of him.

7        Q.   Did you know who he was?  Like could you

8   pick him out from a lineup?

9        A.   I probably could.

10       Q.   You knew him enough that you could have

11  found him or his contact information if you had

12  decided you wanted to bring him to the hearing?

13       A.   Yes, ma'am, I probably could have tracked

14  him down.  It's a relatively small campus.

15       Q.   Sure.  Okay.  Was Dr. Agnew present during

16  that first hearing, November of 2016, to primarily

17  assist Ms. Ortiz since that was Ms. Ortiz's first

18  experience chairing that?

19       A.   Yes, ma'am.  I believe she was there just

20  kind of as an advisor to her in case she got muddled

21  or anything throughout the process.

22       Q.   But Ms. Ortiz took the lead throughout that

23  hearing; right?

1                MR. GREEN:  Object to the form.  You can

2    answer.

3        A.   Yes, ma'am, I believe she was the lead on

4    that one.

5    BY MS. BITZER:

6        Q.   Did the UDC find you responsible on the

7    charges made by Roe 1 and Roe 2?

8        A.   Yes, ma'am, they did.

9        Q.   And did Ms. Ortiz notify you of that

10   decision by letter?

11       A.   Yes, ma'am, she did.

12                (EXHIBIT 9 WAS MARKED

13                 FOR IDENTIFICATION.)

14   BY MS. BITZER:

15       Q.   Do you recognize Exhibit 9?

16       A.   Yes, ma'am.

17       Q.   And this is a letter that Ms. Ortiz sent you

18   notifying you of the UDC's finding of responsible in

19   the Roe 1 and Roe 2 charges?

20       A.   Yes, ma'am.

21       Q.   Did you appeal this decision to

22   Dr. Mitchell?

23       A.   Yes, ma'am, I did.

```
 1              (EXHIBIT 10 WAS MARKED
 2               FOR IDENTIFICATION.)
 3   BY MS. BITZER:
 4       Q.    Do you recognize Exhibit 10 as the appeal
 5   that you submitted?
 6       A.    Yes, ma'am.
 7       Q.    Prior to the first hearing, the Roe 1 and
 8   Roe 2 hearing, were any instructions provided to the
 9   parties by Ms. Ortiz or otherwise about not
10   referencing any other cases?
11       A.    I believe so.
12       Q.    When did she do that?
13       A.    They were told -- we were told before the
14   hearing not to mention any other cases, previous Title
15   IX or other Title IX hearings.
16       Q.    Did Ms. Ortiz tell you that?
17       A.    Yes, ma'am.
18       Q.    She told you and Roe 1 and Roe 2 that?
19       A.    Yes, ma'am, I believe so.
20       Q.    Are there any written rules or policies that
21   Roe 1 or Roe 2 violated by mentioning Miss Jane Doe in
22   that first hearing?
23       A.    I don't recall any like direct policy in the
```

1   Title IX proceedings that says you can't reference

2   another hearing.

3        Q.   Now, you mentioned a few minutes ago some

4   findings of fact that Dr. Agnew prepared.

5        A.   Yes, ma'am.

6             (EXHIBIT 11 WAS MARKED

7              FOR IDENTIFICATION.)

8   BY MS. BITZER:

9        Q.   Is Exhibit 11 that I've just handed you the

10  document to which you're referring as the findings of

11  fact that she prepared?

12       A.   Yes, ma'am.

13       Q.   And was this document in the UDC packet in

14  the first hearing?

15       A.   Yes, ma'am.

16       Q.   Did you object to this document's inclusion

17  in the UDC packet prior to the hearing?

18       A.   Yes, ma'am.

19       Q.   To whom did you object?

20       A.   I believe it was to Ms. Ortiz and -- I think

21  it was Ms. Ortiz that we objected to or brought it up

22  to.

23       Q.   Did you object in writing?

1      A.    I don't recall.  I can't remember if it was

2   verbal or written.

3      Q.    Did you object at the hearing --

4      A.    No, ma'am.

5      Q.     -- to this document's inclusion in the UDC

6   packet?

7      A.    No, ma'am, I don't think I did.

8      Q.    Did you ask the UDC during that hearing to

9   not consider this document in its deliberation?

10      A.    No, ma'am, I don't think so.

11      Q.    Now, Dr. Agnew had served as one of the

12   investigators in the Roe 1 and Roe 2 matter, didn't

13   she?

14      A.    Yes, ma'am, she handled Roe 1 and Roe 2,

15   collected evidence and statements and things like

16   that.

17      Q.    And Ms. Ortiz also served as an investigator

18   in that matter; right?

19      A.    Yes, ma'am.  She handled collecting my

20   statement.  I think they tried to keep us separated so

21   different investigators were collecting things.

22      Q.    Do you have any evidence that Dr. Agnew

23   prepared this document, Exhibit 11, while harboring

1  personal animosity towards you or with a purpose to

2  harm you?

3              MR. GREEN:  Object to the form.

4  BY MS. BITZER:

5      Q.   You can answer.  He can state his objection

6  on the record, but you still --

7              MR. GREEN:  I think he had a question.

8              THE WITNESS:  I don't know what that means.

9  I don't speak lawyer --

10  BY MS. BITZER:

11      Q.   Right.  When I ask a question, your attorney

12  has a right to make an objection.  But you still have

13  to answer my question.

14      A.   Oh, okay.

15      Q.   It's procedural.

16      A.   Okay.

17      Q.   Do I need to restate it?

18      A.   Yes, please.

19      Q.   Sure.  Do you have any evidence that

20  Dr. Agnew prepared this document, Exhibit 11, while

21  harboring personal animosity towards you or with the

22  purpose to harm you personally?

23      A.   When you say "evidence," do you mean like do

1    I have like a text message or something that shows she

2    was out to get me or anything like that?

3        Q.   Any kind of evidence.

4        A.   No, ma'am, I don't have any.

5        Q.   Do you have any evidence that Dr. Agnew

6    prepared this document with the intent for the UDC to

7    find you responsible in that case?

8        A.   I don't have any evidence.

9        Q.   Do you have any evidence that Dr. Agnew

10   utilized any information outside of what had been

11   gathered during the investigation process in preparing

12   this document?

13       A.   I was not around for any of the

14   investigation, so I can't speak to what she may or may

15   not have done.

16       Q.   Was all of the investigation material

17   provided to the UDC for consideration, including this

18   summary?

19       A.   That I'm aware of.

20       Q.   Did you present evidence or testimony at the

21   hearing to refute or rebut any of these things that

22   are listed as findings in Exhibit 11?

23       A.   I don't recall.

1       Q.   Do you dispute that Roe 1 and Roe 2 consumed
2    alcohol both on and off campus?
3       A.   Are you referring to the evening in
4    question?
5       Q.   Yes.
6       A.   I know they consumed off campus, but in my
7    presence I never saw them drink alcohol.
8       Q.   But you weren't with them the entire
9    evening, were you?
10      A.   No, ma'am.
11      Q.   So they may have consumed alcohol on campus
12   and you just didn't see them; is that right?
13      A.   I was with them for the majority of time
14   they were on campus.
15      Q.   So did you dispute that they consumed
16   alcohol on campus?
17      A.   Yes, ma'am, I believe I did.
18      Q.   And did you present evidence of that to the
19   UDC during that hearing?
20      A.   I had nothing other than my word.  So yes,
21   ma'am.
22      Q.   But you testified --
23      A.   Yes, ma'am.

```
1        Q.      -- regarding the lack of alcohol while you
2   were with them; is that fair?
3        A.      Yes, ma'am, I did.
4        Q.      Do you dispute that the drivers were
5   credible?
6        A.      The singular driver?
7        Q.      Well, it's in the second bullet point:
8                "A credible witness who
9                 transported the complainants
10                from campus to the off-campus
11                party ..."
12               That was Student 1, I believe, [Student 1]
13  [Student 1] Is that your recollection of who that was?
14       A.      Yes, ma'am.  She was a sorority sister and
15  good friend of Roe 2 -- or Roe 1, I'm sorry, [Roe 1]
16  Roe 1, and also knew Roe 3 because they were all in
17  the same sorority.
18       Q.      Do you dispute that she was credible when
19  describing them as drunk?
20       A.      Yes, ma'am.
21       Q.      The third bullet point says:
22               "A credible witness who
23                transported the complainants
```

1          from the party to campus at

2          3 a.m. described the

3          complainants as, quote, 'they

4          were gone,' (meaning very

5          drunk)."

6          Was that witness Student 4, █████Student 4█████?

7     A.   Yes, ma'am.

8     Q.   Do you dispute that he was credible?

9     A.   In that aspect, yes.  I would call into

10   question the credibility of that statement.

11    Q.   He came and testified at that hearing,

12   didn't he?  And did you ask him questions?

13         MR. GREEN:  You need to say yes or no for

14   the record.

15    A.   Yes, ma'am.

16   BY MS. BITZER:

17    Q.   And was he asked questions by both sides in

18   the UDC?

19    A.   I believe so.

20    Q.   Do you dispute that sexual intercourse

21   occurred?

22    A.   No, ma'am.

23         MR. GREEN:  Object to the form as to who.

BY MS. BITZER:

    Q.   Okay.  Well, looking at Exhibit 11, it says under the undisputed facts, last bullet point:

             "Sexual intercourse occurred

           between the respondent and each

           complainant."

    Do you agree with that?

    A.   Yes, ma'am.

    Q.   Now, there is a paragraph that says "Disputed," a bullet point.  Is this disputed statement, is that a correct statement of the issue to be decided by the University Disciplinary Committee?

    MR. GREEN:  Object to the form.  You can answer.

    A.   Yes, ma'am, I suppose that's the disputed question.

    Q.   Right.  That was the disputed question for the UDC to decide during that hearing; right?

    A.   Yes, ma'am.

    Q.   So you agree that the issue was properly framed?

    MR. GREEN:  Object to the form.

    A.   Can you rephrase the question, I guess?  I'm

1    improper.  I didn't really know any of them anyway.

2         Q.   And you haven't had any of those

3    conversations since?

4         A.   No, ma'am, no.

5              (EXHIBIT 12 WAS MARKED

6               FOR IDENTIFICATION.)

7    BY MS. BITZER:

8         Q.   I'll show you what I'm marking as

9    Exhibit 12.  Do you know who prepared this timeline?

10        A.   It was either Agnew or Ortiz.  I don't

11   recall exactly.

12        Q.   Do you contend there was anything improper

13   or wrong about this timeline being included in the UDC

14   packet?

15        A.   No, ma'am.

16        Q.   Do you have any -- do you take issue or do

17   you refute any of the information on this timeline?

18   Or does it appear accurate to you?

19        A.   It looks accurate.

20        Q.   Do you have any evidence that Dr. Agnew

21   coached the first hearing UDC members in the Roe 1 and

22   Roe 2 hearing in their deliberations?

23              MR. GREEN: Object to the form.  You can

1   answer.

2        A.   I know she was involved in the deliberation

3   process.  She sat in and gave recommendations and kind

4   of facilitated their discussion.

5   BY MS. BITZER:

6        Q.   Do you know that she did that in the first

7   hearing?

8        A.   Yes, ma'am.  I think it was Ms. Ortiz that

9   told us this.

10       Q.   When did she tell you that?

11       A.   In a discussion after.  I don't recall the

12   exact time.

13       Q.   How was Ms. -- I'm sorry -- how was

14   Dr. Agnew involved in the deliberation process with

15   the first UDC panel?

16       A.   Since I wasn't there, I don't know the

17   entirety of it.  I just know she facilitated the

18   conversation a little bit and made recommendations as

19   far as punishment.  But like I said, since I was not

20   there, I don't know the entire depth of her

21   involvement.

22       Q.   Did she provide recommendations regarding a

23   responsible or nonresponsible finding?

1    A.   I'm not entirely sure.  I just know she

2   provided recommendations at least for punishment.  But

3   I don't know -- I don't know if she said guilty or not

4   guilty.  I'm not entirely sure.  She may or may not

5   have.

6    Q.   Do you know what her recommendations were

7   regarding punishment?

8    A.   I don't recall off the top of my head.  I

9   just know the ones that I got.  But I don't know if

10   she suggested them or who suggested them.

11    Q.   And all of this information comes to you

12   from Ms. Ortiz?

13    A.   Yes, ma'am.  And then I think some of the

14   recordings, bits and pieces.  But yeah, most of it was

15   just from after the fact.

16    Q.   Are deliberations recorded?

17    A.   I don't believe they're recorded.  I don't

18   recall.  I don't think so.

19    Q.   We've already looked at the appeal that you

20   submitted to Dr. Mitchell regarding the Roe 1 and

21   Roe 2 finding.  Did Dr. Mitchell take your concern

22   into account on appeal about that investigative

23   finding, document, Exhibit 11, during his appellate

1     Q.    And he lowered your sanction that had been

2    shared with you by Ms. Ortiz earlier while upholding

3    the responsible finding; correct?

4     A.    Yes, ma'am.

5     Q.    Did Dr. Mitchell revise your sanction

6    regarding housing -- which I think you were just

7    mentioning -- allowing you to remain in your currently

8    assigned housing?

9     A.    If I remember correct, I was originally told

10   I would have to live off campus entirely.  But in this

11   one, in the appeal, I was allowed to stay on campus.

12   I just had to go to the Delta.  And when I found that

13   out, I brought it up because I found out they were

14   moving off campus entirely.  So I requested that,

15   since they were leaving, that I be allowed to stay in

16   my own dorm with my roommate and not have to move.

17              (EXHIBIT 14 WAS MARKED

18               FOR IDENTIFICATION.)

19   BY MS. BITZER:

20    Q.    Do you recognize Exhibit 14 as a memo you

21   received from Dr. Mitchell revising that housing

22   sanction?

23    A.    Yes.

1      Q.    And you were able to maintain your

2   residential assignment?

3      A.    Yes, ma'am, I was.

4           MS. BITZER:  Do y'all want to take a

5   five-minute break?

6           MR. GREEN:  That would be great.

7           (A RECESS WAS TAKEN FROM 10:55 A.M.

8            TO 11:05 A.M.)

9   BY MS. BITZER:

10     Q.    Do you contend that any of the UDC panel

11  members hearing your cases had a personal stake in the

12  outcome of those hearings?

13     A.    Not that I know of.

14     Q.    Do you contend that any of the UDC panel

15  members hearing your cases had a financial stake in

16  the outcome of any of your hearings?

17     A.    Not that I can think of.

18     Q.    Do you contend that any of the UDC panel

19  members hearing your cases prejudged the outcome of

20  your hearings?

21     A.    I mean they could have.  I don't have, like

22  I said, any direct evidence that shows that they did.

23     Q.    Do you contend that any of the UDC panel

1    members hearing your cases harbored personal animosity

2    against you?

3         A.   Not that I know of.

4         Q.   Do you contend that Dr. Mitchell had any

5    pecuniary or financial interest in the outcome of your

6    disciplinary processes?

7         A.   I don't think so.

8         Q.   Do you contend that Dr. Agnew had any

9    pecuniary or financial interest in the outcome of your

10   disciplinary processes?

11        A.   No, ma'am.

12        Q.   Do you contend that Dr. Harrell had any

13   pecuniary or financial interest in the outcome of your

14   disciplinary processes?

15        A.   I don't think so.

16        Q.   Do you contend that Dr. Mitchell had a

17   personal interest or stake in any particular outcome

18   of your disciplinary processes?

19        A.   I suppose not.

20        Q.   Do you contend that Dr. Mitchell harbored

21   any personal animosity against you?

22        A.   I don't think he exactly enjoyed seeing me

23   in his office, but I don't think he specifically had

1   any vendetta against me.

2       Q.   Do you contend that Dr. Agnew had a personal

3   interest or stake in any particular outcome in your

4   disciplinary processes?

5       A.   Similar to Dr. Mitchell.  I don't think they

6   exactly wanted to find me not responsible, but I don't

7   think they had a vendetta, were out to get me, or make

8   it any worse than it had to be.

9       Q.   Do you contend that Dr. Agnew harbored

10  personal animosity against you?

11      A.   I don't think she liked me very much.

12      Q.   Why do you say that?

13      A.   I mean she wasn't -- just due to how she

14  handled the hearings and general conduct like with

15  Dr. Mitchell, as well, and her both.  I just didn't

16  get the feeling they liked me very much.

17      Q.   Do you have any -- that's just a feeling you

18  have, though?

19      A.   Just based off the way they handled the

20  proceedings.  Like I said, it felt a little more

21  biased and unfair, a little more weighted towards the

22  plaintiffs, not so much the defendant.  So it gave me

23  the impression that they wanted to find me

1   responsible; they didn't like me very much based off

2   of how they handled all these proceedings.

3        Q.   Why do you think they didn't like you?

4        A.   I mean I would say due to the fact of what I

5   was being accused of.  And given the atmosphere around

6   certain accusations like that, especially in today's

7   climate, I can see where it would be harder to give

8   someone a fair and unbiased hearing and the benefit of

9   the doubt, at least.  So I guess to me it looked like,

10  because of what I was being accused of, they just

11  wanted to find me responsible without giving me a fair

12  hearing.  And I wasn't exactly making it easy on them.

13  I was kind of fighting it every step of the way,

14  especially with my advisor helping me.

15       Q.   You made an allegation in your complaint --

16  I'm not going to attach a copy as an exhibit.  It's

17  already in.

18            MR. GREEN:  Is this the amended complaint or

19  complaint?

20            MS. BITZER: First Amended Verified

21  Complaint.

22       Q.   I just have a copy for you to be able to

23  refer to for purposes of my question, if you need to.

1  And let me ask my question first.

2          You allege in paragraph 245 of your First

3  Amended Verified Complaint that Dr. Agnew removed

4  Student 2's witness statement from the UDC packet in

5  the second Roe 3 hearing; is that correct?

6      A.    Let me see.  It says Ortiz in this.

7      Q.    Paragraph 245?

8      A.    Oh, I'm sorry.

9      Q.    That's okay.  I want to make sure we're on

10  the same page.  Let's look at paragraph 245.  You

11  allege here that Dr. Agnew removed Student 2's witness

12  statement from the UDC packet.  And this is in

13  connection with the second Roe 3 hearing, so your last

14  hearing in August 2017.

15      A.    Yes, ma'am.

16      Q.    And Student 2, for our purposes of

17  discussion, is   Student 2  ; is that right?

18      A.    Yes, ma'am.

19              (EXHIBIT 15 WAS MARKED

20               FOR IDENTIFICATION.)

21  BY MS. BITZER:

22      Q.    Is Exhibit 15 the statement that you're

23  referring to in paragraph 245 of the complaint that

1   was removed?

2          MR. GREEN:  That's ██Student 11██'s statement.

3          MS. BITZER:  I'm sorry.  I made an error.  I

4   apologize.  I handed you the wrong document.  I'll try

5   again.

6          (EXHIBIT 15 WAS REMARKED.)

7   BY MS. BITZER:

8      Q.   I apologize.  I'll hand you again what I

9   have now correctly marked as my intended Exhibit 15.

10  Is Exhibit 15 the statement of Student 2 that you're

11  referring to as being removed from the UDC packet?

12     A.   (Document review.)  Yes, ma'am.

13     Q.   Had you requested that all witness

14  statements be removed from the UDC packet if those

15  witnesses were not present to be cross-examined?

16     A.   I don't recall if I did or not.

17     Q.   Had you requested that no information

18  regarding prior proceedings in which you were the

19  respondent be included for the UDC's review?

20     A.   Yes, ma'am, I did ask that no prior hearings

21  be brought up, just that it was focused on the one

22  that was present.

23     Q.   And doesn't Student 2's statement here,

1    Exhibit 15, reference your conduct with Roe 1 and Roe

2    2 which was the subject of the first UDC hearing?

3        A.   Yes, ma'am, it does mention it.

4        Q.   All right.  Let me ask you about some

5    documents.

6             (EXHIBIT 16 WAS MARKED

7              FOR IDENTIFICATION.)

8    BY MS. BITZER:

9        Q.   If you'll take a look at Exhibit 16.  Do you

10   recognize this as the initial notice and no-contact

11   order letters that you received regarding Roe 3's

12   complaint against you?

13       A.   Yes, ma'am.

14            (EXHIBIT 17 WAS MARKED

15             FOR IDENTIFICATION.)

16   BY MS. BITZER:

17       Q.   Is Exhibit 17 the second notice letter you

18   received from Ms. Ortiz with more details of the

19   allegations made by Roe 3 against you?

20       A.   Yes, ma'am.

21       Q.   A few months later in February 2017 you made

22   a complaint against Roe 3 for sexual misconduct

23   alleging that you were knowingly exposed to an STD

1    Q.   So was the hearing then rescheduled and in

2    fact heard on March 27, 2017?

3    A.   Yes, ma'am, they did reschedule it for me.

4    Q.   And again, both charges were heard in that

5    hearing; correct?  Roe 3's charge against you and your

6    charge against Roe 3; right?

7    A.   Yes, ma'am, they did them both at the same

8    time.

9    Q.   Did Ms. Ortiz handle that hearing as the UDC

10   chair on her own?

11   A.   That one was Dr. Agnew.  The second Roe 3

12   hearing, so the third hearing?

13   Q.   No.  I'm talking about the first Roe 3

14   hearing.  So it would have been your second total

15   hearing, the first one with you and Roe 3, in March

16   right after you had the assault at Midnight Rodeo.

17   A.   It was Ms. Ortiz that handled that.

18   Q.   Dr. Agnew was not present at all?

19   A.   No.  I believe that was the one she recused

20   herself from.

21   Q.   You had objected to her participating, and

22   she stepped away, didn't she?

23   A.   Yes, ma'am.

1    Q.   Did you receive a letter the day after that
2  hearing notifying you of the decision by the UDC that
3  you were responsible on the sexual violence charge
4  made against you by Roe 3?
5    A.   Yes, ma'am.
6         (EXHIBIT 21 WAS MARKED
7          FOR IDENTIFICATION.)
8  BY MS. BITZER:
9    Q.   Is Exhibit 21 that letter?
10    A.   Yes, ma'am.
11    Q.   Did the UDC find Roe 3 not responsible on
12  your charge against her for sexual violence relating
13  to the STD?
14    A.   Yes, ma'am, they found her not responsible.
15         (EXHIBIT 22 WAS MARKED
16          FOR IDENTIFICATION.)
17  BY MS. BITZER:
18    Q.   Is Exhibit 22 the notice letter you received
19  regarding the decision on your charge against Roe 3?
20    A.   Yes, ma'am.
21    Q.   Did you submit an appeal to Dr. Mitchell on
22  both of those charges?
23    A.   Yes, ma'am, I did.

```
1                    (EXHIBIT 23 WAS MARKED

2                     FOR IDENTIFICATION.)

3    BY MS. BITZER:

4         Q.   Do you recognize Exhibit 23 as the appeal

5    that you submitted to Dr. Mitchell?

6         A.   Yes, ma'am.

7         Q.   Did you and Attorney Green meet with

8    Dr. Mitchell regarding this appeal from the Roe 3

9    cases?

10        A.   I believe we did meet with him on the

11   matter.

12                   (EXHIBIT 24 WAS MARKED

13                    FOR IDENTIFICATION.)

14   BY MS. BITZER:

15        Q.   Do you recognize Exhibit 24 as

16   Dr. Mitchell's appeal decision letter to you dated May

17   2, 2017?

18        A.   Yes, ma'am.

19        Q.   And did he order a new hearing on the charge

20   against you while affirming the not responsible

21   finding for Roe 3 in the charge you made against her?

22        A.   Yes, ma'am.

23        Q.   You made another allegation in your
```

1    complaint in paragraph 302.  You might want to flip to

2    it.  It's on page 58.

3         A.    Okay.

4         Q.    You allege in paragraph 302 of your amended

5    complaint that Dr. Agnew actively invaded the privacy

6    of the UDC in each of the UDC's deliberations in Roe 1

7    and Roe 2 and in the second Roe 3 deliberations.  Do

8    you see that?

9         A.    Yes, ma'am.

10        Q.    What do you mean by "actively invaded the

11   privacy"?

12        A.    Like I stated in the complaint as far as

13   producing findings of fact before the UDC, her

14   assistance in facilitating the recommendations, and

15   then -- I'm trying to remember the specific hearing.

16   But in one of them, without being notified, she and

17   Dr. Mitchell had overturned the UDC's original

18   recommendation and they had given their own.  I don't

19   recall specifically which one.

20             But yes, as listed in the complaint, that is

21   why I would say that she invaded the privacy of the

22   UDC throughout the deliberations.

23        Q.    Okay.  And so you listed three things.  The

1    findings of fact -- and that's the exhibit we were

2    looking at earlier.  I believe it was Exhibit  --

3         A.    11.

4         Q.     -- 11.  That was only in the Roe 1 and Roe

5    2 hearing; right?

6         A.    Uh-huh, yes, ma'am.

7         Q.    Do you have any evidence that she submitted

8    or shared with the Roe 3 second hearing panel any

9    findings of fact from the investigation?

10        A.    Not as she did in the first one.  I don't

11   recall that she did.

12        Q.    You mentioned that Dr. Agnew facilitated

13   recommendations.  What do you mean by that?

14        A.    She -- I can't remember the specific

15   hearing.  I know after one of them the UDC gave their

16   recommendation for punishment, and then she and

17   Dr. Mitchell -- I believe he was involved in it as

18   well -- overturned theirs and gave their own

19   recommendations.

20        Q.    So the UDC only recommends sanctions; right?

21   They're not the conduct administrator who actually

22   imposes the sanctions; is that right?

