# EXHIBIT B

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF ALABAMA

3         SOUTHERN DIVISION

4

5  CIVIL ACTION NO:  1:17-cv-00394-WS-C

6

7  JOHN DOE,

        Plaintiff,

8
   Vs.

9
   THE UNIVERSITY OF SOUTH ALABAMA;
10 MICHAEL A. MITCHELL, individually
   and in his official capacity as
11 Vice President for Student Affairs
   and Dean of Students and Deputy
12 Title IX Coordinator for Students;
   ANDREA C. AGNEW, individually and
13 in her official capacity as
   Assistant Dean of Students; KRISTA
14 HARRELL, individually and in her
   official title as Associate Dean
15 of Students & Title IX Coordinator,
   et al.,
16
        Defendants.
17

18
      VIDEO/WEBCAST DEPOSITION TESTIMONY OF:
19            KRISTA LYNN HARRELL

20
   DATE:     January 12, 2021 - January 13, 2021
21
   TIME:     2:02 p.m.
22
   REPORTED BY:  Daphne M. Cotten, CSR
23

1    that's Dr. Mitchell.  Okay.

2        A.    I am the Associate Dean of

3    Students and Title IX Coordinator.  So in

4    the same position I have been since I

5    arrived in July 2012.

6        Q.    Did you do any Title IX work at

7    any other school besides South Alabama?

8        A.    I did not, sir, no.

9        Q.    I'm sorry, I couldn't hear you.

10       A.    I did not, no.

11       Q.    Okay.  When you came to South

12   Alabama, were you trained already on Title

13   IX issues, or was that something that you

14   trained with when you got to South Alabama?

15       A.    I trained when I arrived, yes,

16   sir.  I did not come with significant

17   training.

18       Q.    Was your position created, or were

19   you filling someone else's position that had

20   left or retired?

21       A.    I was filling the position.  My

22   predecessor took another institution.

23       Q.    Do you know who your predecessor

1  was?

2      A.      Yes, I do.  Robin Jones.

3      Q.      Is she still with the University

4  of South Alabama?

5      A.      No, she's currently with Virginia

6  Tech.

7      Q.      Okay.  Did the University of South

8  Alabama send you to a special Title IX

9  training, or did you learn on campus?  Where

10  did you get your training?

11      A.      My initial training, significant

12  training, was through ATIXA, which is an

13  association that really kind of does a

14  majority of getting training for university

15  professionals really to Title IX.  At least

16  since 2012.

17      Q.      Okay.  What are your duties as the

18  Title IX Coordinator at the University of

19  South Alabama?

20      A.      My duties include responsibility

21  for compliance, overall compliance, for the

22  institution.  I am also -- which includes,

23  you know, policy and procedure, overview,

1    prevention.  And education, overview of

2    that.  The investigation pieces of things.

3    Education, prevention, training,

4    investigations policies.  And then just

5    making sure that we are aware of any trends,

6    those types of things.

7            My day-to-day is not, obviously,

8    all those things.  I oversee that for the

9    system.  And that includes the university

10   campus, as well as the health side.

11       Q.    The health what?

12       A.    Health system.

13       Q.    Okay.

14       A.    I'm the only Title IX Coordinator

15   for the entire -- like university system.

16   It's not just what we think of as main

17   campus, it's also for the health side.

18       Q.    Okay.  Do you answer to anyone on

19   Title IX cases?

20       A.    Can you clarify that question for

21   me?

22       Q.    Yeah.  Do you have anyone above

23   you when it comes to Title IX investigation?

1   A.   Well, again, I don't do the

2   investigations myself.  But in relation to

3   who I report to, I report directly to Mike

4   Mitchell.

5   Q.   Okay.

6   A.   And I also have opportunity to

7   have conversations with the president as

8   needed.  But my direct report is to Dr. Mike

9   Mitchell.

10   Q.   And who was the president at the

11   University of South Alabama?

12   A.   Waldrop.  Dr. Waldrop.

13   Q.   Okay, Dr. Waldrop.  Okay.  Have

14   you trained Mike Mitchell in Title IX cases,

15   or hearings, or any type of component of

16   Title IX?

17   A.   The training that we -- Dr.

18   Mitchell has participated in online training

19   that we do for all faculty/staff.  He has

20   also had specific training.  I would not be

21   able to recall the details of all of them

22   over the years.

23   But we often provide retreats that

1  as their representative to that team.

2      Q.     And to be on the Title IX team,

3  what does that entail exactly?

4      A.     Essentially, it is everyone that

5  served as a Deputy Coordinator.  And those

6  distinctions are available on our web page,

7  the most updated list of the members that

8  served.

9          We also include the Victims

10 Advocate Coordinator, or general counsel.

11 So previous to Kristin would have been Jean

12 Tucker.  Our Chief of Police has been

13 invited.  Captain Keith West has been a part

14 of the team, as he coordinates our query

15 reports, which we have to partner on.  So

16 he's been on a team.

17          And I'm trying to think if there's

18 -- I don't want to miscommunicate anybody

19 else.  That's typically who it is.

20     Q.     Okay.  That's fine.  Tell me, as

21 best you can recall, how you became involved

22 in the Roe 1 Roe 2 case against my client.

23     A.     In Roe 1 Roe 2.  I would have done

1    the intakes for the Roe 1 Roe 2.

2        Q.    And what does that --

3        A.    That's part of my --

4        Q.    I'm sorry.  Go ahead.

5        A.    That's part of my -- so, like I

6    say, I oversee everything.  Part of my

7    responsibilities, particularly during that

8    time, I would have done intakes with all of

9    the potential complainants in the cases to

10   hear what their statements would be to

11   determine whether there was enough to move

12   forward with investigation.

13             Not to determine, obviously,

14   responsibility, just to determine if there's

15   enough for an investigation.  I would have

16   met with both Roe 1 and Roe 2.

17       Q.    How did you become aware of Roe

18   1's allegations against my client?

19       A.    I do not recall the specificity of

20   how I was notified for Roe 1.

21       Q.    Can the University -- can Title IX

22   go forward without the cooperation of a

23   complainant?

1    A.    I'm sorry.  Can you repeat that

2  for me?

3    Q.    Sure.  Can you, as a Title IX

4  officer, find that there's enough

5  information to go forward with an

6  investigation without the cooperation of a

7  complainant?

8    A.    At that particular time we were

9  able to do that, and it was usually in a

10  very exceptional case.  And if it was to be

11  determined if there is enough concern for

12  the rest of the campus community, if we had

13  enough information.  And that's been, again

14  -- it's more of an exception than it is

15  anything else.

16    Q.    What are the factors that you

17  consider as the Title IX Coordinator in

18  determining if there's enough information to

19  go forward with a formal investigation?

20    A.    If there's enough information

21  that's shared that might substantiate a

22  Title IX complaint.  So there are times when

23  what's shared with me wouldn't reach the

1    threshold of potential Title IX complaints.

2    And when we do move it forward, I feel, you

3    know, that there is enough based on what

4    they shared for us to investigate.

5         Q.    Wasn't it a policy at the time, if

6    there's an allegation of sexual misconduct,

7    the University is required to have a formal

8    hearing?

9         A.    For sexual assault.

10        Q.    Right.   That's what I'm talking

11   about.

12        A.    No, you said sexual misconduct.   I

13   just wanted to be clear.

14        Q.    Oh, I'm sorry.   Tell me what your

15   understanding the difference is between

16   sexual misconduct and sexual assault.

17        A.    Well, sexual misconduct can also

18   include harassment, which isn't necessarily

19   something that would be -- it's not

20   typically some kind of intercourse or

21   something -- sexual harassment could be

22   based on general gender discrimination.   It

23   could be people making comments, innuendos,

1    those types of things.

2          Could also be a quid pro quo in

3    certain situations.  Because, obviously, our

4    sexual misconduct policy also covers

5    possibilities for complaints from our

6    faculty and staff.

7        Q.    Okay.  So in this case involving

8    my client, that was an allegation of sexual

9    assault; is that right?

10       A.    From my recollection, yes.

11       Q.    That had to go forward for a

12   formal hearing; is that right?  Or did you

13   have discretion to say, well, I don't find

14   that there's enough evidence to go forward

15   with this investigation?

16       A.    From where it goes for me, on

17   doesn't mean for a hearing necessarily.  So

18   there's steps in between that.  So I want to

19   be clear about that, too.

20       Q.    Okay.

21       A.    So I don't determine whether it's

22   gonna go to a hearing.

23       Q.    Okay.

1    A.    I determine if there's enough for

2  investigation.

3    Q.    Okay.

4    A.    The investigation, wherever the

5  facts lead, determine what's going on

6  specifically, right?  So if -- again, I

7  don't ever determine the specificity of what

8  happened or responsibility for something.

9  The investigation is going to determine kind

10  of the evidence of what's gonna move

11  forward.

12        So maybe out of the investigation

13  for certain cases.  It's really determined

14  in the investigation.  I do initial

15  complaint of what is ascertained by the

16  information in a statement during the

17  intake.

18        So if I feel like what is shared

19  with me is complaint of sexual assault, that

20  is what I'm gonna put forth.  It does not

21  mean that's what is determined -- the

22  investigation could lead to something else.

23  And that's in any case.

1    Q.    Okay.  Tell me --

2    A.    I'm not -- go ahead.  I'm sorry.

3    Q.    Tell me, as you recall, in the Roe

4    1 and Roe 2 complaints what information did

5    you have that you felt it was appropriate to

6    forward the case on for an investigation?

7    A.    And, again, I don't have the case

8    details in front of me, Mr. Green.  So I

9    want to make sure I'm very clear.  I don't

10   remember every single detail about every

11   case.  Unfortunately, we have a number that

12   come through every year.  And that's not to

13   diminish the importance of this one.

14         From my recollection from this

15   case, I felt very strongly, based on what

16   they shared, that there was enough for an

17   investigation kind of given the statements

18   that Roe 1 and Roe 2 made about the

19   situation that happened, I believe if I

20   recall correctly, on campus.

21   Q.    And what about Roe 3?  Do you

22   remember how you came to discover Roe 3?

23   A.    Again, I can't honestly tell you

the specificity of how particular cases got

to me.  They're reported to me all kinds of

ways.  It could have been from something on

campus, it could have been from police, it

could have been through the person.  So I

honestly don't remember how that one got to

me.

