# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION


CIVIL ACTION NO:  1:17-cv-00394-WS-C


JOHN DOE,

          Plaintiff,

Vs.

THE UNIVERSITY OF SOUTH ALABAMA;
MICHAEL A. MITCHELL, individually
and in his official capacity as
Vice President for Student Affairs
and Dean of Students and Deputy
Title IX Coordinator for Students;
ANDREA C. AGNEW, individually and
in her official capacity as
Assistant Dean of Students; KRISTA
HARRELL, individually and in her
official title as Associate Dean
of Students & Title IX Coordinator,
et al.,

          Defendants.



            DEPOSITION TESTIMONY OF:
            MICHAEL A. MITCHELL, Ph.D.


DATE:      September 3, 2020

TIME:      1:02 p.m.

REPORTED BY:  Daphne M. Cotten, CSR

1    Q.    Okay.  Who selected the UDC panel

2    members for the Roe 1 Roe 2 hearing as you

3    recall?

4    A.    Well, the UDC members are selected

5    for their jobs via process through Student

6    Government.

7    Q.    Right.

8    A.    And so the Chief Justice actually

9    leads that process in interviewing them,

10   they're approved by the Student Government,

11   and then they are selected by the Chief

12   Justice to serve on a particular hearing

13   based on their availability and their

14   ability to serve on that particular hearing.

15   And that availability is based on their

16   non-conflict with a particular case.

17   Q.    So that would have been  UDC 6  in

18   this instance?

19   A.    That's correct.

20   Q.    And who would have contacted

21   UDC 6  say, hey, we have a Title IX hearing

22   involving John Doe, we need a panel?  Who

23   would have contacted  UDC 6

1    A.    Typically, the hearing officer.

2  And if Dr. Agnew was serving as the hearing

3  officer, she would have contacted [UDC 6] to

4  say we have a hearing coming up, we need to

5  get a UDC panel together.  If Ms. Ortiz was

6  gonna be the hearing officer, she would have

7  contacted them.

8    Q.    Okay.

9    A.    Or if they were working together,

10 Dr. Agnew may have asked Ms. Ortiz to reach

11 out to [UDC 6] and manage that part of the

12 hearing process.

13   Q.    Would [UDC 6] then determine who

14 the UDC panel members were?

15   A.    [UDC 6] would typically manage that

16 part of it.

17   Q.    And would [UDC 6] provide names

18 then to the student code conduct

19 administrator?  That would be either Kim

20 Ortiz or Dr. Agnew?

21   A.    Correct.

22   Q.    And ultimately would one of those

23 two parties have had the ultimate discretion

1    on who can serve?

2        A.      Actually, it would be up to

3    █UDC 6█ as the Chief Justice, to compose

4    that panel.  And so █UDC 6█ as the Chief

5    Justice, is trained in the process of

6    selecting the panel.  And as the Chief

7    Justice she knows, or he knows, the process

8    of selecting the panel, what needs to be

9    done.

10            And so he or she would really know

11   what to do in regards to selecting the

12   panel.

13       Q.      So students at the University in

14   cases involving sexual violence in Title IX,

15   it's ultimately the responsibility and

16   prerogative of the students to comprise and

17   choose the UDC panel members?

18       A.      The students who are trained to do

19   that would do that, yes.

20       Q.      And that would be █UDC 6█

21       A.      █UDC 6█ would serve as the Chief

22   Justice.

23       Q.      And in terms of faculty members or

1  were gone?  And then she put in parenthesis

2  meaning very drunk.

3          Do you agree that Dr. Agnew made

4  that witness determination of credibility?

5      A.    I do.

6      Q.    And then at the bottom do you

7  agree that she also put, as disputed, with

8  respect to the September 4th incident, the

9  respondent states that the complainants were

10 not incapacitated and did not at any time

11 withdraw consent, whereas the complainants

12 state that they were incapacitated and did

13 not, could not, consent to sexual activity

14 with the respondent?  Do you agree that Dr.

15 Agnew put that down as well?

16     A.    As disputed, yes, sir.

17     Q.    Right.  And in terms of Dr. Agnew,

18 she was -- she sat in on the UDC hearing;

19 did she not?

20     A.    She did.

21     Q.    And her role was to -- and correct

22 me if I'm wrong -- her role was to monitor

23 Kim Ortiz, correct?

```
 1      A.      That's correct.

 2      Q.      And Kim Ortiz was actually the

 3  Student Conduct Code Administrator in title?

 4      A.      Correct.

 5      Q.      Have you listened to the audio of

 6  the hearing?

 7      A.      I did.

 8      Q.      And you would agree with me that

 9  Dr. Agnew -- you could hear her speaking

10  during the hearing.

11      A.      Right.

12      Q.      And she was advising Kim Ortiz on

13  how to rule on certain matters.

14          MS. HART:  Object to the form.

15      A.      Yes.  And I will say that Ms.

16  Ortiz was a conduct officer in training, and

17  that's why Dr. Agnew was there.  This was

18  actually Ms. Ortiz's first hearing, which is

19  the reason why Dr. Agnew was there.

20      Q.      Gotcha.

21      A.      Is to assist her through the

22  process.

23      Q.      Right.
```

1    A.    She had done the training, but she

2    had not actually done a hearing as a conduct

3    officer.  So she actually needed help.

4    Q.    And Dr. Agnew was basically

5    holding her hand.

6    A.    Exactly.

7    Q.    Okay.  And Plaintiff's Exhibit 5,

8    this would have been read by the UDC panel

9    members, correct?

10   A.    Correct.

11   Q.    Every UDC panel member would have

12   seen this, correct?

13   A.    If it's in their packets, yes.

14   Q.    And Dr. Agnew compiled this,

15   correct?

16   A.    Yes.

17   Q.    And Dr. Agnew presided over the

18   hearing in terms of training Kim Ortiz; is

19   that correct?

20   A.    That's correct.

21   Q.    And Dr. Agnew sat in on the UDC

22   deliberations; is that correct?

23   A.    That's correct.

1  definition of consent?

2      A.    If they had questions about the

3  definition of consent, she would have

4  clarified that for them.  Now, the

5  definition of consent would have also been

6  provided to them in their training.

7      Q.    Right.

8      A.    So that's a part of their

9  training.  They would have gotten that prior

10  to this hearing, prior to any of this ever

11  starting.

12      Q.    Right.

13      A.    But if they had additional

14  questions about that, she would have

15  clarified that for them.

16      Q.    Plaintiff's Exhibit 5, this goes

17  into the UDC packet that's read -- let me

18  stop there.  I'm gonna quit asking compound

19  questions.  We've said that

20  Plaintiff's Exhibit 5 was in the UDC packet,

21  correct?

22      A.    Yes.

23      Q.    And this was in the UDC packet of

1    the Roe 1 Roe 2 case, correct?

2        A.    Correct.

3        Q.    And this packet would have been

4    read by the UDC panel members prior to the

5    hearing, correct?

6        A.    Correct.

7        Q.    This would have been --

8    Plaintiff's Exhibit 5 would have been

9    submitted and read by the UDC panel members

10   prior to any testimony from any witness at

11   the hearing.

12       A.    Correct.

13       Q.    The UDC panel that heard the Roe 1

14   Roe 2 case,  UDC 6  was on that, correct?

15       A.    She was.

16       Q.    And  UDC 6  was -- what is  UDC 6 's

17   last name?  I forgot.

