# DOE EXHIBIT 5:
# KRISTA HARRELL
# DEPOSITION EXCERPTS

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NO: 1:17-cv-00394-WS-C

JOHN DOE,

    Plaintiff,

Vs.

THE UNIVERSITY OF SOUTH ALABAMA;
MICHAEL A. MITCHELL, individually
and in his official capacity as
Vice President for Student Affairs
and Dean of Students and Deputy
Title IX Coordinator for Students;
ANDREA C. AGNEW, individually and
in her official capacity as
Assistant Dean of Students; KRISTA
HARRELL, individually and in her
official title as Associate Dean
of Students & Title IX Coordinator,
et al.,

    Defendants.

VIDEO/WEBCAST DEPOSITION TESTIMONY OF:
KRISTA LYNN HARRELL

DATE:   January 12, 2021 - January 13, 2021

TIME:   2:02 p.m.

REPORTED BY:   Daphne M. Cotten, CSR

---

2

S T I P U L A T I O N

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of,

KRISTA LYNN HARRELL,

may be taken before Daphne M. Cotten, Commissioner and Notary Public for the State of Alabama at Large, at Law Office of Matt Green, LLC, The Pollock-Altmayer House, 501 Government Street, Suite 1, Mobile, Alabama, on the 12th day of January, 2021, commencing at approximately 2:02 p.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to the deposition by the witness is not waived, said deposition to have the same force and effect as if full compliance had been had with all laws and rules of court relating to taking of deposition.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel as to any questions, except as to form or leading

---

3

questions, and that counsel for the parties may make objections and assign grounds at the time of trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that notice of the filing of the deposition by the Commissioner is waived.

---

4

A P P E A R A N C E S

BEFORE:

    Daphne M. Cotten, CSR and Notary Public

APPEARING ON BEHALF OF THE PLAINTIFF:

    MATT GREEN, ESQUIRE
    LAW OFFICE OF MATT GREEN, LLC
    THE POLLOCK-ALTMAYER HOUSE
    501 GOVERNMENT STREET, SUITE 1
    MOBILE, ALABAMA 36602

APPEARING ON BEHALF OF THE DEFENDANTS:

    CHRISTINE HARDING HART, ESQUIRE
    HAND ARENDALL, LLC
    MERCHANTS PLAZA
    104 SAINT FRANCIS STREET, SUITE 300
    MOBILE, ALABAMA 36602

    KRISTIN DUKES, ESQUIRE

5

1      I N D E X
2
3   EXAMINATION BY:
4   MR. GREEN..................Pages 10-241
5   MS. HART...................Pages 242-244
6
7        E X H I B I T S
8   Plaintiff's 1...................Page 10
9   Notice of Video/Webcast Deposition
10
11  Plaintiff's 2...................Page 10
12  Krista Harrell's Responses to Plaintiff's
13  First Set of Requests For Production
14
15  Plaintiff's 3...................Page 10
16  Krista Harrell's Responses to Plaintiff's
17  First Set of Interrogatories
18
19  Plaintiff's 4...................Page 10
20  John Doe Exhibit 2:  USA Student Code of
21  Conduct & Flow Chart
22
23

6

1   EXHIBITS (Cont'd)
2
3   Plaintiff's 5...................Page 10
4   Findings - Bates USA 06073
5
6   Plaintiff's 6...................Page 10
7   Clothesline Project
8
9   Plaintiff's 7...................Page 10
10  John Doe Exhibit 7 - USA Title IX Banners at
11  Doe's hearing with Roe 1 and Roe 2
12
13  Plaintiff's 8...................Page 10
14  Alias Key as of October 11, 2017
15
16  Plaintiff's 9...................Page 10
17  University Disciplinary Committee (UDC)
18  Title IX Training
19
20  Plaintiff's 10..................Page 10
21  Greek Leadership Title IX Training
22
23

7

1   EXHIBITS (Cont'd)
2   Plaintiff's 11..................Page 10
3   Notes - Bates USA 07409 - USA 07472
4
5   Plaintiff's 12..................Page 10
6   SAVE Training Title IX Presentation
7
8   Plaintiff's 13..................Page 10
9   Hearing Minutes - Bates USA 07875 - USA
10  07876
11
12  Plaintiff's 14..................Page 10
13  "Drinking too much" doesn't cause rape.
14  Rapists do.
15
16  Plaintiff's 15..................Page 10
17  Hearing Minutes - Bates USA 06305 & USA
18  06309
19
20  Plaintiff's 16..................Page 10
21  Emails - Bates USA 07431, 07443, 07444,
22  07449-07450
23

8

1   EXHIBITS (Cont'd)
2   Plaintiff's 17..................Page 10
3   Gender Box Activity and Script
4
5   Plaintiff's 18..................Page 10
6   Hearing Board Training:  Building a
7   Collaborative and Trauma Informed Approach
8
9   Plaintiff's 19..................Page 10
10  Department of the Army - Report of
11  Proceedings
12
13  Plaintiff's 20..................Page 10
14  John Doe Exhibit 1:  USA Sexual Misconduct
15  Policy & Complaint Resolution Procedures
16
17  Plaintiff's 21..................Page 10
18  John Doe Exhibit 2:  USA Student Code of
19  Conduct & Flow Chart
20
21  Plaintiff's 22..................Page 10
22  Sex Without Consent isn't Sex, It's Rape -
23  Bates USA 04386 - USA 04390