23        A.    I believe so.

1    Q.   Do you have any evidence that Dr. Agnew

2    recommended any particular finding, responsible or not

3    responsible, to the UDC panel members in any of their

4    deliberations?

5    A.   I wasn't specifically in the room.  She may

6    or may not have.

7    Q.   You don't know, do you?

8    A.   No, ma'am.  I wasn't allowed to be in the

9    room.

10    Q.   You heard testimony during our preliminary

11    injunction hearing in October of 2017 that Dr. Agnew

12    facilitated discussions in the August 2017 UDC

13    deliberations, which was the second Roe 2 hearing.

14    A.   Yes, ma'am.

15         MS. HART:  Second Roe 3 hearing.

16         MS. BITZER:  I'm sorry.  Thanks for

17    correcting me.

18    Q.   You heard testimony during the preliminary

19    injunction hearing that Dr. Agnew facilitated

20    discussions in the second Roe 3 hearing in August of

21    2017 but that she did not express opinions or vote on

22    the responsible finding.

23         Do you have any evidence pointing to the

1    contrary?

2        A.    Just her word versus mine.

3        Q.    Well, do you have any evidence to support

4    your word in terms of whether she expressed opinions

5    or voted on a responsible finding in the second Roe 3

6    hearing?

7        A.    No, ma'am, because I wasn't allowed to be in

8    there.

9        Q.    There was also testimony during the

10   preliminary injunction hearing that at the second

11   Roe 3 hearing in August 2017 that the UDC panel had

12   decided on its recommended sanctions before Dr. Agnew

13   then asked a hypothetical question regarding possible

14   other or different sanctions if the same type of case

15   and finding came up again.

16            Do you have any evidence that Dr. Agnew

17   posed the hypothetical question because of any actual

18   bias she harbored against you?

19       A.    I would say it definitely indicates that.

20   Why else would you ask that question?

21       Q.    Well, she knew that you were already on

22   conduct probation; right?

23       A.    Yes, ma'am.

1          Q.    Did the UDC panel members in that second

2    Roe 3 hearing know that you were on conduct probation?

3          A.    I'm trying to remember if it was brought up.

4                MR. GREEN: Object to the form.

5          A.    I can't remember if it was brought up or

6    not.  I know that there had been mention of like

7    previous hearings and other Title IX issues.  I can't

8    recall if it was brought up that I was already on

9    conduct -- already in trouble, I guess.  I can't

10   recall.

11   BY MS. BITZER:

12         Q.    Did you want the second Roe 3 UDC panel to

13   know that you were already on conduct probation at the

14   time they heard that case?

15         A.    Absolutely not.

16         Q.    Do you have any evidence that members of the

17   UDC for the second Roe 3 hearing knew you were already

18   on conduct probation when they were considering their

19   recommended sanctions after finding you responsible?

20         A.    They could have.  I mean the plaintiffs --

21   or Roes 1, 2, and 3 weren't exactly quiet about it,

22   given their connection.  They were very vocal about it

23   even after being told to not bring it up.  So they

1  very well could have -- word could have gotten to any

2  of the panel members.  Like I said, throughout most of

3  the hearings it was brought up that I had other

4  hearings or there were other issues, and then there

5  was also the instance where we had panel members that

6  served on multiple UDCs.  So yes, it's extremely

7  possible that they could have known without the

8  hypothetical question being brought up, which could be

9  an indicator that I was already in trouble.

10       Q.   Since you were already on conduct probation,

11  do you believe that the imposition of the same

12  sanction, probation through the remainder of your

13  academic career, would be appropriate if you had been

14  found responsible on this new charge?

15            MR. GREEN: Object to the form.  You can

16  answer.

17       A.   I mean, yeah, it would have been better to

18  just be on probation.

19  BY MS. BITZER:

20       Q.   Let's look at Exhibit 9 to the amended

21  complaint.  I'm not going to mark it because it's

22  already an exhibit to your complaint.  I'll just let

23  you look at that, if you would.

1   possible.  But I have no like text messages or
2   direct -- where someone stated that they were biased
3   or were going to find me responsible or anything like
4   that, no.
5       Q.   Do you have any evidence that any of those
6   UDC panel members serving during your first Roe 3
7   hearing in March 2017 harbored any personal animosity
8   against you or that they prejudged you?
9       A.   They could have.  But no, I don't know
10  entirely for sure.
11      Q.   Do you contend that members of the UDC panel
12  during your second Roe 3 hearing in August 2017 were
13  biased against you in their decision-making?
14      A.    It's not out of the realm of possibility,
15  but I do not know for sure with 100 percent certainty.
16      Q.   Do you have any evidence that any of those
17  second Roe 3 hearing UDC panel members harbored any
18  personal animosity against you?
19      A.    It's possible, but not for 100 percent
20  certainty.
21      Q.   Do you have any evidence that Dr. Mitchell
22  did or attempted to influence any UDC members in
23  connection with their review, deliberation, and

1   decision in your cases?

2       A.   It was Dr. Agnew that -- not that I know of,

3   no.  I have no direct evidence.

4       Q.   Do you have any evidence that Krista Harrell

5   did or attempted to influence any UDC members in

6   connection with their review, deliberation, and

7   decision in your cases?

8       A.   She could have, but I can't recall anything

9   right off the top of my head.

10       Q.   Do you have any evidence that Dr. Agnew did

11   or attempted to influence any UDC members in

12   connection with their review, deliberation, and

13   decision in your cases?

14       A.   I know with -- like I previously stated, her

15   coaching them and facilitating their discussions and

16   her level of involvement, I would say so.

17       Q.   Now, you have alleged that certain Facebook

18   or other connections among UDC members,

19   administrators, the Roes, or other persons connected

20   to the Roes demonstrate bias.  And Judge Granade in

21   her order has previously stated that Facebook

22   connections or other casual acquaintances are not

23   enough to establish actual bias.

1          So my question is:  Do you have any evidence

2    to establish that those UDC members or administrators

3    who you identified as having a Facebook connection or

4    some other casual knowledge of or working relationship

5    with others caused the decision-makers to have some

6    actual bias against you?

7               MR. GREEN:  Object to the form.  You can

8    answer.

9         A.    I believe it shows -- not so much just

10   because they weren't hanging out on a regular basis

11   and best friends -- but I believe it does establish a

12   pattern, it shows a connection.  Like I said, I don't

13   know the entire depth.  They may have had more of an

14   in-depth relationship.  That's just what I was able to

15   discover on my own with my resources.  But the depth

16   of their relationships in general could have been much

17   deeper.  But that was all I was able to establish with

18   the resources that I had.  But I believe it does show,

19   to at least some extent, that they knew them, they had

20   the ability to get in contact with them.

21              MR. GREEN:  Excuse me.  Try to use names and

22   not they or she or he.

23        A.    The UDC members, Dr. Agnew, Dr. Harrell,

1   Jane Roe 1, 2, and 3, they had the ability to contact
2   each other to some extent and regardless had some
3   knowledge and connection to each other.
4   BY MS. BITZER:
5       Q.   Do you have any evidence that any of those
6   persons with those connections actually reached out to
7   the other to try to influence them to make a decision
8   one way or the other in your cases?
9       A.   It's entirely possible, but I was not privy
10  to their private conversations.  So that's between
11  them and whoever they had the conversation with if
12  they did have it.
13      Q.   Okay.  Do you have any evidence that
14  Dr. Mitchell's Facebook connection with ▇UDC 1▇
15  ▇UDC 1▇, who has been identified as UDC 1 in the Roe 3
16  second hearing, influenced or caused Ms. ▇UDC 1▇ to
17  harbor some actual bias against you or improperly
18  influenced her in her decision as a UDC panel member?
19      A.   Like I said, his Facebook connection with
20  her, the extent of their relationship, I don't know
21  entirely.  But it's a possibility.  But I don't have
22  any direct evidence that Dr. Mitchell tried to
23  influence her decision or reached out to her.  It's

1    possible, but nothing concrete.

2         Q.   Do you have any evidence that Dr. Agnew's

3    involvement as the UDC chair and facilitator during

4    the second Roe 3 hearing influenced or swayed UDC 1's

5    decision one way or the other?

6         A.   As I previously mentioned, she was heavily

7    involved in the hearings and throughout the

8    investigation process and I believe overstepped a lot

9    of boundaries, as I previously mentioned, throughout

10   this.  It's a possibility.

11        Q.   Do you have any evidence that Dr. Mitchell's

12   Facebook connection to Roe 3's athlete boyfriend

13   influenced or caused Dr. Mitchell to harbor any bias

14   against you?

15        A.   I do think he was a very well-known person

16   on campus, very respected athlete.  And the school

17   tends to -- obviously schools tend to treat the

18   athletes pretty well.  It's a possibility it could

19   have influenced her.  I know their dating relationship

20   was rather public, so it could have.  But I don't have

21   anything concrete that shows this influenced his

22   decision.

23        Q.   Do you have any evidence that UDC 3, who was

1    ██████ UDC 3 ██████ who served on the second Roe 3 panel

2    and had a Facebook connection to Roe 3, do you have

3    any evidence that that Facebook connection improperly

4    influenced or caused him to harbor actual bias against

5    you?

6         A.   I think UDC 3 was the one who was in a

7    fraternity, if I remember correctly.  But other than

8    their connection in that aspect, I have nothing that

9    shows any direct bias.  He never explicitly stated

10   anything, to my knowledge.

11        Q.   And he actually testified at the preliminary

12   injunction hearing, didn't he?

13        A.   He did.

14        Q.   Do you have any evidence that UDC 3 and

15   Roe 3 were close personal friends?

16             MR. GREEN:  Object to the form.  Go ahead.

17        A.   I had never personally seen them together.

18   Like I say, they may or may not have.  South is a

19   relatively small community when you stay on campus.

20   It's not out of the realm of possibility, but I can't

21   say with 100 percent certainty.

22   BY MS. BITZER:

23        Q.   Do you have any evidence that UDC 5, UDC 5

1  UDC 5 - that his Facebook connection to Roe 3 caused

2  him to have bias in her favor and against you in his

3  service on the UDC during the August 2017 hearing?

4      A.   As with the others, I don't know the level

5  of their connection.  They may have known each other a

6  little more than just by Facebook, so it's a

7  possibility.

8      Q.   During the preliminary injunction hearing,

9  UDC 5 testified that he knew of Roe 3 but was not

10  close personal friends with her.  Do you have any

11  evidence that UDC 5 was in fact close personal friends

12  with Roe 3?

13      A.   Like I said, it's a possibility.  But I

14  never -- I've never specifically seen them together.

15      Q.   Do you have any evidence that UDC 5's

16  knowing of Roe 3 caused him to have a bias in favor of

17  her and against you when UDC 5 served on the UDC?

18      A.   It's certainly possible, but I have no

19  direct thing that was stated or that I overheard that

20  he mentioned.

21      Q.   UDC 5 also testified in October of 2017 that

22  he knew of Student 1, Student 1 , whose statement

23  was included in the packet that the UDC reviewed.  He

```
 1   also testified that he did not consider her statement
 2   because there wasn't enough information in it.
 3           Do you have any evidence that UDC 5's
 4   knowing of Student 1 caused him to have a bias in
 5   favor of  Roe 3 and against you when he served on the
 6   UDC?
 7       A.   Like I said, I don't know the level of their
 8   connection.  He could have left certain areas of that
 9   out.  I don't know that entirely.  I don't really know
10   him.  But it's possible.
11       Q.   Do you have any evidence that UDC 5 relied
12   on Student 1's statement or that it caused him to be
13   biased against you in reaching his decision?
14       A.   He could have.  I never spoke with him
15   directly, so I don't know.
16       Q.   Do you have any evidence that UDC 6 --
17   that's    UDC 6    -- that her Facebook connection
18   with Dr. Mitchell and her consideration of
19   Dr. Mitchell as a mentor influenced or caused her to
20   harbor any actual bias against you?
21       A.   I don't really know -- I mean when they say
22   "mentor," I don't know if she met with him regularly
23   or ever discussed the case outside of the actual
```

1   hearings.  So it's possible, but I was never privy to

2   their private lives, so I can't say.

3        Q.   Do you have any evidence that Roe 3's

4   involvement as a Nursing Department Senator in the

5   Student Government Association the year prior to the

6   August 2017 hearing caused UDC 6 to be biased against

7   you in her review and decision in that second Roe 3

8   hearing?

9        A.   It certainly shows that they knew each other

10  and had some form of connection, which can create bias

11  if they have a connection to someone.  So I would say

12  that shows something.

13       Q.   What evidence do you have of a friendship

14  between Mike Mitchell and UDC 7,  ███ UDC 7 ███   I'm

15  not sure actually if that is the correct number, but

16  ███ UDC 7 ███  who served as the UDC Student Ad Hoc

17  Chief Justice during the first Roe 3 hearing in March

18  of 2017?

19       A.   Other than that -- I don't really know about

20  their private lives.  They could have met more, known

21  each other a little further, social media connections.

22  But to the full extent, I don't know.

23       Q.   Do you have any evidence of any connection

1    that Mr. ▮UDC 7▮ and Dr. Mitchell had that caused

2    either of them to improperly influence the other or

3    caused them to harbor actual bias against you?

4        A.   No, ma'am.

5        Q.   Regarding UDC 6 -- and that's ▮UDC 6▮

6    ▮UDC 6▮ - she served on both the Roe 1 and Roe 2 UDC

7    and on the second Roe 3 UDC panel.  She testified in

8    federal court in October 2017 that her prior UDC panel

9    experience at your first hearing with Roe 1 and Roe 2

10   did not influence her decision in the August 2017

11   Roe 3 hearing.

12            Do you have any evidence to contradict her

13   testimony?

14       A.   I really didn't know her and I've never

15   really spoken to her or have anybody that I knew speak

16   to her about the case.  She could have, but I have

17   nothing specific.

18       Q.   Do you have any evidence that Dr. Agnew

19   conducted herself in the two hearings of yours that

20   she was present in any different way than she

21   typically conducts UDC hearings?

22       A.   I've never --

23            MR. GREEN:  Object to the form.  You can

1    answer.

2        A.   I've never sat in on a UDC hearing other

3    than the ones I was involved in, so she may have, she

4    may not have.

5    BY MS. BITZER:

6        Q.   You don't have any evidence of that?

7        A.   No, ma'am.

8        Q.   Do you have any evidence that Dr. Agnew

9    expressed any personal opinion during UDC

10   deliberations about whether you were responsible or

11   not for the conduct alleged?

12       A.   Other than her discussion with them during

13   deliberations and things like that, that's about all I

14   have.

15       Q.   But you don't know during those

16   deliberations whether she ever expressed any personal

17   opinion as to whether you should be found responsible

18   or not, do you?

19       A.   Since I was not allowed to sit in on them, I

20   can't say for a certainty.

21       Q.   Following your suspension from the

22   university, were you placed on a leave of absence by

23   your ROTC commander?

1    Q.   Sure.  Did the ROTC hearing panel have all

2  the evidence that your UDC panel members had reviewed?

3         MR. GREEN:  Still object to the form.  You

4  can answer.

5    A.   I don't recall.  I believe the school had --

6  or they had requested information from the school.  If

7  I remember correctly, the school withheld some

8  information, but I don't recall entirely what they

9  withheld, so I don't know all the information they

10  had.  They had their own items in front of them.

11  BY MS. BITZER:

12    Q.   Did Ms. Ortiz testify during the ROTC

13  hearing that a university-appointed advocate should

14  have been appointed to you and that you were not

15  provided a Title IX advocate?

16    A.   Yes, ma'am.

17    Q.   When you made your complaint against Roe 3,

18  was Katrina Kennedy your university-provided advocate

19  and present during that intake meeting?

20    A.   When I made my complaint I was given one.

21  But as a defendant I was not provided an advocate.

22    Q.   Did Mr. Green serve as your advocate

23  throughout the process?

1        A.    Yes.  I had to go and hire an advocate.

2        Q.    Did you ask the university to provide you an

3   advocate?

4        A.    They never said I was allowed to have one.

5   They never gave me any information.  I wasn't well

6   traversed in Title IX regulations.  I was given one

7   when I made the complaint.  But when I was a

8   defendant, I was given nothing, if that clarifies.

9        Q.    And Ms. Katrina Kennedy was the

10  university-provided advocate that you were given when

11  you made the complaint; right?

12       A.    Yes, ma'am.

13       Q.    Did you ever reach out to Ms. Kennedy?

14       A.    No.  I didn't trust any of their

15  advocate-sent employees after my previous experience.

16       Q.    So because of that, you elected to proceed

17  with Mr. Green as your advocate or supporter; is that

18  right?

19       A.    Yes, ma'am.

20       Q.    I'm going to show you the sexual misconduct

21  policy that we talked about a little while ago that

22  you identified in the deposition.  And that sexual

23  misconduct policy, again, for the record, was

1    Exhibit 1 to your amended complaint.  And if you turn
2    to page 19 of this policy under the heading Support
3    Persons, that last paragraph, doesn't the last
4    paragraph there state that:
5                    "The university has a pool of
6                 trained support persons,
7                 referred to as respondent
8                 resources, who are available to
9                 serve as support persons for
10                respondents"?
11   A.    Yes, it does say that.
12   Q.    And it later says in the paragraph that:
13                "A respondent wishing to
14                utilize a respondent resource
15                should make a request to the
16                Title IX coordinator or
17                designee."
18         Do you see that?
19   A.    It says that.
20   Q.    And did you ever make a request to the
21   Title IX coordinator or designee for a respondent
22   resource person?
23   A.    As I previously stated, I'm not a

1    professional.  I had no one that directed me towards

2    this.  So I had no idea this was even an option.  I

3    didn't have any help or resources appointed to me, so

4    no, I had no idea that I was allowed to be given one.

5    And, of course, no one told me this.

6        Q.    It's in the policy, though; right?

7        A.    It's in the policy.

8        Q.    Mr. Green served as your advocate and

9    resource support person as a respondent; correct?

10       A.    Yes.

11       Q.    If you'll look back at Exhibit 17 that we

12   previously marked.  This is a letter from Ms. Ortiz to

13   you in November of 2016, which was a notice letter

14   regarding the charges against you by Roe 3.  In the

15   third paragraph of that letter where there are some

16   website references -- are we in the same area?

17       A.    Yeah.  Where it says The Lowdown and the

18   link?

19       Q.    Right.  It says -- the last sentence of that

20   paragraph says:

21                "You have the right to an

22                advisor of your choosing to

23                assist you in this process."

```
1              Do you see that?
2         A.   Uh-huh (positive response).
3              MR. GREEN:  Is that a yes?
4         A.   Yes, ma'am.  I'm sorry.
5    BY MS. BITZER:
6         Q.   Did you ever ask Ms. Ortiz about providing
7    you an advisor to assist you in the process?
8         A.   I had Mr. Green at this point, as I
9    previously stated.  I didn't trust the school.  So I
10   preferred to stick with my chosen advocate.
11        Q.   Look at Exhibit 6, please.  And again, this
12   is a letter from Ms. Ortiz to you, October 27, 2016,
13   that gave you notice of the charges by Roe 1 and
14   Roe 2; correct?
15        A.   Uh-huh (positive response).
16        Q.   And in the third paragraph of that letter,
17   the last sentence says:
18              "You have the right to an
19               advisor of your choosing to
20               assist you in this process."
21              Do you see that?
22        A.   Uh-huh (positive response).
23        Q.   And did you ask Ms. Ortiz about getting an
```

1    advisor to assist you in the process?

2         A.   No, ma'am.

3         Q.   Did the university ever refuse to provide

4    you with a respondent resource person?

5         A.   No, ma'am.

6         Q.   Since -- I apologize.  This is a duplicative

7    question, but I don't remember if we covered it.

8              The Army Board following the ROTC hearing

9    concluded that you would not be disenrolled from the

10   program; correct?

11        A.   Yes, ma'am.

12        Q.   And you remained in the program until you

13   graduated from the university December 2019; right?

14        A.   Yes, ma'am.

15        Q.   Since that time have you received

16   instructions regarding your military obligations or

17   assignment?

18        A.   Yes, ma'am.

19        Q.   What are they?

20        A.   I have -- from October 25th of this year

21   till March 2nd I will be in Fort Lee, Virginia, for

22   Ordnance Officers School.

23        Q.   March 2nd, 2021?

1      A.    Yes, ma'am.  And then I have a follow-on

2   training that we have to reschedule for EOD school,

3   which is Explosive Ordnance Disposal.  And that would

4   be a couple of months, two to three months, in Fort

5   Lee, Virginia, again.  And then the second parts of it

6   would be at Eglin Air Force Base.  But I'm still

7   waiting for my orders to attend that.

8      Q.    For the EOD school component, will that be

9   tacked on at the end of the March 2 date or you don't

10   know yet?

11      A.    I don't know yet.  It can be or it may be a

12   couple of months in between.  It's just a matter of --

13   with the Corona stuff going on and then when they have

14   opening dates and just my schedule and when they could

15   send me.

16      Q.    And then you would go to Eglin Air Force

17   Base for what?

18      A.    I'll be in Virginia for the first part, for

19   two or three months, I think is how long it is.  And

20   the second part will be at Eglin, and it's like six to

21   eight months.  I think in total I have about a year,

22   give or take, of schooling.

23      Q.    So beginning October of 2020 for about a

```
 1   year you will be getting military education at Fort
 2   Lee or other places as they assign you?
 3       A.   Yes, ma'am.  Not all together as of now.
 4   But in total I've got about a year's worth of
 5   schooling.  When it is is dependent on the military.
 6       Q.   And after your completion of that schooling,
 7   what happens?
 8       A.   I will be reassigned to my unit.  They're
 9   currently deployed, so I'll be in a different unit.
10   But they will reassign me with the Triple 6 in
11   Jacksonville, and then from there just find a civilian
12   job or go back to school or whatever, and I'll do my
13   one weekend a month/two weeks out of the year with my
14   unit until -- I think they deploy every three or four
15   years, so I'll have at least one deployment with them.
16       Q.   And is this with the Army Reserves?
17       A.   The National Guard.
18       Q.   Are you looking forward to getting started
19   in Virginia?
20       A.   Yeah, it will be exciting.  I've never been
21   before.  It will be cold.  I'm not a fan of that.
22       Q.   Are you satisfied with the commission that
23   you've been given?
```

1          MS. BITZER:  All right.  Let's take a lunch

2   break.

3          (LUNCH RECESS FROM 12:37 P.M.

4           TO 1:21 P.M.)

5   BY MS. BITZER:

6       Q.   I'm showing you what is an exhibit to your

7   amended complaint, Exhibit 7.  And the cover page for

8   that exhibit says it is USA Title IX Banners

9   Associated with Roe 1 and Roe 2.  Do you see that?

10      A.   Yes, ma'am.

11      Q.   Do you recognize those pictures?

12      A.   Yes, ma'am.

13      Q.   In what building were these pictures taken?

14      A.   These were in the student center.

15      Q.   Did you take these pictures?

16      A.   Mr. Green and I did.

17      Q.   And when were these pictures taken?

18      A.   They were around October, right around --

19          MR. GREEN:  If you know.

20      A.   I don't know the exact specific date.  No, I

21   don't recall.

22   BY MS. BITZER:

23      Q.   Was it the date of the hearing, of your

1    first hearing involving Roe 1 and Roe 2?  That was in

2    November of 2016.

3         A.    Yes.

4         Q.    Was it the day of the hearing that you took

5    these pictures?

6         A.    Yes.  I believe we were walking in and kind

7    of saw all the pictures -- or the signs.

8         Q.    Okay.  How close in space were these signs

9    or banners hung in relation to the hearing room?

10        A.    So starting with this first one, this banner

11   right here (indicating), when you come up to the

12   student center it said --

13        Q.    The first page of your exhibit; right?

14        A.    Yes, ma'am, the first page.

15        Q.    The one that says:  "My cup is not my

16   consent"?

17        A.    Yes, ma'am.

18        Q.    Okay.

19        A.    That was a rather large banner that was hung

20   up on the second floor -- it's a two-floor building --

21   right over the entrance to the back.  So if you look

22   up, it's right on the railing there.

23        Q.    How close in proximity is that to where the

1    hearing room was?

2        A.   I'd say roughly 30 feet or so, give or take.

3        Q.   Was the hearing room on the first or second

4    floor?

5        A.   Second floor.

6        The second one, I believe that one was

7    downstairs.  The second one with the picture of the

8    red cup was also on this message board.  On the third

9    page, that's a closeup of that one.  That was on the

10    first floor, if I remember correctly.

11        Q.   Okay.  Are the pictures of that flier with

12    the red cup -- you've got three different pictures of

13    that.  Was that flier located in multiple places in

14    the student center?

15        A.   Yes, ma'am.

16        Q.   How many places does this represent?

17        A.   This is two different boards.  Throughout

18    the student center in various locations they have

19    little boards for clubs and stuff like that.  So they

20    have these tacked up.

21        Q.   Where in the student center were these

22    boards located?

23        A.   I know at least one of the boards was

1   located in the main lobby right below the large sign

2   that was hung up on the railing.  One was on the first

3   floor there.  And the second message board, I can't

4   recall where that one was located.  I think it was

5   either on the second floor or located somewhere else

6   in the student center, but I can't recall entirely.

7          Q.    Now, you testified that y'all took the

8   pictures the day of the Roe 1 and Roe 2 hearing;

9   right?

10         A.    Yes.

11         Q.    Were there similar signs or banners placed

12  in the location of the hearing rooms for the next two

13  hearings?

14         A.    Like I said previously, there were signs

15  where they had students posing, and they had things

16  like:  "Using alcohol to get sex is sexual assault"

17  and things like that where they had like pictures of

18  students they had taken, and they would have little

19  like -- just various writing on them posted throughout

20  bathrooms on campus.  I believe they --

21         Q.    Have you produced any pictures of those?

22         A.    No, I have not.  I don't recall if any of

23  these were in other locations off the top of my head.