Q.    Do you remember Dr. Agnew sending

you an email about the allegations, or the

identity of Roe 3, to begin this

investigation?

A.    I don't remember a specific email,

no.

Q.    Do you remember what evidence you

felt was present in the Roe 3 allegation

that you felt was sufficient to forward the

case on to an investigation?

A.    I don't remember, again, the

specificity of all of them, and I would not

want to miscommunicate.  From my

recollection, my best estimation,

recollection, is that the -- I guess what

happened, the incident that was reported by

1   Roe 3 that happened, I believe hers was off

2   campus, was significant and concerning

3   enough, based on the details, to forward on.

4        Q.    Do you remember, as we sit here,

5   what the details were?

6        A.    Sir?

7        Q.    Do you remember as we sit here

8   today what those details were?

9        A.    I remember some of them.  Again, I

10  don't want to miscommunicate.  And I'm

11  saying this very honestly.  There's a lot

12  that come through.  I would never want to

13  make a conflation from -- like conflate one

14  with the other.

15            From my best recollection, I

16  remember Roe 3 mentioning something about --

17  and, again, there was more than this.

18  Clearly.  I don't remember everything about

19  all cases.

20            My best recollection is there is

21  some instance where I believe that she was

22  supposed to be maybe intoxicated or

23  unconscious to the point where Roe 3 might

1    not have been able to give consent.

2              My understanding, if I remember

3    correctly, there was something that might

4    have happened going from a bedroom to a

5    bathroom, if I recall correctly.  Again, I'm

6    making a best estimation.  I remember

7    potentially that in that case Roe 3 might

8    have reported hitting their head on a sink

9    or something in the bathroom -- now,

10   remember, this is years ago -- and kind of

11   going in and out of consciousness.

12       Q.    Okay.

13       A.    Again, that's my best recollection

14   to the details for that.

15       Q.    Okay.

16       A.    That's really the most that I

17   have.

18       Q.    Before you made the determination

19   to forward the case on for investigation,

20   did you interview any collateral witnesses

21   other than the complainants?

22       A.    I don't recall in that case doing

23   that.  That would be unusual if it did

1    happen.  I typically don't.  I don't recall

2    in that case.

3        Q.    Do you recall whether you ever

4    interviewed or called or spoke with or

5    communicated with my client regarding the

6    allegations of Roe 1, Roe 2, or Roe 3 before

7    you made your determination about whether to

8    forward that case on for investigation?

9        A.    I do not recall if I spoke to or

10   communicated with Doe before I would have

11   sent it on for investigation.  Potentially

12   the only way that I would have done that is

13   if Doe required interim measures or

14   accommodations of some kind potentially in

15   classes or something.

16            I typically try to help any party

17   involved with what we now call interim

18   measures.  So if they need help in class or

19   if they missed something related to the

20   process where they're speaking to me or

21   anybody else involved in this class, if

22   they're having trouble, those types of

23   things.  If we had to move housing.  Those

1  types of things would have been something I

2  would have potentially communicated with

3  other parties besides complainants.

4       That can also come from Dr.

5  Mitchell, Dean of Students.  So I don't

6  remember specifically in this case.  But

7  those would be typical times that I would

8  communicate with multiple parties involved.

9  If that makes sense.

10      Q.    Sure.  At your stage when you're

11  investigating and you're investigating about

12  whether to forward the case on for

13  investigation, do you do anything to try to

14  corroborate with the statements of the

15  complainants, or do you just accept it as

16  true?

17      A.    And I just want to clarify.  I

18  don't investigate.  So based on the intake

19  statement that they give me -- I do not try

20  to corroborate anything.  That comes out in

21  the investigation.  All those things are

22  determined during an investigation with the

23  complainant, the respondent, and any

1  witnesses that they call or that we deem

2  necessary.

3      Q.    You're -- and correct me if I'm

4  wrong -- you're the first line in the

5  process of how a Title IX investigation

6  begins, correct?

7      A.    Typically, yes.

8      Q.    And you have the authority to

9  either say, no, this case does not meet the

10  criteria for further investigation or, yes,

11  this case does meet the criteria for further

12  investigation.

13      A.    Yes, sir.

14      Q.    Have you ever found that there's

15  not enough evidence or allegations to go

16  forward with an investigation?

17      A.    Yes.

18      Q.    And when I say investigation, I'm

19  referring to sexual assault or sexual

20  misconduct.

21      A.    Yes.

22      Q.    Okay.  I'm gonna ask you about

23  Plaintiff's Exhibit Number 10.  This was a

Greek Leadership Title IX training that was
provided in discovery, and it's Bates
stamped USA 02646.  It looks like it's got
your name here.  Can you see that?

A.     I do, yes, sir.

Q.     All right.  And can you tell me,
was this a training session that you
presided over?

A.     At the time -- and you'll see
Courtney Diener's name on that.

Q.     Yeah.

A.     And she likely led that.

Q.     Okay.

A.     And she's responsible for coming
together with my consultation.

Q.     Were you there for this training?

A.     I do not recall if I was there.
Likely, if my name's on it, I was.

Q.     Okay.  And it says -- I wanted to
go over with you Myth or Fact.  Now, these
are training materials that you give
students that are in the Greek system; is
that correct?

1    A.    This specifically was done for our

2  fraternity and sorority community.

3    Q.    And is this training -- are these

4  materials consistent with the other

5  materials that you give students regarding

6  Title IX cases?

7    A.    There's some specificity, and

8  based on the audience, right.  So this would

9  be different than training for UDC or -- it

10  just depends on who the audience is relative

11  to what the training is.

12        So this specifically was for our

13  fraternity and sorority community.  And

14  that's how it was designed.

15    Q.    Okay.  Tell me, if you would --

16  this says Myth or Fact, and it's Bates

17  stamped USA 02660.  Is this what you teach

18  or instruct students on when it comes to

19  allegations of sexual assault?

20    A.    The training that we do, again for

21  Greek students for this particular audience,

22  the messaging and outreach is just -- it's a

23  little -- it's different.  It's not what we

1   do for everybody.  It depends on, again, the

2   audience specifically.

3        Q.     Okay.

4        A.     In general --

5               THE COURT REPORTER:  I am having a

6   hard time hearing you.

7        Q.     Yeah, I'm having a hard time

8   hearing you.

9        A.     You're talking about the training

10  in general, correct?

11       Q.     Right.  Is it true that you train

12  students that -- sexual assault usually

13  occurs between strangers.  That's a myth; is

14  that correct?

15       A.     That is what we share in terms of

16  one of our myths, particularly with what I'm

17  seeing here for our Greek students, yes.

18       Q.     And you instruct students that it

19  is estimated that -- that as facts, it's

20  estimated that over 70 percent of rape

21  victims know their attackers; is that right?

22       A.     That is -- the statistic is the

23  word I was looking for.  That's a statistic

1    instructed -- I say y'all.  I shouldn't use

2    a pronoun.  I'm sorry -- the University

3    instructed Greek students with in the

4    context of sexual assault cases; is that

5    correct?

6         A.    Yes.  For this particular --

7         Q.    And that the University also

8    taught that in response to a traumatic event

9    in the context of sexual assault cases, that

10   trauma can impact your memory and ability to

11   recall details of an event.  It is an act of

12   self-preservation and explains why survivors

13   often have fragmented memories.  Is that

14   correct?

15        A.    Yes, for this training.

16        Q.    Well, this training, was it given

17   to other student bodies other than Greeks?

18        A.    I cannot specifically tell you if

19   this specific training was done for anybody

20   else besides Greek leadership during that

21   year.

22        Q.    Were you aware that several Greek

23   members served on the UDC panel members in

1    the several hearings, or at least in the

2    last hearing, my client had?

3              MS. HART:  Object to the form.  Go

4    ahead.  You can answer.

5       A.    I'm not involved in who serves on

6    UDC.  I wouldn't have been privy to that

7    knowledge at the time.

8       Q.    Okay.  Have you ever received any

9    UDC training?

10      A.    Like me personally receiving UDC

11   training?

12      Q.    Right.  Yes, ma'am.

13      A.    When I've been involved in ATIXA

14   trainings, I mean, some of them have

15   included processes that would be related to

16   what we would do with hearings.  But I do

17   not ever see -- I don't have involvement in

18   the UDC process.

19      Q.    Have you ever served on a UDC

20   panel?

21      A.    No.

22      Q.    Have you ever served as a Student

23   Conduct Code Administrator?

1    A.    No, not here.

2    Q.    Have you served anywhere as a

3    Student Conduct Code Administrator?

4    A.    No.

5    Q.    Have you served anywhere as a UDC

6    panel member?

7    A.    Not to my recollection, no.

8    Q.    Did you train other student

9    organizations, like UDC training on Title

10   IX?

11   A.    I have been involved with UDC

12   trainings from time to time over the years.

13   Q.    Okay.  But in terms of this slide

14   here, 02666, Exhibit 10, this trauma that

15   you discussed, you taught students that

16   shock and trauma could cause problems with

17   delay in reporting; is that correct?

18   A.    For this particular training, yes.

19   Q.    Right.  And also trauma can impact

20   -- you taught the Greek students that trauma

21   can impact the ability to remember an act of

22   sexual violence; is that correct?

23   A.    Yes, for this particular training.

trauma, instead of saying, hey, can we get

you to a counselor or, hey, can we get you

to the police, hey can we get you to the

hospital.

Q.    And is that something that you

would practice as the Title IX -- the head

of Title IX at USA when a complainant comes

forward with allegations of sexual assault?

A.    For me trying to not find out what

happened follow this?

Q.    Yes, ma'am.

A.    You know, this -- I think it's a

little bit different, right?  So in my

intake with any complainant, I typically do

not ask many questions except clarifying

questions.  So the purpose of the intake is

for them just to very much, kind of

straightforwardly, make their statement.

I don't try to push for anything

else.  Their statement is what their

statement is.  Again, I might ask clarifying

questions, such as can you please tell me

the person's name, can you please tell me,

1    you know.  If you mention it was in the

2    residence hall, can you tell me which

3    residence hall.

4            You know, can you tell me what

5    time it was, can you tell me where.  Try to

6    get a full picture versus, well, what did

7    you do about it or, you know, can you tell

8    me more about it.  I just take their

9    statement as is, clarify, fill in the gaps.

10   Well, first name is Krista.  What's the last

11   name.