18       A.         UDC 6        .

19       Q.    Thank you.

20            MR. GREEN:  And we can refer to

21   the key name, but we'll substitute it if we

22   need to.

23            MS. HART:  UDC 6.

1 practice.  And so --

2     Q.    Why would it not be a best

3 practice?

4     A.    It had not always been.

5     Q.    But why?

6     A.    I can't tell you that.

7     Q.    Okay.

8     A.    But, as I finish the answer, when

9 it became known to us as we received more

10 information, training, we changed our

11 procedures, we changed our practices.  And

12 so what you see in my letter to John Doe is

13 a reflection of us knowing information

14 regarding what's out there as a best

15 practice.

16     Q.    But you're aware, you testified

17 earlier -- I told you -- I made that

18 specific objection.  Do you remember that?

19     A.    Right.

20     Q.    And you had a chance to hear that.

21 And you yourself made the decision that this

22 should be included in it,

23 Plaintiff's Exhibit 5, correct?

1    A.    Right.

2    Q.    And we're only talking about a

3 moment between the determination of

4 responsibility and the appeal, right?

5    A.    Right.

6    MS. HART:  The appeal decision.

7    MR. GREEN:  The appeal decision,

8 right.  I'm sorry.

9    Q.    So my question is you would agree

10 that under the rules this would be a

11 violation for Dr. Agnew to submit Exhibit 5

12 as part of the UDC packet.

13    A.    Not under the rules, but under

14 best practices.

15    Q.    Can you point for any rule that

16 authorizes Dr. Agnew in this circumstance,

17 in the Roe 1 and Roe 2 case, to submit her

18 investigatory findings as to issues of

19 credibility and fact determinations prior to

20 the hearing to the panel members?

21    A.    Can you restate the question?

22    Q.    Can you point me to any University

23 rule that allows Dr. Agnew to do what she

1  did with Plaintiff's Exhibit 5?

2      A.    There's not a rule.

3      Q.    So there's no rule that authorizes

4  her to do that.

5      A.    No.

6      Q.    Okay.  And one of the grounds of

7  our appeal was exactly that, it was

8  improper.  Do you remember that?

9      A.    Yes.

10      Q.    And I'll read this to you.  You

11  said though Dr. Agnew's report of her

12  investigation findings were intended to be

13  informational for the committee, her

14  assessment of witness credibility could have

15  had some impact on the committee.

16      A.    Correct.

17      Q.    Tell me about that.

18      A.    Well, I think that my statement

19  really says what it says, that her

20  assessment of credibility may have taken an

21  opportunity for the Board to do work that

22  they thought that they should have done,

23  which is make that determination on their

1   own.

2           And I think that my finding in the

3   particular appeal reflected that, which was

4   to modify the appeal.

5       Q.    Right.

6       A.    I did not think, however, that

7   that particular assessment by Dr. Agnew was

8   significant enough to have impacted the

9   determination of responsibility or

10  non-responsibility or to have impacted the

11  process such that I thought that it deserved

12  to be reheard.

13      Q.    Did you discuss with Dr. Agnew

14  Plaintiff's Exhibit 5?  It was one of the

15  grounds of our appeal, as you recall.

16          MS. HART:  Are you asking whether

17  he discussed it with her after the appeal

18  had been filed, or at any time?

19      Q.    I'm sorry.  Anytime during this

20  case.

21      A.    I am going back to think if I did

22  or not, and I can't recall if I did or not.

23      Q.    Okay.

1   think it would be inappropriate for me to

2   quiz them individually about what took place

3   in that room.  Because that could, I think,

4   have far greater impact on the viability of

5   that group moving forward.

6           Because if they think they're

7   gonna be quizzed by me or anybody else

8   about, you know, what's said in that room, I

9   think it could have impact on how they

10  behave and interact in that room.

11          So, no, I would never quiz them

12  about what happened in that room.

13      Q.    Are you aware of any rule that --

14  the rules of the University says UDC panel

15  deliberations have to be in private; is that

16  correct?

17      A.    That's correct.

18      Q.    Are you aware of any rule that

19  allows any administration official, or

20  anybody with the University, to be in the

21  room during the deliberations of the UDC

22  panel?

23      A.    The hearing officer is considered

1    to be a part of that body.

2        Q.      Okay.   Is there a rule that says

3    that the hearing officer could be a part of

4    that body that you're aware of?

5        A.      The hearing officer is a part of

6    that body.  So --

7        Q.      A non-voting member?

8        A.      That's correct.

9        Q.      And that would have been Kim

10   Ortiz, correct?

11       A.      Kim Ortiz.  And, at the time, Dr.

12   Agnew, who was assisting Kim Ortiz.

13       Q.      So the rules allowed for the

14   Student Conduct Code Administrator and

15   anyone assisting her to be present during

16   the deliberations of the UDC?

17       A.      At that time, yes.

18       Q.      Okay.

19       A.      And, again, as I stated earlier,

20   Ms. Ortiz needed assistance both in her role

21   as the hearing officer but also as an

22   advisor to the UDC.  So she needed Dr. Agnew

23   to help her through that first hearing

1  Administrator, Kim Ortiz, do you know if she

2  would have had questions during the

3  deliberation process?

4      A.    If she would have had questions

5  during the --

6      Q.    Yes.

7      A.    Are you asking me if she had

8  questions?

9      Q.    Right.

10     A.    I don't know.

11     Q.    Do you know if she would have

12  responded to any questions the UDC panels

13  had?

14     A.    I'm not sure.

15     Q.    But at the end of the day, you

16  felt that Dr. Agnew's reported findings in

17  Plaintiff's Exhibit 5 could very well have

18  had some impact on the committee, according

19  to your --

20     A.    I did make that assessment.

21     Q.    And in terms of the impact on the

22  committee, that could also have been an

23  impact on their determination of finding my

1  client responsible, correct?

2      A.    I said that it may have had some

3  impact on them.  Now, whether or not it had

4  some impact on their decision of

5  responsibility, I didn't make that

6  statement.  I said it may have had some

7  impact.

8      Q.    Okay.  And in response to that,

9  did you do any follow-up investigation on

10  any purported impact on the committee?

11     A.    I did not.

12     Q.    During the Roe 1 Roe 2 hearing, or

13  before the Roe 1 Roe 2 hearing, there was

14  allegations during the investigation that

15  Roe 3 popped up.  Do you remember that?

16     A.    Yes.

17     Q.    And as I recall, Kim Ortiz

18  redacted out any reference in the UDC packet

19  to Roe 3; is that correct?

20     A.    If I remember correctly, yes.

21     Q.    And that was to ensure that my

22  client, John Doe, had a fair hearing,

23  correct?

1    A.    Yes.

2    Q.    And the audio of that hearing,

3  does it fairly and accurately depict what

4  transpired in the Roe 1 Roe 2 hearing?

5    A.    It's a decent recording, yes.

6    Q.    None of it's been changed or

7  altered in any way.

8    A.    No.

9         MR. GREEN:  I'll move to offer

10  that audio as an exhibit, whatever number

11  we're on.  And that will be the audio of the

12  Roe 1 Roe 2 hearing in its entirety.

13       (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

14  8 WAS MARKED FOR IDENTIFICATION)

15    Q.    Why do you think it was important

16  not to bring up any other case in the Roe 1

17  versus Roe 2 hearing?