21

14:12:57 1  we have done where we take something that
14:13:06 2  either ATIXA has shared with us and provide
14:13:06 3  that for our Title IX team. And Dr.
14:13:07 4  Mitchell has participated in those over the
14:13:09 5  years. And I would say regularly trained.
14:13:14 6       We typically have -- you know,
14:13:17 7  I've been on medical leave since October --
14:13:20 8  but we typically have monthly Title IX team
14:13:24 9  meetings in which I provide updates on
14:13:27 10 trends. If there are things that we need to
14:13:31 11 be aware of, you know, again, legal changes,
14:13:36 12 guidance changes, those types of things. I
14:13:39 13 would consider it an ongoing education.
14:13:42 14     Q.  Okay. In 2016 and '17, who was on
14:13:46 15 the Title IX team at the University of South
14:13:50 16 Alabama?
14:13:50 17     A.  I'm sorry, Matt. You said
14:13:52 18 '16/'17?
14:13:53 19     Q.  Yes, ma'am.
14:13:54 20     A.  I would not be able to tell you
14:13:57 21 all of the members specifically that were on
14:13:58 22 there. I would not be able to recall that
14:14:00 23 offhand right now. So I wouldn't want to

22

14:14:01 1  miscommunicate. I obviously was on a team,
14:14:05 2  I served as a Title IX coordinator since
14:14:07 3  2012. Dr. Mitchell, again as my direct
14:14:10 4  supervisor, has been on that team. So the
14:14:13 5  two of us for certain. Dr. Andrea Agnew
14:14:17 6  would have been on in '16/'17.
14:14:20 7      Q.  Kim Ortiz?
14:14:22 8      A.  I do not remember the date of when
14:14:25 9  Kim started her employment with the
14:14:26 10 institution. I do not believe that it was
14:14:31 11 '16/'17. I don't think she started until
14:14:32 12 after that. But I would not be able to
14:14:34 13 recall for sure.
14:14:35 14     Q.  What about Ms. Preyear?
14:14:37 15     A.  FeAunte Preyear served as our
14:14:40 16 Victims Advocate Coordinator at the time,
14:14:43 17 and she would have been on the Title IX team
14:14:57 18 at that time.
14:14:59 19     Q.  Katrina Kennedy?
14:15:01 20     A.  Katrina Kennedy would not have
14:15:04 21 served on the Title IX team. She's been a
14:15:07 22 victims advocate. But she would not have
14:15:11 23 served on the Title IX team. FeAunte served

23

14:15:11 1  as their representative to that team.
14:15:14 2      Q.  And to be on the Title IX team,
14:15:16 3  what does that entail exactly?
14:15:17 4      A.  Essentially, it is everyone that
14:15:20 5  served as a Deputy Coordinator. And those
14:15:25 6  distinctions are available on our web page,
14:15:29 7  the most updated list of the members that
14:15:31 8  served.
14:15:35 9       We also include the Victims
14:15:39 10 Advocate Coordinator, or general counsel.
14:15:42 11 So previous to Kristin would have been Jean
14:15:46 12 Tucker. Our Chief of Police has been
14:15:51 13 invited. Captain Keith West has been a part
14:15:55 14 of the team, as he coordinates our query
14:15:59 15 reports, which we have to partner on. So
14:16:02 16 he's been on a team.
14:16:04 17      And I'm trying to think if there's
14:16:06 18 -- I don't want to miscommunicate anybody
14:16:10 19 else. That's typically who it is.
14:16:10 20     Q.  Okay. That's fine. Tell me, as
14:16:14 21 best you can recall, how you became involved
14:16:16 22 in the Roe 1 Roe 2 case against my client.
14:16:20 23     A.  In Roe 1 Roe 2. I would have done

24

14:16:25 1  the intakes for the Roe 1 Roe 2.
14:16:31 2      Q.  And what does that --
14:16:31 3      A.  That's part of my --
14:16:32 4      Q.  I'm sorry. Go ahead.
14:16:33 5      A.  That's part of my -- so, like I
14:16:37 6  say, I oversee everything. Part of my
14:16:39 7  responsibilities, particularly during that
14:16:40 8  time, I would have done intakes with all of
14:16:43 9  the potential complainants in the cases to
14:16:46 10 hear what their statements would be to
14:16:49 11 determine whether there was enough to move
14:16:52 12 forward with investigation.
14:16:54 13      Not to determine, obviously,
14:16:55 14 responsibility, just to determine if there's
14:16:57 15 enough for an investigation. I would have
14:16:59 16 met with both Roe 1 and Roe 2.
14:17:03 17     Q.  How did you become aware of Roe
14:17:07 18 1's allegations against my client?
14:17:09 19     A.  I do not recall the specificity of
14:17:12 20 how I was notified for Roe 1.
14:17:20 21     Q.  Can the University -- can Title IX
14:17:22 22 go forward without the cooperation of a
14:17:25 23 complainant?