1       Q.    But during the course or around the time of

2    the other two hearings?

3       A.    Yes, ma'am.

4       Q.    You have submitted or your lawyer has

5    submitted recently an expert disclosure in this case

6    in which two nurse practitioners were named, Shayria

7    Catlin and Eric McCraney.  Did they both work at the

8    Mobile County Board of Health?

9       A.    Yes.  Those were the two that treated me.

10      Q.    Did you go to the Mobile County Board of

11   Health on August 15, 2016?

12      A.    Yes.

13      Q.    What was the purpose of that visit?

14      A.    That would have been for STD treatment for

15   testing and then another visit to get treatment a week

16   later.

17      Q.    Was that your only visit to the Board of

18   Health?

19      A.    Yes.

20      Q.    You say you went twice, once for testing and

21   once for treatment?

22      A.    Yes, ma'am.

23      Q.    Have you sought or obtained any treatment

1       A.   I think so.

2       Q.   Do you have any evidence that any of your

3   UDC panel members were in the same sorority as Roe 1

4   and 3?

5       A.   I believe one of them was.  I think there's

6   a picture of them together.

7       Q.   Who?  Which UDC panel member was in the same

8   sorority as Roe 1 and 3?

9       A.   I don't recall off the top of my head.

10      Q.   So what evidence are you referring to?  A

11  picture?

12      A.   Yes, ma'am, there's pictures and things of

13  them together.

14      Q.   We'll get to that in just a second.

15           You said in this response that you reserve

16  the right to supplement.  Do you have any other

17  information at this time that's responsive to this

18  interrogatory?

19      A.   Not that I can think of off the top of my

20  head.

21      Q.   Do you contend that all UDC panel members in

22  each of the hearings were biased against you because

23  they were trained, in part, by Dr. Agnew?

```
1        A.    I would say it attributed to it.

2        Q.    I'm sorry.  What did you say?

3        A.    Attributed to it or contributed.

4        Q.    What evidence do you have to support that?

5        A.    Other than their relationships and their

6    social media relationships, their connections as far

7    as socially, I don't really have any direct knowledge.

8    Like I said, I'm not privy to their personal lives.  I

9    don't know the full extent.

10       Q.    Okay.  My question is more about the

11   training that Dr. Agnew provided to UDC panel members.

12   Do you have any evidence that any training she

13   provided to UDC panel members caused them to be biased

14   against you?

15       A.    Other than what I was told about the RA

16   training that my girlfriend received from them -- or

17   from Harrell.  As far as Agnew, I was never on a UDC

18   panel, so I don't know the full extent of what she

19   told them or anything like that.  I was never in on

20   those.

21       Q.    Okay.  Looking at your response to

22   interrogatory number 4, it carries over onto page 6,

23   you again mention that at least one female was in a
```

```
1   sorority as was Roe 3 and Roe 1.  Again, do you know
2   who you're talking about there?
3        A.   I don't recall off the top of my head.  It's
4   been a little while.
5        Q.   Was that a UDC member, a female UDC member?
6        A.   Yes.
7        Q.   Do you know what sorority she was in?
8        A.   I think she was either in Alpha Gamma or
9   maybe Kappa Delta.  I can't remember off the top of my
10  head right now.
11       Q.   Was she in the same sorority as Roe 1 and 3?
12       A.   I don't think so.  I don't know off the top
13  of my head.
14       Q.   How would we go about identifying this UDC
15  member that you're talking about in these responses?
16       A.   I'm sure the school would have some kind of
17  record of who the member was and easily look their
18  name up or something and you could find out.
19       Q.   Do you have any evidence that she was in a
20  sorority with them, with Roe 1 and 3?
21       A.   I don't know.
22       Q.   You say in the same response, Number 4, that
23  Roe 1 and 2:
```

```
1                    "... engaged in sexual conduct
2                    with one another but the
3                    defendants never investigated
4                    (them) for Title IX violations
5                    despite university policy
6                    requiring it."
7               Which university policy are you referring
8       to?
9          A.   Well, the one that -- as far as they said
10      they were drinking and they were able to consent to
11      each other but not to me was what we were directing
12      that at.
13         Q.   Can you point me to a particular provision
14      of the Code of Conduct or the sexual misconduct
15      policy?  I'm trying to identify what university policy
16      you're referring to in this response.
17         A.   In Title I about consent -- sexual violence,
18      I guess, as far as under consent.
19         Q.   What policy are you looking at?  I mean
20      what's the --
21         A.   Oh, University of South Alabama's Sexual
22      Misconduct Policy & Complaint Resolution Procedures.
23         Q.   Okay.  And then which section are you
```

```
 1    looking at?
 2         A.    Section D.
 3         Q.    And what's the caption?
 4         A.    Sexual Violence.
 5         Q.    Did Roe 1 or Roe 2 make a complaint about
 6    each other to a Title IX officer, to your knowledge?
 7         A.    No, they did not.
 8         Q.    You state in this interrogatory response
 9    that Roe 1 violated a no-contact order while coming to
10    your dorm room while you were away and that defendants
11    took no meaningful action.
12               Were you out of town when she came to your
13    room?
14         A.    Yes.
15         Q.    Did you have a roommate?
16         A.    Yes.
17         Q.    Who was that?
18         A.    That would have been   Student 4  .
19         Q.    And was Roe 1 there at the invitation or
20    agreement of your roommate?
21         A.    No.  He told me they just showed up.
22         Q.    Was she with somebody else?
23         A.    Yes.
```

1       Q.    Who?

2       A.    I believe she was with -- it might have been

3    Roe 2

4             MR. GREEN:  Roe 2?

5       A.    It was Roe 2.

6    BY MS. BITZER:

7       Q.    Were Roe 1 and Roe 2 friends with Student 4

8       A.    Yes, I'd say -- I guess so.  After all this,

9    all the Title IX stuff started coming out, he was more

10   just -- not on any one particular side, just kind of

11   kept things as cordial as possible between both

12   parties.

13      Q.    Who did you alert at the university about

14   this situation?

15      A.    I let Ms. Ortiz know and Dr. Mitchell and

16   Dr. Agnew.  I just kind of reported it up.

17      Q.    Well, didn't you just actually report it to

18   Ms. Ortiz?

19      A.    I believe so.  And I guess she passed it up.

20      Q.    Did Ms. Ortiz respond to you with a

21   resolution?

22      A.    Eventually.

23      Q.    What do you mean when you say "no meaningful

1    action"?

2         A.    They never did anything about it.

3         Q.    Nothing at all?

4         A.    Nothing ever came of it.

5         Q.    Did Roe 1 ever violate the no-contact order

6    after that?

7         A.    I mean if she was around, I would just have

8    to go the other way.  Or when she was in ROTC, when I

9    kind of came back, since we still had the no-contact

10   order, we had to go to PT at different times or

11   obviously not be around each other if at all possible.

12   So not that I recall off the top of my head.

13        Q.    Did you ever report Roe 1 to Ms. Ortiz or

14   others again for violating the no-contact order after

15   that occurrence of her coming to your room while you

16   were out of town?

17        A.    I don't think so.

18        Q.    Do you have anything else to provide in

19   supplementation to your response?

20        A.    I don't think so.

21        Q.    Let's look at your response to interrogatory

22   number 5.  You reference here some photographs of

23   Dr. Harrell with Roe 3.  How do those photographs

1    demonstrate any bias by Dr. Harrell against you?

2         A.    It establishes a relationship between the

3    two.

4         Q.    Is that all?

5         A.    I'd say that can show bias.  There's

6    obviously a clear relationship there which can lead to

7    bias.

8         Q.    Was Roe 1 in ROTC?

9         A.    She was eventually.  Not at the start.

10        Q.    If you'll look at the response to

11   interrogatory number 7.  It's on page 7.  You assert

12   in this response that Dr. Agnew harbored personal

13   animosity towards you after her conduct in the first

14   hearing.

15            Do you contend that she harbored personal

16   animosity towards you before and during the first

17   hearing?

18        A.    Like I said, I just didn't think she exactly

19   treated me fairly and was too fond of me.  But was she

20   directly rude to me or specifically stated that she

21   had any animosity towards me?  No.  But based off her

22   actions, I would say she had some animosity,

23   especially after bringing an attorney on and not

1    exactly going down easily.  I would say that wasn't

2    exactly easy on their part.  So maybe it created some

3    animosity there.

4         Q.   You referenced a meeting between Dr. Agnew

5    and Dr. Mitchell after the second Roe 3 hearing.  How

6    does that meeting demonstrate that either of them

7    harbored personal animosity towards you?

8         A.   Enough for them to meet and have a

9    discussion based off of increasing the sanctions and

10   how things went within my hearing.  I would say that

11   that shows that they were less than pleased about what

12   they got, so they had to go and add more sanctions and

13   increase the punishment.  So I would say that shows

14   some animosity or dislike.

15        Q.   Did they have any obligation to tell you

16   about their meeting?

17             MR. GREEN: Object to the form.

18        A.   I'm not aware if they were supposed to or

19   not.  I'm not a Title IX professional.

20   BY MS. BITZER:

21        Q.   Is there any rule or policy, to your

22   knowledge, that requires them to disclose such a

23   meeting to you?

1        A.    I'm not entirely sure.

2        Q.    All right.  If you'll look at your response

3    to interrogatory number 9.  It starts on page 8.  You

4    assert that Dr. Agnew's blended roles deprived you of

5    an impartial decision-maker.

6              Dr. Agnew was not a voting member of the

7    UDC, was she?

8        A.    No, she's not allowed to vote.  She's not on

9    the UDC.

10       Q.    And she also did not participate in the

11   first Roe 3 hearing, did she?

12             MR. GREEN: Object to the form.

13       A.    No.

14   BY MS. BITZER:

15       Q.    You say also in response number 9 that

16   Dr. Agnew advocated for the female students.  What do

17   you mean by that?

18       A.    She was a little more, I guess, for the

19   plaintiff as far as accommodating for them or

20   assisting them, providing knowledge as far as things

21   they may need to know.  Like I said before, I was

22   never told directly, hey, here's an advocate or

23   assigned one versus they were just assigned one,

1   here's your advocate.  They helped them throughout the

2   process.  If I wanted to call a witness or needed

3   something, I had a little more difficulty in being

4   afforded that versus them if they needed something or

5   wanted to call a witness.  In one instance I was even

6   asking questions and told to hurry up in one of my

7   hearings.  But they were never rushed or hurried.

8           On multiple occasions Roe 3 was told to pull

9   herself together and answer the questions.  She

10  wouldn't answer my questions.  She would just shut

11  down and refuse to answer my questions.  Versus if I

12  didn't answer a question, I was told:  Hey, answer the

13  question.  You need to carry on here.

14          And I feel like that just shows that they

15  were a little more -- things were weighted more

16  towards the plaintiff versus the defendant.

17      Q.    Okay.  You're saying "they," and my question

18  is about Dr. Agnew.  And so you've said a lot of

19  "they."  And I don't know if what you're saying all

20  relates to Dr. Agnew or to Ms. Ortiz or what.

21      A.    I'm sorry.  Let me clarify.  When Dr. Agnew

22  was over the hearings or involved in the hearings,

23  she, from my perspective, seemed to -- if one of the

```
1    plaintiffs would ask a question, I was told to answer
2    it.  If I wanted to ask or frame a question, for
3    instance -- or I told you I was rushed when I was
4    asking questions.  I was told things weren't relevant,
5    that I needed to move on.  Dr. Agnew wouldn't do that
6    to them.  She would let them not answer questions or
7    just kind of -- it was catered more towards the
8    plaintiff.  She facilitated for the hearing to go that
9    way.
10              MR. GREEN:  You keep saying "plaintiff."
11   Will you make sure -- you're the plaintiff in this
12   suit.
13              THE WITNESS:  Not the plaintiff in this
14   suit.  The Title IX cases.  I'm sorry.
15              MS. HART:  The complainants.
16              THE WITNESS:  The complainants -- thank
17   you -- the complainants in the Title IX cases, things
18   were geared more towards their comfort, you know, and
19   just helping them.
20   BY MS. BITZER:
21       Q.   You didn't have much direct involvement with
22   Dr. Agnew outside of the hearings themselves, did you?
23       A.   No, ma'am.
```

1      Q.    Because Ms. Ortiz was kind of assigned to be

2   your contact throughout the process; right?

3      A.    Yes, ma'am.  She was handling my portion of

4   the investigation.

5      Q.    Right.  Okay.

6            (AN ALARM SOUNDED.)

7            (A RECESS WAS TAKEN FROM 2:55 P.M.

8             TO 3:01 P.M.)

9   BY MS. BITZER:

10     Q.    In your response to interrogatory number 9

11  you say that Dr. Agnew offered testimony at the

12  hearings.  When did she do that?  At what hearings?

13     A.    Number 9?

14     Q.    At the bottom of page 8, top of page 9.  You

15  say that she was offering testimony at the hearings.

16  And my question is:  when did she offer testimony at

17  any hearing?

18     A.    I don't recall right off the top of my head

19  right now.

20     Q.    Do you know who arranged for the location of

21  the hearing room?

22     A.    I think that's just something --

23  Dr. Mitchell or Dr. Agnew or whoever coordinates that

1   stuff handles it.  I'm not sure.

2        Q.   Do you know who did that in these cases?

3        A.   No, ma'am.

4        Q.   In this same response number 9 you mention

5   that:

6             "The UDC panel members that

7             decided my fate had

8             relationships with UDC panel

9             members and the defendants."

10            What relationships do you contend existed

11   between UDC panel members?

12        A.   I'm sure they all knew each other, working

13   with SGA and serving on panels and things like that.

14   South is a relatively small community.  They had some

15   sort of relationship together.

16        Q.   Do you have any evidence that those

17   relationships between UDC panel members caused the UDC

18   panel members to have some actual bias against you?

19        A.   I don't know every detail of their personal

20   lives, so I can't say for certain.

21        Q.   Have you shared with us all the information

22   you have about any existing relationships between UDC

23   members and administrators or complainants?

1    A.    That I can think of, yes, ma'am.

2    Q.    You mention in the same response that you

3 were not allowed to call a critical witness.  During

4 what hearings were you not allowed to call critical

5 witnesses?

6    A.    Specifically for the first hearing with

7 Roe 1 and Roe 2.  The Air Force cadet was a very key

8 witness.  I was not allowed to call him.

9    Q.    Well, you didn't ask him to come testify,

10 did you?

11    A.    I wasn't allowed to.  They said I wasn't.

12 It didn't matter.  It wasn't allowed.

13    Q.    Anybody else that you were not allowed to

14 call?

15    A.    Mr. Student 11  He wasn't allowed to speak.  He

16 was only allowed to give a written statement.

17    Q.    And he's the one who has a no-contact order

18 in place with Roe 1?

19    A.    Yes, ma'am.

20    Q.    And he submitted the statement and you also

21 read it?

22    A.    Yes, ma'am.

23    Q.    In response to number 12 -- it begins on

```
 1   page 11 of your discovery responses -- you state that
 2   you have been labeled a sex offender.  Have you been
 3   required to register as a sex offender with any
 4   governmental entity?
 5        A.   No, ma'am.
 6        Q.   Do you have any evidence that the defendants
 7   in the case -- Dr. Mitchell, Dr. Agnew, or
 8   Dr. Harrell -- have commented outside of the internal
 9   process and this litigation regarding your
10   disciplinary matters?
11             MR. GREEN:  Object as to form.
12        A.   Not that I know of.  I don't keep track of
13   them.
14   BY MS. BITZER:
15        Q.   I may have mentioned -- or asked you this
16   earlier, but you've not been diagnosed with depression
17   by any healthcare provider, have you?
18        A.   I haven't sought out any healthcare provider
19   in order to be diagnosed.
20        Q.   Do you have any intentions to do so?
21        A.   No.  It would affect my career.
22        Q.   You mentioned in response to question number
23   13 that Roe 1 took to social media and that threats of
```

1  physical violence were posted which made you fear for
2  your safety.
3          To whom did you report those threats?
4      A.   I reported them to Ms. Ortiz and also my
5  advisor, Mr. Green, and my family.
6      Q.   You said that in this response that the
7  defendants failed to take responsive remedial action.
8  Which defendants failed to take action?
9      A.   I reported to Ms. Ortiz, and she alerted
10 Dr. Mitchell and Dr. Agnew.  Nothing ever came of it.
11     Q.   Do you know what actions any of them took in
12 response to your concern?
13     A.   None.
14     Q.   Do you know whether Dr. Agnew discussed the
15 matter with anyone?
16     A.   I don't know.
17     Q.   Do you know if Roe 1 -- if Roe 1 or Roe 2
18 were told to stop their social media conversations
19 about it?
20     A.   Not that I'm aware of.
21     Q.   Did Roe 1 stop posting about it?
22     A.   No.
23     Q.   Did you receive any other threatening posts

1    from -- or did you see any other threatening posts
2    from Roe 1 or people on her social media?
3        A.   She had blocked me and I blocked her.
4    People would just let me know if she ever posted
5    anything that still followed her.  But not that I can
6    think of off the top of my head.
7        Q.   I was going to say do you have any evidence
8    of any additional postings by her for which you then
9    alerted someone at the university about?
10       A.   No, ma'am.
11       Q.   All right.  In response to question number
12   16, your response starts on the bottom of page 13.
13   You mentioned lost tuition.  What tuition is it that
14   you lost?
15       A.   I had one semester where my scholarship was
16   pulled from me and then my last semester where I had
17   to pay out of pocket.
18       Q.   When you say one semester pulled from you,
19   are you out of pocket any tuition?
20       A.   I had to pay for it.  So I had to incur
21   student loans versus the military paying for it.
22       Q.   When was that?  What semester?
23       A.   I don't recall which one.  I think it was

```
1    the spring semester before I left.  I can't recall
2    which one it is.
3         Q.   Why did the military pull out of it?
4         A.   My GPA and then just PT score and stuff.  I
5    didn't meet the qualifications to have my scholarship.
6         Q.   Do you attribute that to the disciplinary
7    proceedings?
8         A.   Yes.
9         Q.   And then you say your final semester?
10        A.   Yes, ma'am.
11        Q.   I believe your attorney stated on the record
12   that you'd be providing us an itemization of your
13   out-of-pocket expenses; is that correct?
14        A.   Yes, ma'am.
15        Q.   Are you in the process of gathering those
16   materials?
17        A.   Yes, ma'am.
18        Q.   All right.  In response to our interrogatory
19   number 18, you identified a statement from Student 11,
20   █Student 11█.  And that's the statement that was a
21   one-page witness statement that was provided to the
22   UDC and read by you at the Roe 1 and Roe 2 hearing in
23   November of 2016; right?
```

```
1        A.    Yes, ma'am.

2        Q.    I need to ask you about some of the

3   documents you produced along with these discovery

4   responses.  And I'm not going to mark them as

5   exhibits.  I just need to kind of find out what they

6   are.

7              And so here's a binder that has your

8   document production that we received with your

9   responses.  And you have Bates numbers down on the

10  bottom.  Okay?  And so I'm going to ask you about what

11  some of these documents are.

12             If you'll look at Bates number Doe 57, what

13  is this a picture of?

14       A.    That is a platoon photo of cadets.  I

15  believe that's [   Roe 2   ] in the front row

16  there -- not the very front row but the standing row.

17             MR. GREEN:  Do you want him to mark it for

18  you?

19  BY MS. BITZER:

20       Q.    The first standing row, [   Roe 2   ]?

21       A.    Yeah.  On my left.

22       Q.    (Indicating.)

23       A.    That would be her, yes.
```

```
 1        Q.    For who?

 2        A.    ████████████ UDC 3 ████████████

 3        Q.    And he's UDC 6 -- I'm sorry -- UDC 3.

 4              All right.  Look at the next group of

 5  documents, Doe 129 through 194.  Can you tell me what

 6  these documents are?

 7        A.    A friends list for ██ UDC 5 ██ or potential

 8  friends.

 9        Q.    And he was UDC 5; is that right?

10              He was UDC 5; correct?  He was on the UDC

11  panel for the August 2014 Roe 3 hearing; right?

12        A.    I believe so.

13        Q.    All right.  What are documents 195 through

14  265?

15        A.    ████ UDC 1 ████.  And that looks like a

16  friends list.

17        Q.    Facebook friends?

18        A.    Yes, ma'am.

19        Q.    She was UDC 1.

20              What is document 273?

21        A.    That is going to be an ████████████

22  sorority photo.

23        Q.    Okay.  Is there anybody in this photo that's
```

1    involved in any way in your disciplinary processes?

2         A.   I can't really make out faces entirely.

3    They're painted and this picture is a little blurry.

4    So I can't say with entire certainty.

5         Q.   So what does this document demonstrate

6    relative to this case?

7         A.   That there is a connection between the Jane

8    Roe 3, Jane Roe 1, and UDC members.

9         Q.   Right.  And I'm asking how we can find that

10   out from this picture.

11        A.   I guess I could go back and look and see

12   who's tagged in it.  She might have tagged someone in

13   it.  But it's from her Facebook profile picture.

14             MR. GREEN:  Try not to use "her."

15        A.   █Roe 3█ profile picture, Jane Roe 3, her

16   Facebook profile.

17        Q.   Can you identify any UDC member that heard

18   any of your hearings in this picture?

19        A.   No, I can't pick one out.

20        Q.   Do you see Roe 3 in this picture?

21        A.   It's kind of difficult to make out who is

22   who in this picture.

23        Q.   Can you identify Roe 2 in this picture?

1      A.    That may be [Roe 1] back there.

2      Q.    Can you tell for sure whether any of the

3   Roes are in this picture?

4      A.    Not with 100 percent certainty.  But that, I

5   believe, is Roe 3 and in the back is Roe 1.

6      Q.    Can you mark on my copy Roe 1 and Roe 3, you

7   said?  Are those the only two you can identify?

8      A.    I think I can see Roe 1 right there.

9   (Indicating.)

10     Q.    Can you draw a line and write Roe 1?

11     A.    I think that's her.  (Marking.) That kind of

12   looks like [Roe 3]   It's kind of blurred.

13     Q.    Roe 1 and Roe 3 were sorority sisters; is

14   that right?

15     A.    Yes, ma'am.  I believe that's her.

16   (Marking.)

17     Q.    Do you see any UDC panel members in this

18   photo?

19     A.    Not that I can -- let's see.  Not that I can

20   directly make out right now.

21     Q.    All right.  Could you tell me what 274 and

22   275 are?

23     A.    Those are going to be pictures of

1      Q.    Look at documents Doe 280 through 330, a big

2  group of them.  Are these documents information you

3  have relating to the social media postings that you

4  believe were threatening towards you?

5      A.    Yes, ma'am.

6      Q.    And did Ms. Ortiz alert you to Dr. Agnew's

7  response regarding instructions given to Roe 1 and

8  Roe 2?

9      A.    (Pause.)

10     Q.    I can direct you a little more

11  specifically -- I think there's some duplicates.  But

12  if you'll look at document Bates number 320.

13          MR. GREEN:  It's probably here.

14   (Indicating.)

15  BY MS. BITZER:

16     Q.    Do you see that there is an email from

17  Dr. Agnew to Ms. Ortiz?

18     A.    Yes.

19     Q.    It says that:

20              "She has discussed the matter

21              with the university advocate

22              who has advised the young

23              ladies to discontinue their

```
 1                  social media conversations as
 2                  referenced in the attached
 3                  posts.  Please relay this
 4                  information to John Doe"
 5             Do you see that?
 6        A.   Yes, ma'am.
 7        Q.   And Ms. Ortiz forwarded that information to
 8   you.  Look up just a little bit.
 9        A.   Yes, ma'am.
10        Q.   It looks like, if you flip the page, it
11   says:
12                  "Good afternoon, John Doe  FYI."
13        A.   Yes, ma'am.
14        Q.   So Ms. Ortiz did respond to you about those
15   threats; right?
16        A.   Yes, ma'am.
17        Q.   And that demonstrates what Dr. Agnew's
18   response was?
19        A.   Yes, ma'am.
20        Q.   All right.  If you'll look at documents 331
21   through 332.  Can you tell me what these two pages
22   are?
23        A.   That is a flier for the Consent Carnival on
```

1      A.    Some of them.

2      Q.    Do you know the length of time this display

3   was up?

4      A.    As far as I know, they're still up or things

5   like this.

6      Q.    What do these pictures demonstrate relative

7   to this case?

8      A.    Some of them had things in reference to

9   abuse or assault and then some are just, I guess,

10   motivational things.

11      Q.    Is there anything wrong with these being

12   posted up in the student center?

13            MR. GREEN:  Object to the form.

14      A.    I'd say some in relation to sexual violence

15   and other things of that nature, when I'm walking into

16   a sexual assault hearing, I would argue with those.

17   But something inspirational, absolutely not.

18   BY MS. BITZER:

19      Q.    Do you believe it's improper for a public

20   university to educate students on sexual violence?

21      A.    Absolutely not.

22      Q.    Do you believe it's improper for a public

23   university to educate students about alcohol?

1       A.    No.

2       Q.    Do you believe that by someone generally

3    recognizing a need to support victims of sexual abuse,

4    that that necessarily causes a person to prejudge the

5    circumstance of an individual case?

6            MR. GREEN:  Object to the form.

7       A.    I believe that posting certain things such

8    as like "my cup is not my consent" fliers outside of a

9    sexual assault hearing can create bias and create an

10   atmosphere of bias.