12       Q.    And is that -- I guess that's what

13   I was getting at.  I think that's exactly

14   what I was trying to ask.  For someone that

15   comes to you that said they've experienced

16   trauma, you don't try to figure out exactly

17   what happened, you just try to provide them

18   resources and support to someone like that;

19   is that correct?

20           MS. HART:  Object to the form.

21       A.    I do that and I ask them to let me

22   know what happened.  So I don't probe beyond

23   what they share with me.  Which I do think I

1 provide both. Because at the end of every

2 session with them, I give them connection to

3 counseling, an offer for counseling, any of

4 those types of things. And I also give them

5 the opportunity to let me know what

6 happened.

7     Q. Okay. And my next question would

8 be you don't do -- you don't go out -- let

9 me rephrase that.

10     After a complainant, or like Roe

11 1, Roe 2, or Roe 3, came in and they

12 disclosed to you that they'd been sexually

13 assaulted, you don't reach out or do any

14 independent investigation to corroborate

15 what they're saying is true, do you?

16     A. No.

17     Q. You just accept what they say is

18 true, correct?

19     A. I take reports in good faith.

20     Q. I mean, I guess my question --

21 maybe I misstated it. You don't challenge

22 their version, the complainant's version, do

23 you?

1  A.  No.

2  Q.  So, I mean --

3  A.  I don't -- no, I don't do that.

4  Q.  And whatever they tell you, you're

5  trained -- and you train people to come to

6  you and disclose this information without

7  having to be probed or questioned regarding

8  their voracity; is that correct?

9  A.  Tell me what voracity means.  It's

10  been a long day.

11  Q.  Their truthfulness.  Their ability

12  -- you don't say, well, I don't believe you,

13  or I believe you, you just take down what

14  they say and you presume it's truthful.

15  A.  Right, I take it in good faith.  I

16  don't necessarily say it's true, I take it

17  in good faith.

18  Q.  Okay.

19  A.  Whatever they said to me, if it

20  rises to the level or the threshold I feel

21  like for investigation, if there's enough to

22  investigate -- again, I don't determine

23  whether something happened or not, I just

1  determine if there's enough to investigate

2  it.  And then it moves forward or not.

3      Q.    Have you ever had a sexual assault

4  complaint brought to you that you have not

5  forwarded on for investigation?

6      A.    I would not be able to recall that

7  at this time for sure.  My estimation would

8  be probably.  But I can't recall for sure,

9  not able to accurate.

10     Q.    Have you ever had any males come

11  forward to you alleging that they've been a

12  victim of sexual assault?

13     A.    I don't recall for certain in

14  regards to sexual assault.  I know that we

15  have had male complainants for sexual

16  misconduct for sure.

17     Q.    Okay.

18     A.    In general.  I don't remember what

19  they've come forward with.

20     Q.    And once the -- I'm referring to

21  slide 02680, still Exhibit 10.  A victim

22  advocate, is that someone that you notify

23  once a complaint has been filed?  Is that

1  correct?

2      A.    Yes, sir, that is correct.

3      Q.    And in this case, was Ms. Preyear,

4  was she the victim advocate for all three

5  Roes?

6      A.    Yes, sir, from my recollection she

7  was.

8      Q.    Okay.  I'm gonna show you

9  Exhibit 9, which was a June 23rd, 2017 UDC

10 Title IX Training Agenda.  It lists you as a

11 facilitator; is that correct?

12     A.    With Darlene.

13     Q.    What is a facilitator, Dr.

14 Harrell?

15     A.    It just means I was a presenter of

16 particular information related to what I was

17 -- you know, my expertise.

18     Q.    And do you know what you

19 presented?

20     A.    I don't recall exactly what I

21 presented for that, no.

22     Q.    Let me try to zoom out, see if I

23 can zoom out here.

1    Q.    But this is a UDC event, correct?

2    A.    Yes.

3    Q.    This was a training event,

4  correct?

5    A.    Yes.

6    Q.    And these were UDC panel members

7  that were trained that trauma affects

8  memory, correct?

9         MS. HART:  Object to the form.

10    A.    Yeah.  But, again, UDC is trained

11  to make sure that they're able to separate

12  the trauma.  And what's based on they need

13  to evaluate, too.

14    Q.    What do you understand the UDC

15  role is in evaluating on what they need to

16  evaluate?

17    A.    It just -- they're evaluating

18  based on what the level of consent is

19  typically in the situation.

20    Q.    And if the memory of a complainant

21  is fuzzy, or inconsistent, the UDC panel

22  members are trained that that is a direct

23  consequence of trauma; are they not?

 1    A.    Not necessarily.

 2    Q.    What other things are UDC panel

 3 members trained to recognize besides trauma

 4 that could lead to inconsistent statements

 5 of a complainant?

 6    A.    I'm not -- I would not be

 7 absolutely sure to be able to tell you what

 8 that would be.

 9    Q.    Are you aware of any on your

10 training and experience?

11    A.    Am I aware of other reasons why

12 they might have -- say that again for me,

13 Matt.  I'm sorry.

14    Q.    Are you aware of any other

15 training the University gives with respect

16 to reasons a complainant's memory of events

17 may be inconsistent or lacking?

18    A.    I'm not.  I don't recall.  I

19 wouldn't be able to tell you.

20    Q.    But the University does teach UDC

21 panel members that trauma often times is a

22 factor in a complainant not being able to

23 remember, or having inconsistent memories;

1    A.    Yes, I can read that.

2    Q.    Do you see where I have the cursor

3  and it highlighted?

4    A.    Yes, I can see that.

5    Q.    Okay.

6        MS. HART:  Just to help, it's page

7  -- there's a page 60 at the bottom of that

8  page, right?

9        MR. GREEN:  Yeah.

10   Q.    You got it?

11   A.    Uh-huh.

12   Q.    And I guess my question to you, is

13 private -- is it your understanding that

14 private means just the UDC and the Student

15 Conduct Administrator?  Is that right?

16   A.    That would be what I would

17 understand.  I believe that as a Title IX

18 Coordinator I can be a part of any process

19 or proceeding.  I never sit in on them,

20 ever.  I've never been in on them.

21   Q.    Why have you not sat in on them if

22 you --

23        MS. HART:  Let's let her finish

1  the answer first.

2      Q.    Oh, I'm sorry.  I didn't mean to

3  cut you off, Dr. Harrell.

4      A.    That's okay.  And honestly I don't

5  remember what I was saying.  But essentially

6  the only people that, from my knowledge -- I

7  mean, I am not involved in the hearing

8  process -- is that it's typically just the

9  UDC and the conduct administrator.

10          As Title IX Coordinator, I can be

11  involved in any -- you know, I can sit in

12  and observe if I need to.  But I haven't

13  ever to this point.  I think is what

14  Christine was mentioning for me to finish.

15     Q.    Do you know why the UDC should

16  meet in private?

17     A.    Do I know why the UDC should meet

18  in private.  My understanding is that a UDC

19  can make their deliberations and discuss the

20  evidence presented during the hearing.

21     Q.    Would it be like they could feel

22  free to debate their true opinions?

23     A.    I do believe that they discuss

1  exception that I've known of in the past or

2  could tell you now.

3      Q.    And is it important that the UDC

4  panel members meet in private so that they

5  can have a free and open discussion and not

6  have to have anybody hear their true

7  opinions about the evidence presented at the

8  hearing?

9      A.    I'm not involved in the hearing

10  process.   But, you know, that is -- we try

11  to -- you know, everything is set up in the

12  policy to make sure that we have a fair and

13  equitable process.

14          So that's in there to try to do

15  that.   There must be an opportunity for an

16  exception if it doesn't have must in the

17  statement.

18      Q.    When it says shall, do you think

19  that shall means should, or shall means

20  shall?   Do you understand the difference?

21      A.    I don't -- no.

22      Q.    Can you tell me what other persons

23  other than a UDC panel member or Student

1  shall.

2      A.      (No audible response).

3      Q.      I'm sorry.  I didn't hear you.

4      A.      Yes.  I'm sorry.

5      Q.      Who else do you think could sit in

6  on a UDC deliberation besides a UDC panel

7  member and a Student Conduct Administrator,

8  the exceptions that you could envision that

9  it would be permissible?

10     A.      Again, I think I've mentioned I

11 can't think of exceptions off the top of my

12 head right now.

13     Q.      Okay.

14     A.      Like I said, Title IX Coordinator

15 can be involved in any process at any point.

16 But I never have, and don't envision that

17 happening.

18     Q.      Would you agree that no other

19 person other than a UDC panel member could

20 vote in a hearing deliberation?

21     A.      Again, I'm not involved in the

22 hearing process.  But from my knowledge and

23 understanding, only UDC members should be

```
 1    involved, you know, each of them having a
 2    determining voice in what their
 3    recommendation is.
 4        Q.    Would it be proper for a Student
 5    Conduct Administrator to participate, or
 6    facilitate, in the UDC deliberations?
 7        A.    Again, I'm not involved in the
 8    hearing process, but it -- there could be a
 9    time where the conduct administrator might
10    need to clarify something or, you know,
11    again clarify something that maybe the UDC
12    had asked related to the process.
13        Q.    Are you aware of Student Conduct
14    Administrators participating, or
15    facilitating, in UDC deliberations?
16        A.    I think those are two different
17    things.  Again, I'm not involved in the
18    hearing process, so I couldn't tell you for
19    sure what's happening.  Again, I would
20    imagine that there are times when a Student
21    Conduct Administrator might, you know,
22    again, ask -- excuse me -- answer clarifying
23    questions.  But I'm not certain what happens
```

1  during those hearings or deliberations.

2     Q.    Are you familiar with the rules of

3  the Student Code of Conduct?

4     A.    Yes, I am familiar.

5     Q.    Are you familiar with the

6  disciplinary procedures that we've talked

7  about?

8     A.    Yes.  But I would not be able to

9  probably tell you them offhand.  But I am

10  familiar with them.

11     Q.    Are you familiar with the sexual

12  misconduct policy and complaint procedure

13  that the University had in place at the time

14  of my client's hearings?

15     A.    At the time of the hearings, yes.

16  I am not as versed in them, because we've

17  had several iterations since 2016/2017.  Or

18  I think that was the year.  We've gone

19  through annual revisions.

20        I obviously was involved with the

21  policy at the time and -- you know, it just

22  depends on what it is.  But I was involved.

23  We've had so many revisions that sometimes

1  it's difficult to remember what --

2      Q.      Sure.

3      A.      -- policy was revised in what

4  year.