18    A.    Well, in all of our hearings we

19  typically try to stay on the case at hand.

20  So it's not just for Roe 1 Roe 2, it's

21  really for any case.  We try to hear the

22  matter at hand.

23    Q.    Okay.  And I'm gonna refer to

1  Plaintiff's Exhibit 3.  We made -- part of

2  our appeal was that the introduction of, I

3  guess, the misconduct in Roe 1 and Roe 2 is

4  how we described it, in violating the

5  instructions of the University, Ms. Ortiz,

6  Dr. Agnew, and repeatedly referring to Roe

7  3, that that compromised my client's ability

8  to get a fair and impartial hearing.  That

9  was one of the grounds of our appeal.  Do

10 you remember that?

11     A.     Yes.

12            MS. HART:  Object to the form.

13     Q.     You addressed it in Plaintiff's

14 Exhibit 3.  Is that how you addressed it,

15 the highlighted provision?

16     A.     Yes.

17     Q.     Can you read it for the court

18 reporter so she has it for the record?

19     A.     Sure.  "I find the severity of

20 your sanction may have been impacted by the

21 introduction of Jane Doe in your proceeding,

22 thus potentially portraying you as a threat

23 to the campus community."

     Q.     Did you ever consider the
introduction -- I know you considered it as
affecting the severity of the sanction --
but did you ever consider that issue
regarding the introduction of Roe 3
allegations into the Roe 1 Roe 2 hearing in
the terms of the impact it may have had on
the UDC's determination of responsibility?
     A.     I did not.
     Q.     And didn't we ask for you to
consider that?
     A.     I'd have to go back to your letter
--
     Q.     Okay.
     A.     -- to see specifically what you
asked for --
     Q.     Okay.
     A.     -- to answer that question.  So
I'm not quite sure.
     Q.     Okay.  Did you conference with Dr.
Agnew on the appeal of the Roe 1 versus
Roe 2?  Because I believe you testified that
you did conference with her after the second

1    Roe 3 hearing.

2              MS. HART:   Object to the form.

3         A.    I don't remember.

4         Q.    Did you conference or discuss with

5    anyone the appeal of John Doe in the Roe 1

6    Roe 2 hearing?

7         A.    I don't recall that I did.   But I

8    don't specifically remember.   I think I had

9    everything that I needed.   But I don't

10   remember.

11        Q.    Did you meet with Roe 1 or Roe 2

12   after the UDC hearing and on the appeal?

13        A.    For Roe 1 or 2?

14        Q.    Did you meet with either one --

15        A.    I'm looking back at this letter.

16   Because often times it'll tell me if I did

17   or not.   I didn't.   So let me look at it.

18        Q.    Sure.

19        A.    I did.

20        Q.    Do you remember what that

21   conversation was?

22        A.    You know, I don't.   Because I

23   don't, and did not, keep my notes from that

1    conversation.  So, no, I don't have any

2    specific memories of those conversations --

3        Q.    Right.

4        A.    -- with either Roe 1 or Roe 2, or

5    John Doe for that matter.

6        Q.    Do you remember meeting with John

7    Doe and myself on the appeal?

8        A.    I do remember meeting.  Because I

9    met with all parties in this particular

10   case.

11       Q.    Did you talk to Ms. Ortiz about

12   the hearing on the appeal?

13       A.    I don't remember meeting with Ms.

14   Ortiz about the case.

15       Q.    Did anyone instruct the UDC panel

16   at any time to disregard any reference to

17   Roe 3 that you're aware of?

18       A.    In what timeframe?

19       Q.    During the hearing or during the

20   deliberations.

21       A.    I think that there may have been

22   on the recording some instructions to the

23   Board to disregard the comments.  I don't

1     A.     Yes, I did.

2     Q.     And did you consider that only as

3 to the severity of the sanction?

4     A.     I considered them as an impact on

5 the fairness and impartial hearing, and also

6 on his -- and the impact to the severity of

7 sanction.  And I covered what I call --

8 when you say your impact to a fair hearing,

9 I covered in the bullet on page 2 when I

10 talk about due process.

11     And so when you're talking about

12 fair hearing, I'm talking about due process.

13 And so I dismissed all due process claims in

14 that bullet.  So I reviewed his access to a

15 fair hearing in that bullet where I talked

16 about due process.

17     Q.     Okay.

18     A.     And so I looked at all of that

19 when I reviewed the appeal when I talk about

20 that bullet of due process.

21     Q.     So in your ruling there, you said

22 that the introduction of the Roe 3

23 allegations could have an impact on the

1  severity of sanction, correct?

2      A.      Right.

3      Q.      And it could have created the

4  impression that my client was a threat to

5  campus community, correct?

6      A.      Right.

7      Q.      Would you not agree that if

8  someone was viewed as a threat to the campus

9  community, that a panel would be more likely

10  than not to find that person responsible?

11      A.      In the educational system that

12  we're operating in, the finding of

13  responsibility is then followed by the

14  sanction.  And so the sanction in this case

15  was that he was going to be removed from

16  campus housing.  And so that finding of

17  responsibility came before that removal from

18  housing.

19      Q.      Uh-huh.

20      A.      And so when I looked at that

21  finding of responsibility and the sanction

22  -- again, the finding came before the

23  sanction.  And so in my review of the

1    finding and the sanction, I modified the

2    sanction to allow for the student to stay in

3    housing given the fact that I found that

4    there may have been some impact of the

5    circumstances that you discussed.

6           Because the removal from housing

7    may have indeed been because of the

8    perception that he may have been a danger to

9    campus.

10       Q.    Okay.

11       A.    And so my decision was to say you

12   can stay on campus, but because of the

13   finding of responsibility you may not have

14   contact with the complainants.

15       Q.    I'm gonna move on just briefly to

16   the first Roe 3 hearing.  In that case Roe 3

17   testified that, or brought into the hearing,

18   allegations of Roe 1 and Roe 2, correct?

19       A.    Uh-huh.

20       Q.    And she only mentioned that once,

21   right?

22       A.    Yes.

23       Q.    And, in fact, you ruled that the

1          MR. GREEN:  Oh, Roe 3 first

2   hearing.  Okay.

3          MS. HART:  I'm just trying to

4   prevent this from being --

5          MR. GREEN:  I think that's it,

6   Plaintiff's Exhibit 4.  Double check me, if

7   you would, Christine.

8          MS. HART:  Yes, this is

9   Plaintiff's Exhibit 4, Dr. Mitchell's appeal

10  decision in the first Roe 3 hearing.

11

12  BY MR. GREEN:

13     Q.    Is that correct?  Do you recognize

14  Plaintiff's Exhibit 4, Dr. Mitchell?

15     A.    Yes.

16     Q.    And that's your appeal on the

17  decision we were just discussing in the

18  first Roe 3 hearing?

19     A.    That's correct.

20         MS. HART:  And, again, there's

21  some yellow highlighting on Exhibit 4.  It

22  was highlighted by Mr. Green, I believe.

23         MR. GREEN:  Sure.

1      MS. HART:  Thank you.

2

3   BY MR. GREEN:

4      Q.    And in that hearing appeal you put

5   in the charge filed against you, I find that

6   the introduction of prior allegations

7   against you were significant enough to

8   warrant that this charge be heard again

9   during a new proceeding with a different

10  committee; is that correct?