29

14:21:16 1   Q.   Okay. Tell me --
14:21:16 2   A.   I'm not -- go ahead. I'm sorry.
14:21:18 3   Q.   Tell me, as you recall, in the Roe
14:21:23 4   1 and Roe 2 complaints what information did
14:21:24 5   you have that you felt it was appropriate to
14:21:27 6   forward the case on for an investigation?
14:21:30 7   A.   And, again, I don't have the case
14:21:33 8   details in front of me, Mr. Green. So I
14:21:35 9   want to make sure I'm very clear. I don't
14:21:38 10  remember every single detail about every
14:21:41 11  case. Unfortunately, we have a number that
14:21:41 12  come through every year. And that's not to
14:21:41 13  diminish the importance of this one.
14:21:47 14       From my recollection from this
14:21:48 15  case, I felt very strongly, based on what
14:21:55 16  they shared, that there was enough for an
14:21:58 17  investigation kind of given the statements
14:21:59 18  that Roe 1 and Roe 2 made about the
14:22:05 19  situation that happened, I believe if I
14:22:08 20  recall correctly, on campus.
14:22:13 21  Q.   And what about Roe 3? Do you
14:22:15 22  remember how you came to discover Roe 3?
14:22:19 23  A.   Again, I can't honestly tell you

30

14:22:23 1   the specificity of how particular cases got
14:22:26 2   to me. They're reported to me all kinds of
14:22:30 3   ways. It could have been from something on
14:22:33 4   campus, it could have been from police, it
14:22:33 5   could have been through the person. So I
14:22:36 6   honestly don't remember how that one got to
14:22:38 7   me.
14:22:39 8   Q.   Do you remember Dr. Agnew sending
14:22:41 9   you an email about the allegations, or the
14:22:46 10  identity of Roe 3, to begin this
14:22:47 11  investigation?
14:22:48 12  A.   I don't remember a specific email,
14:22:50 13  no.
14:22:50 14  Q.   Do you remember what evidence you
14:22:57 15  felt was present in the Roe 3 allegation
14:23:01 16  that you felt was sufficient to forward the
14:23:03 17  case on to an investigation?
14:23:05 18  A.   I don't remember, again, the
14:23:07 19  specificity of all of them, and I would not
14:23:10 20  want to miscommunicate. From my
14:23:13 21  recollection, my best estimation,
14:23:15 22  recollection, is that the -- I guess what
14:23:21 23  happened, the incident that was reported by

31

14:23:24 1   Roe 3 that happened, I believe hers was off
14:23:28 2   campus, was significant and concerning
14:23:31 3   enough, based on the details, to forward on.
14:23:33 4   Q.   Do you remember, as we sit here,
14:23:35 5   what the details were?
14:23:36 6   A.   Sir?
14:23:37 7   Q.   Do you remember as we sit here
14:23:39 8   today what those details were?
14:23:41 9   A.   I remember some of them. Again, I
14:23:43 10  don't want to miscommunicate. And I'm
14:23:47 11  saying this very honestly. There's a lot
14:23:49 12  that come through. I would never want to
14:23:49 13  make a conflation from -- like conflate one
14:23:49 14  with the other.
14:23:54 15       From my best recollection, I
14:23:59 16  remember Roe 3 mentioning something about --
14:24:02 17  and, again, there was more than this.
14:24:05 18  Clearly. I don't remember everything about
14:24:06 19  all cases.
14:24:08 20       My best recollection is there is
14:24:10 21  some instance where I believe that she was
14:24:12 22  supposed to be maybe intoxicated or
14:24:17 23  unconscious to the point where Roe 3 might

32

14:24:20 1   not have been able to give consent.
14:24:22 2        My understanding, if I remember
14:24:24 3   correctly, there was something that might
14:24:26 4   have happened going from a bedroom to a
14:24:29 5   bathroom, if I recall correctly. Again, I'm
14:24:33 6   making a best estimation. I remember
14:24:33 7   potentially that in that case Roe 3 might
14:24:36 8   have reported hitting their head on a sink
14:24:36 9   or something in the bathroom -- now,
14:24:44 10  remember, this is years ago -- and kind of
14:24:47 11  going in and out of consciousness.
14:24:47 12  Q.   Okay.
14:24:50 13  A.   Again, that's my best recollection
14:24:52 14  to the details for that.
14:24:52 15  Q.   Okay.
14:24:53 16  A.   That's really the most that I
14:24:53 17  have.
14:24:55 18  Q.   Before you made the determination
14:24:57 19  to forward the case on for investigation,
14:24:59 20  did you interview any collateral witnesses
14:25:02 21  other than the complainants?
14:25:04 22  A.   I don't recall in that case doing
14:25:08 23  that. That would be unusual if it did

## Page 73

```
15:12:50  1    A.    Yes, I can read that.
15:12:51  2    Q.    Do you see where I have the cursor
15:12:54  3  and it highlighted?
15:12:55  4    A.    Yes, I can see that.
15:12:55  5    Q.    Okay.
15:12:56  6          MS. HART: Just to help, it's page
15:12:58  7  -- there's a page 60 at the bottom of that
15:13:00  8  page, right?
15:13:01  9          MR. GREEN: Yeah.
15:13:01 10    Q.    You got it?
15:13:01 11    A.    Uh-huh.
15:13:05 12    Q.    And I guess my question to you, is
15:13:07 13  private -- is it your understanding that
15:13:10 14  private means just the UDC and the Student
15:13:15 15  Conduct Administrator? Is that right?
15:13:15 16    A.    That would be what I would
15:13:17 17  understand. I believe that as a Title IX
15:13:21 18  Coordinator I can be a part of any process
15:13:23 19  or proceeding. I never sit in on them,
15:13:24 20  ever. I've never been in on them.
15:13:27 21    Q.    Why have you not sat in on them if
15:13:29 22  you --
15:13:31 23          MS. HART: Let's let her finish
```