11   BY MS. BITZER:

12      Q.    But doesn't necessarily create bias; right?

13      A.    I would say it would.

14      Q.    Absolutely, you're positive about that?

15      A.    I would say it would.

16           MS. BITZER:  All right.  Let me ask

17   Christine a question or two.  We'll take a quick

18   break.

19           (A RECESS WAS TAKEN FROM 3:33 P.M.

20            3:34 P.M.)

21           MS. BITZER:  I don't have any further

22   questions.

23           MR. GREEN:  Thank you very much.

9/4/2017                    University of South Alabama Mail - Re: Due Process Requests for UDC by Advocate on behalf of ▓John Doe▓

 Jag Mail

Michael Mitchell <mmitchell@southalabama.edu>

## Re: Due Process Requests for UDC by Advocate on behalf of ▓John Doe▓
1 message

**Michael Mitchell** <mmitchell@southalabama.edu>                    Mon, Mar 27, 2017 at 12:00 PM
To: Matt Green <mattgreenlaw@comcast.net>
Cc: "Kim R. Ortiz" <krortiz@southalabama.edu>, ▓▓▓▓▓ John Doe ▓▓▓▓▓>, Andrea Agnew
<aagnew@southalabama.edu>

▓John Doe▓

*Here are my response to your questions:*

*1.  Members of the UDC have a copy of the University's Sexual Misconduct Policy and Resolution Procedures and the
definition of incapacity will be covered per the policy prior to the hearing, as will other relevant sections of the policy.*

*2.  Though I do not find that any prior conduct by Dr. Agnew merits her removal from this proceeding, Dr. Agnew has
recused herself from today's proceeding.  She would have only been there to be a resource to the process.  You may
indeed call her as a witness, but you should be aware that she may not be able to answer any question that creates a
conflict of interest related to her capacity with today's cases.  Please contact Dr. Agnew by 1pm today if you would like to
call her as a witness.*

*3. USA's policy specifically indicates that deliberations are not included as a part of the single verbatim record.  This is
covered in Lowdown in the section on formal hearings (p.61 - A7 and A8).*

*4.  All witnesses will be instructed that they should refrain from mentioning any prior Title IX hearings involving you.  This will
be done before they enter the hearing and outside of the presence of the UDC.*

Dr. Michael Mitchell
Vice President for Student Affairs and Dean of Students
Division of Student Affairs
mmitchell@southalabama.edu
P: (251) 460-6172
F: (251) 460-6157
—
Division of Student Affairs/Student Center 245
350 Campus Drive
Mobile, AL 36688-0002
southalabama.edu



On Mon, Mar 27, 2017 at 9:17 AM, Matt Green <mattgreenlaw@comcast.net> wrote:

Dr. Mitchell & Ms. Ortiz,

As ▓John Doe▓ Advocate for this afternoon's hearing. We have several requests in ▓John Doe▓'s capacity as both a Title IX
complainant and respondent:

1. The UDC be instructed on the definition of incapacity as opposed to intoxication- " A person is "mentally
   incapacitated" if the person lacks the ability to understand the fact, nature, or extent of a sexual situation due to a ·

EXHIBIT
3
Doe

USA 06525
Doe vs. USA

narcotic or intoxicating substance administered without their consent. A person is "physically helpless" if the person is generally unconscious or unable to communicate." See Sexual Misconduct Policy & Complaint Resolution Procedures, IV,D, 2: Consent. Since the University Code of Conduct Consent Definition is in conflict with the USA Sexual Misconduct Policy Resolution Procedures definition, the latter controls (See  USA Sexual Misconduct Policy and Complaint Resolution Procedures, VII., A:Complaint Resolution Procedures)

"All complaints of sexual misconduct will be investigated and resolved pursuant to the Complaint Resolution Procedures, which, along with this policy, are the exclusive means of resolving complaints of sexual misconduct. To the extent this policy and/or the Complaint Resolution Procedures conflict with any other University policy, this policy and/or the Complaint Resolution Procedures, as the case may be, will control. Under the Complaint Resolution Procedures, the party making a complaint is referred to as the "complainant" and the person accused of misconduct is referred to as the "respondent.". (Emphasis Added)

2. The removal of Andrea Agnew from the proceeding as ▮John Doe▮ may call her as a witness;  additionally Dr. Agnew's removal is appropriate based on her animus and malice exhibited against ▮John Doe▮ in the prior hearing as confirmed by her prejudicial conduct (acknowledged by Dr. Mitchell in the last hearing in reducing the UDC recommendation of punishment); additionally it has come to the attention of ▮John Doe▮ and his advocate that Dr. Agnew had improper contact with the prior UDC panel outside the presence of ▮John Doe▮ and his advocate in the prior hearing. Clearly her continued involvement in this process (particularly since she personally participated in investigating ▮Jane Roe 3▮ allegations against ▮John Doe▮ and participated in drafting allegations of sexual assault against ▮John Doe▮ which is being submitted to the UDC over our objection ) renders her unfit to participate in today's hearing as an arbiter, judge, or ruling on any objections.

3. ▮John Doe▮ specifically requests the hearing, deliberations, and any/all  conversation  USA officials have with members of the UDC be recorded in its entirety to ensure that no future improper contact with members of the UDC panel occur, and to ensure ▮John Doe▮ is afforded due process of law and as guaranteed by the USA Student Code of Conduct and the Alabama state and federal constitutions. If there are concerns with privacy, the University may object to the admission of such materials in a court of law, but the failure to preserve this evidence is a violation of Alabama law. Failure to honor this request constitutes spoliation of evidence under Alabama law and may result in adverse legal consequences against the University in any future legal action.

4. That all witnesses be instructed prior to this afternoon's hearing and outside the presence of the UDC panel members to in no way reference of mention any prior Title IX hearings ▮John Doe▮ was involved in.

Thank you for this consideration in this most important day of ▮John Doe▮'s academic career and his reputational property interest.


Matt Green

Advocate for Title IX Complainant and Respondent ▮John Doe▮



Matt Green| Attorney at Law Office/Fax:  (251) 434-8500

| Mattgreenlaw@comcast.net |www.mattgreen.lawyer | 501 Government Street, Suite 1 |  Mobile, AL 36602


Anything included in or attached to this electronic mail is intended only for the addressee and may contain PRIVILEGED and CONFIDENTIAL information and/or ATTORNEY WORK PRODUCT.  If you are not the intended recipient and/or you have received this electronic mail in error, you are hereby notified that any dissemination of this communication is STRICTLY PROHIBITED.  Please immediately delete all electronic copies of this message and its attachments, destroy any hard copies created, and notify Matt Green, Esq.


On November 14, 2016 at 9:11 AM "Kim R. Ortiz" <krortiz@southalabama.edu> wrote:

I am available now. Atty. Green.

USA 06526
Doe vs. USA



Kim Ortiz <krortiz@southalabama.edu>

 Cases
1 message

**Kim R. Ortiz** <krortiz@southalabama.edu>                                    Wed, Mar 22, 2017 at 9:05 AM
To: John Doe
Cc: Andrea Agnew <aagnew@southalabama.edu>

Good Morning, John Doe

In response to your question; yes, both cases will be heard on **Monday, March 27, 2017**, beginning at **2:00 p.m.**, in the **Marx Library-Room 181.**

Should you have any further questions, please let me know.

Kind Regards,

Kim R. Ortiz, Ed.S, M.A.

Coordinator of Student Conduct

krortiz@southalabama.edu

P: (251) 461-1991

F: (251) 460-6157

—

University of South Alabama

Division of Student Affairs

Student Center 245

350 Campus Drive

Mobile, AL 36688

southalabama.edu

**CONFIDENTIALITY NOTICE**

This E-mail message, including any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged and/or confidential. If you are not the intended recipient, please notify immediately by replying to this message; and then, delete this message from your system. Any use, dissemination, distribution, and/or reproduction of this message by unintended recipients is prohibited. This communication does not form any contractual obligation on behalf of the sender.



EXHIBIT
4
Doe

USA 06216
Doe vs. USA



UNIVERSITY OF SOUTH ALABAMA

October 27, 2016

**John Doe**
Sent electronically to **John Doe**

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2016012301

October 27, 2016

Dear **John Doe**
**John Doe**

On September 30, 2016, two female students reported to the Title IX Office an allegation of sexual misconduct involving you. The alleged sexual misconduct took place on campus on September 9, 2016. The two female students allege they were too incapacitated to provide consent to you for sex.

The University's investigation is intended to determine whether:

- Sexual intercourse was forcible; or
- Sexual intercourse took place under conditions where the two female students were incapacitated; and you either knew that or should have known that from the circumstances you were aware of; or
- Whether if not forcible or based on incapacitation, there was consent to the sexual intercourse by clear word or action.

This letter serves as notice that we will be conducting an impartial investigation of this allegation according to the procedures detailed in THE LOWDOWN, available at http://www.southalabama.edu/departments/studentaffairs/lowdown/. The relevant investigation and resolution procedures can be found at http://www.southalabama.edu/departments/studentaffairs/studentconduct/. You have the right to an advisor of your choosing to assist you in this process.

Retaliation
This letter also serves as a reminder that the University of South Alabama prohibits retaliation, which is defined as: "Any intentional, adverse action taken by an accused individual or allied third party, absent legitimate nondiscriminatory purposes, as reprisal against a participant in a civil rights grievance proceeding." Retaliation exists when an individual harasses, intimidates, or takes other adverse actions against a person because of that person's participation in an investigation or discrimination or sexual misconduct, or their support of someone involved in an investigation of discrimination or sexual misconduct.

Retaliatory actions include, but are not limited to, threats or actual violence against the person or that person's property, adverse educational or employment consequences, ridicule, intimidation, bullying, or ostracism. The University will impose sanctions on any faculty, student, or staff member found to be engaging in retaliation, or individuals who encourage third parties to retaliate on their behalf. If you experience any retaliation, please contact either Kim R. Ortiz, Ed.S, Coordinator of Student Conduct, at 251.460.6172, or krortiz@southalabama.edu; or Dr. Andrea Agnew, Assistant Dean of Students, at 251.460.7212, or aagnew@southalabama.edu.

You have the right to discuss this matter with your advisor(s) and others, but the University is required under federal law to conduct this investigation confidentially. We ask for your discretion in what you choose to share and hope that you will respect the private and sensitive nature of these allegations.

OFFICE OF STUDENT CONDUCT
STUDENT CENTER 245   |   350 Campus Drive   |   Mobile, Alabama 36688-0002
TEL: (251) 460-6172   |   FAX: (251) 460-6157   |   SouthAlabama.edu



EXHIBIT
6
Doe

USA 06035
Doe vs. USA

If you have any questions, please contact either Kim R. Ortiz, Ed.S, Coordinator of Student Conduct, at 251.460.6172, or krortiz@southalabama.edu; or Dr. Andrea Agnew, Assistant Dean of Students, at 251.460.7212, or aagnew@southalabama.edu. Your full cooperation with the investigation is anticipated and appreciated.

Sincerely,

Kim R. Ortiz, Ed.S, M.A.
Coordinator of Student Conduct

CC:   Dr. Andrea Agnew, Assistant Dean of Students

USA 06036
Doe vs. USA

Case 1:17-cv-00394-CG-C   Document 43-4 *SEALED*   Filed 10/11/17   Page 4 of 47   PageID #: 1903

## UNIVERSITY OF SOUTH ALABAMA

November 15, 2016

▋▋▋▋▋

Sent electronically to ▋▋▋▋▋▋▋▋▋▋▋

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2016012301

Dear Mr. ▋▋ J00538375:

The following decision has been reached in your case:

ALLEGED VIOLATION(S) and DECISION:

    1. 07e. Engaging in Sexual Violence -- Responsible

SANCTIONS:

You are on conduct probation for the remainder of your academic career. During your period of conduct probation, you may not visit University Housing, the Grove, or the Fresh Foods Company Dining Facility. Further violations of the *Code of Student Conduct* may result in more severe sanctions, including suspension or expulsion.

There is a mutual *No Contact Order* between you and ▋▋▋▋▋▋ and ▋▋▋▋▋▋▋▋. You are directed to avoid contact with either until such time as this order is lifted in writing. Both you and ▋▋▋▋ and ▋▋▋▋▋▋ are to refrain from: (1) approaching one another at any time; (2) calling one another at any time; (3) sending via E-mail, campus or regular mail anything to one another; (4) contacting or communicating with one another, including through a third party, in any way at any time. Should you need to contact either, you must do so through this office.

You must complete 100 hours of community service by Friday, December 1, 2017. Fifty (50) hours must be completed by Monday, May 1, 2017. Information to arrange this community service will be E-mailed to you by Tuesday, January 3, 2017. You must complete your community service hours, and return your signed service form(s) to this office no later than Friday, December 8, 2017.

Your housing contract has been terminated. Please contact your community director to arrange a proper checkout. Should you fail to perform a proper checkout, you will incur a $150 improper checkout fee charged directly to your student account. You must return your keys to the Housing office by 12:00 p.m. of Friday, December 9, 2016. You are ineligible to live in or visit campus housing during your period of conduct probation.

You must complete an educational module(s) on prevention of sexual violence. Information will be E-mailed to you by Tuesday, January 3, 2017.


EXHIBIT
9
Doe

Case 1:17-cv-00394-CG-C   Document 101-1   Filed 01/29/21   Page 126 of 199   PageID #: 2889
Case 1:17-cv-00394-CG-C   Document 43-4 *SEALED*   Filed 10/11/17   Page 5 of 47
PageID #: 1904

DISPUTED:

With respect to the Sunday, September 4, 2016, incident; you stated that ████████████ and ████████████████ were not incapacitated and did not at any time withdraw consent, whereas ████████s and ████████████████ stated that they were incapacitated and did not consent to sexual activity with you.

RATIONAL and ANALYSIS by the UNIVERSITY DISCIPLINARY COMMITTEE (UDC):

The decision-making process of the University Disciplinary Committee was grounded on the University of South Alabama Sexual Misconduct Policy & Complaint Resolution Procedures and the *Code of Student Conduct* and careful consideration of testimony given.

Alabama Code 13A-6-70(c) states:  "If a person is incapacitated by alcohol or drugs such that the person cannot understand the fact, nature, or extent of the sexual situation, there is no consent even in the person self-administered the alcohol or drugs" (p. 9).  Based on the preponderance of evidence, the UDC determined the complainants were more likely than not incapacitated and, therefore, could not give consent.

If you wish to appeal this decision, the appeal must be filed with the Dean of Students Office (Student Center, Suite 245, 251.460.6172) no later than Tuesday, November 22, 2016. Click the following link, to file your appeal electronically: Appeal

For more information, please visit http://www.southalabama.edu/departments/studentaffairs/studentconduct/index.html. Should you have any questions, please let me know.

Sincerely,

Kim R. Ortiz, Ed.S, M.A.
Coordinator of Student Conduct

CC:   Dr. Andrea Agnew, Assistant Dean of Students
      Dr. Michael Mitchell, VP for Student Affairs and Dean of Students
      Dr. James Bridgeforth, Director of Housing
      Tammy Orso, USAPD Patrol Captain
      Dr. Krista Harrell
      Complainant
      Complainant



Appeal Request Form
Submitted on November 16, 2016 at 9:47:34 am CST

Type:                     **Any student interested in filing an appeal should**
Urgency:                  **complete the form below. Please note that you**
                          **will need your case number when submitting this**
Incident Date:            **request. Your case number can be found on your**
Incident Time:            **outcome letter that was delivered to you, detailing**
Reported by               Incident Location:        **the decision made in your case.**

Name:
Title:                                              **2016-11-16**
Email:
Phone:
Address:                                             .

Involved Parties

**John Doe**                    **John Doe**              **John Doe**

Appeal Grounds and Rationale

Case Number  (Your case number can be found on your Notice of Decision and Sanctions letter).
**2016012301**

Grounds for Appeal  (Please select all that apply). Appeals that do not fall within these criteria will be disregarded.
**Violation of procedural rights., Evidence not available at the time of hearing.**

The appeals process requires a written appeal letter. The written appeal should include the grounds for appeal, all
relevant information, and the desired outcome.  Please provide the rationale, details, and specifics for each of the
options you selected above. If you would prefer, you may choose to attach a written appeal letter below.
**Appeal Form**

**Grounds for Appeal (Please select all that apply). Appeals that do not fall within these criteria will be**
**disregarded.(Required)**
**Violation of procedural rights.**
**Severity of disciplinary action.**
**Evidence not available at the time of hearing.**

**Misconduct of both complaining witnesses who violated the rules of the hearing by disclosing the existence**
**of Jane Doe despite repeated warnings from Ms. Ortiz and Ms. Agnew; at one point both complainants were**
**taken from the hearing and admonished---such conduct so prejudiced my case as to violate my right to a fair**
**hearing**
**Prior to the hearing Ms. Agnew made specific findings of fact in writing, including the credibility of**
**witnesses, and pre-judged my case. These findings were made prior to the case being argued before the**
**UDC. Additionally the findings were so one-sided as to prejudice my ability to have a fair and full and**
**unbiased hearing. I objected prior to the hearing, but Ms. Agnew refused to withdraw it or alter in any way.**
**This finding of fact was presented to all members of the UDC at the outset of the hearing. Since this case**
**involved and hinged around the credibility of the witnesses, Ms. Agnew pre-judged the case. Ms. Agnew**
**assumed the rule of the UDC and is not authorized to make a determination in this matter- Ms. Agnew acted**
**without any authority to do so and usurped a function reserved to the UDC. This was clearly a violation of**
**Due Process**
**Refusal of Ms. Ortiz and/or Ms. Agnew to require disclosure of the identity of the Air Force Cadet who had**
**consensual three way sex earlier that evening with both complainants- the identity of that witness would**
**allow me to offer evidence as to their level or lack of intoxication/incapacity; failure to allow questioning in**
**this regard violated due process and prevented me from having a fair hearing**



USA 06020
Doe vs. USA

The Written Decision issued by the University cites  language that purports to be from  Ala. Code Section
13A-6-70(c). This statute does not say this an for the University to base its decision on an incorrect citation
of a statute is a violation of due process

No where in the notice given me does the University provide by what vote the UDC is authorized to make a
finding of RESPONSIBLE. As such any student accused is unaware whether the UDC vote may be sustained
by a simple majority vote or a unanimous vote.

The complainants delay in reporting their claims severely prejudiced my ability to gather evidence to mount
a defense (including specifically text messages between myself and the complainants which had been long
deleted by the time I became aware of the charges)

I specifically requested video footage be obtained to refute the complainants lack of intoxication and/or
incapacity--the University failed to produce this or make a good faith effort to follow up on my request

I summoned a witness who was the subject of a prior Title IX complaint by one of the complainants. This
witness appeared at the hearing and was prepared to testify as to this complainants lack of veracity and prior
false allegations of sexual abuse. I was not allowed to call this witness on my behalf. Instead I was forced to
read a statement he wrote. This witness was critical to my defense and his inabiltity to testify severly
prejudiced my ability to present a defense

The setting and location of the hearing was so fraught with unfairness that I was denied a fair and unbiased
hearing. Just outside the hearing room, someone hung banners and flyers in the common area alleging sex
involving alcohol was a TITLE IX violation--this could be seen by all members of the UDC

One of the complainants is a Member of the sorority. It is my understanding that two of the UDC panel
members were members of the same sorority. Although these persons were removed, no effort as far as I am
aware of was made by any of the Title IX compliance people to poll the remaining and new UDC members to
see if they had been contacted by the former UDC members and whether the allegations had been discussed
among the UDC panel member prior to the hearing

Although the Title IX hearing alleged the burden of proof, nothing in the Title IX rules promulgated by the
University says who exactly has the burden of proof. Apparenlty from the hearing it is the University's
position that the accused student has the burden of proof, but no where in the materials presented
(LOWDOWN or University Student COde of Conduct) is the University authorized to shift this burden to me.
As such the University acted without legal authority to make this my burden, and failed to provide adequate
notice that I bore the burden of proof

I have never been arrested or the subject of any Title IX investigation prior to this matter. The UDC failed to
adquately consider my prior consensual relationship with both parties, the post event conduct with both
parties, and the prior sexual threesome between the two complaining witnesses and a third party on the
same evening. The University failed at all to consider any mitigating evidence before passing judgment. As
such i am appealing the severity of the action taken by the University in this matter,

The University has engaged in systematic plan to deprive me of a fair hearing. Although i only have 2 days to
appeal the UDC finding, the written notice says: "If you wish to appeal this decision, the appeal must be filed
with the Dean of Students Office (Student Center, Suite 245, 251.460.6172) no later than Tuesday, November
22, 2016. Click the following link, to file your appeal electronically: Appeal" However the Student Code of
Conduct says my appeal to the Dean of Students within two (2) working days of the hearing decision.

I appealing the decision and the punishment enacted based on the above mentioned violation of precedural
rights, severity of the disciplinary action, and evidence not available at the time of the hearing. Based on the
following I am asking the complaint and findings by the UDC be dismissed, or in the alternative a new
hearing before a new UDC panel be convened and fair hearing with the opportunity to present my witnesses
and evidence.


**John Doe**


The Law Office of Matt Green, LLC
The Pollock-Altmayer House
501 Government Street, Suite 1
Mobile, AL 36602
Ph: (251) 434-8500
Facsimile: (251)434-8500


Anything included in or attached to this electronic mail is intended only for the addressee and may contain

**PRIVILEGED and CONFIDENTIAL information and/or ATTORNEY WORK PRODUCT.  If you are not the intended recipient and/or you have received this electronic mail in error, you are hereby notified that any dissemination of this communication is STRICTLY PROHIBITED.  Please immediately delete all electronic copies of this message and its attachments, destroy any hard copies created, and notify Matt Green, Esq.**

Attachments

img0372.jpg
img0373.jpg
img0374.jpg
img0375.jpg

*Pending IR #00002435*
*Submitted from 69.85.215.51 and routed to Judith Friedhoff (Administrative Assistant I)*
*Copies to: mmitchell@southalabama.edu,aehughes@southalabama.edu*

USA 06022
Doe vs. USA

FINDINGS

Undisputed

- Complainants consumed alcohol both on and off campus.
- A credible witness who transported the complainants from campus to the off-campus party between the hours of 11pm and midnight and who also observed them at the party described the complainants as "drunk".
- A credible witness who transported the complainants from the party to campus at 3:00am described the complainants as, "they were gone" (meaning very drunk).
- Text messages and phone logs support the complainants' statement of events and timeline.
- Text messages and phone logs do not support the respondent's statement of events and timeline.
- Sexual intercourse occurred between the respondent and each complainant.

Disputed

- With respect to the September 4th incident, the Respondent states that the complainants were not incapacitated and did not at any time withdraw consent, whereas the Complainants state that they were incapacitated and did not/could not consent to sexual activity with the Respondent.

**CONFIDENTIAL**



EXHIBIT

11

Doe

USA 06073
Doe vs. USA

Timeline of Events Related to the Allegation of Sexual Violence/Sexual Misconduct

Saturday, September 3, 2016 @ 7:00 p.m.-10:00 p.m.
**Roe 2**   arrived to **Roe 1**   room between 7:00 p.m.-10:00 p.m.  There was a drinking party in progress.

Saturday, September 3, 2016 @ 11:00 p.m.-12 midnight
**Student 1**(designated driver),   **Roe 2**   and **Roe 1** arrived at the home on Vanderbilt.  There was a drinking party in progress.

Saturday, September 3-4, 2016 @ 12:00 a.m.-2:28 a.m.
**Roe 1** and **Roe 2**   "hooked up" with a male Air Force cadet.

Sunday, September 4, 2016 @ 3:00 a.m.
**Roe 1** and **Roe 2**   were picked up from the home on Vanderbilt by**Student 4**(driver) and  **John Doe**

Sunday, September 4, 2016 @ 3:07 to 3:10 a.m.
Texting between**John Doe**& **Roe 2**
**John Doe**called  **Roe 1**

Sunday, September 4, 2016 @ 3:10 a.m. - 3:20 a.m.
Hickey cover up

Sunday, September 4, 2016 @ 3:20 a.m.
**Roe 1**  **Roe 2**   and **John Doe**started their campus walk.

Sunday, September 4, 2016 @ 3:20 a.m.-4:05 a.m.
**Roe 2**   **Roe 1**   and **John Doe**walked campus.  Both girls played in the fountain by the Bell Tower.

Sunday, September 4, 2016 @ approximately 4:15 a.m.
**Roe 1**   **Roe 2**   and **John Doe**arrived at **Roe 1**   dorm room

Sunday, September 4, 2016 @ approximately 5:00 a.m.
Sexual encounter between   **Roe 2**  , **Roe 1**   and **John Doe**

Sunday, September 4, 2016. @ approximately 6:30 a.m.
**John Doe**woke up, put on his clothes, and left.

Sunday, September 4, 2016, @ 10:00 a.m. or 11:00 a.m.
**Roe 2**   awakens.  **Roe 1** is still asleep.

Sunday, September 4, 2016 @ 11:13 a.m.
**Roe 2**   texted**John Doe**saying, "Sorry".

Sunday, September 4, 2016 @ 11:25 a.m.
**John Doe** texted   **Roe 2**   saying, "You good?"