5      Q.      Have any revisions or changes been

6  made to the rules or procedures that we've

7  discussed since my client's hearing about

8  deliberations of the UDC?

9      A.      I wouldn't be able to tell you for

10 sure specifically.  We have had a number of

11 changes overall to the policy and the

12 procedures in the last four plus years.

13     Q.      Who is now allowed to participate

14 in the UDC deliberations in an allegation of

15 sexual misconduct?

16     A.      I don't recall offhand.

17     Q.      Has it changed?

18     A.      I don't believe it's changed.

19 Again, I don't have it right in front of me.

20 I don't believe it's changed.

21     Q.      Are you aware of any rule or

22 procedure that's changed since my client's

23 hearings with respect to the rules of the

1    Code of Student Conduct or the sexual

2    misconduct policy and complaint procedures?

3        A.    There have been changes in general

4    to the policy and complaint procedures, yes.

5        Q.    My question is have there been any

6    that have been made as a result of my

7    client's cases.

8        A.    Oh.  I don't think we do anything

9    specifically as a result of particular

10   cases.  I think we look annually based on

11   the best practices and guidance that we

12   have.

13       Q.    What is your understanding of the

14   role of a Student Conduct Administrator in

15   the context of a sexual misconduct or

16   violence complaint?

17       A.    The administrator, you know, there

18   again, they take the decision of the UDC,

19   and they're the ones that are communicating

20   with the respondent at the time.  You know,

21   they're also hearing sanctions.  They're

22   also the ones that typically respondents

23   communicate with the most to be able to kind

1  of -- again, if there's an appeal, the

2  administrator will communicate that.  And

3  then, obviously, the appellate person will

4  do that as well.

5     Q.    Should the Student Conduct

6  Administrator determine which witness is

7  believable, or is that something that the

8  UDC should decide?

9     A.    Again, I'm not involved in the

10  decision-making process in a hearing.  But

11  from my understanding, the determination

12  based on, I guess, what's happening based on

13  the evidence that's provided by any party is

14  up to the UDC members.

15     Q.    And in terms of which witness is

16  believable, or which party is believable,

17  and which party is not believable, that's a

18  function of the UDC, right?

19     A.    In terms of determining

20  credibility, that is a function of the UDC.

21     Q.    And in terms of finding of fact

22  about, you know, whether someone was able to

23  consent or not, or whether someone was

```
1       A.      To me --

2               MS. HART:  Object to the form.

3   Sorry.  Go ahead.

4       A.      To me we obviously need to follow

5   policy.  And we do everything we can to

6   prevent any, you know, kind of deviation

7   from that to be able to give a fair and

8   equitable process to everybody.  If there is

9   a concern about the policy not being

10  followed, there are opportunities for people

11  to raise their concerns.

12      Q.      And that's the reason you have the

13  policy, right, is so that the process is

14  fair and equitable, correct?

15      A.      We do our very best to provide a

16  fair and equitable process, yes.

17      Q.      If the rules aren't followed, that

18  could compromise someone's ability to get a

19  fair and equitable and impartial hearing,

20  couldn't it?

21              MS. HART:  Object to the form.

22      A.      Say that again for me, Matt.  I'm

23  sorry.
```

1    Q.    Sure.  If the rules were not

2    followed, if any rule was violated in these

3    policies that we talked about, that could

4    compromise an individual's right to a fair,

5    impartial, and equitable hearing, correct?

6           MS. HART:  Object to the form.

7    A.    Again, we do our best to follow

8    the policy.  There might be instances where

9    a deviation from it might raise a concern

10    from some party that they did not have a

11    fair and equitable process.

12           In that case, we have an appeals

13    process of which we do so they have another

14    opportunity to share their grievance about

15    potentially what the determination was, what

16    the process was, and go through that

17    opportunity.

18    Q.    The rules are there to be

19    followed, correct?

20    A.    We do our best to follow policy,

21    yes, sir.

22    Q.    And if the rules aren't followed,

23    that could mean that the process was not

1  fair.  Would you agree with that?

2      A.    I don't think one instance of

3  potentially a deviation from the policy

4  means the entire process is unfair.

5      Q.    Do you --

6      A.    I don't think that --

7      Q.    Go ahead.

8      A.    I'm sorry.  Just in general, I

9  wouldn't think that would discount the rest

10  of the process because there was one piece

11  of it that might have deviated from the

12  policy.  I don't think that somebody could

13  ascertain the entire process was then unfair

14  or inequitable.

15      Q.    What policies do you think are

16  permissible to deviate from and still be

17  fair?

18      A.    Say that for me again, Matt.

19      Q.    Sure.  What policies do you

20  believe it's okay to deviate from, or not

21  follow, and still be fair?

22      A.    I don't really -- I think that's a

23  really general question.

1    Q.    Well, I'm not trying to trick you.

2  You just said that -- if I'm not misquoting

3  you -- that you said that you don't think

4  it's necessarily unfair and inequitable if

5  one policy is not followed.

6          And my question to you is can you

7  tell me a specific policy you believe, or

8  rule, that if it was not followed it would

9  still be fair and equitable?

10         MS. HART:  Object to the form.  Go

11 ahead.

12   A.    I want to clarify that I said I

13 don't think because one part of a policy

14 wasn't followed, that means the whole

15 process was inequitable or unfair.  I mean,

16 I think it would be really challenging for

17 an entire policy not to be followed.  There

18 are so many pieces of policy.  I don't

19 remember at this point how long it was.

20         To me, if one part of the policy

21 potentially was not followed, or is believed

22 not to be followed by a party involved in

23 the process, I don't think that means that

1   the rest of the process was inequitable or

2   unfair.

3       Q.    If a rule was broken -- who gets

4   to determine which rules can be broken and

5   which can be followed and still be fair?

6           MS. HART:  Object to the form.  Go

7   ahead.

8       Q.    Do you understand my question?

9       A.    Sir?

10      Q.    My question -- did you understand

11  my question?

12      A.    I think a little bit.  I still

13  think it's kind of general.  But from my

14  understanding of what you're asking -- and

15  I'll do my best to answer -- is that we do

16  the best to follow policy, again.  I mean,

17  Kristin can tell you.

18          But if there's a point to where

19  that happens, the person that might feel,

20  you know, that there is harm to them or was

21  unfair or inequitable to them, can file an

22  appeal.  And at that point the appellate

23  decision-maker would be the one that would

1  determine if they felt like their process

2  was unfair and inequitable.

3      Q.    Should the person who sits on the

4  appeal be neutral and impartial?

5      A.    That is the goal, is that the

6  appeals person has no prejudgment.

7      Q.    And should the person who sits on

8  the appeal not have participated in the

9  finding of a student being responsible, or

10  in the severity of punishment, before he

11  rules on the appeal?

12          MS. HART:  Object to the form.

13      A.    We do our best to make sure that

14  the appeals person has no prejudgment.

15      Q.    Right.  Let me ask a specific

16  question.  If the appeal person participated

17  in the severity of punishment that came out

18  of the Student Conduct Administrator, he

19  participated in that, and then the student

20  appealed that decision to the same person

21  who participated in the determination of

22  sanction, would that person be fair and

23  impartial?

1      A.     I don't know if really understand

2   the question still.   If you're talking about

3   the person that made the appeal -- is that

4   who you're talking about?

5      Q.     I'm talking about that third

6   party.

7      A.     Yeah, I'm trying to clarify.   I

8   just want to make --

9      Q.     The third party who had

10  participated, or conferenced, with the

11  decision to increase the sanction, and then

12  you as a responding party appeals it to that

13  same third party.   Do you believe that it's

14  appropriate for someone, that third party,

15  to sit in judgment of their prior decision

16  in the case?

17         MS. HART:   Object to the form.

18     A.     I don't see a problem if the

19  person is unbiased and taking into account

20  the evidence presented during any part of

21  the process.

22     Q.     Can you tell me the reason to have

23  an additional layer of review on appeal?

1    A.    We've already discussed this.  I

2  feel like I've already answered that

3  question.

4    Q.    Did you participate in any of the

5  Roe 1, Roe 2, Roe 3 hearings after the

6  initial referral for investigation?

7    A.    No, sir, I did not participate in

8  any of the hearings.

9    Q.    Who did you refer the case to for

10  investigation?

11    A.    Which one, sir?

12    Q.    Roe 1, Roe 2, and Roe 3.  Who did

13  you refer them to for investigation?

14    A.    The way that our process goes is

15  that after I do the intake, I submit my

16  complaint memo, the intake memo, to Dr. Mike

17  Mitchell solely so he is able to share it

18  with whoever the Student Conduct

19  Administrator is at the time.  And I believe

20  at this time it was Dr. Agnew.

21    Q.    Okay.  I'm gonna show you

22  Plaintiff's Exhibit 7.  These were banners

23  that were hanging up in the Student Center

1    Q.    Does she work with you?

2    A.    Yes, uh-huh.

3    Q.    What is this IG@USA_SAVE?

4    A.    I have no idea.  I'm assuming at

5  the time it was probably an Instagram handle

6  for one of the student organizations or

7  student groups.

8    Q.    Do you know what SAVE is?

9    A.    SAVE was the educator program --

10 it folded maybe a year or so ago.

11   Q.    My Cup is Not my Consent, does

12 that have to do with alcohol or drugs?  What

13 is that about?

14   A.    I'm sure it's related to alcohol.

15   Q.    Using alcohol to get sex is sexual

16 assault.  Is that what these banners were

17 hanging up?  Do you recall this hanging up

18 in the Student Center?

19   A.    I certainly don't recall them.  We

20 have so much stuff there.  Because of free

21 speech, there's stuff all over all of our

22 bulletin boards, banners hanging up all the

23 time.

```
 1    were appealing the UDC panel's decision in,
 2    I think, the Roe 1 Roe 2 case.
 3        A.     Yes, sir.
 4        Q.     Is this you?
 5        A.     That's me.
 6        Q.     Can you tell me -- it wasn't just
 7    you, there were lots of photographs around.
 8    Was this part of the Clothesline Project?
 9        A.     No, sir.  That's a separate
10    project called Dear World.  They came on
11    November 4th.  That was the day after the
12    election that year.  It has nothing to do
13    with sexual assault.  It's an international
14    phenomenon that people do.  They come in and
15    people are able to share something that's
16    important to them by writing it on and
17    taking pictures -- it's a photography
18    project.
19        Q.     Okay.
20             MS. HART:  Can you identify what
21    we're talking about for the record?
22             MR. GREEN:  Plaintiff's Exhibit 6,
23    Bates stamped Clothesline Project 1, 2, and,
```

1    looks like, 3.