11     A.    That is correct.

12     Q.    What was the reason why you felt

13  that Mr. Doe, my client, deserved a new

14  hearing?

15     A.    In this particular case I felt

16  that there was more concrete evidence that

17  there had been instruction that there was to

18  be no mention of previous cases in this

19  hearing.

20     Q.    And the reason for that was so

21  that the UDC panel would not have any other

22  allegation of my client's engaging in sexual

23  misconduct, correct?

1    A.    The reason was that we try to,

2  again as I mentioned earlier, we try not to

3  have any cases from -- we try not to have

4  any previous cases mentioned in the

5  adjudication of current cases.

6    Q.    And a UDC panel member should only

7  be aware of just the complaint in front of

8  it, correct?

9    A.    We try to do that in all of our

10  cases, that's correct.

11    Q.    And that's an important rule,

12  isn't it?

13    A.    We try to do that, yes.

14    Q.    And why is that rule important?

15    A.    So that the panel can look at the

16  issue that's in front of them.

17    Q.    Is it important too to guarantee

18  fairness?

19    A.    It's important.

20    Q.    Right.  And it's important to

21  clients like Mr. Doe that are accused of

22  this type of misconduct, correct?

23    A.    It's important in these processes.

1      Q.    Okay.  And it was important enough

2  for you to order a new hearing based on the

3  UDC panel members hearing prior allegations

4  of misconduct of my client.  Is that fair?

5           MS. HART:  Object to the form.

6      A.    I did recommend a new hearing in

7  this case.

8      Q.    And it was because you found that

9  the introduction of prior allegations

10  against my client was significant enough to

11  warrant that the charge be heard again with

12  a new proceeding with a different committee,

13  right?

14      A.    That's correct.

15      Q.    In the next hearing, the second

16  hearing of Jane Roe 3,  ███ UDC 6 ███  UDC 6,

17  she was brought back in as a UDC panel

18  member, correct?

19      A.    I'm sorry, you said the next

20  hearing.

21      Q.    The second Roe 3 hearing, which

22  would have been the third overall hearing of

23  my client, do you remember that?

1      Q.    And I believe it was because we

2   objected to the introduction of a prior

3   allegation.  Do you remember that?

4            MS. HART:  Object to the form.

5   When you ask if he remembers, do you mean

6   from his review of the appeal?  Because he

7   wasn't there.

8            MR. GREEN:  He wasn't there, but

9   -- let me rephrase it.

10     Q.    Did you get a phone call during

11  the hearing?

12     A.    Yes, I do remember getting a call.

13     Q.    And did you get a phone call from

14  Kim Ortiz?

15     A.    Yes.

16     Q.    And do you remember if this was

17  during the hearing?

18     A.    It was during the hearing.

19     Q.    And was it in response to Roe 3

20  mentioning Roe 1 or Roe 2 during the course

21  of the proceeding?

22     A.    It was related to the hearing and

23  the need for a break.  There was confusion

1  in the hearing.

2      Q.    Can you recall what the

3  conversation was?

4      A.    There had been a mention of a

5  previous hearing, or previous case in the

6  hearing, and Ms. Ortiz needed to know what

7  to do.

8      Q.    Okay.  And what did you tell her?

9      A.    To proceed with the hearing and

10  that we would, if needed, manage the issue

11  in appeal.

12      Q.    Prior to the first Roe 3 hearing

13  do you remember that John Doe had filed a

14  complaint with you asking that Dr. Agnew

15  recuse herself?

16      A.    I do.

17      Q.    And do you remember Dr. Agnew in

18  fact recusing herself?

19      A.    She did.

20      Q.    And, in fact, she did not

21  participate in the first Roe 3 hearing, did

22  she?

23      A.    She did not.

1      Q.     Did you believe that the recusal

2  was not warranted?  Is that what you said?

3             MS. HART:  Do you have any --

4             MR. GREEN:  I thought I had the

5  email.

6             (WHEREUPON, PLAINTIFF'S EXHIBIT

7  NUMBER 9 WAS MARKED FOR IDENTIFICATION)

8             MR. GREEN:  Here it is.  And I

9  highlighted again.  I'm sorry.

10     Q.     This is an email -- I think you

11  emailed me on this.  I had previously

12  emailed you, or maybe my client did, and my

13  email's on the next page, where we asked for

14  the removal of Dr. Agnew from the

15  proceeding.  And your response was -- and

16  it's dated, looks like, March 27th, 2017.

17             "Though I do not find that any

18  prior conduct by Dr. Agnew merits her

19  removal from this proceeding, Dr. Agnew has

20  recused herself from today's proceeding."

21  Do you remember that?

22     A.     I do.

23     Q.     Did you have a conversation with

1    her about that?

2        A.    I did.

3        Q.    Tell me about that, if you would.

4        A.    It was pretty simple.  I informed

5    her that Mr. Doe was asking that she recuse

6    herself from the proceedings.  And she said,

7    "You know what?  That's fine with me.  I

8    don't have an issue with that."

9        Q.    Okay.

10       A.    So it was not very complicated at

11   all.

12       Q.    And she agreed to recuse, correct?

13       A.    That's correct.

14       Q.    And then after that hearing, the

15   next hearing she was assigned to be the

16   Student Conduct Code Administrator in that

17   hearing; is that correct?

18       A.    That's correct.

19       Q.    Myself and my client, we objected

20   on the same grounds.  Do you remember that?

21       A.    I do.

22       Q.    And it was -- I guess it was your

23   call whether or not she had to recuse; would

1  that be correct?

2      A.    Restate that question, please.

3      Q.    When we asked that Dr. Agnew be

4  recused from the last hearing -- she'd been

5  recused from the second hearing, now I'm

6  going to the third hearing -- we asked for

7  her to be recused, and she did not recuse

8  herself, correct?

9          MS. HART:  Object to the form.  Go

10  ahead.

11      A.    That's correct.

12      Q.    My question to you is is that a

13  determination that you made or is that a

14  determination that Dr. Agnew made?

15      A.    That's a determination that I

16  made.

17      Q.    Okay.  And your determination, you

18  considered it as the decision-maker in that,

19  correct?

20      A.    I did make the decision.

21      Q.    And Dr. Agnew had recused already

22  once before involving my client, correct?

23      A.    That's correct.

1    Q.    And the last hearing we asked her

2 to recuse herself again, and this time she

3 does not.

4         MS. HART:  Object to the form.

5    Q.    She does not recuse.

6    A.    I appointed her to serve as the

7 conduct officer for the second Roe --

8    Q.    Okay.

9    A.    Third --

10   Q.    The second Roe 3 --

11   A.    A third hearing.

12   Q.    The third hearing.

13   A.    Yes.

14   Q.    That's a determination you made.

15   A.    That's correct.

16   Q.    Did Dr. Agnew ever say, Dr.

17 Mitchell, I've already recused in this case

18 involving Mr. Doe, I really -- involving the

19 same parties, right?  It involved Jane Roe 3

20 and my client John Doe -- she'd already

21 recused in this case, correct?