## Page 74

```
15:13:33  1  the answer first.
15:13:34  2    Q.    Oh, I'm sorry. I didn't mean to
15:13:35  3  cut you off, Dr. Harrell.
15:13:35  4    A.    That's okay. And honestly I don't
15:13:36  5  remember what I was saying. But essentially
15:13:39  6  the only people that, from my knowledge -- I
15:13:44  7  mean, I am not involved in the hearing
15:13:46  8  process -- is that it's typically just the
15:13:48  9  UDC and the conduct administrator.
15:13:54 10          As Title IX Coordinator, I can be
15:13:55 11  involved in any -- you know, I can sit in
15:13:55 12  and observe if I need to. But I haven't
15:13:58 13  ever to this point. I think is what
15:13:58 14  Christine was mentioning for me to finish.
15:14:03 15    Q.    Do you know why the UDC should
15:14:07 16  meet in private?
15:14:12 17    A.    Do I know why the UDC should meet
15:14:13 18  in private. My understanding is that a UDC
15:14:17 19  can make their deliberations and discuss the
15:14:21 20  evidence presented during the hearing.
15:14:27 21    Q.    Would it be like they could feel
15:14:30 22  free to debate their true opinions?
15:14:34 23    A.    I do believe that they discuss
```

## Page 75

```
15:14:38  1  their points of view about the evidence
15:14:42  2  presented during the hearing from all
15:14:44  3  parties involved.
15:14:45  4    Q.    Based on your training and
15:14:47  5  experience and knowledge in this area, the
15:14:49  6  privacy component of the UDC deliberation,
15:14:52  7  is that an important rule?
15:14:54  8    A.    I wouldn't be able to make a
15:14:58  9  determination whether it's an important
15:15:01 10  rule. I mean, I --
15:15:02 11    Q.    Is it a rule that is
15:15:06 12  discretionary, or should it be followed?
15:15:06 13    A.    Anything in the policy, we follow.
15:15:09 14    Q.    And if it's not followed, that
15:15:11 15  would be in violation of the rule?
15:15:13 16    A.    Potentially.
15:15:26 17    Q.    Can you envision where it would be
15:15:28 18  okay to not follow the rule that the UDC
15:15:32 19  shall meet in private?
15:15:36 20    A.    At this point, I can't make a
15:15:36 21  determination of what would be the
15:15:36 22  exception.
15:15:42 23    Q.    Okay. And it says shall. Do you
```

## Page 76

```
15:15:44  1  see where it says shall?
15:15:46  2    A.    It doesn't say -- that is
15:15:49  3  different than must. That language is --
15:15:52  4  the must and shall is important throughout.
15:15:52  5    Q.    Right.
15:15:52  6    A.    That was not something --
15:15:59  7    Q.    I'm sorry. Go ahead.
15:16:00  8    A.    Shall is not something that they
15:16:04  9  must do.
15:16:04 10    Q.    It doesn't seem like there's much
15:16:08 11  wiggle room in that rule to me. Am I
15:16:10 12  reading that the same way you are?
15:16:12 13    A.    I'm not sure what you mean by
15:16:14 14  wiggle room. Again, shall, they can make --
15:16:17 15  there could be an exception. Must would be
15:16:24 16  they must be in private.
15:16:24 17    Q.    Okay.
15:16:25 18    A.    Shall would mean that there is a
15:16:26 19  potential exception that could be possible.
15:16:27 20    Q.    Can you tell me what exceptions
15:16:29 21  that you know of in the rules where the UDC
15:16:33 22  should not meet in private?
15:16:35 23    A.    Again, I don't know of any
```

15:21:01 1 during those hearings or deliberations.
15:21:05 2    Q.   Are you familiar with the rules of
15:21:08 3 the Student Code of Conduct?
15:21:10 4    A.   Yes, I am familiar.
15:21:12 5    Q.   Are you familiar with the
15:21:13 6 disciplinary procedures that we've talked
15:21:17 7 about?
15:21:17 8    A.   Yes.  But I would not be able to
15:21:19 9 probably tell you them offhand.  But I am
15:21:24 10 familiar with them.
15:21:24 11    Q.   Are you familiar with the sexual
15:21:24 12 misconduct policy and complaint procedure
15:21:30 13 that the University had in place at the time
15:21:31 14 of my client's hearings?
15:21:33 15    A.   At the time of the hearings, yes.
15:21:35 16 I am not as versed in them, because we've
15:21:40 17 had several iterations since 2016/2017.  Or
15:21:41 18 I think that was the year.  We've gone
15:21:44 19 through annual revisions.
15:21:46 20         I obviously was involved with the
15:21:53 21 policy at the time and -- you know, it just
15:21:54 22 depends on what it is.  But I was involved.
15:21:56 23 We've had so many revisions that sometimes