CONFIDENTIAL



EXHIBIT
12
Doe

USA 06029
Doe vs. USA



UNIVERSITY OF SOUTH ALABAMA

December 14, 2016

To:  **John Doe**
     **John Doe**

From:  Michael A. Mitchell, Ph.D.
       Vice President for Student Affairs and
       Dean of Students

Re:    Appeal Review

This letter is in response to your November 16, 2016 appeal of the judicial decision rendered by the University Disciplinary Committee on November 15, 2016. In your November 21, 2016 meeting with me, you expressed the reasons for your appeal in the following categories:

1. Violation of procedural rights
2. Severity of disciplinary action
3. Evidence not available at the time of hearing

After meeting with you, I met with complainants in the case, reviewed the audio recording for the hearing, reviewed the statements submitted, and met with the hearing officers. I have come to the following conclusions related to your appeal:

- Though Dr. Agnew's report of her investigation findings were intended to be informational for the committee, her assessment of witness credibility could have had some impact on the committee.
- Any video recordings of the Bell Tower from the morning of the incident were no longer available, as the 30-day retention period for video had expired at the time of request.
- The identity of the Air Force cadet was not information that was required to be provided to you.
- The UDC makes its decision using the preponderance of the evidence by simple majority.
- The statement submitted by your witness ( **Student 11** ) provided sufficient information to the committee on why you were calling him as a witness. Because of his history with one of the complainants, I find that the decision to limit his presence was reasonable.

VICE PRESIDENT FOR STUDENT AFFAIRS / DEAN OF STUDENTS
SC 245 | 350 Campus Drive | Mobile, Alabama 36688-0002
TEL (251) 460-6172 / FAX (251) 460-6157
EO/AA Employer – minorities/females/veterans/disabilities/sexual orientation/gender identity



EXHIBIT

13

Doe

USA 06101
Doe vs. USA

- Any remaining claims of violation of due process were not found to be substantive in this appeal. No claims presented warrant that this case be sent back to the UDC to be heard again.
- I have not been made aware of any new evidence that was not presented in the original hearing.
- I find that the severity of your sanction may have been impacted by the introduction of Jane Doe in your proceedings, thus potentially portraying you as a threat to the campus community.
- Lastly, I find that the information presented during this process does support the complainants' claims that they were intoxicated beyond the point of being able to consent to sex and that there had been a conversation shortly before the event in which the complainants indicated their intent to not engage in future sexual contact with you.

Therefore, I am upholding the board's finding of responsible in this case. I am, however, modifying the residential removal dictated by the board. You shall be allowed to maintain campus residence but you will not be allowed to reside in the Gamma area as long as either complainant resides in the Gamma area.

I have worked with Housing and Dining to hold a private room for you in Delta 3. You are not obligated to accept this assignment and you may terminate your housing contract, without penalty and move off campus. You will need to notify Dr. James Bridgeforth, Director of Housing, of your decision on residence by January 3, 2017.

All other sanctions and no contact orders issued by the UDC remain unchanged.

At this time, you have exhausted the appeals process related to this case. This decision is final.


Cc: Dr. Andrea Agnew
     Dr. James Bridgeforth
     Kim Ortiz
     Tammy Orso
     **Roe 2**
     **Roe 1**

USA 06102
Doe vs. USA



UNIVERSITY OF SOUTH ALABAMA

January 4, 2017

To:     **John Doe**

From:   Michael Mitchell, Ph.D.
        Vice President for Student Affairs and
        Dean of Students

Re:     Revision to Final Appeal Decision

On December 15, 2016, I notified you of my decision in your appeal of a UDC decision in the case brought by     **Roe 2**     and **Roe 1**

Part of my decision allowed you to maintain campus residence but to be relocated outside of the Beta/Gamma area.

Since my last communication with you, the complainants in this case have requested and been granted a release from their housing contracts. Given this new development, I find there to be no cause for your relocation related to this matter. You may maintain your current assignment in university housing.

CC:     Dr. Andrea Agnew, Assistant Dean of Students
        Dr. Krista Harrell, Associate Dean of Students
        Kim Ortiz, Coordinator of Student Conduct
        James Bridgeforth, Director of Housing
        Tammy Orso, USAPD Patrol Captain
        **Roe 2**
        **Roe 1**





EXHIBIT

14

Doe

USA 06103
Doe vs. USA

# ℒ𝒮𝒜

## UNIVERSITY OF SOUTH ALABAMA

November 16, 2016

John Doe
Sent electronically to      John Doe

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2016016401

November 16, 2016

Dear John Doe:
John Doe

On November 7, 2016, a female student reported to the Title IX Office an allegation of sexual misconduct involving you. The alleged sexual misconduct took place off campus. The female student alleges she was too incapacitated to provide consent to you for sex.

The University's investigation is intended to determine whether:

- Sexual intercourse was forcible; or
- Sexual intercourse took place under conditions where the two female students were incapacitated; and you either knew that or should have known that from the circumstances you were aware of; or
- Whether if not forcible or based on incapacitation, there was consent to the sexual intercourse by clear word or action.

This letter serves as notice that we will be conducting an impartial investigation of this allegation according to the procedures detailed in THE LOWDOWN, available at http://www.southalabama.edu/departments/studentaffairs/lowdown/. The relevant investigation and resolution procedures can be found at http://www.southalabama.edu/departments/studentaffairs/studentconduct/. You have the right to an advisor of your choosing to assist you in this process.

Retaliation
This letter also serves as a reminder that the University of South Alabama prohibits retaliation. Retaliation consists of materially adverse action taken against a person because the person made a good faith report of sexual misconduct or participated in the investigation of a report of sexual misconduct, such as by serving as a witness or support person.

Retaliatory actions include—but are not limited to—threats or actual violence against the person or that person's property, adverse educational or employment consequences, ridicule, intimidation, bullying, or ostracism. The University will impose sanctions on any faculty, student, or staff member found to be engaging in retaliation, or individuals who encourage third parties to retaliate on their behalf. If you experience any retaliation, please contact either Kim R. Ortiz, Ed.S, Coordinator of Student Conduct, at 251.460.6172, or krortiz@southalabama.edu; or Dr. Andrea Agnew, Assistant Dean of Students, at 251.460.7212, or aagnew@southalabama.edu.

You have the right to discuss this matter with your advisor(s) and others, but the University is required under federal law to conduct this investigation confidentially. We ask for your discretion in what you choose to share, and hope that you will respect the private and sensitive nature of these allegations.

If you have any questions, please contact either Kim R. Ortiz, Ed.S, Coordinator of Student Conduct, at 251.460.6172, or krortiz@southalabama.edu; or Dr. Andrea Agnew, Assistant Dean of Students, at 251.460.7212, or aagnew@southalabama.edu. Your full cooperation with the investigation is anticipated and appreciated.

EXHIBIT
17
Doe

USA 00134
Doe vs. USA

Sincerely,

Kim R. Ortiz, Ed.S, M.A.
Coordinator of Student Conduct

CC:   Dr. Andrea Agnew, Assistant Dean of Students

USA 00135
Doe vs. USA



UNIVERSITY OF SOUTH ALABAMA

March 28, 2017

███ John Doe ███
Sent electronically to ███████ John Doe ███████

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2016016401

Dear ███ John Doe ███:

The following decision has been reached in your case:

ALLEGED VIOLATION(S) and DECISION:

    1. 07e. Engaging in Sexual Violence -- Responsible

SANCTIONS:

You are suspended from the University of South Alabama effective Friday, May 5, 2017.  You may resume classes at the University of South Alabama for the Spring, 2018, term.  During the period of suspension, you may not visit the campus for any reason. If you must visit the campus for a business purpose, the visit must be cleared by the Office of the Dean of Students at least 24 business hours prior to your intended visit.

You are on conduct probation for the remainder of your academic career.

There is a mutual *No Contact Order* between ███ Jane Roe 3 ███ and you.  You are directed to avoid contact with ███ Jane Roe 3 ███ until this order is lifted in writing.  Both ███ Jane Roe 3 ███ and you are to refrain from: (1) approaching one another at any time; (2) calling or texting one another at any time; (3) sending E-mail, campus, or regular mail to each other; (4) contacting or communicating with one another, including through a third party, in any way at any time.  Should you need to contact her, you must do so through this office.

RATIONALE and ANALYSIS by the UNIVERSITY DISCIPLINARY COMMITTEE (UDC):

Based on a preponderance of evidence, it was determined by the University Disciplinary Committee that the complainant did not provide explicit and unambiguous consent to engage in sexual activity with the respondent.

The decision-making process of the University Disciplinary Committee was grounded in the University of South Alabama Sexual Misconduct Policy & Complaint Resolution Procedures and the *Code of Student Conduct* and careful consideration of testimony given.

If you wish to appeal this decision, the appeal must be filed with the Dean of Students Office

EXHIBIT
21
Doe

USA 06534
Doe vs. USA

(Student Center, Suite 245, 251.460.6172) no later than seven business days from the date of this letter (by Tuesday, April 4, 2017). Click the following link, to file your appeal electronically: Appeal

For more information, please visit http://www.southalabama.edu/departments/studentaffairs/studentconduct/index.html. Should you have any questions, please let me know.

Sincerely,

Kim R. Ortiz, Ed.S, M.A.
Coordinator of Student Conduct

CC:   Dr. Michael Mitchell, VP for Student Affairs and Dean of Students
      Dr. Krista Harrell
      Dr. Andrea Agnew, Assistant Dean of Students
      Complainant

USA 06535
Doe vs. USA

# UNIVERSITY OF SOUTH ALABAMA

March 28, 2017

▮▮▮▮▮

Sent electronically to ▮▮▮▮▮▮▮▮▮▮▮▮

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2016030901

Dear Ms. ▮▮▮ J00537626:

The following decision has been reached in your case:

ALLEGED VIOLATION(S) and DECISION:

1. 07e. Engaging in Sexual Violence -- Not Responsible

SANCTIONS:

There is a mutual *No Contact Order* between ▮▮▮▮▮▮ and you. You are directed to avoid contact with ▮▮▮▮▮▮, until this order is lifted in writing. Both ▮▮▮▮▮▮ and you are to refrain from: (1) approaching one another at any time; (2) calling or texting one another at any time; (3) sending E-mail, campus, or regular mail to each other; (4) contacting or communicating with one another, including through a third party, in any way at any time. Should you need to contact him, you must do so through this office.

No further action is required on your part.

RATIONALE and ANALYSIS by the UNIVERSITY DISCIPLINARY COMMITTEE (UDC):

In regards to the August, 2016, incident; there is a lack of preponderance of evidence to support that the respondent, ▮▮▮▮▮▮, transmitted a sexually transmitted disease (STD) ▮▮▮ ▮▮▮▮▮▮) to the complainant, ▮▮▮▮▮▮

The decision-making process of the University Disciplinary Committee was grounded in the University of South Alabama Sexual Misconduct Policy & Complaint Resolution Procedures and the *Code of Student Conduct* and careful consideration of testimony given.

If you wish to appeal this decision, the appeal must be filed with the Dean of Students Office (Student Center, Suite 245, 251.460.6172 no later than two business days from the date of this letter (by Tuesday, April 4, 2017). Click the following link, to file your appeal electronically: Appeal

For more information, please visit http://www.southalabama.edu/departments/studentaffairs/studentconduct/index.html. Should you

OFFICE OF STUDENT CONDUCT
STUDENT CENTER 245  |  350 Campus Drive  |  Mobile, Alabama 36688-0002
TEL: (251) 460-6172  |  FAX: (251) 460-6157  |  SouthAlabama.edu



EXHIBIT

22

Doe

Case 1:17-cv-00394-CG-C   Document 101-1   Filed 01/29/21   Page 140 of 199   PageID #:
2903
Case 1:17-cv-00394-CG-C   Document 43-4 *SEALED*   Filed 10/11/17   Page 24 of 47
PageID #: 1923

have any questions, please let me know.

Sincerely,

Kim R. Ortiz, Ed.S, M.A.
Coordinator of Student Conduct

CC:   Dr. Michael Mitchell, VP for Student Affairs and Dean of Students
      Dr. Krista Harrell
      Dr. Andrea Agnew, Assistant Dean of Students
      Complainant

Case 1:17-cv-00394-CG-C   Document 43-4 *SEALED*   Filed 10/11/17   Page 25 of 47
PageID #: 1924

Appeal must be filed with the Dean of Students within two (2) working days of the hearing decision.  The office is located in the Student Center, Suite 245.  To schedule an appointment with the Dean, please call (251) 460-6172.

# REQUEST FOR APPEAL HEARING

STUDENT:

DATE:

REASON FOR APPEAL (Check One):

_____ A. Violation of Procedural Rights

_____ B. Severity of Discipline Action

_____ C. Evidence Not Available at the Time of the Hearing

Fact(s) that should be considered:



**<u>Regarding Case Number: 2016016401</u>**
**<u>Regarding Case Number: 2016030901</u>**

<u>Appeal Form</u>: My name is <span style="background:black;color:white">John Doe</span> and I hereby enter two appeals in these cases.

**<u>Regarding Case Number: 2016016401</u>**

*Grounds for Appeal as to* FINDING OF RESPONSIBLE AS TO TITLE IX COMPLAINT AGAINST <span style="background:black;color:white">John Doe</span>

I hereby file the following appeal based on a Violation of procedural rights; the Severity of disciplinary action; and Evidence not available at the time of hearing.

1.      The University of South Alabama's failure to prevent the testimony of <span style="background:black;color:white">Jane Roe 3</span> as to prior conduct of <span style="background:black;color:white">John Doe</span> and the allegations of prior complaints and Title IX hearing despite the personal assurance of Dean Mitchell in e-mail correspondence that no such testimony would be allowed. After <span style="background:black;color:white">Jane Roe 3</span> breached this and testified to matters deemed inadmissible, I made a request to dismiss <span style="background:black;color:white">Roe 3</span>s complaint for intentional misconduct prejudicial to the administration of a fair and impartial hearing. In the alternative I requested a new UDC panel untainted by the prejudice. Both requests were denied by Kim Ortiz the Hearing Officer after a phone consultation with you the Dean. This was a material and prejudicial violation of procedural rights occurred that affected the determination of the discipline. (**See attached Exhibit A: E-mail assurance from Dean Mitchell due process would be afforded**) It should be noted that this is a repeated failure of USA to afford me a fair and impartial hearing because the same misconduct by the complainant (allowing the complainant to testify about my prior sexual history) occurred in my prior Title IX complaint.

2.      The UDC applied the incorrect standard of consent. The UDC applied the definition of CONSENT as defined by USA *Student Code of Conduct* 7.E. This definition of CONSENT differs from the USA Sexual Misconduct Policy & Complaint Resolution Procedures, IV,D, 2: CONSENT.  Since the University Code of Conduct Consent Definition is in conflict with the USA Sexual Misconduct Policy Resolution Procedures definition, the latter controls (See USA Sexual Misconduct Policy and Complaint Resolution Procedures, VII., A:Complaint Resolution Procedures)

        "All complaints of sexual misconduct will be investigated and resolved pursuant to the Complaint Resolution Procedures, which, along with this policy, are the exclusive means of resolving complaints of sexual misconduct. <u>To the extent this policy and/or the Complaint Resolution Procedures conflict with any other University policy, this policy and/or the Complaint Resolution Procedures, as the case may be, will control</u>. Under the Complaint Resolution Procedures, the party



<span style="background:black;color:white">John Doe</span> v. USA-1

EXHIBIT

23

Doe

PENGAD 800-631-6989

USA 06552
Doe vs. USA

making a complaint is referred to as the "complainant" and the person accused of misconduct is referred to as the "respondent." (*Emphasis Added*)

The UDC failed to follow USA's own rules.

3.       Additionally USA prohibited me from introducing the sexual history of <mark>Jane Roe 3</mark> to the UDC, but allowed and authorized <mark>Jane Roe 3</mark> to introduce the sexual history of <mark>John Doe</mark> USA treated me differently evidencing a bias by the University against males.

4.       USA failed to disclose what benefits were afforded <mark>Jane Roe 3</mark> as a result of her filing a Title IX complaint against me. (**See attached Exhibit B**)   In so doing USA denied me the opportunity to effectively cross examine <mark>Roe 3</mark> and to fully present his side of the story. This evidence was critical to establish bias on part of my accuser and is exculpatory. I had no way to know about critical evidence that would impeach my accuser's credibility, and this was a case where the panel's decision hinged on a credibility decision (<mark>Roe 3</mark> called no witnesses in support of her claims at the UDC hearing) The right to some form of cross-examination in university expulsion hearings is a clearly established due process right when cross-examination is "essential to due process," as in a case that turns on "a choice between believing an accuser and an accused." See <u>Flaim v. Med. Coll. of Ohio</u>, 418 F.3d 629, 641 (6th Cir. 2005). Despite USA's reliance on FERPA to deny my request, Due Process (of Constitutional import) in this context controls. USA withheld critical evidence and information from me. Without discovery or mandatory disclosures, or the active assistance and participation of my advocate, I was left to rely on the beneficence of USA's administrators. I had no way to know about critical evidence that would impeach my accuser's credibility, and this was a case where the panel's decision hinged on a credibility decision. My right to cross examination was effectively denied by the USA's failure to turn over critical impeachment evidence. I only had what I could unearth on my own and what USA provided in the file to form the basis of any cross-examination. I never had the assistance of my university appointed Title IX advocate. My university appointed advocate never even showed up to help me at my Title IX hearing.  See also <u>Doe v. Ohio State Univ.</u>, S.D.Ohio No. 2:15-cv-2830, 2016 U.S. Dist. LEXIS 154179 (Nov. 7, 2016)   See also <u>Doe v. Ohio State Univ.</u>, S.D.Ohio No. 2:15-cv-2830, 2016 U.S. Dist. LEXIS 154179 (Nov. 7, 2016)

5.       Despite <mark>Jane Roe 3</mark>'s disclosure of information involving allegations involving the prior Title IX complaint, Kim Ortiz attempted to remedy the disclosure and told the UDC to disregard. This was an ineffective attempt to minimize the prejudice. This was ineffective and the prejudice could not be undone. Additionally ORTIZ instructed the panel outside the presence of myself and my advocate. So I am unaware of exactly what ex parte instruction was given the UDC panel. Based on this the hearing and my rights were prejudiced and my procedural rights were violated.

 <mark>John Doe</mark> v. USA-2

6.    USA had no jurisdiction over me because Title IX specifically exempts institutions that train individuals for the military or merchant marine. Since USA has an ROTC program of which I am both a member and scholarship recipient, I am not subject to Title IX. Title IX does not apply to an educational institution the primary purpose or which is the training of individuals for the military services of the United States or the merchant marine. 20 U.S.C. § 1681(a)(4); 34 C.F.R. § 106.13.

7.    During the UDC panel hearing Roe 3's Title IX advocate directly addressed me instructing me to answer a question. This misconduct was clearly inappropriate and prejudiced me in front of the UDC panel. USA took no corrective action. No admonition was given Roe 3's Title IX advocate for her misconduct. Such conduct prejudiced me in the eyes of the UDC and specifically violated USA's Sexual Misconduct Policy & Complaint Resolution Procedures and the Code of Student Conduct.

8.    The written statements presented to the UDC were not statements of the witnesses; rather they were typewritten statements of AGNEW whom AGNEW or the members of USA had the witnesses sign. AGNEW was removed from participation in the UDC hearing, so allowing her statements in amounted to a violation of my procedural rights. As such my procedural rights were violated.

9.    USA had no jurisdiction over me to even entertain this Title IX complaint. The complained of conduct occurred off campus, when school was not in session, and involved absolutely no educational program or activity. (See *Title IX Legal Manual, United States Department of Justice, Civil Rights Division, III. Scope of Coverage; C: Covered Education Program or Activity* (pages 48-49), 2001](**See attached Exhibit C: Motion To Dismiss previously served upon USA**) Additionally USA has no jurisdiction over me in this matter under its own rules -Sexual Misconduct Policy & Complaint Resolution Procedures and the Code of Student Conduct. The University's sanctioning and questioning me for off- campus sexual conduct under the facts of this case violates my right to privacy and liberty protected under the Due Process Clause of the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment gives me the full right to engage in private conduct without university intervention. See *Lawrence v. Texas*, 539 U.S. 558 (2003); see also *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 847 (1992). I hereby reassert all of my arguments presented in the attached Motion to Dismiss I filed with USA.

10.    My procedural rights were violated by the intentional misconduct of the complaining witness who violated the rules of the hearing and specific instruction by Dean Mitchell by

John Doe *v. USA*-3

disclosing the existence of prior facts and names and circumstances of prior TITLE IX complaint against me.

11.     The four person UDC panel consisted of two university students in violation of the United States Department of Education, OCR "Questions and Answers on Title IX and Sexual Violence, p. 30, FN30.[1]

12.     USA has a policy which encourages *ex parte* communications between the hearing officer (in this instance KIM ORTIZ) and the UDC members. ORTIZ addressed the UDC panel members *ex parte* both before, during, and after the hearing. I have the right to be present during these ex parte communications. I requested the university record these instances so as to adequately present his claims before a court of law. Despite my request to preserve this evidence USA denied me this request.

13.     I was denied any opportunity to question and cross-examine witnesses and witness statements which the University allowed to be offered in as evidence against me. These written statements contained multiple hearsay statements and were unreliable but were presented to the UDC as fact. I could not challenge the veracity of the written statements. These include the written statements of a former Title IX complainant my ex-girlfriend, ███ Jane Roe 1 ███. Also admitted were statements of ███ Student 1 ███, ███ Student 5 ███, **and** ███ Student 2 ███ I was offered no opportunity to cross- examine these witnesses. In so doing USA denied me the opportunity to cross examine the witness statements offered by my accuser and to fully present my side of the story. This evidence is critical to establish bias on part of the accuser and is exculpatory. I had no way to know about critical evidence that would impeach my accuser's credibility, and this was a case where the panel's decision hinged on a credibility decision (██Roe 3██ called no witnesses in support of her claims at the UDC hearing)

14.     The UDC predicated its ruling on "it was determined by the University Disciplinary Committee that the complainant did not provide explicit and unambiguous consent to engage in sexual activity with the respondent." ██Roe 3██ never asserted this in any of her more than 5 hours of in three separate interviews with USA Title IX representatives and USA administrators and employees. ██Roe 3██ alleged only that she was intoxicated and incapacitated, not that she did not provide explicit and unambiguous consent. I prepared my defense based upon the allegations outlined in the Title IX investigative report. ██Roe 3██ abruptly and without notice changed her

---

[1] "Although Title IX does not dictate the membership of a hearing board, OCR discourages schools from allowing students to serve on hearing boards in cases involving allegations of sexual violence."

██John Doe██ v. USA-4

TITLE IX complaint and presented this new allegation for the first time at the hearing. I was not given adequate notice nor opportunity to challenge this evidence.

15.     The finding of responsible was not supported by the weight of the evidence submitted to the UDC.

16.     USA allowed ▇Roe 3▇ to make a victim impact statement before the UDC made a finding of responsible and such violated my right to fair hearing and his right to a neutral and impartial ruling from the UDC.

17.     The complainant's delay in reporting their claims, some 91 days, severely prejudiced my ability to gather evidence to mount a defense.

18.     Although the Title IX hearing alleged the burden of proof, nothing in the Title IX rules promulgated by the University says who exactly has the burden of proof. Apparently from the hearing it is the University's position that the accused student has the burden of proof, but nowhere in the materials presented (LOWDOWN or University Student Code of Conduct) is the University authorized to shift this burden to me. As such the University acted without legal authority to make this my burden, and failed to provide adequate notice that I bore the burden of proof.

19.     The UDC has adopted a "preponderance of the evidence standard" promulgated by the United States Department of Education's Office for Civil Rights (OCR). The 2011 "dear colleague" letter from the Office for Civil Rights of the U.S. Department of Education under the Obama administration defines acts of sexual violence (rape, sexual assault, etc.) as "discrimination based on sex." Among other policies, this letter mandates that universities and colleges (if they want to keep federal funding) investigate claims of sexual assault made by students and apply the "preponderance of evidence" standard when determining guilt.[2] Additionally USA's policy only requires a majority vote in favor of a finding or responsible. To introduce a new agency rule, OCR is obligated under the federal Administrative Procedures Act (APA) to publish a notice of its proposed rules change and must allow a period for public comment, which they did not do. OCR must also fully respond to issues and data raised by the

---

[2] "Dear Colleague" Letter, Office of the Assistant Secretary, Office for Civil Rights, Department of Education, April 4, 2011, *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

▇John Doe▇ v. USA-5

public in any final rule.[3] Therefore, USA's adoption of this preponderance of the evidence standard is in violation of the APA and operated to deprive me of due process of law in this instance.

20.     I have never been arrested or charged with any crime or even accused by a crime by any of these Title IX complainants. The University failed at all to consider any mitigating evidence before passing judgment. As such I am appealing the severity of the action taken by the University in this matter.

I appealing the decision and the punishment enacted based on the above mentioned violations of procedural rights, severity of the disciplinary action, and evidence not available at the time of the hearing. Based on the following I am asking the complaint and findings by the UDC be dismissed, or in the alternative a new hearing before a new UDC panel be convened and fair hearing with the opportunity to present my witnesses and evidence.

/s/ John Doe
April 3, 2017

### Regarding Case Number: 2016030901

**Appeal Form:** My name is John Doe and I hereby enter an appeal to the finding of NOT RESPONSIBLE for Jane Roe 3 's sexual assault of me.