2        Q.    I'm moving down to the Clothesline

3    Project, and this is Bates stamped

4    Clothesline Project 4.  What is this?

5        A.    Those are shirts that survivors,

6    or people that consider them survivors,

7    excuse me, of sexual assault are invited to,

8    I guess -- design's the wrong word -- but

9    make whatever they want to related to kind

10   of their experience.

11            And it's also a national project

12   that happens pretty much on most campuses in

13   most communities nationwide.

14       Q.    Do you know why it was done at

15   this time, during our appeal process?

16            MS. HART:  Object to the form.  Go

17   ahead.

18       A.    It's during Sexual Assault

19   Awareness Month when a lot of prevention

20   education and student groups do things to

21   promote prevention and awareness around

22   sexual assault.

23       Q.    Okay.  What month is Sexual

1  Violence Prevention Month?

2      A.    It's April.  And what I was gonna

3  mention in my previous response is that a

4  student center, which is what ours is

5  called, a student union, in the very

6  foundation of what it is, it was designed to

7  be a forum for this course from the very

8  beginnings in England.

9          So we are a place where everybody

10 can share their thoughts, feelings, whatever

11 they want to do, their stances on things at

12 any point during the year as long as it does

13 not promote hate speech.

14         And so that's kind of our forum.

15 So, yes, it's during Sexual Assault

16 Awareness Month, yes, sir.

17     Q.    But this forum, this sexual

18 violence forum, is literally, I mean, right

19 outside the office of Dr. Mitchell where the

20 appeal of a sexual assault allegation was

21 being made.  Were you aware of that?

22         MS. HART:  Object to the form.

23     A.    I was not aware of that.  I didn't

1    know what -- I'm not involved in hearing

2    processes, so I don't know when they happen.

3        Q.    And you say you're not involved.

4    So you didn't participate in the Clothesline

5    Project?

6        A.    That's not what you asked me.  You

7    asked me about the hearing process.  I'm

8    not involved in the hearing process.

9        Q.    Oh, I'm sorry.  I meant --

10       A.    That's okay.  I'm not involved in

11   the hearing process.  In terms of the

12   Clothesline Project, again, Title IX reports

13   to me, right?  So if there's prevention

14   things that are happening, I might be aware.

15            In this instance -- again,

16   students are allowed to do and share what

17   they want to.  They're messaging about

18   prevention, or whatever they want to share.

19   It's open.  And we cannot stop them from

20   putting it anywhere in the Student Center

21   that is allowed.

22            So it would be all -- what you're

23   seeing, kind of around the railing, the

1  panel members that were members of SAVE?

2      A.    That were members of SAVE, no.

3  I'm not familiar with who is on UDC.

4      Q.    Do you think it would be improper

5  for a UDC panel member in a sexual violence

6  case involving alcohol to be a member of

7  SAVE?

8      A.    I don't, no.

9      Q.    Are there any rules with respect

10 to organizations that a UDC panel member can

11 or cannot be a member of?

12     A.    No.

13     Q.    Are there any rules with regard to

14 disclosure of student groups that a UDC

15 panel member must disclose membership in?

16     A.    No, they don't have to disclose

17 membership in any group.  They just are, you

18 know -- they have training to help them

19 determine whether they would have a conflict

20 or not.

21           But, I mean, they're -- UDC

22 members are members of lots of different

23 organizations, I would imagine.

```
1       Q.     I'd like to go over with you
2   emails that were produced, this is
3   Plaintiff's Exhibit 11, by the University.
4   Is this your handwriting on Bates stamp USA
5   07409?
6       A.     Yes.
7              MS. HART:  You said emails.  These
8   are notes, right?
9              MR. GREEN:  Well, I don't know.
10      Q.     Are these notes, Dr. Harrell?
11      A.     That's a note, yeah.  It's just a
12  PDF.  My handwriting.
13      Q.     Okay.  Is this your handwriting
14  you say?
15      A.     Yes, that is my handwriting.
16      Q.     Who is Katrina Kennedy?
17      A.     Katrina Kennedy used to be an
18  employee of the institution who served as a
19  victim's advocate.
20      Q.     And she sat in on this initial
21  meeting with John Doe; is that right?
22      A.     It looks to be, yes, sir.
23      Q.     Okay.
```

1    A.    She must have been involved in the

2    case, yes.

3    Q.    I didn't hear you.

4    A.    She must have been assigned -- she

5    must have been a victim advocate on call,

6    yes, sir.

7    Q.    Okay.  And once you got this

8    complaint of my client, John Doe, against

9    Roe 3, what did you do?

10    A.    Typically, I usually review it,

11    make sure that I feel like there's enough

12    there, like we've talked about before, to

13    reach the threshold of a possible Title IX

14    violation.  And that might take, oh, you

15    know -- I don't, again, try to go find out

16    -- I'm not trying to investigate, I'm just

17    trying to make some determinations.  And if

18    I do, then I forward it on, like I normally

19    would for investigation if I found that it

20    did reach the threshold.

21    Q.    Is that what you -- did you feel

22    that my client's Title IX complaint met that

23    threshold?

1    A.    I feel like I did forward it on.

2  I honestly can't recall.  But I feel like --

3  I remember this situation, because I'm

4  pretty sure it was about Doe stating that, I

5  think, Roe 3 knowingly transmitted an STI

6  and didn't disclose it to him.

7    Q.    Okay.  You did a Title IX memo

8  summary.  Was that the handwritten notes

9  that we just saw a second ago?

10    A.    No, typically it's a typed up

11  memo.  That's just literally my chicken

12  scratch, you know, looking so terrible.  But

13  it's essentially language --

14    Q.    This may be it right here.  Is

15  this it?  This is Bates stamped 07412.  I

16  guess that's it, John Doe, the complainant?

17    A.    Yes.

18    Q.    It says here Title IX Coordinator

19  shared contact information and the victim's

20  advocate coordinator shared her contact

21  information.  Was that Ms. Kennedy?

22    A.    Yes.

23    Q.    I'm gonna move down in the same

1   looks like an email that Jane Roe 1 sent you

2   about housing contracts on campus and moving

3   off campus.  Do you recall that?

4      A.    I vaguely recall it, yes.

5      Q.    Do you recall the University

6   allowing her to get out of her housing

7   contract, her being Roe 1?

8      A.    I believe that they did.  I don't

9   remember.  Yeah.  I mean, to be honest, I

10   don't remember 1,000 percent.  But I think

11   that they were released, or she was

12   released, from her housing contract, yeah.

13      Q.    And here's an email.  This is

14   Bates stamped 07444 under the same Exhibit

15   11.  FeAunte Preyear, is that the victim's

16   advocate for Roe 1 and Roe 2?

17      A.    Yes.

18      Q.    And in this -- this is an email

19   that she sent you and copied Dr. Mitchell

20   and James Bridgeforth; is that correct?

21      A.    Yes.

22      Q.    And James Bridgeforth, is he with

23   Housing at University of South Alabama?

    1      Q.     Well, there's only one --

    2             THE COURT REPORTER:  Dr. Harrell,

    3      could you please slow down a bit for me?

    4             THE WITNESS:  I will definitely

    5      slow down.  I'm sorry.

    6      A.     Matt, can you clarify which cases?

    7      I want to make sure I'm being clear about

    8      which ones you're asking about.  Because I

    9      can --

   10      Q.     There was only --

   11      A.     You know I can provide a

   12      respondent accommodations, too.  So I just

   13      want to make sure which case you're talking

   14      about.

   15      Q.     John Doe was a Title IX

   16      complainant, correct?

   17      A.     Yes, sir, in a different case.

   18      Q.     That's the case I'm talking about.

   19      Did you make any accommodations, or advise

   20      him of any accommodations?

   21      A.     I would have offered the same

   22      thing to him, that if you need something you

   23      need to let us know.

Q.    I did not see a record that
reflected that.  Are you aware if you
actually did that?

A.    Record that reflected what?

Q.    Any accommodations that were
offered to my client.

A.    I don't offer accommodations.  The
students, they ask for things.  So, like, if
you go back to those -- when we go through
their initial intake, I mention to them if
you -- I just want to make you aware that
there's counseling available, you know, the
advocate is here for you, if you need
accommodations you need to let me know.  I
don't particularly tell them do you want to
move housing.  There are times when I ask
questions related to things they say.

        Now, if Doe, in his case as a
complainant, would have mentioned to me that
I don't feel comfortable living in, wherever
he was living at the time, or I don't feel
comfortable in my class because Roe 3 is in
my class, we could have done something.  Or

1  we might have.  I don't even remember.  But

2  some of those things are based on what the

3  students tell me.

4         So, in this case, my guess is

5  these students had a concern that they were

6  living near the respondent.  And vice versa

7  potentially.  I mean, again, I don't

8  remember the circumstances around this one.

9     Q.    Does a Title IX advocate have to

10  have special training by the University to

11  serve as an advocate?

12     A.    They do not get trained from the

13  University, they are trained by Lifelines,

14  who I mentioned earlier, the partner in the

15  community.  They do the same type of work in

16  the city.

17         So our advocates at the University

18  receive the same training the advocates in

19  the community do.  We don't do that

20  training.

21     Q.    Does the University have a list of

22  Title IX advocates, like FeAunte Preyear or

23  Ms. Katrina Kennedy, that they go from?

1    A.    Yes, we have an advocate on-call

2  list.  We're currently at one.  As you can

3  imagine, it's not a job everybody runs to to

4  volunteer for.  But at the time, I think we

5  were on a rotation of two or three people.

6  I can't recall exactly.  But definitely

7  FeAunte and Katrina were advocates at that

8  time.

9    Q.    To serve as a Title IX advocate

10  for a Title IX complainant, the University

11  would require that that person have to come

12  from y'all's on-call list; is that correct?

13    A.    Yes, sir, that is correct.

14    Q.    I want to skip to 07454.  It looks

15  like a couple of Post-it notes.  Can you

16  tell me what I'm looking at here?

17    A.    I wish I could.  That is my

18  scribble.  Kristin tells us to give

19  everything that we have in our files.  This

20  is probably it.  I have no idea.