22   A.    It was the same case.

23   Q.    Right.  And you instructed her to

1  proceed as the Student Conduct Code

2  Administrator despite the prior recusal?

3      A.    I did.

4      Q.    There was some testimony at the

5  preliminary injunction hearing I'd like to

6  ask you about.  We're talking about the

7  third hearing, the one that UDC 6 serves on.

8  When UDC 6 serves on the panel as the Chief

9  Justice, does she have any special role as a

10  UDC member?  Or let me rephrase.  Does she

11  lead the deliberations, UDC 6?

12      A.    You know, I've never sat in on the

13  deliberations, so I don't -- I don't know

14  that she has any special role in that

15  process as the Chief Justice.

16      Q.    Right.

17      A.    Most of her or his work really

18  happens before the hearing takes place in

19  the coordination of the justices and getting

20  their schedules arranged, making sure that

21  they are communicated with before the

22  hearing and getting them actually there and

23  in place and ready to serve.

1    Q.    Okay.  The UDC panel recommended

2  -- and I'm going to the third hearing --

3  they recommended a lesser sanction than

4  ultimately what was imposed; isn't that

5  correct?

6    A.    That's correct.

7    Q.    And after the UDC panel in the

8  third hearing makes their finding of

9  responsibility and their recommendation of

10  punishment, Dr. Agnew called you; is that

11  right?

12    A.    That's correct.

13    Q.    Or she sent you a text or

14  something.

15    A.    She communicated with me, yes.

16    Q.    And you met with her.

17    A.    I did.

18    Q.    And was this that night?

19    A.    I don't remember.  May have been

20  the next day or something like that.

21    Q.    And this would have been in your

22  office?

23    A.    I think so.

1    Q.    And it would have been just you

2  and her?

3    A.    That's correct.

4    Q.    And the door would have been

5  closed?

6    A.    I don't remember.

7    Q.    And this would have been a private

8  conversation?

9    A.    It would have been.

10    Q.    And you and her would have what

11  you testified to as conferenced.  Do you

12  remember that?

13    A.    It would have been a conversation,

14  yes.

15    Q.    Am I misstating that -- maybe that

16  was what Dr. Agnew -- I thought the word

17  conferenced was used.

18    A.    It may have been.

19       MS. HART:  Do you have the

20  testimony?

21       MR. GREEN:  I do.  I've just got

22  to find it.

23    Q.    So tell me about that.  What did

1  y'all talk about?

2      A.    Dr. Agnew talked with me about the

3  recommendation from the Board, and also

4  talked with me about the fact that the

5  Board, of course, was not aware of any

6  previous information or cases of Mr. Doe.

7  But that because of a previous

8  responsibility finding in the previous case,

9  she talked about her recommendation that

10  because there was a previous finding, that

11  it would be her recommendation that there be

12  a step up from the Board's recommendation

13  because of previous finding.

14      Q.    And you were aware -- I don't

15  know, you weren't aware at that point that

16  UDC 6 had served on the third hearing, were

17  you?

18      A.    I had not seen any hearing lists

19  at that point, so I don't know who had

20  served.

21      Q.    But you would agree with me that

22  UDC 6 knew of the prior responsibility

23  finding in a prior Roe 1 Roe 2 hearing,

1    correct?

2        A.    I can't say that she knew.  I

3    hadn't talked to her.  I don't know.

4        Q.    I'm talking about you.  Do you

5    know?

6        A.    I know now.

7        Q.    Yeah.

8        A.    But I couldn't say that she knew

9    at the time.  I wouldn't be able to say

10   that.

11       Q.    Sure.  So we know that at least

12   one panel member knew, and actually

13   participated, in a prior case involving my

14   client, right?

15       A.    Yes.

16       Q.    And despite that, UDC 6 still

17   recommended a lesser sanction than what was

18   ultimately given by Dr. Agnew, correct?

19       A.    And her training would have told

20   her to do that.

21       Q.    So that's a yes?

22       A.    Yes.

23       Q.    And Dr. Agnew came to you to ask

1  for your advice; is that correct?

2     A.   Dr. Agnew came to me to talk about

3  an unusual circumstance of looking at her

4  decision in light of having a student who

5  had multiple responsibilities, or findings

6  of responsibilities, in Title IX, which is

7  unusual, and having to make that decision

8  outside of the UDC.

9        And so it was a professional type.

10  A second set of ears, per se.

11     Q.   It was a decision made outside of

12  the UDC, correct?  That's what you just

13  said?

14     A.   I'm sorry.  Repeat that.

15     Q.   It was a decision she made outside

16  of the UDC, right?

17       MS. HART:  What decision?

18       MR. GREEN:  The decision of the

19  severity of the punishment.

20     A.   It was a decision that she made in

21  conference with the UDC.  But the UDC

22  couldn't have made it, because they didn't

23  have all the information.

1    Q.    But they didn't, correct?

2    A.    They didn't, yes.

3    Q.    And that's why Dr. Agnew was

4 coming to you, correct?

5    A.    To let me hear what she was

6 thinking.

7    Q.    And she shared her thoughts with

8 you.

9    A.    That's correct.

10    Q.    Are you in a position -- I guess

11 you were in a position of authority over

12 her; is that correct?

13    A.    I would have been her supervisor.

14    Q.    And she would have to report to

15 you, right?

16    A.    That's correct.

17    Q.    And ultimately you would hear any

18 appeal of the case, correct?

19    A.    That's correct.

20    Q.    And ultimately you would hear any

21 appeal of a severity of sanction that she

22 gave, correct?

23    A.    That's correct.

1    Q.    And ultimately you would hear the

2  appeal of the sanction that she would have

3  given that deviated from the UDC, correct?

4    A.    I would hear the appeal.

5    Q.    In this case how long was this

6  conversation where you and Dr. Agnew

7  conferenced?

8    A.    It wasn't very long at all.

9    Q.    Did she express to you that she

10  felt that the severity of the sanction was

11  not enough, not strong enough?

12        MS. HART:  Do you mean the

13  sanctions recommended by the UDC?

14    Q.    Did Dr. Agnew express to you her

15  concern that the UDC panel severity of

16  punishment was not strong enough?

17    A.    I don't know that those were her

18  exact words.  Because she -- I don't think

19  she was worried about the severity of their

20  sanction.  Because she knew that they didn't

21  have all the information.

22        And so she would not have been

23  worried about the severity of their

1   sanctioning.  Because she knew that they

2   didn't have enough information to make a

3   sanction, because they didn't know his

4   complete profile, they didn't have his

5   complete judicial record.  And so she wasn't

6   concerned about the severity of their

7   sanction, she was more concerned with their

8   finding of responsibility or

9   non-responsibility.

10          She knew that they would not be

11  able to probably accurately come up with a

12  sanction, because they didn't have a full

13  conduct record.  Which they shouldn't have

14  had a full conduct record, because he had a

15  previous file which they had no access to.

16          So she wasn't concerned about the

17  severity of sanctions, she was more

18  concerned about their finding of

19  responsibility or non-responsibility.

20     Q.    Did she ever say that -- well, she

21  didn't come to you complaining about he'd

22  been found not responsible, did she?

23     A.    No.

1    Q.    She came to you because she was

2  concerned that the recommendation of

3  sanction did not fit, in her eyes, what she

4  thought was the appropriate sanction,

5  correct?

6         MS. HART:  Object to the form.

7    A.    Again, I'll say that -- that's not

8  how I viewed her meeting with me.