15:22:02 1 it's difficult to remember what --
15:22:02 2    Q.   Sure.
15:22:02 3    A.   -- policy was revised in what
15:22:02 4 year.
15:22:05 5    Q.   Have any revisions or changes been
15:22:07 6 made to the rules or procedures that we've
15:22:11 7 discussed since my client's hearing about
15:22:14 8 deliberations of the UDC?
15:22:16 9    A.   I wouldn't be able to tell you for
15:22:20 10 sure specifically.  We have had a number of
15:22:23 11 changes overall to the policy and the
15:22:27 12 procedures in the last four plus years.
15:22:30 13    Q.   Who is now allowed to participate
15:22:31 14 in the UDC deliberations in an allegation of
15:22:36 15 sexual misconduct?
15:22:37 16    A.   I don't recall offhand.
15:22:40 17    Q.   Has it changed?
15:22:42 18    A.   I don't believe it's changed.
15:22:42 19 Again, I don't have it right in front of me.
15:22:45 20 I don't believe it's changed.
15:22:46 21    Q.   Are you aware of any rule or
15:22:48 22 procedure that's changed since my client's
15:22:53 23 hearings with respect to the rules of the

15:23:01 1 Code of Student Conduct or the sexual
15:23:04 2 misconduct policy and complaint procedures?
15:23:08 3    A.   There have been changes in general
15:23:13 4 to the policy and complaint procedures, yes.
15:23:17 5    Q.   My question is have there been any
15:23:20 6 that have been made as a result of my
15:23:22 7 client's cases.
15:23:23 8    A.   Oh.  I don't think we do anything
15:23:26 9 specifically as a result of particular
15:23:28 10 cases.  I think we look annually based on
15:23:32 11 the best practices and guidance that we
15:23:35 12 have.
15:23:36 13    Q.   What is your understanding of the
15:23:38 14 role of a Student Conduct Administrator in
15:23:41 15 the context of a sexual misconduct or
15:23:46 16 violence complaint?
15:23:48 17    A.   The administrator, you know, there
15:23:54 18 again, they take the decision of the UDC,
15:24:01 19 and they're the ones that are communicating
15:24:06 20 with the respondent at the time.  You know,
15:24:10 21 they're also hearing sanctions.  They're
15:24:15 22 also the ones that typically respondents
15:24:20 23 communicate with the most to be able to kind

15:24:23 1 of -- again, if there's an appeal, the
15:24:26 2 administrator will communicate that.  And
15:24:30 3 then, obviously, the appellate person will
15:24:31 4 do that as well.
15:24:32 5    Q.   Should the Student Conduct
15:24:38 6 Administrator determine which witness is
15:24:41 7 believable, or is that something that the
15:24:44 8 UDC should decide?
15:24:45 9    A.   Again, I'm not involved in the
15:24:47 10 decision-making process in a hearing.  But
15:24:50 11 from my understanding, the determination
15:24:54 12 based on, I guess, what's happening based on
15:24:58 13 the evidence that's provided by any party is
15:25:00 14 up to the UDC members.
15:25:02 15    Q.   And in terms of which witness is
15:25:06 16 believable, or which party is believable,
15:25:09 17 and which party is not believable, that's a
15:25:12 18 function of the UDC, right?
15:25:13 19    A.   In terms of determining
15:25:17 20 credibility, that is a function of the UDC.
15:25:19 21    Q.   And in terms of finding of fact
15:25:22 22 about, you know, whether someone was able to
15:25:24 23 consent or not, or whether someone was

## 85

1 incapacitated, or whether someone was
2 intoxicated, that would be a function of the
3 UDC, right?
4  A. We train to make the determination
5 based on the definition of consent.
6  Q. Right. And it's important that
7 the UDC makes that decision; is that
8 correct?
9  A. The UDC makes that decision.
10  Q. And that's an important rule,
11 isn't it?
12  A. In my opinion I think it's -- we
13 should follow the policy, which means the
14 UDC is determining --
15  Q. If that policy is not followed, if
16 that rule is not followed, is that a bad
17 thing?
18  A. We do our very best to follow the
19 policy.
20  Q. I understand your position. But
21 my question is a little bit different. If
22 that policy is not followed, would that be
23 wrong?

## 86

1  A. To me --
2  MS. HART: Object to the form.
3 Sorry. Go ahead.
4  A. To me we obviously need to follow
5 policy. And we do everything we can to
6 prevent any, you know, kind of deviation
7 from that to be able to give a fair and
8 equitable process to everybody. If there is
9 a concern about the policy not being
10 followed, there are opportunities for people
11 to raise their concerns.
12  Q. And that's the reason you have the
13 policy, right, is so that the process is
14 fair and equitable, correct?
15  A. We do our very best to provide a
16 fair and equitable process, yes.
17  Q. If the rules aren't followed, that
18 could compromise someone's ability to get a
19 fair and equitable and impartial hearing,
20 couldn't it?
21  MS. HART: Object to the form.
22  A. Say that again for me, Matt. I'm
23 sorry.