**Grounds for Appeal as to FINDING OF NOT RESPONSIBLE AS TO TITLE IX COMPLAINT AGAINST     Jane Roe 3     BY     John Doe**

1. **THE INVESTIGATION INTO     John Doe     'S TITLE IX CLAIM WAS INADEQUATE & BIASED:** The University assigned Krista Harrell to handle and process my complaint. My initial complaint was handled with hostility and doubt by Ms. Harrell from the outset. She initially denied that my complaint was event covered by Title IX. It was only after I, John Doe, pointed out to her USA's Sexual Misconduct Policy & Complaint Resolution Procedures D. Sexual Violence 3. Examples of Sexual Violence (see attached e-mail from Krista Harrell, the USA Title IX Coordinator and Associate Dean of Students) that she reluctantly agreed to process my complaint. For the University to assign the same Title IX coordinator who investigated me, found sufficient cause of the Roe 3 's complaint against me to be approved is a clear conflict of interest. Additionally when I reached out to Dr. Harrell I was told she was too busy to see me. Additionally the only person interviewed for my claim was Roe 3 and it involved a single paragraph, with no attempt at investigating the veracity of her statement. Roe 3 was afforded

---

[3] *See* 5 U.S.C. §553. An agency regulation or new interpretation of a regulation that does not satisfy the notice-and-comment requirements of the Administrative Procedures Act is rendered invalid, and the prior regulation is reinstated until the agency promulgates valid alternative regulation. *See Abington Memorial Hospital v. Heckler*, 750 F.2d 242 (3rd Cir. 1984); *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997)

John Doe *v. USA-6*

over 5 hours of interview on three separate occasions by USA to help gather evidence in her Title IX complaint against me. No attempt to gather medical records of [Roe 3] was attempted-USA cited FERPA, but nothing prevented USA from asking [Roe 3] to voluntarily provide medical records (i.e. consent). I never had any assistance my university appointed Title IX advocate in gathering evidence other than what I could unearth on my own and what USA provided in the file to form the basis of any cross-examination of [Jane Roe 3] or any of the witnesses who provided written statements to the UDC. I never had the assistance of his university appointed Title IX advocate.  See also Doe v. Ohio State Univ., S.D.Ohio No. 2:15-cv-2830, 2016 U.S. Dist. LEXIS 154179 (Nov. 7, 2016)   Additionally there was credible evidence and even an admission from [Roe 3] that she knowingly exposed another student to a sexually transmitted disease earlier in the same evening, yet because the student exposed was a male and because [Roe 3] had herself filed a Title IX complaint the University failed to even investigate this claim. The exposed student event testified live before the UDC. This student admitted he has not been tested. In handling my TITLE IX complaint, USA violated their own Sexual Misconduct Policy & Complaint Resolution Procedures and the Code of Student Conduct.

2.     USA has denied me equal protection of the law in violation of the Fourteenth Amendment.

3.     I was denied the assistance of a university appointed Title IX advocate to help me with my Title IX complaint against [Jane Roe 3] At no point did a Title IX advocate attempt to help or communicate with me after I filed my Title IX complaint. My Title IX advocate could have encourage USA to investigate the inconsistent testimony of [Jane Roe 3] could have helped me gather evidence to further my Title IX complaint. The Title IX advocate could have helped gather key evidence to impeach the credibility of the complainant including what evidence there was to corroborate the complainant's allegations that she dropped a class, quit SGA, quit her job, and stopped cleaning her room. The Title IX advocate appointed by USA failed to even appear at my IX hearing; the Title IX advocate failed to attempt to contact me in any way after I filed my Title IX complaint. This is gross incompetence and further evidences USA's bias against male Title IX complainants. Additionally when I attempted to have Dr. Krista Harrell schedule my Title IX complaint with [Roe 3]'s Title IX complaint I was met with resistance and recalcitrance from Harrell. Furthermore, USA and/or Harrell delayed in processing my Title IX complaint.

4.     USA Title IX interviewed [Jane Roe 3] on three different occasions spanning over five (5) hours worth of testimony from her in processing her Title IX complaint. USA engaged in numerous witness interviews in response to [Roe 3]'s Title IX complaint. USA afforded me none of this same attention and evidence gathering to help him in his Title IX complaint. Other than [Jane Roe 3], USA failed to interview a single other witness in response to my Title IX

[John Doe] v. USA-7

complaint. In fact USA assigned ANDREA AGNEW (or she took it upon herself) to question `Roe 3` regarding my complaint. This is a gross deviation from USA's promised commitment to a fair and impartial process, and evidence of impermissible gender bias under Title IX because she was the USA official assigned to help `Roe 3` in her Title IX complaint against me.

5.      USA denied me a fair and impartial hearing in his Title IX complaint by assigning his case to be handled by Krista Harrell. Ms. Harrell had already investigated `Roe 3`'s Title IX complaint against me and has participated in the investigation of me, and participated in a finding that the university "proceed forward with an investigation" of me based on the identical facts and circumstances I alleged that `Roe 3` assaulted him. Dr. Harrell played an instrumental role in helping `Roe 3` bring forth her Title IX complaint against me. Also, Dr. Harrell played a critical role in my previous Title IX hearing as she helped `Jane Roe 1` and `Roe 2` `Roe 2` bring forth sexual assault charges against me. `Roe 3` failed to disclose her assault upon me in her Title IX complaint and this is critical fact in the UDC evaluating `Roe 3`'s credibility. USA had other Title IX coordinators who could have fairly heard my Title IX complaint and actively help present my claim and gather evidence as USA does for female complainants like `Roe 3` `Roe 1`, and `Roe 2` If USA was truly committed to "avoid conflicts of interest that could call into question the integrity of the process" it would have reassigned my case to different Title IX coordinator so I could get a fair, neutral, and impartial hearing. (p.20 of *USA Sexual Misconduct Policy & Complaint Resolution Procedures*)

6.      USA treated me differently from `Roe 3` in determining whether he satisfied the requirements and conditions for the provision of benefits and services available to me when I filed my Title IX complaint.

7.      Upon information and belief USA denied me similar benefits, aid, and services that female Title IX complainants are and were offered; additionally USA otherwise limited me in the enjoyment of rights, privileges, advantages or opportunities USA afforded `Roe 3` and other female Title IX complainants.

`Roe 3` knowing transmitted a sexually transmitted disease to me. USA never took my complaint seriously, never provided me the services and benefits female Title IX complainants were afforded. It is disheartening that the USA appointed Title IX advocate did not even show up to help me at my Title IX hearing?

I appealing the UDC ruling based on the above mentioned violations of procedural rights and evidence not available at the time of the hearing. Based on the following I am asking the UDC finding be set aside and that I be given a Title IX advocate who will help me navigate the maze of Title IX evidence gathering to and to convene a new fair hearing with the opportunity to present my witnesses and evidence.

/s/ `John Doe`
April 3, 2017

`John Doe` v. USA-8

# EXHIBIT A

John Doe v. USA-9

3/30/2017                    XFINITY Connect Re_ Due Process Requests for UDC by Advocate on behalf of <span class="redacted">John Doe</span> Printout

**Michael Mitchell <mmitchell@southalabama.edu>**                    3/27/2017 12:00 PM

## Re: Due Process Requests for UDC by Advocate on behalf of <span class="redacted">John Doe</span> <span class="redacted">John Doe</span>

To Matt Green <mattgreenlaw@comcast.net>   Copy Kim R. Ortiz <krortiz@southalabama.edu> •
<span class="redacted">John Doe</span> • Andrea Agnew <aagnew@southalabama.edu>

<span class="redacted">John Doe</span>

Here are my response to your questions:

1. Members of the UDC have a copy of the University's Sexual Misconduct Policy and Resolution Procedures and the definition of incapacity will be covered per the policy prior to the hearing, as will other relevant sections of the policy.

2. Though I do not find that any prior conduct by Dr. Agnew merits her removal from this proceeding, Dr. Agnew has recused herself from today's proceeding. She would have only been there to be a resource to the process. You may indeed call her as a witness, but you should be aware that she may not be able to answer any question that creates a conflict of interest related to her capacity with today's cases. Please contact Dr. Agnew by 1pm today if you would like to call her as a witness.

3. USA's policy specifically indicates that deliberations are not included as a part of the single verbatim record. This is covered in Lowdown in the section on formal hearings (p.61 - A7 and A8).

4. All witnesses will be instructed that they should refrain from mentioning any prior Title IX hearings involving you. This will be done before they enter the hearing and outside of the presence of the UDC.

Dr. Michael Mitchell
*Vice President for Student Affairs and Dean of Students*
Division of Student Affairs
mmitchell@southalabama.edu
P: (251) 460-6172
F: (251) 460-6157
—
Division of Student Affairs/Student Center 245
350 Campus Drive
Mobile, AL 36688-0002
southalabama.edu



On Mon, Mar 27, 2017 at 9:17 AM, Matt Green <mattgreenlaw@comcast.net> wrote:

Dr. Mitchell & Ms. Ortiz,

As <span class="redacted">John Doe</span>'s Advocate for this afternoon's hearing. We have several requests in <span class="redacted">John Doe</span>'s capacity as both a Title IX complainant and respondent:

<span class="redacted">John Doe</span> v. USA1/?)

1. The UDC be instructed on the definition of incapacity as opposed to intoxication-" A person is "mentally incapacitated" if the person lacks the ability to understand the fact, nature, or extent of a sexual situation due to a narcotic or
intoxicating substance administered without their consent. A person is "physically helpless" if the person is generally unconscious or unable to communicate." See Sexual Misconduct Policy & Complaint Resolution Procedures, IV,D, 2: Consent.  Since the University Code of Conduct Consent Definition is in conflict with the USA Sexual Misconduct Policy Resolution Procedures definition, the latter controls (See  USA Sexual Misconduct Policy and Complaint Resolution Procedures, VII., A:Complaint Resolution Procedures)

"All complaints of sexual misconduct will be investigated and resolved pursuant to the Complaint Resolution Procedures, which, along with this policy, are the exclusive means of resolving complaints of sexual misconduct. To the extent this policy and/or the Complaint Resolution Procedures conflict with any other University policy, this policy and/or the Complaint Resolution Procedures, as the case may be, will control. Under the Complaint Resolution Procedures, the party making a complaint is referred to as the "complainant" and the person accused of misconduct is referred to as the "respondent.". (Emphasis Added)

2. The removal of Andrea Agnew from the proceeding as [John Doe] may call her as a witness; additionally Dr. Agnew's removal is appropriate based on her animus and malice exhibited against [John Doe] in the prior hearing as confirmed by her prejudicial conduct (acknowledged by Dr. Mitchell in the last hearing in reducing the UDC recommendation of punishment; additionally it has come to the attention of [John Doe] and his advocate that Dr. Agnew had improper contact with the prior UDC panel outside the presence of [John Doe] and his advocate in the prior hearing. Clearly her continued involvement in this process (particularly since she personally participated in investigating [Jane Roe 3]'s allegations against [John Doe] and participated in drafting allegations of sexual assault against [John Doe] which is being submitted to the UDC over our objection ) renders her unfit to participate in today's hearing as an arbiter, judge, or ruling on any objections.

3. [John Doe] specifically requests the hearing, deliberations, and any/all conversation USA officials have with members of the UDC be recorded in its entirety to ensure that no future improper contact with members of the UDC panel occur, and to ensure [John Doe] is afforded due process of law and as guaranteed by the USA Student Code of Conduct and the Alabama state and federal constitutions. If there are concerns with privacy, the University may object to the admission of such materials in a court of law, but the failure to preserve this evidence is a violation of Alabama law. Failure to honor this request constitutes spoliation of evidence under Alabama law and may result in adverse legal consequences against the University in any future legal action.

4. That all witnesses be instructed prior to and outside the presence of the UDC panel members to in no way reference of mention any prior Title IX hearings [John Doe] was involved in.

Thank you for this consideration in this most important day of [John Doe] academic career and his reputational property interest.


Matt Green

Advocate for Title IX Complainant and Respondent [John Doe]


Matt Green| Attorney at Law Office/Fax: (251) 434-8500
| Mattgreenlaw@comcast.net |www.mattgreen.lawyer | 501 Government Street, Suite 1 |  Mobile, AL 36602


Anything included in or attached to this electronic mail is intended only for the addressee and may contain PRIVILEGED and CONFIDENTIAL information and/or ATTORNEY WORK PRODUCT. If you are not the intended recipient and/or you have received this electronic mail in error, you are hereby notified that any

USA 06562
Doe vs. USA

# EXHIBIT B

John Doe *v. USA-12*

USA 06563
Doe vs. USA

3/30/2017                     XFINITY Connect Fwd_ Requests from ▓John Doe▓ Printout

▓▓▓▓▓ John Doe ▓▓▓▓▓>                                    3/21/2017 10:13 AM

## Fwd: Requests from ▓ John Doe ▓

To Mattgreenlaw@comcast.net <mattgreenlaw@comcast.net>

--------- Forwarded message ---------
From: Kim R. Ortiz <krortiz@southalabama.edu>
Date: Tue, Mar 21, 2017 at 09:39
Subject: Re: Requests from ▓ John Doe ▓
To: Andrea Agnew <aagnew@southalabama.edu>

Dr. Agnew:

I received these links yesterday.  Perhaps, the question wasn't clear.  Were any
accommodations made for ▓Roe 3▓ in terms of classes, schedules, separations (besides
the No Contact Agreement), etc.  Sometimes accommodations are made for students
(e.g., by your office); those are the ones he's seeking to learn.

Kind Regards,
Kim R. Ortiz, Ed.S, M.A.
Coordinator of Student Conduct
krortiz@southalabama.edu
P: (251) 461-1991
F: (251) 460-6157
—

University of South Alabama
Division of Student Affairs
Student Center 245
350 Campus Drive
Mobile, AL 36688
southalabama.edu

**CONFIDENTIALITY NOTICE**
This E-mail message, including any attachments, is intended only for the use of the individual or
entity to which it is addressed and may contain information that is privileged and/or confidential. If
you are not the intended recipient, please notify immediately by replying to this message; and
then, delete this message from your system.  Any use, dissemination, distribution, and/or
reproduction of this message by unintended recipients is prohibited.  This communication does not
form any contractual obligation on behalf of the sender.

3/30/2017                    XFINITY Connect Fwd_Requests from  Printout

On Tue, Mar 21, 2017 at 9:31 AM, Andrea Agnew <aagnew@southalabama.edu> wrote:

Kim,
Per the document link that I sent to you on yesterday
(http://www.southalabama.edu/departments/studentaffairs/titlenine/resources/victimsrightsstatement.pdf)
*Victim's Rights in Cases of Sexual Harassment, Sexual Assault, Domestic Violence, Dating Violence and Stalking:*

*The Victim's Advocate Program (VAP) provides **confidential** support for student sexual assault victims. The VAP assists in linking students to resources at the University and in the community. The VAP provides emotional support and assistance concerning counseling, alternate housing assignments, academic alternatives, medical treatment, disciplinary process and court proceedings. The advocates are University personnel who are formally trained by the Mobile Rape Crisis Center and agree to assist students in their time of need.*

Per FERPA:

*FERPA generally prohibits the improper disclosure of personally identifiable information derived from education records.*

*Under FERPA, a school may not generally disclose personally identifiable information from an eligible student's education records to a third party unless the eligible student has provided written consent.*

I hope this information empowers you to respond to the student's request.

Dr. Andrea C. Agnew
Assistant Dean of Students
Student Disability Services
aagnew@southalabama.edu
P: (251) 460-7212
F: (251) 414-8176
---
Educational Services Building
320 Alumni Circle Suite 19
Mobile, AL 36688-0002
southalabama.edu

UṢA

On Mon, Mar 20, 2017 at 4:22 PM, Kim R. Ortiz <krortiz@southalabama.edu> wrote:

What *specific* accommodations have been provided to Roe 3 by the University?  Please advise of those specific accommodations.

Kind Regards,

Kim R. Ortiz, Ed.S, M.A.

Coordinator of Student Conduct

krortiz@southalabama.edu

 v. USA

USA 06565
Doe vs. USA

3/30/2017                    XFINITY Connect Fwd_ Requests from ███John Doe███ Printout

P: (251) 461-1991

F: (251) 460-6157

—

University of South Alabama

Division of Student Affairs

Student Center 245

350 Campus Drive

Mobile, AL 36688

southalabama.edu

**CONFIDENTIALITY NOTICE**

This E-mail message, including any attachments, is intended only for the use of
the individual or entity to which it is addressed and may contain information that is
privileged and/or confidential. If you are not the intended recipient, please notify
immediately by replying to this message; and then, delete this message from your system.
Any use, dissemination, distribution, and/or reproduction of this message by unintended
recipients is prohibited. This communication does not form any contractual obligation on
behalf of the sender.

On Mon, Mar 20, 2017 at 4:17 PM, Andrea Agnew <aagnew@southalabama.edu> wrote:

Ms. Ortiz,
The documents at the links below should provide you with information to address ███John Doe███

http://familypolicy.ed.gov/sites/fpco.ed.gov/files/DCL_Medical%20Records_Final%20Signed_dated_9-2.pdf

http://www.southalabama.edu/departments/studentaffairs/studentconduct/respondentrights.html

http://www.southalabama.edu/departments/studentaffairs/titlenine/resources/victimsrightsstatement.pdf

Dr. Andrea C. Agnew
Assistant Dean of Students
Student Disability Services
aagnew@southalabama.edu
P: (251) 460-7212
F: (251) 414-8176
—

Educational Services Building
320 Alumni Circle Suite 19
Mobile, AL 36688-0002
southalabama.edu



███John Doe███ v. USA 5/5

USA 06566
Doe vs. USA

On Mon, Mar 20, 2017 at 4:00 PM, Kim R. Ortiz <krortiz@southalabama.edu> wrote:

Dr. Agnew:

Please see the following two requests from John Doe Kindly advise how this information can be obtained.

Kind Regards,

Kim R. Ortiz, Ed.S, M.A.

Coordinator of Student Conduct

krortiz@southalabama.edu

P: (251) 461-1991

F: (251) 460-6157

—

University of South Alabama

Division of Student Affairs

Student Center 245

350 Campus Drive

Mobile, AL 36688

southalabama.edu

**CONFIDENTIALITY NOTICE**

This E-mail message, including any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged and/or confidential. If you are not the intended recipient, please notify immediately by replying to this message; and then, delete this message from your system. Any use, dissemination, distribution, and/or reproduction of this message by unintended recipients is prohibited. This communication does not form any contractual obligation on behalf of the sender.

———— Forwarded message ————
From: ▇▇▇▇▇▇ John Doe ▇▇▇▇▇▇▇ >
Date: Mon, Mar 20, 2017 at 3:48 PM
Subject: Re: Confirmation of Hearing
To: "Kim R. Ortiz" <krortiz@southalabama.edu>

I want any accommodations ▇Roe 3▇ has bren given and her medical records post and pre alleged incident

▇▇John Doe▇▇ v. USA4P6

USA 06567
Doe vs. USA

3/30/2017                                    XFINITY Connect Fwd_ Requests from  John Doe  Printout

- USA-BLUE_Email.png (5 KB)

John Doe  v. USA

USA 06568
Doe vs. USA

# EXHIBIT C

John Doe v. USA-18

USA 06569
Doe vs. USA



**Matt Green**
Attorney At Law

p: 251.434.8500
f: 251.434.8500
e: mattgreenlaw@comcast.net
w: mattgreen.lawyer

January 12, 2017

Michael A. Mitchell, Ph.D.
VP for Student Affairs & Dean of Students
University of South Alabama
350 Campus Drive
Mobile, AL 36688-0022
Email: mmitchell@southalabama.edu

Kim R. Ortiz, Ed.S., M.A.
Coordinator of Student Conduct
Division of Student Affairs
University of South Alabama
350 Campus Drive
Mobile, AL 36688-0022
E-mail: krortiz@southalabama.edu
P: (251) 461-1991

Dr. Andrea Agnew
Assistant Dean of Students
University of South Alabama
350 Campus Drive
Mobile, AL 36688-0022
E-mail: aagnew@southalabama.edu

Kristin Dukes, Associate University Attorney
University of So. Alabama Legal Dept.
307 N University Boulevard Ad 140
Mobile, AL 36688-0002
E-mail: Kdukes@southalabama.edu
F: (251) 460-6157

Page **1** of **10**

John Doe v. USA, et. al.-001

The Pollock-Altmayer House - 501 Government Street, Suite 1 - Mobile, Alabama 36602

USA 06570
Doe vs. USA

Legal Memorandum In Support of Student John Doe's Motion to Dismiss Title IX Complaint

**Regarding Case Number: 2016016401**

Dr. Mitchell and Dr. Agnew,

It is now January 11, 2017 and we have no firm date for any hearing in reference to the above cited Title IX *investigation*.[1] As you are aware the complainant in this matter waited over two months to even file a Title IX complaint. She alleges that she and my client engaged in two acts of off campus sexual intercourse while spending the night with my client. She claims the first instance of sexual intercourse was without her consent and then the next morning she engaged in sexual intercourse with my client consensually. Despite the preposterous and slanderous allegations of the complaint, the University of South Alabama continues to pursue this matter. The University of South Alabama has no jurisdiction under Title IX to sanction John Doe for the conduct alleged, that occurred off campus, and did not implicate any university program or activity. The alleged violation was in no way part of or related to any "University-sponsored activity." Finally the alleged violation has had no adverse affect on the University community and the pursuits of the objectives of the University. Title IX does not cover the alleged conduct in question. For the university to sanction such conduct would violate the plain language of Title IX jurisdiction, as well as the Fourteenth Amendment to the United States Constitution. As grounds for why the University has no jurisdiction you should consider the following.

---

[1] Having not heard from your office in quite some time, my client e-mailed Ms. Ortiz recently to find out if and when a hearing in this matter would be held. Mr. Ortiz responded on January 4, 2017 as follows:

Good Morning,

Per my calendar and notes, the hearing is *tentatively* slated for Thursday, January 19, 2017 or Friday, January 20, 2017. I will keep you apprised.

Kind Regards,

Kim R. Ortiz, Ed.S, M.A.

Page **2** of **10**

I.   TITLE IX JURISDICTION OF THE UNIVERSITY OF SOUTH
     ALABAMA UNDER THE FACTS AND CIRCUMSTANCES OF THIS
     CASE DOES NOT APPLY TO OFF CAMPUS SEXUAL RELATIONS
     BETWEEN STUDENTS

Title IX of the Education Amendments of 1972 (Title IX), 86 Stat. 373, as
amended, 20 U.S.C. § 1681 *et seq.* provides:

(a)   PROHIBITION AGAINST DISCRIMINATION; EXCEPTIONS

No person in the United States shall, on the basis of sex, be excluded
from participation in, be denied the benefits of, or be subjected to
discrimination under any <u>education program or activity</u> receiving
Federal financial assistance." 20 U.S.C. § 1681(a). *(emphasis added)*

(b)   "EDUCATIONAL INSTITUTION" DEFINED
For purposes of this chapter an educational institution means any
public or private preschool, elementary, or secondary school, or any
institution of vocational, professional, or higher education, except that
in the case of an educational institution composed of more than one
school, college, or department which are administratively separate
units, such term means each such school, college, or department.

Title IX of the Education Amendments of 1972 (Title IX), 86 Stat. 373, as
amended, 20 U.S.C. § 1687 lays out the interpretation of university's "programs or
activity"

For the purposes of this chapter, the term "<u>program or activity</u>" and
"<u>program</u>" mean <u>all of the operations of</u>—

(2)(A) a college, <u>university</u>, or other postsecondary institution, or a
public system of higher education; or

It is clear that off campus sexual relations between adult students in a private
residence that is not in any way related to a University of South Alabama education
program or activity is not covered by Title IX. Unfortunately, it appears the
University of South Alabama is relying heavily on the Office of Civil Rights 2011
Dear Colleague Letter [DCL] that contains the following language:

John Doe **v. USA, et. al.-003**

John Doe *v. USA-21*

USA 06572
Doe vs. USA

> Schools may have an obligation to respond to student-on-student sexual harassment that
> initially occurred off school grounds, outside a school's education program or activity. If a
> student files a complaint with the school, regardless of where the conduct occurred, the school
> must process the complaint in accordance with its established procedures. Because students
> often experience the continuing effects of off-campus sexual harassment in the educational
> setting, schools should consider the effects of the off-campus conduct when evaluating
> whether there is a hostile environment on campus. For example, if a student alleges that he or
> she was sexually assaulted by another student off school grounds, and that upon returning to
> school he or she was taunted and harassed by other students who are the alleged perpetrator's
> friends, the school should take the earlier sexual assault into account in determining whether
> there is a sexually hostile environment. The school also should take steps to protect a student
> who was assaulted off campus from further sexual harassment or retaliation from the
> perpetrator and his or her associates.

*2011 OCR Dear Colleague Letter*

The 2011 OCR DCL does not require the University to take any action against my client for off campus conduct in this instance. Most recently this very issue arose in a case where the University of Kanas sanctioned a student for off campus conduct against another student. The University of Kansas relied on the 2011 OCR in asserting an obligation to investigate and sanction a student predicated upon the 2011 OCR DCL. The Kansas Court of Appeals rejected the university's interpretation and said the university had no jurisdiction. See *Yeasin v. University of Kansas*, 2015 WL 561617 (Kan. Ct. App. Sept.25, 2015)

> Note the letter [2011 OCR Dear Colleague Letter] does not direct the
> school to take action off-campus. Instead, the letter clearly advises
> that the school must take steps to prevent or eliminate a sexually
> hostile environment. It seems obvious that the only environment the
> University can control is on campus or at University sponsored or
> supervised events. After all, the University is not an agency of law
> enforcement but is rather an institution of learning.

I am attaching this case for you review. Even assuming that the University is somehow bound to follow the 2011 OCR DCL, the DCL clearly requires some *subsequent misconduct* of my client occur *on school grounds* ("sexual misconduct that initially occurred off school grounds" clearly mandates some subsequent misconduct that occurred on school grounds to trigger the university's jurisdiction) The complaint does simply does not allege this (see below)

Page **4** of **10**

John Doe v. USA, et. al.-004
John Doe v. USA-22

PERSONAL AND CONFIDENTIAL

Regarding Case Number: 2016016401

November 16, 2016

Dear John Doe
John Doe

On November 7, 2016, a female student reported to the Title IX Office an allegation of sexual misconduct involving you. The alleged sexual misconduct took place off campus. The female student alleges she was too incapacitated to provide consent to you for sex.