21    Q.    It says --

22    A.    Probably talking about -- it looks

23  like all of them were in ROTC at the time.

1    A.    I don't know if it's initials for

2 a faculty member or if it's like Physical

3 Education.

4    Q.    Okay.

5    A.    I'm not sure.

6    Q.    Do you know what accommodations

7 faculty members or professors gave Roe 3 as

8 a result of her making the complaint?

9    A.    Unless you show me my notes, I

10 would not be able to recall that, yeah.

11    Q.    Yeah, I don't have anything.  Did

12 you keep notes that show what accommodations

13 were given to her?

14    A.    If they tell me.  Or if I have to

15 help negotiate them.  Otherwise, no.

16    Q.    Tell me what --

17    A.    Some students do it on their own.

18 But some don't feel comfortable doing that,

19 and so -- or they need more assistance.  And

20 sometimes I do have to help negotiate.

21        Now, in this case, if I don't have

22 notes on it, that means that they were able

23 to do what they needed to do in regard to

1   their classes.

2       Q.    Did she specifically ask you to

3   send this, or do you do this on every case

4   there's a Title IX complaint involving

5   sexual violence?

6       A.    As I mentioned before, I do it

7   when a student asks me to.

8       Q.    I'm sorry?

9       A.    As I mentioned previously, I do it

10  when the students ask me to.

11      Q.    Okay.  I'm having a hard time

12  understanding you.  So if I don't hear you,

13  I'm sorry.  I just didn't hear that.

14      A.    That's okay.  As I mentioned

15  before previously, like when you asked me

16  questions earlier --

17      Q.    Okay.

18      A.    Yeah.  I mean, I do it when the

19  students ask me to do it.

20      Q.    You sent this letter, email, to

21  faculty members that tell the faculty

22  members, hey, you have to provide her

23  accommodation inclusive of assistance with

1  her courses; is that right?

2      A.      They have to do reasonable

3  accommodations, yes.

4      Q.      What type of reasonable

5  accommodations are we talking about?

6      A.      What's mentioned here.  Again,

7  being flexible making up -- so if she -- say

8  she was, you know, meeting with me and she

9  missed a class.  In this particular case,

10  Roe 3, if that's who we're talking about,

11  say she missed a class when she was meeting

12  with me.  Ask that her professor be

13  flexible, that the absences negatively

14  affected her grade.  Or maybe she can attend

15  another session to make up for that missed

16  class during her time.

17          If there was an exam that happened

18  right after the reported incident, that if

19  the party member, in this case Roe 3, who is

20  a complainant, felt that that negatively

21  impacted their opportunity to study for that

22  exam or adequately prepare, that the faculty

23  member give extra time, things like that.

1          Again, it depends on what they

2     negotiated.  And I don't know the

3     specificity of what she needed.

4          Q.    I mean, could a professor change a

5     student's grade based on your request here

6     that they shall provide accommodations to

7     Roe 3?

8          A.    That would be up to the faculty

9     member.

10          Q.    Okay.  But when you say shall --

11     or must, excuse me -- when you say must

12     provide accommodations, your understanding

13     is accommodations could include changing

14     grades or providing other additional help to

15     a student simply by making a complaint of

16     Title IX sexual violence?

17          A.    I don't believe it would jump to

18     changing a grade.  That would be

19     particularly up to a faculty member.

20     Reasonable accommodations are what I mention

21     there.  It's not necessarily changing a

22     student's grades.  Giving them the

23     opportunity to make sure that they're able

1  to complete their work in an adequate way

2  that they find reasonable, too.

3        Now, they might not do anything,

4  you know, in terms of something significant.

5  They might say, against negotiations, say,

6  well, I don't feel like, you know -- you

7  don't need another week for the quiz, can

8  you do it tomorrow.

9        I mean, there are things that they

10  negotiate that I think are reasonable.  But

11  that's completely between the faculty member

12  and the student involved.

13     Q.    Can you tell me what issues she

14  said she was having trouble meeting?

15     A.    To be honest, I would not be able

16  to recall.

17     Q.    This was during the pendency of

18  the Title IX case, correct?  Was this before

19  she was determined to be -- she's already

20  been determined to be a victim by y'all,

21  correct?

22        MS. HART:  Object to the form.

23     A.    I don't determine -- she was a

1  January 13, 2021.

2  1:52 p.m.

3          MR. GREEN:  I think we're just

4  gonna keep going from where we left off

5  yesterday.  You're still under oath and all

6  that.

7

8  BY MR. GREEN:

9      Q.    I'm looking at Plaintiff's

10  Exhibit 20, which is the USA Sexual

11  Misconduct Policy and Complaint.  And I had

12  some stuff here, let me see.

13          MS. HART:  Are we on the record?

14          MR. GREEN:  Yes.

15      Q.    And this is on page 20, and it's

16  under General Principles Applicable to the

17  Investigation and Resolution Process.  That

18  would be rules that would govern

19  investigations of sexual misconduct, like

20  the case my client had; is that right?

21      A.    Yes, it would.

22      Q.    And one of the rules they mention,

23  or general principles they mention, is to

1   conduct a thorough, fair, and impartial

2   investigation that provides the parties an

3   equal opportuny to present information and

4   equivalent procedural safeguards.

5          Can you tell me, based on your

6   training and experience and knowledge in the

7   Title IX field, how you define that, how you

8   interpret that?

9      A.    And, again, I'm not involved in

10  the investigations in day-to-day, so I

11  wouldn't be a party that is responsible for

12  any of that part of the process.  Again, we

13  just look at, you know again in terms of

14  fair and impartial, is it fair.  We're doing

15  the very best we can to make sure that all

16  the parties involved have equal access to an

17  equitable process.

18          I mean, really.  And, you know,

19  thorough.  I mean, I -- and I know -- I

20  mean, it's making sure that we do the very

21  best we can to find out all the information

22  we possibly can.

23      Q.    Is transparency in the process an

1  that.  I support whatever the Student

2  Conduct Administrator felt was most

3  appropriate in terms of dissemination of

4  information related to the case to the

5  individual parties involved.

6      Q.    Do you train students on Title IX?

7      A.    I train students in general or

8  students related to a process?

9      Q.    Do you train UDC panel members?

10     A.    I do training from time to time

11  with UDC panel members related to the

12  specifics around reporting and the guidance,

13  I guess the legal process in and of itself.

14         So that's really where my training

15  specifically has tended to lie if I have

16  done it in the past for UDC.

17     Q.    And your training consists of

18  legal components and education for UDC panel

19  members; isn't that correct?

20     A.    It gives -- my training for UDC

21  panel members related to Title IX is a

22  general overview of legal guidance that

23  we're given by the Feds.  I am not an

1  attorney. I am not legally trained. So I

2  am sharing, you know, my best interpretation

3  based on the training I received of the

4  legal guidance.

5      Q.    Plaintiff's Exhibit 9, that was an

6  agenda of a Title IX training that you gave

7  UDC panel members of June 23rd, 2017; is

8  that correct?

9      A.    Yes, sir.  I think we discussed

10 some of this yesterday.

11     Q.    Right.  And we talked about Title

12 IX.  That's a federal statute; is it not?

13     A.    Yes, sir.

14     Q.    And we talked about -- you talked

15 about Aims, Terms, Process and Context, Case

16 Study, and Resources; is that correct?

17     A.    Based on what the agenda is in

18 front of me, that must have been what I

19 shared.

20     Q.    And you're the Associate Dean of

21 Students and Title IX Coordinator at the

22 time, correct?

23     A.    Yes, sir.

1    Q.    And these are slides of the
2  training agenda you gave, correct?

3    A.    Yes, it seems to be.  From what
4  you're sharing, yes, sir.

5    Q.    And in that training you gave
6  instructions and lectures on key laws,
7  correct?

8    A.    I did a brief overview of key
9  laws, yes.

10   Q.    And you also did an overview of
11 Title IX, and that is a law, correct?

12   A.    Yes, sir.

13   Q.    And part of that deals with law,
14 right?  Legal matters?

15   A.    Yes, sir.

16   Q.    And compliance with the law,
17 correct?

18   A.    Yes, sir.

19   Q.    And that's your responsibility to
20 instruct UDC panel members on the law.

21   A.    It is part of my responsibilities,
22 when asked, to give that training, yes, sir.

23   Q.    So is that yes?

1      A.      Yes, sir.

2      Q.      Okay.  And, in fact, the slide

3  here I'm referring to, USA 06002, it talks

4  about you coordinate University compliance

5  with Title IX, right?

6      A.      Yes, sir.

7      Q.      Including complaints of sexual

8  misconduct, right?

9      A.      Yes, sir.

10     Q.      And you specifically instruct the

11  UDC panel members on the rules that the

12  University follows with respect to the

13  implementation of Title IX; is that correct?

14     A.      I do briefly.  I do not go into

15  specific detail with them.

16     Q.      And there's reference to the

17  Lowdown; is that correct?

18     A.      Yes, sir, it's in reference to the

19  Lowdown, specifically just about where they

20  can find it.

21     Q.      And the Lowdown is related to

22  Title IX enforcement in what way?

23     A.      The Lowdown is the Student Code of

1  Conduct handbook essentially.  And Title IX,

2  the policy, is also found within that Code

3  of Student Conduct, which is what we call

4  the Lowdown.

5      Q.    Right.  And you also instruct on

6  Title IX compliance within the context of

7  what we went over as Exhibit 20, Sexual

8  Misconduct Policy and Complaint Procedure,

9  with the University of South Alabama; is

10 that correct?

11     A.    Say that again for me, Matt.  Did

12 I have responsibility for it?

13     Q.    Right.  You instruct the UDC panel

14 members on the Sexual Misconduct Policy and

15 Complaint Procedure, correct?

16     A.    I do in some brief details.  I do

17 not go into it in large detail, not there.

18     Q.    Okay.  In your materials you

19 reference a Dear Colleague letter from

20 Vice-President Biden; is that correct?

21     A.    It looks to be from what you're

22 showing me, yes, sir.

23     Q.    And, in fact, you also mention

1    A.    In partnership with my previous

2    staff member I compiled.  There are also

3    what is the guidance tells us to make sure

4    we share information about.

5    Q.    And the Campus SaVE Act is another

6    law that you instruct UDC panel members on,

7    correct?

8    A.    I briefly review that, yes, sir.

9    Q.    You would instruct UDC panel

10   members on campus and community resources;

11   is that correct?