9    Q.    That's what I'm trying to figure

10  out, if you can recollect the conversation.

11  Can you ball park it for me what y'all

12  talked about?

13    A.    Well, I thought I just did.

14    Q.    Well, you told me she was more

15  concerned about responsible versus not

16  responsible.  But my question is --

17    A.    Okay.  Let me restate it.

18    Q.    Okay.

19    A.    So the Board has a process.  They

20  find him responsible, they recommend a

21  sanction.  So as the hearing officer, Dr.

22  Agnew has that finding of responsibility,

23  she has that sanction.  As she's going into

1  that process, she knows that that finding of

2  responsibility and that sanction most likely

3  aren't going to match.

4          Again, this is an unusual

5  situation because there are very few

6  students who are going to have a prior

7  finding of responsibility for sexual

8  misconduct and that are going through that

9  process again.

10          And the Board isn't going to know

11  that.  So she's -- she almost already knows

12  that that Board isn't going to come up with

13  a sanction that's going to likely match

14  that, because they don't have all the

15  information.

16      Q.    Okay.

17      A.    So if that makes more sense.

18      Q.    Okay.  I'm not trying to be

19  argumentative, but part of that's not true,

20  right?  I mean, we know that UDC 6, she

21  knew, she knew about the prior history of my

22  client, correct?

23          MS. HART:  Object to the form.

1   objection in there.  There's no audio of the

2   UDC deliberations.  I mean, we all agree

3   with that.

4           MR. GREEN:  Correct.

5       Q.    You don't know what was said, do

6   you?

7       A.    I don't.

8       Q.    And you never asked UDC 6 what she

9   talked about in any hearing, did you?

10      A.    I did not.

11      Q.    So you don't know, correct?

12      A.    I don't.

13      Q.    You don't know what was said by

14  UDC 6 in any hearing she participated in, do

15  you?

16          MS. HART:  Object to the form.

17      A.    I don't.

18      Q.    After Dr. Agnew discusses the

19  severity of sanction, what do you tell her?

20      A.    I'm just listening, to be quite

21  honest.

22      Q.    You don't say anything?

23      A.    She's reviewing what she thinks.

1   And as the person who is her supervisor, I'm

2   listening to her thoughts and, you know,

3   making sure that, you know, her ideas and

4   thoughts on, you know, what she thinks is a

5   recommendation into, you know, what are, you

6   know, rational and reasonable and fit into,

7   you know, what we would do as an

8   institution.

9           And, for the most part, we're

10   done.  And it's -- as a hearing officer,

11   it's Andrea's call.

12       Q.    Well, if it's her call, why did

13   she come meet with you?

14       A.    I'm her supervisor.  We work well

15   together.  I would hope that she values my

16   opinion as much as I value hers.  It's not

17   uncommon for us to talk through items,

18   issues.  So not uncommon at all.

19       Q.    Did you give her your opinion?

20       A.    I listened to her opinion and told

21   her that, you know, I thought it sounded

22   fair.

23       Q.    What did she say after you told

1    her you thought it sounded fair?

2         A.    We were done.

3         Q.    Dr. Agnew actually gave a more

4    severe sanction than what the UDC

5    recommended in the last hearing; is that

6    correct?

7         A.    She did.

8         Q.    And the severity of sanction is a

9    grounds for one of the appeals; is that

10   correct?

11        A.    It is.

12        Q.    And ultimately, before you heard

13   the appeal -- because you did hear the

14   appeal in this third hearing, right?

15        A.    I did.

16        Q.    You had made the determination

17   before the appeal that Dr. Agnew's decision

18   to increase the sanction sounded good to

19   you, correct?

20             MS. HART:  Object to the form.

21        A.    I had listened to her rationale

22   and I had not disagreed with her.

23        Q.    I thought you said "it sounded

1  good to me."

2          MS. HART: Object to the form.

3     Q.    Is that a yes or a no?

4     A.    I'm not disagreeing with you.

5     Q.    Okay. So yes?

6     A.    Yes.

7     Q.    After y'all conferenced, you and

8  Dr. Agnew conferenced, she then issues the

9  finding of responsibility; is that correct?

10     A.    That's correct.

11     Q.    And she would have put in there

12  the severity of sanction, or the sanction

13  imposed, correct?

14     A.    She would have listed the

15  sanctions in his letter.

16     Q.    And Dr. Agnew never put in that

17  the UDC recommended a lesser sanction, did

18  she?

19     A.    She did not include that in the

20  letter.

21     Q.    Do the rules require Dr. Agnew to

22  disclose that the UDC recommended a lesser

23  sanction?

1     A.    The rules do not require that.

2     Q.    You would agree, however, that

3 that would be a ground for appeal.

4     MS. HART:  Object to the form.

5     A.    I don't agree with that.

6     Q.    You don't.  I'm not asking you do

7 you agree with the merits of it.  But that

8 could be a ground for an appeal, correct?

9     A.    Not in my opinion.

10    Q.    Can you point to any rules that

11 tell you, or tell any student, that they

12 can't assert as a grounds of appeal that the

13 UDC recommended a lesser sanction than what

14 a University official ultimately handed

15 down?

16    A.    There is no rule that points to

17 that.

18    Q.    That's just something that you do

19 on your own.

20    MS. HART:  Object to the form.

21    A.    I'm not sure I understand your

22 question.

23    Q.    If there's no rule that authorizes

```
 1   that, where do you -- what authority --
 2           MS. HART:  Authorizes what?
 3   Sorry, Matt.  I didn't mean to interrupt
 4   you.
 5       Q.    I was asking about the -- are
 6   there any rules that limit a student's
 7   ability to raise the severity of sanction?
 8       A.    That limits a student's ability to
 9   raise the --
10       Q.    Severity of sanction imposed.
11           MS. HART:  As a ground for appeal?
12           MR. GREEN:  Right.
13       A.    Any rules that limit a student's
14   ability to raise --
15       Q.    You want me to rephrase it?
16       A.    Yes.
17       Q.    Is there a rule that says -- like
18   in this instance, Mr. John Doe, although the
19   UDC panel recommended a lesser sanction, Dr.
20   Agnew increased the sanction.  But under our
21   rules, that's not a valid ground for you to
22   appeal the severity of sanction.  Is there a
23   rule that says something along those lines?
```

1    A.    There is not.

2    Q.    So my client could have raised

3    that as an issue, even if you didn't feel

4    that it had merit.

5    A.    Well, there's nothing that would

6    have required us to inform him that that,

7    per your previous question, that that had

8    occurred.

9    Q.    Right.

10    A.    Because Dr. Agnew, as the conduct

11    officer, works in conjunction with the UDC.

12    And as a member of -- as a hearing officer,

13    a member of the board.  So when Dr. Agnew as

14    the conduct officer issues the decision from

15    the UDC, it is -- that decision has come

16    from the UDC.  The recommendation from the

17    UDC is a recommendation.

18        Dr. Agnew, as the conduct officer

19    in this particular case, was privy to

20    information that the UDC, rightfully so,

21    should not have had.  And so she was tasked

22    with making a decision, based on their

23    recommendation, that they did not have the

1    information to make.

2            So, in most cases, the

3    recommendation that comes from the UDC is

4    the information that the student will get in

5    their letter.