## 87

1  Q. Sure. If the rules were not
2 followed, if any rule was violated in these
3 policies that we talked about, that could
4 compromise an individual's right to a fair,
5 impartial, and equitable hearing, correct?
6  MS. HART: Object to the form.
7  A. Again, we do our best to follow
8 the policy. There might be instances where
9 a deviation from it might raise a concern
10 from some party that they did not have a
11 fair and equitable process.
12  In that case, we have an appeals
13 process of which we do so they have another
14 opportunity to share their grievance about
15 potentially what the determination was, what
16 the process was, and go through that
17 opportunity.
18  Q. The rules are there to be
19 followed, correct?
20  A. We do our best to follow policy,
21 yes, sir.
22  Q. And if the rules aren't followed,
23 that could mean that the process was not

## 88

1 fair. Would you agree with that?
2  A. I don't think one instance of
3 potentially a deviation from the policy
4 means the entire process is unfair.
5  Q. Do you --
6  A. I don't think that --
7  Q. Go ahead.
8  A. I'm sorry. Just in general, I
9 wouldn't think that would discount the rest
10 of the process because there was one piece
11 of it that might have deviated from the
12 policy. I don't think that somebody could
13 ascertain the entire process was then unfair
14 or inequitable.
15  Q. What policies do you think are
16 permissible to deviate from and still be
17 fair?
18  A. Say that for me again, Matt.
19  Q. Sure. What policies do you
20 believe it's okay to deviate from, or not
21 follow, and still be fair?
22  A. I don't really -- I think that's a
23 really general question.

## 89

1  Q. Well, I'm not trying to trick you.
2  You just said that -- if I'm not misquoting
3  you -- that you said that you don't think
4  it's necessarily unfair and inequitable if
5  one policy is not followed.
6      And my question to you is can you
7  tell me a specific policy you believe, or
8  rule, that if it was not followed it would
9  still be fair and equitable?
10     MS. HART: Object to the form. Go
11 ahead.
12    A. I want to clarify that I said I
13 don't think because one part of a policy
14 wasn't followed, that means the whole
15 process was inequitable or unfair. I mean,
16 I think it would be really challenging for
17 an entire policy not to be followed. There
18 are so many pieces of policy. I don't
19 remember at this point how long it was.
20     To me, if one part of the policy
21 potentially was not followed, or is believed
22 not to be followed by a party involved in
23 the process, I don't think that means that

## 90

1  the rest of the process was inequitable or
2  unfair.
3     Q. If a rule was broken -- who gets
4  to determine which rules can be broken and
5  which can be followed and still be fair?
6     MS. HART: Object to the form. Go
7  ahead.
8     Q. Do you understand my question?
9     A. Sir?
10    Q. My question -- did you understand
11 my question?
12    A. I think a little bit. I still
13 think it's kind of general. But from my
14 understanding of what you're asking -- and
15 I'll do my best to answer -- is that we do
16 the best to follow policy, again. I mean,
17 Kristin can tell you.
18     But if there's a point to where
19 that happens, the person that might feel,
20 you know, that there is harm to them or was
21 unfair or inequitable to them, can file an
22 appeal. And at that point the appellate
23 decision-maker would be the one that would

## 91

1  determine if they felt like their process
2  was unfair and inequitable.
3     Q. Should the person who sits on the
4  appeal be neutral and impartial?
5     A. That is the goal, is that the
6  appeals person has no prejudgment.
7     Q. And should the person who sits on
8  the appeal not have participated in the
9  finding of a student being responsible, or
10 in the severity of punishment, before he
11 rules on the appeal?
12    MS. HART: Object to the form.
13    A. We do our best to make sure that
14 the appeals person has no prejudgment.
15    Q. Right. Let me ask a specific
16 question. If the appeal person participated
17 in the severity of punishment that came out
18 of the Student Conduct Administrator, he
19 participated in that, and then the student
20 appealed that decision to the same person
21 who participated in the determination of
22 sanction, would that person be fair and
23 impartial?

## 92

1     MS. HART: Object to the form.
2     A. I don't think it necessarily means
3  that person is impartial -- I'm sorry -- I
4  don't necessarily think that that means that
5  person would be impartial -- I mean --
6  excuse me -- I don't think that that means
7  that person could not be impartial or make
8  an unbiased decision in an appeal.
9     Q. Okay. So I guess my question is
10 to you, you think's it's permissible for the
11 person who hears the appeal, who also
12 participated in discussion of the sanction
13 of punishment, to be the same person.
14    MS. HART: Object to the form.
15    A. That does not typically happen and
16 to my knowledge is not something that we
17 would typically do.
18    Q. Why?
19    A. Because typically there is
20 somebody separate. There is another layer
21 to it.
22    Q. Right. And that's -- the reason
23 you have another layer is that -- it's a

**93**

15:33:18 1 new, fresh set of eyes in someone who is
15:33:22 2 fair and impartial and doesn't know, or has
3 not participated, in the process to that
4 point; is that correct?
5
6 (WHEREUPON, THERE WAS A BRIEF INTERRUPTION)
7
8 Q. An ambulance just went by our
9 office.
10 A. I heard it, too.
11 Q. Okay.
15:33:35 12 A. That's not necessarily why we do
15:33:38 13 that. It's just how the structure was set
15:33:40 14 up. And, again, I'm not involved in all
15:33:43 15 that. But, you know -- the idea would be
15:33:50 16 for them to be different people, just
15:33:52 17 because there's another layer and somebody
15:33:55 18 else to hear it. But it doesn't mean that
15:33:56 19 it always happens that way.
15:33:58 20 Q. Why do you think that other layer
15:34:00 21 is important?
15:34:04 22 MS. HART: Object to the form.
15:34:05 23 A. I don't know if I really have a