The University's investigation is intended to determine whether:

- Sexual intercourse was forcible; or
- Sexual intercourse took place under conditions where the two female students were incapacitated; and you either knew that or should have known that from the circumstances you were aware of; or
- Whether if not forcible or based on incapacitation, there was consent to the sexual intercourse by clear word or action.

*Complaint in this Case (Case No. 2016016401)[2]*

Finally to the extent the University seeks to expand its jurisdiction based on the 2011 DCL in derogation of the clear language of Title IX, the clear and unambiguous language of Title IX controls and any interpretation to the contrary is a nullity.

It is clear the University of South Alabama believes that to comply with Title IX it should extend its jurisdiction to disciplining students for off-campus (what you perceive) misconduct that in no way implicates any university program or activity.

The United States Supreme Court has held that Title IX requires some stronger nexus to the university to trigger Title IX jurisdiction. *See* Davis v. Monroe County Bd. of Ed., 526 U.S. 629, 645 (1999) [*hereinafter Davis*]

Moreover, because the harassment must occur "under" "the operations of" a funding recipient, see 20 U.S.C. § 1681(a); §1687 (defining "program or activity"), the harassment must take place in a context subject to the school district's control, Webster's Third New International Dictionary of the English Language, *supra*, at 2487 (defining "under" as "in or into a condition of subjection, regulation, or subordination"; "subject to the guidance and instruction of"); Random House Dictionary of the English Language, *supra*, at 1543 (defining "under" as "subject to the authority, direction, or supervision of").

---

[2] It should be noted that the complaint is lacking the most basic elements of due process- the name of the accuser, the date the event alleged occurred, the location of the event (other than off campus).

Page 5 of 10

John Doe v. USA, et. al.-005
John Doe v. USA-23

> These factors combine to limit a recipient's [in our case the University of South Alabama] damages liability to circumstances <u>wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs</u>. Only then can the recipient be said to "expose" its students to harassment or "cause" them to undergo it "under" the recipient's programs. (*Emphasis added*)

The University of South Alabama had no degree of control (certainly not substantial) over either my client or the complainant or the context in which the alleged misconduct occurred. The alleged conduct occurred in the confines of a private off campus residence between two adults who happen to be students at the University of South Alabama.

The University has no obligation under Title IX for failure to investigate allegations of sexual relations between consenting adults while off campus that in no way implicates an education or activity. As <u>Davis</u> noted:

> The language of Title IX itself–particularly when viewed in conjunction with the requirement that the recipient have notice of Title IX's prohibitions to be liable for damages–also <u>cabins the range of misconduct that the statute proscribes</u>. The statute's plain language confines the scope of prohibited conduct <u>based on the recipient's degree of control over the harasser and the environment in which the harassment occurs</u>. See <u>Davis v. Monroe County Bd. of Ed.</u>, 526 U.S. 629, 645 (1999)

<u>Davis v. Monroe County Bd. of Ed.</u>, 526 U.S. 629, 630 (1999) is still good law and is binding upon the University of South Alabama.

II.    **JURISDICTION OF THE UNIVERSITY OF SOUTH ALABAMA UNDER THE FACTS AND CIRCUMSTANCES OF THIS CASE DOES NOT APPLY IN THIS INSTANCE BASED ON ITS OWN RULES [See University Student Code of Conduct, Prohibited Conduct]**

The University's own student code of conduct requires a nexus to a "University- sponsored activity," which it defines as "any activity, or or off campus,which is inititated, aided, authorized, or supervised by the University..." *See below*

**John Doe v. USA, et. al.-006**
John Doe v. USA-24

### 7. PROHIBITED CONDUCT

University jurisdiction and discipline attaches to conduct which occurs on University premises, or at University related or sponsored activities, whether on or off University premises, or which adversely effects the University community and the pursuit of the objectives of the University. The following non-academic misconduct is subject to disciplinary action.

The term "jurisdiction" for an individual student shall mean that individual is subject to the University Judicial System if he or she is alleged to have violated a University conduct regulation
- While attending nay University orientation program.
- During any semester for which the individual is or has been registered as a student at the University, including, but not limited to those who fail to complete the semester and those who are co-op students, and
- During an interval between consecutive semesters of registration.

The term "University premises" means any and all land, buildings, facilities, and/or other property in the possession of, owned, used, leased, rented or controlled by the University, including adjacent or pertinent streets or sidewalks.

The term "University-sponsored activity" means any activity, on or off campus, which is initiated, aided, authorized, or supervised by the University. The terms "University" and "institution" mean the University of South Alabama.

*The Lowdown*, p. 53

As discussed above, the allegations of the complaint implicate no "university sponsored activity."

**III.   COMPELLING MY CLIENT TO APPEAR BEFORE THE UNIVERSITY TO TESTIFY REGARDING INTIMATE AND DETAILS OF SEXUAL RELATIONS BETWEEN TWO ADULTS WHICH OCCURRED OFF CAMPUS IS IN CLEAR VIOLATION OF THE FOURTEENTH AMENDMENT DUE PROCESS CLAUSE AND IS VIOLATION OF MY CLIENT'S CIVIL RIGHTS**

The University's sanctioning and questioning my client for off- campus sexual conduct under the facts of this case violates my client's right to privacy and liberty protected under the Due Process Clause of the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment gives my client the full right to engage in private conduct without university intervention. See *Lawrence v. Texas*, 539 U.S. 558 (2003); see also *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 847 (1992).

Clearly the University's decision to bring charges against my client constitutes state action for purposes of the Fourteenth Amendment. I am afraid the University's fear of following it's interpretation of the OCR's 2011 Dear Colleague Letter (DCL) has failed to adequately consider the implication such an investigation has upon my client. The University has compelled my client to come before a

John Doe **v. USA, et. al.-007**

John Doe v. USA-25

USA 06576
Doe vs. USA

university official and disciplinary board of strangers and answer questions regarding intimate sexual relations of a private nature in a private residence off campus that is in no way related to any university program or university sponsored activity. Failure of my client to testify or "cooperate" in this matter will no doubt result in adverse action by the University including expulsion. My client has already suffered injury by having to respond the complaint and retain counsel to fight these baseless allegations. Failure to accommodate and balance my client's fundamental liberty and privacy rights are actionable as a matter of law.

For the university to compel my client under penalty of possible expulsion (or any *further* adverse action) under the auspices of Title IX or the student code of conduct to testify as to matters of private and intimate sexual relations under these facts implicates my client's fundamental right to privacy and liberty. The United States Supreme Court has held that punishing an individual for consensual sexual intimacy violates their vital interests in liberty and privacy protected by the Due Process Clause of the Fourteenth Amendment. *Lawrence v. Texas*, 539 U.S. 558 (2003). Such a right is clearly established and has been for over a decade. If the University continues to pursue this investigation, my client intends to pursue a 42 U.S. Code § 1983 action against the university for deprivation of his civil rights. Please be aware my client will be entitled to injunctive relief, money damages, and attorney fees.[3]

My client's sexual relationship with an adult female off campus under these facts is no business of the university. "Liberty protects the person from unwarranted government intrusions into a dwelling or other private places." *Lawrence v. Texas*, 539 U.S. 558 (2003) My client has a fundamental libery interest in the autonomy of his person. In explaining the respect the Constitution demands for the autonomy of the person in making these choices, the United States Supreme Court has held:

> These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State. *Lawrence v. Texas*, 539 U.S. 558, 574 (2003)

---

[3] 42 U.S. Code § 1983: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

John Doe v. USA, et. al.-008
John Doe v. USA-26

USA 06577
Doe vs. USA

My client is entitled to respect for his private life. The University of South Alabama cannot demean this private conduct. My client has a liberty right under the Due Process Clause to engage in sexual relations without under interference by or intervention of the University. "It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 847 (1992).

Freedom extends beyond spatial bounds. Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct. *Lawrence v. Texas*, 539 U.S. 558, 562 (2003).

For the foregoing reasons, I am respectfully requesting the charges against my client be dismissed. If the University seeks to continue with this investigation and ignore this well established law we are prepared to litigate this matter in a court of law.

Sincerely,

Matt Green, Esq.
For *The Law Office of Matt Green, LLC*
Attorney for Student John Doe

John Doe v. USA, et. al.-009

John Doe v. USA-27

USA 06578
Doe vs. USA

cc://

Michael A. Mitchell, Ph.D.
Vice President for Student Affairs &
Dean of Students
University of South Alabama
350 Campus Drive
Mobile, AL 36688-0022
Email: mmitchell@southalabama.edu

Dr. Andrew Agnew
Assistant Dean of Students
University of South Alabama
350 Campus Drive
Mobile, AL 36688-0022
E-mail: aagnew@southalabama.edu

Kim R. Ortiz, Ed.S., M.A.
Coordinator of Student Conduct
Division of Student Affairs
University of South Alabama
350 Campus Drive
Mobile, AL 36688-0022
E-mail: krortiz@southalabama.edu
P: (251) 461-1991
F: (251) 460-6157

Kristin Dukes, Associate University
Attorney
University of South Alabama Legal
Department
307 N University Boulevard Ad 140
Mobile, AL 36688-0002
E-mail:Kdukes@southalabama.edu
Phone: (251) 460-6294
Facsmile: (251) 460-7541

John Doe v. USA, et. al.-010
John Doe v. USA-28

USA 06579
Doe vs. USA

# EXHIBIT A

# TITLE IX COMPLAINT

John Doe v. USA, et. al.-011

John Doe v. USA-29

USA 06580
Doe vs. USA



# UNIVERSITY OF SOUTH ALABAMA

November 16, 2016

██ John Doe ██
Sent electronically to ████ John Doe ████

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2016016401

November 16, 2016

Dear █ John Doe █:
████ John Doe ████

On November 7, 2016, a female student reported to the Title IX Office an allegation of sexual misconduct involving you. The alleged sexual misconduct took place off campus. The female student alleges she was too incapacitated to provide consent to you for sex.

The University's investigation is intended to determine whether:

- Sexual intercourse was forcible; or
- Sexual intercourse took place under conditions where the two female students were incapacitated; and you either knew that or should have known that from the circumstances you were aware of; or
- Whether if not forcible or based on incapacitation, there was consent to the sexual intercourse by clear word or action.

This letter serves as notice that we will be conducting an impartial investigation of this allegation according to the procedures detailed in THE LOWDOWN, available at http://www.southalabama.edu/departments/studentaffairs/lowdown/. The relevant investigation and resolution procedures can be found at http://www.southalabama.edu/departments/studentaffairs/studentconduct/. You have the right to an advisor of your choosing to assist you in this process.

*Retaliation*
This letter also serves as a reminder that the University of South Alabama prohibits retaliation. Retaliation consists of materially adverse action taken against a person because the person made a good faith report of sexual misconduct or participated in the investigation of a report of sexual misconduct, such as by serving as a witness or support person.

Retaliatory actions include--but are not limited to--threats or actual violence against the person or that person's property, adverse educational or employment consequences, ridicule, intimidation, bullying, or ostracism. The University will impose sanctions on any faculty, student, or staff member found to be engaging in retaliation, or individuals who encourage third parties to retaliate on their behalf. If you experience any retaliation, please contact either Kim R. Ortiz, Ed.S, Coordinator of Student Conduct, at 251.460.6172, or krortiz@southalabama.edu; or Dr. Andrea Agnew, Assistant Dean of Students, at 251.460.7212, or aagnew@southalabama.edu.

You have the right to discuss this matter with your advisor(s) and others, but the University is required under federal law to conduct this investigation confidentially. We ask for your discretion in what you choose to share, and hope that you will respect the private and sensitive nature of these allegations.

If you have any questions, please contact either Kim R. Ortiz, Ed.S, Coordinator of Student Conduct, at 251.460.6172, or krortiz@southalabama.edu; or Dr. Andrea Agnew, Assistant Dean of Students, at 251.460.7212, or aagnew@southalabama.edu. Your full cooperation with the investigation is anticipated and appreciated.

OFFICE OF STUDENT CONDUCT
STUDENT CENTER 245 | 350 Campus Drive | Mobile, Alabama 36688-0002
TEL: (251) 460-6172 | FAX: (251) 460-6157 | SouthAlabama.edu

██ John Doe ██ **v. USA, et. al.-012**
██ John Doe ██ *v. USA-30*

Sincerely,

Kim R. Ortiz, Ed.S, M.A.
Coordinator of Student Conduct

CC:    Dr. Andrea Agnew, Assistant Dean of Students

John Doe v. USA, et. al.-013
John Doe v. USA-31

# EXHIBIT B:

*Yeasin v. University of Kansas*, 2015 WL 561617 (Kan. Ct. App. Sept.25, 2015)

John Doe v. USA, et. al.-014

John Doe v. USA-32

USA 06583
Doe vs. USA

No. 113,098

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

NAVID YEASIN,
*Appellee,*

v.

UNIVERSITY OF KANSAS,
*Appellant.*


SYLLABUS BY THE COURT

1.

Parties in an agency action before the district court under the Kansas Judicial Review Act may appeal the district court's decision to the appellate courts, just as parties do in other civil cases. An appellate court then exercises the same statutorily limited review as though the petition for review had been directly filed in the appellate court.


2.

Appellate courts no longer apply the doctrine of operative construction or extend deference to an agency's or board's statutory interpretation.


3.

An appellate court exercises unlimited review on questions of statutory interpretation without deference to a university's interpretation of its student code.


Appeal from Douglas District Court; ROBERT W. FAIRCHILD, judge. Opinion filed September 25, 2015. Affirmed.


1

John Doe v. USA, et. al.-015
John Doe v. USA-33

*Sara L. Trower*, associate general counsel and special assistant attorney general, for appellant.

*Terence E. Leibold*, of Petefish, Immel, Heeb & Hird, LLP, of Lawrence, for appellee.

*Stephen Douglas Bonney*, for amicus curiae ACLU Foundation of Kansas.

*Don Saxton*, for amici curiae Student Press Law Center and Foundation for Individual Rights in Education.

*Maureen A. Redeker* and *Peter J. Paukstelis*, for amicus curiae Kansas State University.

Before GREEN, P.J., HILL, J., and TIMOTHY G. LAHEY, District Judge, assigned.

HILL, J.:  During the summer break of 2013, Navid Yeasin engaged in reprehensible, demeaning, and criminal behavior with W., who is also a University of Kansas student. In addition, Yeasin posted a series of puerile and sexually harassing tweets on his account. None of this conduct occurred on campus or at a University sponsored or supervised event. The Student Code, the rules by which the University can impose discipline upon its students, deals only with conduct on campus or at University sponsored or supervised events. We therefore hold that the University had no authority to expel Yeasin. We affirm the district court's similar ruling and dissolve the stay order issued in this case.

*The dating relationship of two students deteriorates.*

Yeasin and W. met during the fall semester of 2012 when both students were enrolled in the same geology class at the University of Kansas. They dated off and on from November 2012 through May 2013. Their relationship was turbulent.

In late June 2013, Yeasin drove W. to see her therapist. While she was at her therapy session, Yeasin stayed in the car and read text and Facebook messages on W.'s

2

John Doe **v. USA, et. al.-016**
John Doe *v. USA-34*

USA 06585
Doe vs. USA

phone. When W. returned, Yeasin angrily confronted W. about some messages she had sent to another man. The argument continued as they drove around Olathe. W. told Yeasin she did not want to spend the day with him and to take her back to her car. Yeasin became angry again but agreed.

Once at W.'s car, Yeasin took W.'s phone, locked the car doors, and then drove away with W. Yeasin told W. that he was going to make her pay for what she had done. W. repeatedly asked Yeasin to let her out of the car, and he refused. Yeasin also refused to return W.'s phone and physically prevented her from taking her phone back. When W. told Yeasin that she was scared and to take her home, Yeasin responded, "'[N]o, not until you pay the consequences for what you've done and make sure you'll never do this again.'" Sometime between 5 p.m. and 6 p.m., Yeasin took W. back to the parking lot where her car was parked. W. left when a friend picked her up in the parking lot around 10 p.m. Yeasin called W. around 1 a.m. threatening her, and at one point told her he "would make it so that [W.] wouldn't be welcome at any of the universities in Kansas."

W. reported this confrontation to the police. The State charged Yeasin with criminal restraint, battery, and criminal deprivation of property. Yeasin subsequently entered into a diversion agreement with the State on the criminal charges in August 2013. In a companion case, the Johnson County District Court issued a final order of protection from abuse directing Yeasin to have no contact with W. for 1 year.

*Yeasin's victim complains to the University authorities.*

Back on campus in August 2013, W. filed a complaint with the Office of Institutional Opportunity and Access. Generally known by the acronym IOA, it is the office responsible for investigating complaints of discrimination and harassment at the University.

3

John Doe v. USA, et. al.-017
John Doe v. USA-35

USA 06586
Doe vs. USA

On August 8, 2013, an IOA investigator, Jennifer Brooks, interviewed W. regarding her complaint. The IOA opened an investigation. That same day, Yeasin tweeted, "On the brightside you won't have mutated kids. #goodriddens." About a week later, IOA Investigator Steve Steinhilber interviewed Yeasin regarding the complaint. Steinhilber advised Yeasin of his rights and responsibilities during the investigation.

After considering the Johnson County District Court's final protection from abuse order, the IOA decided to issue a no-contact order because Yeasin had engaged in abusive and threatening behavior that made W. afraid to be on campus and continued to post tweets regarding W., which were creating further distress and fear. Specifically, the no-contact order warned Yeasin of possible expulsion:

> "You are hereby informed that this 'no contact' order means that you understand you are prohibited from initiating, or contributing through third-parties, to any physical, verbal, electronic, or written communication with [W.], her family, her friends or her associates. This also includes a prohibition from interfering with her personal possessions. . . . Moreover, retaliation against persons who may pursue or participate in a University investigation, whether by you directly or by your associates, is a violation of University policy.
>
> "A violation of this ruling could result in . . . formal removal from the premises and a recommendation for further conduct sanctioning; including, but not limited to, suspension and expulsion from the University."

That same evening, Yeasin tweeted, "'Jesus Navid, how is it that you always end up dating the psycho bitches?' #butreallyguys." The next day, on August 15, 2013, Yeasin tweeted, "'Oh right, negative boob job. I remember her.'" A week later on August 23, 2013, Yeasin tweeted, "'If I could say one thing to you it would probably be "Go fuck yourself you piece of shit." #butseriouslygofuckyourself #crazyassex.'" Then, on September 5, 2013, Yeasin tweeted, "'Lol, she goes up to my friends and hugs them and then unfriends them on Facebook. #psycho #lolwhat.'"

4

John Doe v. USA, et. al.-018

John Doe v. USA-36

On September 6, 2013, W. told Brooks about the August 23, 2013, tweet Yeasin posted. That same day, Brooks sent Yeasin an email to clarify that even though the August 23, 2013, tweet Yeasin posted did not identify W. by name, the tweet was a form of communication in violation of the no-contact order. Brooks gave Yeasin a second warning that "[g]oing forward, if you make any reference regarding [W.], *directly or indirectly*, on any type of social media or other communication outlet, you will be immediately referred to the Student Conduct Officer for possible sanctions which may result in expulsion from the University." (Emphasis added.)

Some 7 hours later, on September 7, 2013, Yeasin tweeted, "lol you're so obsessed with me you gotta creep on me using your friends accounts #crazybitch." Then, on September 13, 2013, Yeasin tweeted, "30 Reasons to Love Natural Breasts totalfratmove.com/30-reasons-to-. . .via@totalfratmove #doublenegativeboobjob."

On September 17, 2013, the IOA Executive Director Jane McQueeney, concerned that Yeasin's "behavior was escalating" and that he did not understand the no-contact order, conducted a follow-up interview with Yeasin.

At that interview, McQueeney reiterated to Yeasin that both the protection order and no-contact order forbade direct and indirect contact with W. Yeasin acknowledged understanding the no-contact order as meaning he was not to contact W. and stated, "'the twitter thing was a lapse on my part.'" Yeasin expressed that it had not occurred to him that a tweet would be a violation of the protection order or no-contact order and that he had not intended his tweets to reach W. Yeasin stated that he did not post any other tweets about W. after receiving the September 6, 2013, email from Brooks. Yeasin did admit to posting the August 8, 2013, and August 23, 2013, tweets and confirmed they were both about W. However, he claimed that the September 7, 2013, tweet using the hashtag "crazybitch" referred to someone else, not W., and that only the hashtag "#crazyassex" or "#psycho" would be referring to W. Yeasin acknowledged that the

5

John Doe v. USA, et. al.-019
John Doe v. USA-37

August 8, 2013, tweet might have been referring to W.'s "'spine thing'" and that he knew W. had gotten breast implants and had inherited a rib cage deformity but claimed that the September 13, 2013, tweet was not about W., her medical issues, or her surgery. Yeasin told McQueeney that he would not tweet anything that could be perceived as being directed at W. and he recognized doing so was a violation of both the protection order and the no-contact order.

The IOA completed its investigation and issued a report to Tammara Durham, Vice Provost of Student Affairs. The report recommended that disciplinary action should be taken against Yeasin. The IOA report concluded that "while some of the conduct in this case occurred off campus this past summer," the preponderance of the evidence nevertheless showed that Yeasin's conduct had affected the on-campus environment for W., thus violating the University's sexual harassment policy. The IOA also found that Yeasin knowingly and purposefully violated the no-contact order by continually "harassing" W. on social media even after being informed that this indirect contact was in violation of that no-contact order. The IOA communicated its findings and recommendations to Yeasin the same day and reiterated to him that the no-contact order remained in effect.

After receiving the IOA report, the Director of Student Conduct & Community Standards, Nicholas Kehrwald, set a formal hearing and gave notice to Yeasin. Pointing to the IOA's findings, Kehrwald repeated the allegations against Yeasin and specified that Yeasin's conduct violated Article 22.A.1 of the Student Code, the University's sexual harassment policy, and the no-contact order. Kehrwald complained of Yeasin's conduct off campus having an effect on campus:

"[R]epeatedly posting demeaning tweets referenced at [W.], physically restraining [W.] in your car on July 1, 2013. IOA's finding was based on the fact that you held [W.], against her will, for three hours in your car, yelled at [W.], called her demeaning names,

6

John Doe v. USA, et. al.-020
John Doe v. USA-38

and threatened suicide when she attempted to break-up with you. The record also
indicates that you have had electronic communications directed at [W.] after August 14,
2013. While some of these actions have occurred off-campus, the record demonstrates the
relationship and behavior has had on-campus [effects] for [W.]"

Kehrwald advised Yeasin that a formal student conduct hearing would be held on
November 4, 2013, and the no-contact order remained in effect.

On October 23, 2013, Yeasin tweeted, "'At least I'm proportionate.' #NDB #boobs
@MorganLCox."

At the student conduct hearing, the hearing panel told Yeasin that the charges
against him were for violating Article 22.A.1 of the Student Code and the University's
sexual harassment policy. The hearing panel then reviewed the written documents from
the case file and then heard from W., IOA Executive Director McQueeney, IOA
Investigators Steinhilber and Brooks, and Yeasin.

The hearing panel found that Yeasin more likely than not had violated both Article
22.A.1 and the University's sexual harassment policy.

In the panel's view, Yeasin's behavior threatened the physical health, welfare, and
safety of W. Specifically, the panel focused on Yeasin's off-campus actions:

> "Yeasin physically restrained [W.] in his car, yelled at her for hours and
> demonstrated hostile, controlling and unstable behavior, making [W.] afraid for her
> safety. [W.] repeatedly expressed during the time she was restrained in the car, 'I am
> scared. I am scared for my safety. [. . .] I do not feel safe.'"

Then, citing various tweets Yeasin posted after the no-contact order and the September 7,
2013, tweet Yeasin posted after receiving the September 6, 2013, email from the IOA

7

John Doe v. USA, et. al.-021

John Doe v. USA-39

clarifying the no-contact order, the hearing panel also found that Yeasin had violated the no-contact order:

> "Yeasin repeatedly followed and attempted to make unwanted contact, including but not limited to physical or electronic contact with [W.] via text message, twitter and in person after the no-contact order had been delivered to Yeasin, and after IOA had made clarification with Yeasin that any reference regarding W., directly or indirectly, was a violation of the no-contact order."

In concluding that Yeasin violated the University's sexual harassment policy, the hearing panel found "the behavior of Yeasin is unwelcome, based upon sex or sex stereotypes, and are so severe, pervasive and objectively offensive that they have the purpose or effect of substantially interfering with [W.'s] academic performance or participation in the University's programs and activities."

To support its findings, the panel cited Yeasin's off-campus conduct towards W. on June 29, 2013, his threat towards W. on the morning of June 30, 2013, "indicating he would make the University of Kansas campus environment so hostile, W. would not attend any university in the state of Kansas," and statements made by W. about the impact of her relationship with Yeasin and his actions.

The hearing panel recommended that Yeasin be expelled permanently and banned from the University campus until W. graduated.