12   A.    Yes, sir, it is.

13   Q.    And that would have been community

14   resources for those who you've described as

15   survivors of sexual misconduct or sexual

16   assault; is that correct?

17   A.    For any member that finds

18   themselves as a party in a Title IX process.

19   Q.    Oh.  So respondents as well?

20   A.    Yes, respondents as well.  Yes,

21   sir.  As I mentioned previously yesterday,

22   respondents are able to take advantage of

23   counseling and testing if they want to make

1    a report of some kind to any of the law

2    enforcement mentioned.  They can go to the

3    student health center if they felt it was

4    necessary and/or appropriate.  We have

5    respondent resources, which is listed in

6    that.

7        Q.    Right.  What are the respondent

8    resources?

9        A.    Response resources are a group of

10   trained faculty and staff of whom are able

11   to help a respondent in a timely process be

12   guided through in terms of helping them

13   understand the process.  It can be

14   overwhelming for people.  We have been told

15   it can be overwhelming for people going

16   through the process, as any party.

17              And so the response resources are

18   there to answer factual information about

19   the process in and of itself, the policy.

20   They can help guide them to other resources

21   and answer general questions and, again, to

22   serve as a basic resource for them, in

23   addition to anybody that somebody might want

1    to have for themselves.

2        Q.    In what way can the process be

3    overwhelming for a responding party, or a

4    respondent?

5        A.    I could not make assumption

6    because I've never been a respondent in a

7    process.  From my understanding, from what

8    I've been told, that if they've never been a

9    part of the process, they don't necessarily

10   know what to expect.

11           The policy, in and of itself, I

12   don't recall the time of '16/'17 how long it

13   was, but it was likely upwards of 30 or so

14   pages between the policy and the procedures.

15           So sometimes students or faculty,

16   staff, other employees, members of our

17   community, want to have additional resources

18   to help them navigate, you know, just

19   answering general questions.

20           As I mentioned previously in

21   yesterday's session, you know, really any

22   party going through the process might find

23   themselves in stress.  So that's why we

1    Q.    Can you tell me -- I mean --

2 because I've looked over lots of documents,

3 and I have not seen anything that advised me

4 that my client was advised of any resources

5 as a respondent.

6         MS. HART:  Object to the form.  Go

7 ahead and answer.

8    A.    As I mentioned, it's in the

9 policy.  And that is information that we

10 share with any party that's involved in a

11 process.

12    Q.    In what policy?  Because there's

13 several policies, right?

14    A.    Sexual misconduct policy, yes,

15 sir.

16    Q.    The one we were just talking about

17 on Exhibit 20; is that right?

18    A.    Yes.  I don't remember the number.

19 But, yes, sir, the sexual misconduct policy.

20    Q.    Okay.

21    A.    Counseling and testing information

22 has always been in there.  Law enforcement

23 to some degree.  I don't know if it's just

1  list of rights that are commensurate with

2  those listed under the victim's rights in

3  student conduct hearings.

4      MS. HART:  Object to the form.

5   Q.    Do you understand my question?

6   A.    To be honest, I think it was a

7  lot.  I'm gonna do my best to try to answer

8  it.  You tell me if I need to give

9  different, or some more, specific

10  information.  I'll do the best I can.

11   Q.    Okay.

12   A.    But for me -- the process is

13  designed for the respondent to have a fair

14  and impartial and equitable process.  If

15  you're saying in '16 and '17 that we did not

16  have it specifically elaborated in this

17  policy does not mean that the respondent

18  didn't have the opportunity to have similar

19  equitable requests for what we called

20  accommodations at the time and what we call

21  interim measures now.

22   Q.    Could my client, as a respondent,

23  in your understanding of the rules in 2017,

1    ask for a transfer of classes as a

2    respondent?

3        A.    The respondent at that time, or

4    any time, could have asked for specific

5    things related to trying to negotiate

6    courses.  Like I mentioned yesterday, which

7    I know is the continuation of this, is if

8    they had to come to a meeting or a hearing

9    related to the process, we could have worked

10   with them related to that.  If they had

11   other difficulties, they could have

12   discussed this.

13           But we have done a number of

14   things to try to assist any party going

15   through a process the opportunity to have

16   reasonable, necessary accommodations as we

17   move forward.

18       Q.    Were you aware that after the

19   Title IX complaint was made against my

20   client he received threats of physical

21   violence and notified the University?  Were

22   you aware of that?

23       A.    I don't recall that.

1  members related to a potential conflict of

2  interest.

3      Q.    Uh-huh.

4      A.    So --

5      Q.    Would it be a conflict of interest

6  for a UDC panel member to be friends with a

7  party in a Title IX case?

8      A.    I don't think any -- I think it's

9  difficult to determine that automatically

10 previous connections automatically

11 disqualifies somebody from being a part of a

12 UDC.

13     Q.    And if a UDC panel member didn't

14 disclose that, we would never know; is that

15 correct?

16     A.    I mean, answering your question

17 very literally, no, somebody wouldn't know

18 that.

19     Q.    Okay.  Would it be a conflict of

20 interest for a UDC panel member to be in the

21 same sorority or fraternity, or in the Greek

22 system, with a party to a Title IX

23 complaint?

1    this specific example an affiliation related

2    to, like, group stuff or something.  I don't

3    think that that means that they should

4    automatically be disqualified, no, sir.

5        Q.    Well, I know not automatically.

6    But would that be cause of concern for you

7    or the University or a reasonable person to

8    investigate to see if that potential

9    conflict of interest was a disqualifying

10   conflict of interest?

11       A.    I do not think that that would be

12   a disqualifying --

13       Q.    Does the University have a list,

14   or a policy, with respect to disqualifying

15   conflicts of interest?

16       A.    Not to my knowledge.

17       Q.    Did the University ever, as far as

18   you know, have a list of disqualifying

19   conflicts of interest?

20       A.    Not to my knowledge.  But I'm not

21   involved, again, in the training of the UDC

22   related to conflict.

23       Q.    Would it be a conflict of interest

1   for a UDC panel member to serve in multiple

2   hearings involving the same respondent?

3       A.      I don't see that as an issue if

4   the person involved has been trained to the

5   level that we expect from the UDC.  We're

6   asking them to be fair and impartial.

7               And so I don't feel like that

8   necessarily means they have any prejudgment

9   of any kind.

10      Q.      Would you believe it would be a

11  conflict of interest if the UDC panel member

12  had found the responding student responsible

13  in a prior act of sexual misconduct to serve

14  in a subsequent Title IX hearing involving

15  the same respondent?

16      A.      Again, I don't think that

17  necessarily the general principle means that

18  that person is gonna have prejudgment.  They

19  have been trained to speak up if they feel

20  like they have a conflict of interest or if

21  there is a concern.  And we have a process

22  that I feel like would, or does --

23      Q.      But the process is unwritten,

1  yes.

2     Q.     Subsequent to that investigation,

3  my client came forward with a complaint

4  involving the same complainant, Roe 3; is

5  that correct?

6     A.     Yes, sir.

7     Q.     And in that capacity he made a

8  complaint that he had been sexually

9  assaulted by Roe 3; is that correct?

10    A.     From my recollection, yes.

11    Q.     And you felt -- he came to see

12  you; is that correct?

13    A.     Yes, complainants come to me as

14  the Title IX Coordinator.

15    Q.     And you had already found enough

16  evidence, in your opinion, that my client

17  had committed an act of sexual violence on

18  Roe 3 that merited further investigation,

19  correct?

20    A.     Not correct.  I don't -- I make

21  sure there's enough to be investigated --

22    Q.     Correct.  You had the authority

23  not to send it on, but you made a decision

1          MS. HART:  Object to the form.

2      A.      Can you be more specific about who

3  that conflict of interest would be?

4      Q.      Well, sure.  I mean, it's the same

5  party.  You've already interviewed Roe 3,

6  found sufficient evidence that she's been

7  sexually assaulted by my client, and

8  forwarded that case on for further

9  investigation.  And then my client comes to

10  see you as a Title IX complainant involving

11  the same case and same set of facts.

12          And my question to you is you

13  don't see that there is a conflict of

14  interest with your participation?

15          MS. HART:  Object to the form.

16      A.      I absolutely do not.

17      Q.      Okay.

18      A.      That is not accurate from what you

19  described --

20      Q.      We're having a hard time hearing

21  you, Dr. Harrell.  I'm sorry.

22      A.      That's okay.  That is not accurate

23  from what you described in the lead-up to

1  the question.  In addition, I am a trained

2  professional that has years of experience.

3  It is not unusual for me to get complaints

4  from people that are friendly, that they are

5  in contact with one another.

6        Again, for me to reiterate, I do

7  not determine if something has happened or

8  not, nor do I determine responsibility of

9  anything, any case.  I solely determine if

10  there's enough to forward on for

11  investigation.

12        In the case of Roe 3, I determined

13  there was enough to investigate.  I did not

14  determine that a sexual assault happened.

15  In the case with, I believe, Doe, I

16  determined, I believe, that there was enough

17  to forward on for investigation for his

18  complaint of knowingly transmitting STI for

19  a Title IX possible violation.

20     Q.    Do you think that would be fair to

21  Roe 3 in that instance where she had

22  confided in you that she had been sexually

23  assaulted and that you interview her

1  assaulter, she's alleged, and then turn

2  around and use that evidence to submit a

3  case against her?  Do you understand that

4  question?

5      A.    I think I do.  And I actually do

6  not see it as an issue.  People come to me

7  to share facts in a statement.  I don't see

8  that the counseling -- they have

9  confidential people that all of them can

10  utilize.  I'm not that resource.  They are

11  stating facts for me to forward on, and

12  that's solely what I do.

13      Q.    Okay.  And you would be the one

14  that would determine if you had a conflict

15  of interest; is that correct?

16      A.    Yes, I would be.

17      Q.    Do you think it would have been a

18  better practice perhaps to segregate Roe 3

19  and John Doe in their Title IX complaints

20  where you weren't involved in both?

21      A.    I'm involved in a number of cases

22  in Title IX.  All the complaints, unless I

23  have a significant exceptional conflict of

1    interest, come through me.  At that point in

2    time, I saw no issue with me taking in both

3    general factual statements and forwarding

4    them on for review at all.

5        Q.    Did you discuss a potential

6    conflict of interest in a case where both

7    Roe 3 and John Doe both alleged sexual

8    violence against the other party in the same

9    case?