6        Q.    Uh-huh.

7        A.    Again, this is an unusual case

8    where there's a previous finding of

9    responsibility with a list of sanctions, and

10   the conduct board did not have that

11   information.

12           And as a conduct officer, Dr.

13   Agnew had to take that information into

14   account to make a decision based on the

15   recommendation from the Board.

16       Q.    Dr. Agnew never told my client

17   about the UDC's recommendation of punishment

18   in the last hearing, did she?

19       A.    I didn't hear that last part.    I'm

20   sorry.

21       Q.    Dr. Agnew never told my client,

22   John Doe, about the UDC recommendation of

23   punishment in the last hearing, did she?

1 know if they saw that banner or not.

2     Q.    And your duties as the ultimate

3 appeal authority in this case, you could

4 have questioned the UDC panel members if

5 they had seen these banners?

6     A.    I would not have questioned the

7 UDC panel.

8     Q.    So you never questioned any -- you

9 may have said this -- you never questioned

10 --

11     A.    No, I did not question the UDC

12 panel.

13     Q.    Let me make sure we get it

14 correct. You never questioned any UDC panel

15 member in any three hearings?

16     A.    No.

17     Q.    Not talked to any UDC panel member

18 at all.

19     A.    No.

20     Q.    And you said at the preliminary

21 injunction hearing you testified that you

22 knew    UDC 6    well, correct?

23     A.    Yes.

1  Q.  She was Chief Justice of the

2  Student --

3  A.  Student Government Association.

4  Q.  And as her duties -- some of her

5  duties would include serving as a UDC panel

6  member?

7  A.  Yes.

8  Q.  And is that by virtue of her

9  position as a Chief Justice or because she's

10  best trained?

11  A.  By virtue of her title as an

12  elected Student Government officer.

13  Q.  And you testified at the

14  preliminary injunction that she was very

15  mature, correct?

16  A.  Yes.

17  Q.  Levelheaded?

18  A.  Yes.

19  Q.  Responsible?

20  A.  Yes.

21  Q.  And you said it was a pleasure to

22  work with her; is that correct?

23  A.  That's correct.

1    Q.    And you were  UDC 6 s advisor.

2    A.    That's right.

3    Q.    What would the role of an advisor

4  be?

5    A.    Attend their weekly meetings.  And

6  I also answer any questions that they have

7  related to their individual responsibilities

8  as officers, and do anything else that they

9  need me to do as they perform their duties

10  and responsibilities as student government

11  officers.

12    Q.    And she was -- UDC 6 was in a

13  scholarship program?

14    A.    She was a leadership scholar.

15    Q.    And what does that mean?

16    A.    She received a $2,000 a year

17  scholarship.  And she was responsible for

18  completing 20 hours of community service

19  each semester and maintain membership in at

20  least two student organizations.

21    Q.    And what two student organizations

22  did she maintain a membership in?

23    A.    She had several.  Student

1    Government was one, of course.  She was a

2    member of a sorority as well.  She had more

3    than enough.

4        Q.    What sorority was she in?

5        A.    Delta Sigma Theta.

6        Q.    And who made sure that she

7    completed her community service?

8        A.    We have Bridgette Sutherland, who

9    took over the program for me.

10        Q.    Did you ever monitor her community

11    service?

12        A.    Initially.

13        Q.    Did you approve any community

14    service that she did?

15        A.    Initially.

16        Q.    Did you ever teach her in any

17    courses?

18        A.    In her first year.

19        Q.    What did you teach her?

20        A.    Her first year spurious class.

21        Q.    How many people were in that

22    class?

23        A.    Just over 30.

1    Q.    And how many days a week would

2  this class be?

3    A.    Tuesdays and Thursdays, I think.

4    Q.    Did y'all ever participate in any

5  extracurricular outside school events

6  together?

7    A.    Not that I recall.  They did some

8  activities after class, but nothing that we

9  did that I was involved in.  They did stuff.

10    Q.    When she would have been a member

11  of the UDC panels in my client's cases, you

12  said she would have participated in

13  deliberations, correct?

14    A.    Yes.

15    Q.    And she would have exchanged ideas

16  with the panel members?

17    A.    I'm assuming she would have.

18    Q.    Wasn't she the person that read

19  the -- on sanction in the Roe 1 versus Roe 2

20  hearings?

21    A.    I can't remember.

22    Q.    Did Dr. Agnew have a similar

23  relationship with  UDC 6 ?

1    the Air Force cadet, may have information

2    relevant or pertinent to the intoxication of

3    Roe 1 or Roe 2?

4         A.    I couldn't say.

5         Q.    But, as the appeal officer, you

6    could have investigated that?

7         A.    I didn't.

8         Q.    I know you didn't.  But I guess my

9    question was we raised that as one of our

10   appeals, right?

11        A.    Yes.

12        Q.    And that could have been

13   investigated, correct?

14        A.    I'm looking for my letter.

15             MS. HART:  Exhibit 3?

16        A.    After reviewing what I wrote in my

17   letter, I did not find that information to

18   be significant enough to be continued to be

19   reviewed.  If that makes sense.  That's

20   probably a bad sentence, to be continued to

21   be reviewed.  I didn't find it to be

22   significant enough to be reviewed.

23        Q.    After looking at the timeline of

1       MS. HART:  This is a copy of the

2  exhibit.

3

4  BY MR. GREEN:

5       Q.    And I'll read this to you and see

6  if it refreshes your memory.

7            "The setting and location of the

8  hearing was so fraught with unfairness that

9  I was denied a fair and unbiased hearing.

10  Just outside the hearing room someone hung

11  banners and flyers in the common area

12  alleging sex involving alcohol was a Title

13  IX violation.  This could be seen by all

14  members of the UDC."

15           This was one of the grounds of

16  John Doe's appeal of the Roe 1 Roe 2

17  hearing.  Do you recall that?

18       A.    Yes.

19       Q.    Those pictures that we looked at a

20  second ago.  Tell me what your investigation

21  on appeal revealed with respect to this

22  claim.

23       A.    Sure.  Part of what we are

1  required to do through Title IX and through

2  the Violence Against Women Act and other

3  federal laws is to provide education.  And

4  part of that particular banner and other

5  flyers across campus and other programs is

6  part of that education.

7          And I think that we can provide

8  that education, and also provide equitable

9  processes.  And that one doesn't have to

10  preclude the other.  And in this particular

11  case, I don't believe that those banners had

12  the effect of influencing that particular

13  UDC committee in this particular process.

14      Q.    And I understand that's your

15  opinion.  Can you tell me what facts you

16  base the opinion on?  Were there any

17  witnesses that you interviewed in that

18  regard?

19      A.    No, I didn't interview the

20  witnesses on that.

21      Q.    You already said you never

22  interviewed any UDC panel members.  Did you

23  interview any witnesses that testified, in

1  it?

2          MS. HART:  Object to the form.

3      A.    I don't remember the exact

4  location of where that banner is.  So it's

5  -- my office from that atrium is probably,

6  you know, maybe 20 feet.  But that whole

7  area is -- I mean, it's a large area.

8      Q.    Right.

9      A.    So that could have been anywhere

10  in that large area.

11      Q.    Was there more than one banner

12  hung?

13      A.    I don't remember.

14      Q.    Okay.  I'm looking also again at

15  Plaintiff's Exhibit 10.  It says My Cup is

16  not My Consent.  Is this a University flyer?