**94**

15:34:09 1 thought process on whether that's important
15:34:11 2 or not.
15:34:12 3 Q. Well, you said it's important -- I
15:34:14 4 thought you said it's important to have
15:34:15 5 another layer.
15:34:17 6 A. I'm sorry if I said that. I'm not
15:34:21 7 sure why I feel like it's important. To me
15:34:24 8 it's just -- we typically have another
15:34:25 9 layer, you know. And from -- again,
15:34:32 10 typically, I'm not involved in the hearing
15:34:35 11 process.
15:34:44 12 Q. Let me ask you a hypothetical.
15:34:48 13 Let's say you are a student who has been
15:34:50 14 found responsible for an act of sexual
15:34:54 15 violence, okay, and I'm the Student Conduct
15:34:57 16 Administrator, and I'm not sure about the
15:35:00 17 proper sanction that's recommended by the
15:35:02 18 UDC panel. You with me?
15:35:05 19 A. You're responding you're not sure
15:35:09 20 of the proper sanctioning? Is that what you
15:35:11 21 said?
15:35:13 22 Q. Assume for this hypothetical that
15:35:14 23 you're a student who's been responsible for

**95**

15:35:17 1 a crime -- excuse me -- for sexual violence
15:35:20 2 under the Student Code of Conduct, and I was
15:35:23 3 the Student Conduct Administrator in that
15:35:27 4 hearing, okay?
15:35:28 5 A. Uh-huh.
15:35:28 6 Q. And the UDC recommended a specific
15:35:33 7 sanction. And as Student Conduct
15:35:36 8 Administrator, under the rules I have the
15:35:38 9 authority either to accept that sanction or
15:35:41 10 to deviate from it, correct?
15:35:43 11 A. As who had responsibility to
15:35:50 12 accept it? I'm sorry. You're losing me.
15:35:52 13 Q. Okay. I'm the Student Conduct
15:35:56 14 Administrator, right? I'm the non-voting
15:35:58 15 member of the UDC, right?
15:36:00 16 A. Okay.
15:36:01 17 Q. And I sit in on the deliberation,
15:36:04 18 right?
15:36:04 19 A. Okay.
15:36:05 20 Q. And the UDC finds you responsible
15:36:08 21 for sexual violence, right?
15:36:10 22 A. As the respondent.
15:36:12 23 Q. Right. You with me?

**96**

15:36:14 1 A. I'm with you.
15:36:16 2 Q. All right. And then the UDC, they
15:36:17 3 come up with a recommended sanction, okay?
15:36:20 4 A. Uh-huh.
15:36:22 5 Q. And they give it to me as the
15:36:25 6 Student Conduct Administrator, correct?
15:36:27 7 A. I'm with you.
15:36:28 8 Q. And as the Student Conduct
15:36:30 9 Administrator, I can either accept that
15:36:32 10 recommendation or I can deviate and either
15:36:36 11 go up or down in terms of severity of
15:36:39 12 sanction, correct?
15:36:40 13 A. That's my understanding.
15:36:42 14 Q. And then after I take this -- I
15:36:45 15 don't make the ruling on it -- I go meet
15:36:45 16 with Kristin Dukes. And I say, Kristin, I
15:36:50 17 don't like this recommendation, I don't
15:36:52 18 think it's severe enough. And I conference
15:36:55 19 with Kristin. And after talking with
15:36:59 20 Kristin, and we conference, I decide that,
15:37:01 21 you know what, I don't think this sanction
15:37:03 22 is sufficient, I'm going to increase it.
15:37:07 23 So I come back and I increase the

**225**

1 University gives in the UDC hearing that,
2 extraneous information, or information
3 that's not related to the act that's in
4 question?
5   A.   To be honest, I don't think your
6 question is quite clear. To my knowledge,
7 I'm not involved in what they're trained on
8 specifically. So I can't answer that
9 question.
10  Q.   Okay. But you participate in
11 drafting of the policy and the rules, right?
12  A.   I do.
13  Q.   Has there ever been a discussion
14 or are you aware of any rule that says that
15 the UDC is only allowed to hear the facts of
16 a particular case and evidence of other acts
17 of sexual misconduct are not allowed in, or
18 to be heard by the panel?
19  A.   It sounds familiar. The
20 specificity of it, again, I don't recall
21 line by line the policy.
22      MS. HART: Matt, we need to take a
23 break in a minute. I don't want to cut you

**226**

1 off in the middle of necessarily a question,
2 but we do need a break.
3      MR. GREEN: Okay. That's fine.
4 You want to take about a five-minute break?
5      THE WITNESS: That would be great.
6 I just need to get something to drink.
7      MR. GREEN: Okay.
8
9      (WHEREUPON, A BRIEF RECESS WAS TAKEN)
10
11 BY MR. GREEN:
12  Q.   Dr. Harrell, a Student Conduct
13 Code Administrator, are they designated by
14 the Dean? Is that right?
15  A.   The Student Conduct Code
16 Administrator, yes, should be designated by
17 the Dean of Students.
18  Q.   Okay. And there were two in my
19 client's cases, Kim Ortiz and Dr. Agnew. Do
20 you know both of them?
21  A.   Yes. I'm familiar with both of
22 them, yes, sir.
23  Q.   Okay. And, ultimately, they were