After reviewing the complaint, the evidence presented at the formal hearing, and the hearing panel's sanction recommendations, Vice Provost Durham agreed with the hearing panel. The University expelled Yeasin and banned him from campus for violating Article 22.A.1 and the University's sexual harassment policy. In her November 13, 2013, decision letter, Vice Provost Durham found:

8

John Doe **v. USA, et. al.-022**

John Doe *v. USA-40*

USA 06591
Doe vs. USA

- Yeasin's "conduct on June 28, 2013 and subsequent electronic communication was so severe, pervasive and objectively offensive that it interfered with [W.'s] academic performance and equal opportunity to participate in and benefit from University programs and activities";

- Yeasin's tweets referencing W. both on and after August 14, 2013, violated the no-contact order and the September 6, 2013, clarifying email;

- the combination of Yeasin's conduct on June 28, 2013, and violation of the no-contact order and the September 6, 2013, clarifying email qualified as a violation of the University's sexual harassment policy, specifically "unwelcome comments about W.'s body, unwelcome physical closeness, and unwelcome jokes or teasing of a sexual nature";

- Yeasin's behavior threatened the physical health, welfare, and safety of W. in violation of Article 22.A.1; and

- Yeasin's conduct "created an imminent threat of danger to W. on campus and unreasonably obstructed and interfered with her learning environment."

Yeasin appealed his expulsion to the University Judicial Board. The Board denied him any relief. With this denial, Yeasin had exhausted his administrative remedies. He then sought judicial review of the University's actions.

*How the district court handled this matter.*

After pointing out that the University presented no evidence that the conduct set forth as the basis for the alleged Article 22 Student Code violation occurred on campus or at a University sponsored event, the district court found that the Student Code, as written, did not apply to off-campus conduct. Specifically, Article 22 of the Student Code stated that the misconduct in question must occur on campus or at University sponsored events. The language relied upon by the University from Article 20—"or as otherwise required by federal, state or local law"—was ambiguous as to providing notice of what conduct

9

John Doe **v. USA, et. al.-023**
John Doe *v. USA-41*

was subject to disciplinary action. Article 18, in contrast, provided specific notice when the University may initiate proceedings for conduct violating federal, state, or local law and that such conduct must occur on campus.

Next, given its finding that the University erroneously interpreted the Student Code by applying it to off-campus conduct, the district court found that the University's decision that Yeasin violated Article 22 was not supported by substantial evidence because it failed to establish that Yeasin's conduct occurred on campus or at a university-sponsored event.

The district court ordered that the University readmit Yeasin, reimburse or credit Yeasin for his fall 2013 semester tuition and fees that he paid, and pay the transcript fees. However, the court issued a stay order at the University's request.

The University appeals the district court's grant of relief to Yeasin, and Yeasin cross-appeals the district court's stay of judgment. The American Civil Liberties Union Foundation of Kansas; the Foundation for Individual Rights in Education, Inc., and Student Press Law Center; and Kansas State University each submitted an amicus curiae brief in support of Yeasin.

*We list the pertinent rules and policies.*

This action is brought as a judicial review of agency actions according to the Kansas Judicial Review Act, K.S.A. 2014 Supp. 77-601 *et seq.* Parties in an agency action before the district court under the KJRA may appeal the district court's decision to the appellate courts, just as parties do in other civil cases. K.S.A. 77-623. We exercise the same statutorily limited review as though Yeasin's petition had been directly filed in this court. See *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010). Contrary to the University's wishes, we no longer apply the doctrine of operative

10

John Doe v. USA, et. al.-024
John Doe v. USA-42

construction or extend deference to an agency's or board's statutory interpretation. In *Douglas v. Ad Astra Information Systems*, 296 Kan. 552, 559, 293 P.3d 723 (2013), the court held that the doctrine of operative construction has been abandoned, abrogated, disallowed, disapproved, ousted, overruled, and permanently relegated to the history books where it will never again affect the outcome of an appeal. *In re Tax Appeal of LaFarge Midwest*, 293 Kan. 1039, 1044, 271 P.3d 732 (2012). Thus, this court exercises unlimited review on questions of statutory interpretation without deference to the University's interpretation of its Student Code. See *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs.*, 290 Kan. 446, 457, 228 P.3d 403 (2010).

The University's Student Code and sexual harassment policy controls the issues arising in this case. The purpose of the Student Code is to outline the rights of students and many of the standards of conduct expected within the University's community. The Student Code advises that students must "adhere to all published rules, regulations and policies" and the failure to do so may subject a student to disciplinary action. The record on appeal discloses that posttrial, the University advised the district court that in light of its decision, the Student Code has been revised. Those revisions are not in the record and they did not affect the district court's decision. We do not consider those revisions either.

The Student Code and the various University policies create a comprehensive regulatory scheme for the discipline of students. The following specific provisions of the Student Code bear on the issues presented in this case.

Under the Bill of Rights section, Article 2.A guarantees the right of freedom of expression. Article 2.C recognizes the right of a student to be "free from harassment or discrimination based on . . . sex." That article also directs the aggrieved student to University policies on sexual harassment for further guidance and clarifies that the IOA is responsible for inquiries regarding the University's nondiscrimination policies.

11

John Doe v. USA, et. al.-025
John Doe v. USA-43

Article 18, under the heading "Violation of Law and University Discipline," describes the University's ability to hold a student accountable for his or her conduct that violates the law and the Student Code. The University can proceed against a student and not wait for the outcome of any prosecution:

> "*If a violation of federal, state or local law occurs on campus* and is also a violation of a published University regulation, the University may institute its own proceedings against an offender who may be subjected to criminal prosecution. Proceedings under the Code may be carried out prior to, simultaneously with or following civil or criminal proceedings without regard to the pendency of civil or criminal litigation in court or criminal arrest and prosecution." (Emphasis added.)

Article 20, which falls under the heading "Privacy," is situated between two articles describing a student's right to privacy and the protection of a student's educational records. It provides: "The University may not institute disciplinary proceedings unless the alleged violation(s) giving rise to the disciplinary action *occurs on University premises or at University sponsored or supervised events, or as otherwise required by federal, state, or local law*." (Emphasis added.)

Article 22 is under the heading "Conduct of Students and Organizations." It describes when a student's nonacademic misconduct is subject to disciplinary action by the University. Violations of policies, rules, and regulations can lead to discipline:

> "Students . . . are expected to conduct themselves as responsible members of the University community. *While on University premises or at University sponsored or supervised events*, students and organizations are subject to disciplinary action for violations of published policies, rules and regulations of the University and Regents, and for the following offenses: . . . . (Emphasis added.)

One of those offenses is described in Article 22.A.1, which states a student commits an offense against a person when a student

12

John Doe v. USA, et. al.-026
John Doe v. USA-44

USA 06595
Doe vs. USA

> "[t]hreatens the physical health, welfare, or safety of another person, places another person in serious bodily harm, or uses physical force in a manner that endangers the health, welfare or safety of another person; or willfully, maliciously and repeatedly follows or attempts to make unwanted contact, including but not limited to physical or electronic contact, with another person. This prohibition includes, but is not limited to, acts of sexual assault."

Article 22.F.2 describes the limitations of sanctioning a student for nonacademic misconduct and states: "No sanctions or other disciplinary measures may be imposed against a student . . . by the University concerning non-academic conduct other than that . . . prescribed in this code."

We turn to the University's policy prohibiting sexual harassment. It states: "Sexual harassment is a violation of . . . federal and state law. Specifically, sexual harassment is a form of illegal discrimination in violation of . . . Title IX of the Education Amendments of 1972." The policy further describes sexual harassment, in part, as:

> "'[C]onduct which includes physical contact, advances and comments made in person and/or by phone, text message, email or other electronic medium, that is unwelcome; based on sex or gender stereotypes; and is so severe, pervasive and objectively offensive that it interferes with a person's academic performance, employment or equal opportunity to participate in or benefit from University programs or activities.'"

These are the rules we have to work with.

Faced with a serious complaint of sexual harassment involving two students, the University took prompt action. It investigated the circumstances, separated as best it could the antagonists and removed the cause of the conflict through expulsion. The trouble is, the Student Code did not give the University authority to act when the misconduct occurred somewhere other than its campus or at University sponsored or

13

John Doe v. USA, et. al.-027
John Doe v. USA-45

supervised events. There is no proof in the record that Yeasin posted the tweets while he was on campus.

Through every step of the disciplinary proceedings, the University relied on Article 22 of the Student Code as the basis for Yeasin's discipline. But, on appeal, the University cherry-picks a small phrase from Article 20 to argue that it did indeed have the authority to expel Yeasin for his actions in Johnson County during the summer and for his tweets in violation of the no-contact order.

The University asks us to find that the district court should have interpreted the phrase "or as otherwise required by federal, state or local law" found in Article 20 to mean that the University's jurisdiction to discipline a student for violating Article 22.A. extended to a student's off-campus conduct. The University argues that this interpretation of Article 20 is consistent with the obligations imposed on it under Title IX.

The University does not dispute that it used its student disciplinary procedure, *i.e.*, the Student Code, instead of some separate grievance procedures to resolve Title IX complaints regarding sexual harassment grievances.

The 2011 "Dear Colleague Letter" specifically warned that if the recipient to Title IX funds relies on student disciplinary procedures for Title IX compliance, it should have its Title IX coordinator review the recipient's disciplinary procedures to ensure that the procedures comply with the requirements of Title IX and then the recipient should "implement changes as needed."

The University's fears of federal reprimands arising from Title IX are not without some merit. The "Dear Colleague Letter" sent to various educational institutions across the country in 2011 is filled with advice, illustrations, and implicit warnings. The loss of

14

John Doe v. USA, et. al.-028
John Doe v. USA-46

USA 06597
Doe vs. USA

federal funding which the U.S. Department of Education suggests is a possibility, would be calamitous.

In particular, one example from the letter is pertinent to this case. It deals with the effect of off-campus events and the on-campus environment:

> "Schools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity. If a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures. Because students often experience the continuing effects of off-campus sexual harassment in the educational setting, schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus. For example, if a student alleges that he or she was sexually assaulted by another student off school grounds, and that upon returning to school he or she was taunted and harassed by other students who are the alleged perpetrator's friends, the school should take the earlier sexual assault into account in determining whether there is a sexually hostile environment. The school also should take steps to protect a student who was assaulted off campus from further sexual harassment or retaliation from the perpetrator and his or her associates."

Note the letter does not direct the school to take action off-campus. Instead, the letter clearly advises that the school must take steps to prevent or eliminate a sexually hostile environment. It seems obvious that the only environment the University can control is on campus or at University sponsored or supervised events. After all, the University is not an agency of law enforcement but is rather an institution of learning.

The University believes that to comply with Title IX requirements it must, and did, extend its jurisdiction to disciplining its students for off-campus misconduct. In contrast, Kansas State University contends in its amicus curiae brief that Title IX does not require a school to sanction students for off-campus conduct.

15

John Doe v. USA, et. al.-029
John Doe v. USA-47

USA 06598
Doe vs. USA

To resolve this first issue we need not address whether Title IX requires a recipient to Title IX funds to discipline off-campus conduct. Instead, the extent that a Title IX recipient believes it exerts jurisdiction over student conduct to comply with its Title IX obligations must be reflected in the language chosen for its student disciplinary procedures or separate procedures to resolve such complaints. In other words, if we are to agree that the University's jurisdiction to discipline students extended to off-campus misconduct, we must find that power clearly arises from the express framework of the Student Code and not because we simply accept that the authority *should* be there based on the University's own interpretation of Title IX.

In contrast to the University's position, Yeasin argues the University cannot claim Article 20 gave it jurisdiction to discipline him for off-campus conduct for two reasons. First, he argues the phrase the University relies upon in Article 20 is ambiguous, and second, the University expelled him for violating Article 22, which expressly contradicts any such interpretation of Article 20. Since Article 22 is the more specific section of the Student Code that clearly indicates where the prohibited misconduct must occur, it controls.

Every application of a text to particular circumstances entails interpretation. In determining whether a conflict between Article 20 and Article 22 exists and how to resolve any such conflict, it is useful to consider certain fundamental principles of statutory interpretation. When we deal with cases involving enactments of the legislature, the most fundamental rule of statutory construction is that the intent of the legislature governs, if that intent can be ascertained. *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607, 214 P.3d 676 (2009). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 918, 296 P.3d 1106 (2013).

16

John Doe v. USA, et. al.-030
John Doe v. USA-48

USA 06599
Doe vs. USA

When a statute is plain and unambiguous, an appellate court does not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it. *In re Tax Appeal of Burch*, 296 Kan. 713, 722, 294 P.3d 1155 (2013). But when the statute's language is ambiguous, appellate courts can employ canons of construction to construe the legislature's intent. *Northern Natural Gas Co.*, 296 Kan. at 918.

Keeping these principles in mind, the claimed conflicts between the Student Code can be resolved. A careful reading of the plain language of the Student Code clarifies where the student conduct that is subject to discipline must occur.

The University argues that the Article 20 phrase "or as otherwise required by federal, state or local law" nullifies the language preceding it which indicates that it can only institute disciplinary proceedings for conduct "on University premises or at University sponsored or supervised events." The University suggests that the "or" must be read disjunctively rather than conjunctively. Basically, this argument means Article 20 is simply making a list of separate alternatives.

Clearly, there are no words in the last phrase of the sentence that mentions where these violations of other laws may occur to be punishable. The phrase is merely a reference to the laws that could be violated. This portion of Article 20 is a series of "or's," joining phrases of equal stature: "on University premises *or* at University sponsored . . . *or* supervised events . . . *or* as otherwise required by federal law . . . ." (Emphasis added.) The sentence makes a list of alternatives. There is nothing in the language of the article, or the punctuation, that compels us to hold that the last "or" in this series should be read any differently than those that come before it.

Our interpretation, which adds no language to the Article, creates no ambiguity here. The intent is clear. If there is a violation of some federal, state, or local law not

17

John Doe v. USA, et. al.-031
John Doe v. USA-49

USA 06600
Doe vs. USA

specified in the Student Code that occurs on University premises or at University sponsored or supervised events, the University can institute disciplinary proceedings against the offender. This interpretation is consistent with Article 18 of the Student Code. Other authorities can prosecute violations of those laws that occur elsewhere. The "other" authority here, of course, was the Johnson County District Attorney filing charges against Yeasin for his deplorable treatment of W.

If we construed Article 20 as the University wants, we must insert words to the effect "for conduct wherever committed." The phrase then becomes, "or as otherwise required by federal, state, or local law for conduct wherever committed." If that is what the drafters of the Student Code meant, the article could have been written in that fashion. Unlike the preceding language in Article 20, the phrase "or as otherwise required by federal, state or local law" does not specify where the conduct subject to disciplinary proceedings under federal, state, or local law must have occurred to be punishable by the University.

Furthermore, Article 20 is one of three articles located in section 16 of the Student Code entitled, "Privacy." This section deals with matters of confidentiality, not jurisdiction. Article 19 advises students that they surrender none of their privacy rights by joining the University. Article 21, in turn, deals extensively with the private nature of educational records and how the University will treat them. Within the context of privacy concerns, Article 20 advises students of procedural limitations. If its purpose was to establish when the University may institute disciplinary action or enunciate the University's jurisdiction, it lacks any heading to that effect. If that was the intended purpose, it would have been placed with or included in Article 18 in the section of the Student Code entitled, "Violation of Law and University Discipline."

We must also point out that the phrase "required by law" does not even attempt to list what type of conduct that is subject to federal, state, or local law, is being regulated,

18

John Doe v. USA, et. al.-032

John Doe v. USA-50

USA 06601
Doe vs. USA

or by affirming that the conduct relates in some way to the University's Title IX policies. The University vainly tries to pile all of this onto a phrase that is simple and straightforward.

Appellate courts strive to give effect, if possible, to the various provisions of an entire act with a view of reconciling and bringing the provisions into workable harmony. *Northern Natural Gas Co.,* 296 Kan. at 918. The University's argument that Article 20 suggests that the University may take disciplinary action for student conduct wherever it occurs, when required by federal, state, or local law, ignores all of the other pertinent articles in the Student Code. In other words, the University cannot reconcile its interpretation of the language in Article 20 with the language in Article 18 or Article 22.

More importantly, the University expelled Yeasin for conduct specifically violating Article 22 and its published sexual harassment policy. Article 20, with its reference to federal, state or local law, must be read in context within its place in the overall regulatory scheme for disciplining students for nonacademic misconduct that is found in the Student Code. We note that a student's conduct in violation of the University's published sexual harassment policy falls under Article 22, which states, "students . . . are subject to disciplinary action for violations of published policies" of the University.

Article 22 specifically directs that the only nonacademic misconduct subject to disciplinary action or expulsion is misconduct that occurs on campus or at a University sponsored event. The Student Counsel did not choose to rely solely on Article 18 to clarify its jurisdiction and eliminate the phrase, "[w]hile on University premises or at University sponsored or supervised events," nor did it expand on this phrase by referring to the public law component of Article 18 and clarifying where alleged violations falling under this language must occur.

19

John Doe **v. USA, et. al.-033**
John Doe v. USA-51

Generally, specific provisions control over general provisions regarding the same subject. See *Ft. Hays St. Univ.,* 290 Kan. at 463. Because Article 18 and Article 22 both concern alleged violations of student conduct the University seeks to discipline, and they contain more specific language directing that the University's authority only extends to on-campus or at University sponsored events than the general provision in Article 20 that gives no indication as to where the misconduct must occur, the more specific statutes control.

The district court did not err in interpreting the Student Code to mean it applies only to student conduct that occurs on campus or at University sponsored activities. Accordingly, because the University erroneously interpreted the Student Code as giving it jurisdiction to discipline Yeasin for off-campus conduct and does not dispute that Yeasin's conduct giving rise to his expulsion did not occur on campus or at University sponsored events, this court need not address the second issue, *i.e.,* whether the University's decision to expel Yeasin was supported by substantial evidence.

Similarly, given our conclusion that the district court did not err in granting Yeasin's petition, we need not address the other questions before us, *i.e.,* whether Title IX permits the University to extend its jurisdiction to discipline student conduct occurring off campus and whether Yeasin's tweets were protected speech under the First Amendment to the United States Constitution.

As a final note, in view of our holding, Yeasin's cross-appeal concerning the propriety of the district court's stay order is now moot.

We affirm the district court's grant of relief, and the stay order is hereby lifted.

20

John Doe v. USA, et. al.-034
John Doe v. USA-52

USA 06603
Doe vs. USA

Case 1:17-cv-00394-CG-C   Document 43-4 *SEALED*   Filed 10/11/17   Page 27 of 47
PageID #: 1926

# UNIVERSITY OF SOUTH ALABAMA



VICE PRESIDENT FOR STUDENT AFFAIRS
AND DEAN OF STUDENTS

TELEPHONE: (251) 463-6172
STUDENT CENTER SUITE 245
350 CAMPUS DRIVE
MOBILE, ALABAMA 36688-0002
FAX: (251) 460-6157

May 2, 2017

███████████

Sent electronically to ████████████████████

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2016016401

May 2, 2017

This letter is in response to your April 3, 2017 appeal of the two decisions rendered by the University Disciplinary Committee on March 28, 2017. My response to your appeal was delayed in order to give me time to gather additional documentation requested by you from ████████ and to fully consider your appeal of both matters following my meeting with ████████ on April 17, 2017 and the meeting with you and your attorney on April 20, 2017.

After meeting with both parties in the two related cases and reviewing the audio recording for the hearing as well as medical records provided by ████████, I have come to the following conclusions related to your appeal:

In the charge filed against you, I find that the introduction of prior allegations against you was significant enough to warrant that this charge be heard again during a new proceeding with a different committee. In your meeting with me, you inquired about the possibility of an informal hearing to resolve this matter. Our policy mandates that charges related to sexual violence cannot be resolved informally. Dr. Andrea Agnew will contact both parties related to the scheduling of a new hearing, and she will preside over the new hearing rather than Ms. Ortiz. Dr. Agnew's level of experience presiding over Title IX hearings will provide additional assurance that all required policies and procedures will be followed. I have not found any indication that she has any conflict of interest in such participation, as her role throughout these proceedings has been as a neutral investigator and facilitator. Any issue related to the complainant's advocate will be addressed by me directly with the advocate prior to the new hearing. Any remaining claims of violation in your appeal were not found to merit further action.

AN EQUAL OPPORTUNITY/EQUAL ACCESS INSTITUTION



EXHIBIT
24
Doe

Case 1:17-cv-00394-CG-C   Document 101-1   Filed 01/29/21   Page 195 of 199   PageID #: 2958
Case 1:17-cv-00394-CG-C   Document 43-4 *SEALED*   Filed 10/11/17   Page 28 of 47
PageID #: 1927

In the charge that you filed against ███████, you requested that ███████ voluntarily provide her medical records for consideration. ███████ has since provided her record from Student Health for my review.  As part of the appeals process, ███████ also submitted text messages which indicate that the alleged assaults took place on August 7, 2016. ███████ Student Health record indicates that she went to Student Health on August 10, 2016 after experiencing symptoms for approximately two days.

In our appeal meeting, you requested all of ███████ medical records to be submitted for review and ███ ███ has declined that request. Given the conclusive nature of the August 10, 2016 report, I do not find that additional records are necessary to render my decision.

I find the documentation submitted by ███████ in your charge against her to be sufficient to support the Board's original finding of "not responsible." I do not find support for your claim that you were treated differently than ███████ was treated in her complaint.  I do find that you were given access to an advocate, as are all complainants.  You were not able to produce an example of a time during which you requested assistance from your advocate and that assistance was denied.  The appeals process related to this charge has been exhausted and the decision on this charge is final.

Sincerely,

Dr. Michael Mitchell
VP for Student Affairs and Dean of Students

CC:   Dr. Andrea Agnew, Assistant Dean of Students
      Tammy Orso, USAPD Patrol Captain
      Kim R. Ortiz, Student Conduct Coordinator
      ███████

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

JOHN DOE

    Plaintiff,

v.

MICHAEL A. MITCHELL, et al,

    Defendants.

CIVIL ACTION NO.: 1:17-CV-00394-CG-C

---

### PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF DISCOVERY

---

COMES NOW Plaintiff, JOHN DOE, and in response to Defendants' First Set of Discovery Requests, adopts all previously filed complaints, motions, and pleadings, and responds to Defendants' First Set of Discovery Requests as follows:

### INTERROGATORIES

1. Describe with detail the Army ROTC disciplinary process you received, including nature of the proceeding, the conduct that was at issue or considered in the proceeding, the dates and location of the proceeding, the names and contact information of any witnesses and hearing officers who participated in the proceeding, the evidence presented in the proceeding, and the result of the proceeding, including any disciplinary sanctions imposed.

**RESPONSE:**

**The Formal Board Convened and Completed the matter on February 15, 2018. The Board issued its findings and recommendations were finalized and submitted on**



2.  Identify and describe any personal relationships you have with any of the named
    Defendants, Kim Ortiz, or any of the UDC members who served on any of your hearing
    panels.

**RESPONSE: No personal relationships.**

3.  Identify and describe any personal relationships between the named Defendants or
    members of the UDC who served on any of your hearing panels, and Jane Roe 1, Jane
    Roe 2, or Jane Roe 3.

**RESPONSE:**

**Roe 3 was a member of SGA and served with UDC panel member. Roe 3 had a personal
relationship with Defendant Harrell. Roe 1 & Roe 3 were in the same sorority, and
UDC panel members were active in Greek life. Defendant Mitchell mentored at least
one UDC panel members. Defendant Mitchell was also friends with a popular student
athlete and also boyfriend of Roe 3. Otherwise, I have detailed this in my ninety-one
page amended complaint with exhibits. We just received discovery and I have not had a
chance to fully review. Since discovery is just beginning, I reserve to the right to
supplement.**

4.  Identify the names of the individuals whom you contend were biased against you in a
    manner which affected your UDC proceedings.  For each person, describe how they were
    biased against you and how that affected your UDC proceedings.

**RESPONSE:**

**This is detailed in my amended ninety-one page amended complaint with exhibits.  I
made repeated requests to Dr. Mitchell for the removal of Dr. Agnew from my
hearings. Specifically Dr. Agnew made findings of fact and determinations of credibility**

before any hearing was even held or witnesses called to testify. Dr. Agnew trained these UDC panel members, played a part in their selection, and presided over their deliberations. At one time, Dr. Mitchell removed her, but then he put her back in charge. The defendants repeatedly assured me and my advocate that the second Roe 3 hearing would be free from any mention of or evidence of any prior sexual misconduct/ Title IX allegations, yet specifically included a UDC panel member in the second Roe 3 hearing who found me responsible for sexual violence in the Roe 1/Roe 2 hearing.

I do remember at least one female was in a sorority as was Roe 3, and Roe 1. Roe 2 was in a picture with Dr. Harrell along with other members of some group I do not know but she knew her. Roe 1 and Roe 2 also regularly posted on social media about the case and they are friends with various people, some could easily have been UDC members or known them. Roe 1 and Roe 2 were both intoxicated and defendants were aware of this and both engaged in sexual contact with one another but the defendants never investigated Roe 1 or Roe 2 for Title IX violations, despite university policy requiring it. Instead I was singled out. While awaiting my first Title IX hearing and after the defendants entered a mutual no contact order, Roe 1 violated the no contact order and came into my private dorm room while I was away. The defendants took no meaningful action against her. I reserve the right to supplement this response once I have reviewed the defendant's discovery responses and depositions. Otherwise seem amended complaint and exhibits.

5. For each person identified in Interrogatory 4 above, describe a) how you learned about this person's bias, and b) when you learned about that bias.

**RESPONSE:**

## VERIFICATION

     I, John Doe, hereby declare under penalty of perjury that the facts stated in my foregoing responses to Defendant's First Set of Interrogatories are true and correct to the best of my knowledge, information, and belief.

**John Doe**

JOHN DOE

SWORN TO AND SUBSCRIBED
BEFORE ME ON THIS THE
5th DAY OF ___June___, 2020

NOTARY PUBLIC
My Commission Expires: _7/23/2022_