10            MS. HART:  Object to the form.

11       A.    I do not recall that.

12       Q.    Have you ever had a situation like

13   this where the respondent has filed a

14   complaint against the complainant and the

15   complainant obviously has filed a complaint

16   against the respondent involving the same

17   facts?

18       A.    I certainly would not be able to

19   remember my hundreds of cases over the

20   years.

21       Q.    And you would probably remember

22   that?

23       A.    Not necessarily, no.

1    interest that they should not cross?

2              MS. HART:  Object to the form.

3         A.    I don't train them on

4    the conflicts of interest --

5         Q.    Are you aware of any University

6    policy or procedure or training that

7    involves UDC training on conflicts of

8    interest that a UDC panel member should not

9    cross or violate?

10        A.    I'm not aware specifically what's

11   in their UDC training relating to conflict

12   of interest.

13        Q.    That would be something that would

14   be in the policy if there was one?

15        A.    Not -- it may or may not.  Because

16   a precedent that they train on might not be

17   in the policy.

18        Q.    Are there certain policies and

19   procedures that you're aware of that are not

20   in the Student Code of Conduct or the Sexual

21   Misconduct Training and Procedures that the

22   University follows?

23        A.    Not specifically that I'm aware

1      A.      From my understanding of the

2  process.  But I'm not in the day-to-day.

3      Q.      And as a Title IX, you have the

4  authority to sit in on Title IX cases,

5  right?

6      A.      I do, yes, sir.

7      Q.      Have you ever sat in on a Title IX

8  case?

9      A.      Not a hearing.  Sat in on a case.

10      Q.      You have never sat in on a Title

11  IX sexual misconduct hearing.

12      A.      Not to my recollection, no, sir.

13      Q.      Okay.  In this case, Dr. Agnew was

14  one of the Student Conduct Administrators.

15  Were you aware of that?

16      A.      From my recollection based on our

17  conversation, yes, sir.

18      Q.      The parties are instructed to

19  follow the rules at the hearing, right?

20      A.      The parties are instructed to

21  follow policy.

22      Q.      I'm not trying to split hairs with

23  you.  I'm gonna get back to -- I'm not

1    Administrator is picked by the Dean of

2    Students; is that right?

3        A.    Yes, typically the SCA is

4    designated by the Dean of Students.  Yes,

5    sir.

6        Q.    Is Dr. Agnew qualified to be --

7    was she qualified to be a Student Conduct

8    Administrator?

9        A.    In 2016/2017, Dr. Agnew had ample

10   training to be the Student Conduct

11   Administrator, yes, sir.

12       Q.    Were you confident in her ability

13   to be fair and impartial?

14       A.    I am one hundred percent confident

15   in Dr. Agnew, what you said, be impartial,

16   yes, sir.

17       Q.    Do you believe that she would

18   follow the rules of the UDC training?

19       A.    I think Dr. Agnew would do her

20   very best to follow every policy and

21   procedure that was outlined for the process

22   that she was responsible for, yes, sir.

23       Q.    And if Dr. Agnew instructed a

1 off in the middle of necessarily a question,

2 but we do need a break.

3      MR. GREEN: Okay. That's fine.

4 You want to take about a five-minute break?

5      THE WITNESS: That would be great.

6 I just need to get something to drink.

7      MR. GREEN: Okay.

8

9   (WHEREUPON, A BRIEF RECESS WAS TAKEN)

10

11 BY MR. GREEN:

12   Q. Dr. Harrell, a Student Conduct

13 Code Administrator, are they designated by

14 the Dean? Is that right?

15   A. The Student Conduct Code

16 Administrator, yes, should be designated by

17 the Dean of Students.

18   Q. Okay. And there were two in my

19 client's cases, Kim Ortiz and Dr. Agnew. Do

20 you know both of them?

21   A. Yes. I'm familiar with both of

22 them, yes, sir.

23   Q. Okay. And, ultimately, they were

1    Q.    Okay.  Did Kim Ortiz and Dr. Agnew

2 have expertise and training to serve as

3 Student Conduct Code Administrators in 2016

4 and 2017?

5    A.    To my knowledge they did, yes.

6    Q.    And, tell me, how did you know Dr.

7 Agnew?

8    A.    We worked together in the Division

9 of Student Affairs.

10    Q.    And how did you know Kim Ortiz?

11    A.    Same.  We both work in the

12 Division of Student Affairs, worked in the

13 Division of Student Affairs.

14    Q.    Did you see them once every week,

15 or every day?  How often would you see them?

16    A.    It depended on -- it honestly

17 depended on the week.

18    Q.    Did you discuss my client's cases

19 with either Dr. Agnew or Kim Ortiz?

20    A.    I don't -- I don't recall

21 specifically.  I potentially probably did

22 with Dr. Agnew.  It's not unusual for us to

23 try to see where things are in a process.

1  That's part of my responsibility, is to have

2  an understanding of where the case is and

3  how far we are along.

4      Q.    Would you find Dr. Agnew to be

5  reliable?

6      A.    I feel like Dr. Agnew is probably

7  one of the most professionally and reliable

8  people I have ever met as a colleague.

9      Q.    Would you find Kim Ortiz to be

10 reliable?

11     A.    I did not work with Kim as long.

12 But I would find that she was reliable in

13 the job that we asked her to do while she

14 was at USA.

15     Q.    Would you find Dr. Agnew to be

16 trustworthy?

17     A.    I find Andrea Agnew to be

18 extremely trustworthy.

19     Q.    Would you find Kim Ortiz to be

20 trustworthy?

21     A.    I did not work with Ms. Ortiz as

22 long.  But I found her, during that time, to

23 be trustworthy in the role that we had her

1  responsibilities.

2      Q.      Do you recall if you ever spoke

3  with Kim Ortiz about my client or about Roe

4  1, Roe 2, or Roe 3?

5      A.      To be honest, I have no

6  recollection if I did or didn't.  Again, it

7  might not be unusual for me to ask if she

8  was the investigator or the Student Code

9  Administrator at the time where her piece of

10 the process was.

11     Q.      If we talked about the

12 trauma-informed training that UDC panel

13 members are given, would you agree with me

14 that there are other factors that could

15 cause memory problems other than trauma for

16 a complainant?

17     A.      I mean, in general there might be

18 issues related to something we're not aware

19 of that might cause issue with memory.

20     Q.      Perhaps jealousy?

21     A.      I would not be able to mention --

22 I do not think jealousy would necessarily

23 mean that they are not able to remember

1  requesting I should say, because it's --

2  academic accommodations would hinder their

3  ability to be truthful or have memory of

4  certain instances during their testimony.

5     Q.    What about making the complaint,

6  or their ability to tell the truth in a

7  Title IX complaint, in the context of

8  seeking additional housing accommodations?

9     A.    Affecting their memory?

10    Q.    Affecting their ability to tell

11 the truth.

12    A.    I do not believe that any party

13 that's asking for or requesting housing

14 accommodations is then -- I certainly don't

15 think that that affects them being truthful

16 in their testimony, no.

17    Q.    And you take their complaint to be

18 truthful, correct?

19    A.    I take any party's testimony to be

20 in good faith.  I'm not involved in those

21 hearing processes.

22    Q.    Were you aware that Roe 1 had made

23 a prior Title IX complaint that was found to

1  applied to that case, would they need to

2  consult the Code of Student Conduct or the

3  sexual misconduct policy, or both?

4      A.    Okay.  It would be a reference to

5  the sexual misconduct policy.  That's what

6  they would reference.  It is also found in

7  the Code of Student Conduct.  But they would

8  reference the sexual misconduct policy if

9  they had a question about a Title IX

10 process.

11     Q.    If there's a conflict between the

12 Code of Student Conduct and the sexual

13 misconduct policy for a case involving a

14 sexual misconduct violation, which policy

15 would control?

16     A.    The sexual misconduct policy is

17 the policy we follow for any Title IX

18 issues.

19     Q.    Okay.

20         MS. HART:  That was all I had.

21

22         (Whereupon, the Deposition was

23 concluded at approximately 4:55 p.m.)

# DEPONENT CERTIFICATE

STATE OF ALABAMA )

MOBILE COUNTY )

I, Krista Harrell_____, do hereby certify that on this 27th day of January, 2021, I have read the foregoing transcript, and to the best of my knowledge, it constitutes a true and correct transcript of my testimony taken on oral examination on the 12th/13th day of January , 2021, with the corrections noted on the attached errata sheet.

_____

KRISTA LYNN HARRELL

Subscribed and sworn to, before me this 27th day of January , 2021

NOTARY PUBLIC
My commission Expires:

MILDRED M. HARTZOG
Notary Public, Alabama State at Large
My Commission Expires Sept. 12, 2021

# ERRATA SHEET

| PAGE | LINE | EXPLANATION |
|------|------|-------------|
| 15 | 8 | "Greek Student Center's" should be "Green Student Centers'" |
| 17 | 22 | After "took," insert "a position at." |
| 22 | 1 | "a team" should be "the team" |
| 23 | 10 | "or" should be "and" |
| 23 | 14 | "query" should be "Clery" |
| 24 | 5 | After "my," insert "responsibilities". |
| 31 | 14 | "other" should be "another" |
| 36 | 14 | "for coming" should be "for that coming" |
| 42 | 2 | "do" should be "did" |
| 56 | 12 | "Darlene" should be "Darleen" |
| 57 | 13 | "Darlene" should be "Darleen" |
| 57 | 16 | "Darlene" should be "Darleen" |
| 74 | 18 | "in private." should be "in private?" |
| 108 | 21 | "Rachel Golden" should be "Rachael Bolden" |
| 111 | 4 | "Rachel's" should be "Rachael's" |
| 119 | 23 | "Theta Phi Alpha" should be "Zeta Tau Alpha" |
| 121 | 1 | "yes" should be "no" |
| 130 | 15 | "Rachel Goldman" should be "Rachael Bolden" |
| 130 | 22 | "Rachel" should be "Rachael" |

## ERRATA SHEET

| PAGE | LINE | EXPLANATION |
|------|------|-------------|
| 169 | 9 | "response" should be "respondent" |
| 169 | 17 | "response" should be "respondent" |
| 171 | 2 | "response" should be "respondent" |
| 200 | 18 | "STI" should be "STD" |
| 218 | 15 | add "to" before "be impartial" |
| 233 | 21 | "Or did." should be "Or didn't." |