17      A.    The Violence Prevention Alliance

18  is a University affiliated committee of

19  sorts.

20      Q.    Is that an advocacy --

21      A.    It is.

22      Q.    And what do they advocate?

23      A.    Awareness around Title IX, sexual

1  assault awareness, education, that type of

2  thing.

3      Q.    Under the University's policy is

4  simply using alcohol to get sex considered

5  sexual assault?

6      A.    Restate the question.

7      Q.    This banner, it says -- or

8  flyer -- there's an asterisk and it says

9  using alcohol to get sex is sexual assault.

10 Is that the University of South Alabama's

11 rules on Title IX, or any university rule?

12     A.    That is not a specific university

13 rule.  Our university rules are around

14 consent.

15     Q.    Right.

16     A.    And at this particular time, it

17 was you were not able to provide consent if

18 you were unable to -- if you were at a point

19 when you could not, because of alcohol, give

20 consent.

21     Q.    Was incapacity --

22     A.    Incapacitated.  You were not able

23 to provide consent.

1      Q.    Right.  And I guess my question is

2  is that -- I mean, you could still be

3  intoxicated but not incapacitated and not

4  violate the rules engaging in sexual

5  relations with another individual under the

6  definition of consent.

7           MS. HART:  Object to the form.

8      A.    Rephrase that.

9      Q.    Consent between an individual, two

10  individuals, is not cancelled or obviated

11  just by intoxication, is it?

12     A.    No.

13     Q.    And, in fact, the rules at the

14  University that were in place at the time

15  says that at least one of the parties has to

16  be incapacitated; isn't that correct?

17     A.    That's correct.

18     Q.    And only if a person is

19  incapacitated could consent not be validly

20  given.

21     A.    That's correct.

22     Q.    So I guess getting back to this

23  point, using alcohol to get sex is sexual

1    assault, that's not necessarily true under

2    the rules in place at the time of the Roe 1

3    versus Roe 2 hearing, correct?

4        A.    Per policy, I would say yes.

5        Q.    Is there anything that the

6    University has changed with respect to

7    policies and procedures after my client's

8    three hearings?

9        A.    Well, the entire policy recently

10   changed.

11       Q.    Right.

12       A.    Are you asking --

13       Q.    Before the new regulations from

14   the Department of Education came out --

15           MS. HART:  This year you mean?

16           MR. GREEN:  Yeah.

17       Q.    Between the last time my client

18   was disciplined and between the time the new

19   regulations came out, did y'all make, y'all

20   being the University, make any changes to

21   the policies and procedures in these Title

22   IX cases?

23       A.    Well, we actually review our

1 training?

2     A.    I don't know that she had to do

3 any special training, because I believe she

4 had done the training.

5     Q.    Did you ever notify John Doe or

6 me, his advocate, about that?

7     A.    No.

8     Q.    Was that one of the reasons why

9 you did not allow her to participate, her

10 being Kim Ortiz, in the last hearing

11 involving Roe 3?

12     A.    I knew that Andrea Agnew was our

13 strongest hearing officer.

14     Q.    And when you say strongest, tell

15 me what you mean by that.

16     A.    She had the most experience.

17     Q.    And Dr. Agnew had recused herself

18 from the prior hearing, right?

19     A.    Right.

20     Q.    And she had made inappropriate

21 findings of fact and witness credibility

22 determinations that you felt impacted the

23 UDC panel in Roe 1 and Roe 2, right?

1    A.    I wouldn't say inappropriate.

2    Q.    Well, had an impact?

3    A.    I think that they may have

4    impacted the ability, the panel's ability,

5    to -- I forget the language that I used in

6    my appeal.  I did not call them

7    inappropriate.  But I did make some

8    modifications to the decision, based on

9    that, and some other pieces in that initial

10    process.

11          But Dr. Agnew was definitely the

12    more seasoned conduct officer of the two.

13    And I had two.

14    Q.    You only had two?

15    A.    Two.

16    Q.    You never took any disciplinary

17    action against Dr. Agnew, did you?

18    A.    No, I did not.

19    Q.    And you did against Ms. Ortiz,

20    correct?

21    A.    I don't know if I would call it

22    disciplinary action.

23    Q.    You ordered her to do remedial

1  parties in these Title IX proceedings?

2      A.    No.

3      Q.    So anything that you know about

4  what happened, where would you have gotten

5  that information?

6      A.    It would have been from the files

7  that were given to me as a part of either

8  the appeals or packets that were part of

9  those processes.

10     Q.    When the investigator conducts

11  their investigation of a Title IX case, do

12  they make evaluations as to what is

13  considered relevant?

14     A.    They do.

15     Q.    And that is something that they're

16  expected to do; is that correct?

17     A.    That is.  They are expected to do

18  that.

19     Q.    How are the staff selected to

20  serve on a University disciplinary

21  committee?

22     A.    Most of our staff members have

23  volunteered to serve on the University

1    discipline committee.  Some of them have

2    wanted to get experience in University

3    disciplinary committee, so they volunteer

4    for professional reasons so they can get

5    experience in conduct for professional

6    reasons.  Some of them just want to

7    volunteer, just to volunteer and say I want

8    to help out.

9         Q.    Does the Chief Justice contact the

10   staff, UDC?

11        A.    Typically the Conduct

12   Administrator contacts the staff members.

13        Q.    At the time of these Title IX

14   cases, was the investigator expected to

15   generate a report of the investigations?

16        A.    At the time of the --

17        Q.    Of the Title IX cases that are the

18   subject of this litigation.

19        A.    Yes.

20        Q.    You were not present at any of the

21   UDC hearings, correct?

22        A.    No, ma'am.

23        Q.    Is your testimony today about what

1    happened at the hearings based on the best

2    of your recollection from your listening to

3    the audiotapes?

4        A.    Yes, ma'am.

5        Q.    Are the audiotapes the best record

6    of what actually happened at the hearings?

7        A.    That is correct.

8              MR. GREEN:  Object to the form.

9              MS. HART:  That's all I have.

10             MR. GREEN:  Thank you.

11

12             (Whereupon, the Deposition was

13   concluded at approximately 4:48 p.m.)

14

15

16

17

18

19

20

21

22

23

STATE OF ALABAMA    )

MOBILE COUNTY       )

          I, _Michael A. Mitchell, Ph.D_ , do hereby certify that on this _28th_ day of _October_ , 2020, I have read the foregoing transcript, and to the best of my knowledge, it constitutes a true and correct transcript of my testimony taken on oral examination on the _3rd_ day of _September_ , 2020.

MICHAEL A. MITCHELL, PH.D.

Subscribed and sworn to, before me this _28th_ day of _October_ , 2020

_____
NOTARY PUBLIC
My Commission Expires: 12-14.2020

1                    ERRATA SHEET

2

3     PAGE              LINE              EXPLANATION

4     66                 7                Change "UBC" to "UDC"

5     146                8                Change "Sutherland" to "Soderlind"

6     146                20               Change "spurious" to "experience"

7     173                10     Change "Diante Prayer (phonetic)" to "FeAunte' Preyear"

8     173                12               Change "Diante" to " FeAunte' "

9     180                22       Change "non-residential" to "residential"

10

11

12

13

14

15

16

17

18

19

20

21

22

23