**227**

1 designated, both were designated, by Dr.
2 Mitchell to be Student Conduct Code
3 Administrators; is that correct?
4   A.   I'm not familiar with particular
5 circumstances. I've seen, yes, that he did
6 designate them, yes, sir.
7   Q.   Okay. And did they work -- did
8 Kim Ortiz and Dr. Andrea Agnew, did they
9 work in the same office with Dr. Mitchell at
10 the time?
11  A.   They did not work in the same
12 physical suite. Ms. Ortiz did. Dr. Agnew's
13 office was in a different physical building.
14  Q.   Okay.
15  A.   But they worked together, you
16 know, collegially.
17  Q.   The University would only entrust
18 someone as a Student Conduct Code
19 Administrator if they were trained properly.
20 Would that be right?
21  A.   My estimation is that they were
22 selected based on their expertise and
23 training.

**228**

1   Q.   Okay. Did Kim Ortiz and Dr. Agnew
2 have expertise and training to serve as
3 Student Conduct Code Administrators in 2016
4 and 2017?
5   A.   To my knowledge they did, yes.
6   Q.   And, tell me, how did you know Dr.
7 Agnew?
8   A.   We worked together in the Division
9 of Student Affairs.
10  Q.   And how did you know Kim Ortiz?
11  A.   Same. We both work in the
12 Division of Student Affairs, worked in the
13 Division of Student Affairs.
14  Q.   Did you see them once every week,
15 or every day? How often would you see them?
16  A.   It depended on -- it honestly
17 depended on the week.
18  Q.   Did you discuss my client's cases
19 with either Dr. Agnew or Kim Ortiz?
20  A.   I don't -- I don't recall
21 specifically. I potentially probably did
22 with Dr. Agnew. It's not unusual for us to
23 try to see where things are in a process.

### 229

1 That's part of my responsibility, is to have
2 an understanding of where the case is and
3 how far we are along.
4  Q.  Would you find Dr. Agnew to be
5 reliable?
6  A.  I feel like Dr. Agnew is probably
7 one of the most professionally and reliable
8 people I have ever met as a colleague.
9  Q.  Would you find Kim Ortiz to be
10 reliable?
11  A.  I did not work with Kim as long.
12 But I would find that she was reliable in
13 the job that we asked her to do while she
14 was at USA.
15  Q.  Would you find Dr. Agnew to be
16 trustworthy?
17  A.  I find Andrea Agnew to be
18 extremely trustworthy.
19  Q.  Would you find Kim Ortiz to be
20 trustworthy?
21  A.  I did not work with Ms. Ortiz as
22 long. But I found her, during that time, to
23 be trustworthy in the role that we had her

### 230

1 in, yes, sir.
2  Q.  Do you believe Dr. Agnew to be
3 truthful?
4  A.  I have no reason to believe Dr.
5 Agnew is anything other than truthful.
6  Q.  Do you believe Kim Ortiz to be
7 truthful?
8  A.  I have no reason to believe Ms.
9 Ortiz is anything other than truthful.
10  Q.  And if either one of those persons
11 were not reliable, trustworthy and truthful,
12 they should not serve as a Student Conduct
13 Administrator. Would you agree with that?
14  A.  That's not my determination to
15 make.
16  Q.  Well, based on your training and
17 experience in Title IX affairs and your
18 experience in drafting the rules and
19 procedures regarding these investigations,
20 can you answer in that context?
21  A.  I'll say that given my role as a
22 Title IX Coordinator, we do everything we
23 possibly can to make sure that everybody

### 231

1 involved in the process is truthful, has
2 integrity, and -- so as far as everybody
3 that's deemed for a role, they're necessary.
4   So if the Dean of Students
5 designates a Student Conduct Administrator,
6 they must deem them, I would imagine, to be
7 truthful and have integrity.
8  Q.  Would you believe Dr. Andrea Agnew
9 if she was placed under oath?
10  A.  Yes.
11  Q.  Would you believe Kim Ortiz if she
12 was placed under oath?
13  A.  Yes, of course.
14  Q.  Were you aware that Doctor --
15 excuse me -- that Kim Ortiz testified in a
16 subsequent ROTC hearing involving my client?
17  A.  I was not made aware of that.
18  Q.  Were you aware that she testified,
19 she being Kim Ortiz, under oath at the ROTC
20 hearing that my client did not get a fair
21 and impartial hearing by the UDC panel and
22 the University?
23   MS. HART:  Object to the form.

### 232

1  A.  I was not aware of that at the
2 time that that hearing took place.
3  Q.  Have you been subsequently made
4 aware of that?
5  A.  I have subsequently been made
6 aware of that.
7  Q.  Have you read her testimony?
8  A.  I have not read her testimony, no,
9 sir.
10  Q.  What do you know about that?
11  A.  I do not know any specifics
12 related to the testimony other than what you
13 just mentioned, the general idea that that's
14 what she said.
15  Q.  Were you or anyone with the
16 University ever called to testify at the
17 ROTC hearing involving my client?
18  A.  I cannot answer that for other
19 people. I was not called.
20  Q.  Okay. Can you tell me why Kim
21 Ortiz is no longer employed at South
22 Alabama?
23  A.  I cannot tell you that, no, sir.