IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOHN DOE,

    Plaintiff,

v.

  MICHAEL A. MITCHELL, et al.,

  Defendants.

CIVIL ACTION NO.:  1:17-CV-394-CG-C

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

> PRES: "In your professional opinion, Did John Doe receive a fair and impartial hearing
> from the university regarding this matter, yes or no please?"
> MS. ORTIZ: "No."

*(Doc. 108-4, PageID.3683-3684)*

Plaintiff, John Doe, submits this brief in opposition to defendants' motion for summary judgment (Doc.105). For the reasons below, general issues of material fact exist so that the defendants' motion is due to be denied. Doe alleges that the defendants unlawfully deprived him of fair and impartial hearings by neutral arbiters, that the defendants were biased, and that the defendants violated their own rules in the disciplinary process to deprive Doe of fair and unbiased proceedings. In so doing, the defendants denied Doe due process secured by the Fifth and Fourteenth Amendments to the United States Constitution and in violation of 42 U.S.C. §1983; and in violation of Article I, Section 13 of the Alabama Constitution. (Doc.43, pp.53-54). Plaintiff adopts and incorporates by reference all previously filed transcripts, exhibits, evidence, and arguments.

## I.    UNDISPUTED STATEMENT OF FACTS

Defendants disciplined John Doe, a ROTC undergraduate student for non-academic sexual violence in cases involving female students Roe 1, Roe 2, and Roe 3. Prior to the Roe 1-2 incident, Roe 1 and Doe were in a dating relationship. (Doc. 103-4, p. 75).  Roe 1 and Roe 2 had engaged in prior mutual consensual threesomes with Doe. (Doc. 103-4, p.47,75). The Roe 1-2 allegations stem from a subsequent threesome where Roe 1-2 claimed they lacked the capacity to consent to sex with Doe on September 3-4, 2016 because of alcohol consumption. (Doc.43, p.16.) The Roe 3 allegation stems from an off campus sexual encounter with Doe before the fall semester of 2016, where Roe 3 alleges she lacked the capacity to consent to sex because of alcohol consumption.  Defendant Harrell recommended sexual misconduct charges be forwarded on for investigation against Doe for all three Roes (Doc. 109-5, PageID.4173, 4174).

In the Roe 1-2 case, Harrell forwarded the case to Defendant Andrea Agnew, and Kim Ortiz to investigate. (Doc. 109-5, PageID.4174)  Ortiz served as the Student Conduct Code Administrator (SCA). (Doc.103-4.).  This was Ortiz's first hearing as a SCA (Doc. 109-2, PageID.3931) UDC 6, the SGA Chief Justice, served on the Roe 1-2 UDC. (Doc. 109-4, PageID.4112] Agnew was an investigator in the Roe 1-Roe 2 case, interviewing both complainants and in compiling the UDC packet on the day of the hearing. (Doc. 109-2, PageID:3928, 3929). Before the Roe 1-2 hearing, Agnew authored a written report of "undisputed" "findings" including that "credible" witnesses supported complainants, that the evidence "support the complainants' statement of events and timeline" and "do not support the respondent's statement of events and timeline." (Doc.109-1; Doc. 109-3, PageID.4003) This exhibit was placed in the UDC packet before the hearing.(Doc. 109-2, PageID.3930) Doe and his advocate objected before the hearing, but Agnew overruled the objection and allowed the exhibit

to be included in the UDC packet.(Doc. 109-2, PageID.3930; Doc. 109-3, PageID.4003) UDC panel members were trained and instructed to follow and accept Agnew's undisputed findings in arriving at their decision.(Doc. 109-4, PageID.4113)

During course of the Roe 1-2 investigation, another female Roe 3 (identified as Jane Doe) came forward with allegations of sexual violence against Doe.[1] Prior to and during the hearing, Roe1 and Roe 2 were specifically instructed not to mention Jane Doe, as it was an improper reference to unrelated sexual misconduct allegations. (Doc. 109-3, PageID.4014, 4017).[2]   Still, Roe 1 or Roe 2 referenced Jane Doe four times during the UDC hearing at times over the repeated admonitions and rulings from both Ortiz and Agnew. (Doc.103-4, Ex. 6 audio of hearing) After this, the UDC retired for deliberations. Both Agnew and Ortiz sat in on the deliberations of the UDC panel. (Doc.103-4,) UDC deliberations are private and are not recorded or transcribed.[3] The respondent and the complainants were then dismissed and excluded from the deliberations. Agnew admitted, "I was there for the deliberations and I also submitted notes of *my deliberations*." (Doc. 109-3, PageID.4007) later, the UDC found Doe Responsible for sexual violence and recommended a host of sanctions. (Doc.43-4 PageID.1903). Doe appealed the finding to Defendant Mitchell who ruled that Agnew's undisputed findings and assessment of witness credibility "*could have had some impact on the committee*" and that the "*severity of your sanction may have been impacted by the introduction of Jane Doe into your proceedings, thus potentially portraying you as a threat*

---

[1] References to Jane Doe in the Roe 1-2 UDC hearing transcript is Roe 3. (Doc. 109-3, PageID.4018)

[2] Defendants take issue that Doe referenced Student 11 in the Roe1-2 hearing. However, Agnew specifically authorized Student 11's statement introduction as probative of Roe 1's lack of credibility. (Doc. 109-3, PageID.4018; PageID.1901) According to Student 11, Roe 1 had falsely accused him of sexual violence as well. Student 11 was ultimately found not responsible by a UDC panel.

[3] After the Roe1-2 hearing and Agnew's conduct, Doe requested defendants record the UDC deliberations in Roe 3. Defendants denied that request. (PageID.1861, 1912, 1915).

*to the campus community…Lastly, I find that the information presented during this process does support the complainants' claims they were intoxicated beyond the point of being able to consent to sex…Therefore I am upholding the board's finding of responsible in this case*." (Doc.43-4, PageID.1906, 1907) (*Emphasis added*) A review of Mitchell's original draft version reveals: "I find the severity of your sanction may have been **impartial** [*sic*] by the introduction of Jane Doe into your proceedings, thus potentially portraying you as a threat to the campus community." (emphasis added) (Doc. 108-7, PageID.3861)

Then, the Roe 3 case proceeded. Before the first Roe 3 hearing, John Doe requested Agnew recuse from the hearing because of her conduct in pre-judging the Roe 1-2 case. Agnew recused. (Doc.43-4 PageID.1915) before the hearing, John Doe and his advocate requested that the parties be instructed not to mention any prior Title IX cases of John Doe (Doc 43-4, PageID.1912) Defendant Mitchell concurred, and promised all witnesses would be instructed not to mention any prior Title IX hearings involving Doe. (PageID.1915) The first Roe 3 hearing began on March 27, 2017 with Ortiz again presiding as the SCA. During this hearing, Roe 3 violated the rule during the hearing by referencing Roe 1 and Roe 2 a single time.(Doc 103-5, p 17) The UDC found Doe responsible, and he appealed. On the appeal, Mitchell ordered a new hearing: "*In the charge filed against you, I find that the introduction of prior allegations against you was significant enough to warrant that this charge be heard again during a new proceeding with a different committee*." (PageID.1926-1927)

On the Roe 3 re-hearing (second Roe 3 hearing), Mitchell appointed Agnew as SCA despite her prior recusal from this same case, involving the same parties, and the same charge. (Doc. 109-3, PageID.4014, 4046.) After two prior hearings where Roe 1, Roe 2, and Roe 3 all referenced impermissible alleged unrelated conduct of John Doe, Defendants Mitchell and Agnew both promised to shield the UDC from any other allegations of Roe 1-2. Still, Agnew later contacted

UDC 6 to gather the necessary students to serve on the UDC, despite promising the new UDC panel in Roe 3 would be shielded from any reference to Roe 1-2. (Doc. 109-2, PageID.3929; Doc. 109-3, PageID.4004.) Doe's advocate, the undersigned, did not recognize UDC 6 from the Roe1-2 case. Agnew served as the SCA in the second Roe 3 hearing and sat in on the UDC deliberations. "*I was part of the deliberations*." (Doc. 109-3, PageID.4027 referring to the second Roe 3 hearing.) During the deliberations, Agnew took notes of the mental impressions of the UDC she felt were important. (Doc.41, pp.111-115) Agnew queried members of the UDC during the deliberations in a "gut check" asking each UDC panel member how they felt, the rationale for their decision, and that they consider among other things "the information that's part of the investigative report." (Doc. 41, pp. 29-30, 90) After finding Doe responsible, the UDC deliberated on the sanction to be imposed and recommended conduct probation. (Doc. 40-2, p. 231)  After this recommendation and while the UDC was still in deliberations, Agnew posed hypotheticals to the UDC because of Doe's prior Roe 1-2 sanction.  (Doc.41, p. 104,117) Still, the UDC did not alter their recommended sanction of conduct probation. (Doc.103-4, p 92.) Agnew took the UDC recommended sanction and met in private with Defendant Mitchell where both concurred in increasing the sanction to suspension. (Doc. 109-2, PageID.3947-3948). Neither Mitchell nor Agnew informed Doe or his advocate the UDC recommended sanction. (Doc. 109-2, PageID.3951). Doe appealed again to Mitchell who ruled "*I find no wrongdoing by Dr. Andrea Agnew in her work with the University Disciplinary Committee, to including training of the UDC and* <u>*facilitation of the hearing and decision processes*</u>." (PageID.1932) (*emphasis added*)

After the October 3, 2017 preliminary injunction hearing held, the United States Department of the Army, USA ROTC Program, convened a board of officers on February 15, 2018 to determine whether Doe should be disenrolled from the ROTC program as a result of the

defendants' Title IX adjudications of Doe. Besides the Board, a University of South Alabama representative was attended and observed the hearing. (Doc. 108-4, PageID.3675-3676). Each of the five members of the Board members took an oath, witnesses were sworn and subject cross-examination. (Doc. 108-4, PageID.3676-3777). Kim Ortiz testified, under oath, subject to cross-examination by the Board, that Doe did not receive a fair and impartial hearing. (Doc. 108-4, PageID.3684). In exonerating Doe of the allegations of sexual misconduct the army ROTC board ruled:

> Under careful consideration, despite being found responsible of Engaging in Sexual Violence by the USA's UDC...the board has determined that the **respondent's due process from the university was in question as supported by the evidence**, furthermore; no real or tangible evidence exists before the board that the respondent has ever engaged in any such misconduct, supporting his claim that he was no responsible for the alleged violations and committed no misconduct...The complete lack of information about the hearings not available for board review was amplified by both documentary evidence and **compelling witness testimony introduced by the respondent that supported his claim that the UDC's due process was improper, biased, and overall unfair. The evidence presented by the respondent indicates violations of the university's self-imposed rules.**" (Doc. 108-4, PageID.3670)...The respondents claim of a lack of due process under the university was assumed to be without merit in the absence of evidence. A critical witness to this claim was Kim Ortiz, as called by the respondent during the presentation of his evidence. **The testimony of Ms. Ortiz carried significant weight in the board's consideration and scrutiny of the respondent's due process under the university as well as the right to an impartial and unbiased hearing. The increased weight of her testimony was in light of her status as a university employee and duty position as a coordinator of student conduct. She stated under oath that no police reports were filed, that the respondent could have and was not provided a Title IX advocate, that she felt he did not receive a fair and impartial hearing. Ms. Oritz confirmed that standard assembled UDCs' are comprised of both students and faculty staff members which suggested to the board that there was an increased potential for bias with students involved in the adjudication process, which was a component of the respondent's claim.**" (Doc. 108-4, PageID.3672). (*emphasis added*)...

## II.   ARGUMENT

    A. AGNEW'S WRITTEN "UNDISPUTED" FINDINGS DEPRIVED DOE OF A FAIR AND IMPARTIAL INVESTIGATION, HEARING, AND ADJUDICATION IN ROE 1-2; DOE "RESPONSIBLE BY DEFAULT"

Defendants launched their Title IX investigation of Doe with the promise "[W]e will be conducting an impartial investigation of this allegation according to the procedures detailed in THE LOWDOWN." (Doc.43-4, PageID.1909). Before the Roe 1-Roe 2 hearing, and while meeting with Ortiz, Doe and his advocate learned Agnew had completed her investigation, and authored a list of her investigative findings to be included in the UDC packet.(Doc. 109-1, PageID.3917) Agnew divided her findings into two distinct categories: Undisputed and Disputed.

> **FINDINGS**
>
> **Undisputed**
>
> - Complainants consumed alcohol both on and off campus.
> - A credible witness who transported the complainants from campus to the off-campus party between the hours of 11pm and midnight and who also observed them at the party described the complainants as "drunk".
> - A credible witness who transported the complainants from the party to campus at 3:00am described the complainants as, "they were gone" (meaning very drunk).
> - Text messages and phone logs support the complainants' statement of events and timeline.
> - Text messages and phone logs do not support the respondent's statement of events and timeline.
> - Sexual intercourse occurred between the respondent and each complainant.

Agnew in her Undisputed FINDINGS noted "*A credible witness who transported the complainants from the party to campus at 3:00AM described the complainants as, 'they were gone' (meaning very drunk).*" Agnew never took this statement, and never spoke to or personally met, or observed this witness. (Doc. 109-3, PageID.4004) Agnew was unaware of any university disciplinary rule or policy that authorized her to submit written findings of fact and determinations of witness credibility to the UDC. (Doc. 109-3, PageID.4004) Agnew had never submitted an undisputed finding exhibit to a UDC panel before and has not since Doe. (Doc. 109-3, PageID.4002) This was not a standard policy, and plaintiff was treated differently. When asked if it is important that the university disciplinary rules are followed, Agnew responded, "*I mean that's such an ambiguous statement*." (Doc. 109-3, PageID.4004) When

asked if a rule is not followed would it violate that rule, Harrell responded "*potentially*." (Doc. 109-5, PageID.4175)

Before the hearing, Doe and his advocate objected to Agnew's findings of fact and determinations of witness credibility being included in the UDC packet. Agnew overruled Doe and his advocate. (Doc. 109-2, PageID.3930)  Agnew was not the SCA. (Doc. 109-3, PageID.3996) Agnew had no authority under university disciplinary rules to make evidentiary rulings. (PageID.1860: "The hearing shall be conducted by the Student Conduct Administrator…Offer pertinent records, exhibits, and written statements for consideration <u>by the Student Conduct Administrator at his/her discretion</u>")(*emphasis added*) (Doc.41, p.118) Agnew served as an investigator in the case. She only interviewed the complainants, and witnesses for the complainants. (Doc. 109-3, PageID.3997, 4001-4002) Agnew never interviewed Doe, nor any of Doe's witnesses (Doc. 109-3, PageID.3997).[4] Ortiz interviewed Doe and his witnesses.  Before the Roe1-2 hearing, Agnew, along with Ortiz, met privately with the UDC panel in the pre-hearing outside the presence of the parties. (Doc. 109-3, PageID.4000) Agnew was unable to point to any university disciplinary rule that authorized her to be present at a pre-hearing of the UDC. (Doc. 109-3, PageID.4000) The UDC panel reviewed the exhibit file, which included Agnew's findings. (Doc. 109-3, PageID.4000, 4001) During the pre-hearing, the UDC would review the evidence. (Doc. 109-3, Page ID.4047)

Agnew acknowledged that the SCA has the authority to determine what is placed in the UDC packet (Doc. 109-3, PageID.4005) Agnew acknowledged the role of the UDC is to make

---

[4] Determining the credibility or lack of credibility of a witness like Doe without ever without ever speaking to him smacks of pre-judgment and bias, particularly in a case that boiled down to a "he said/she said." Agnew had no reliable way of evaluating Doe's lack of credibility. <u>Doe v. Purdue Univ.</u>, 928 F.3d 652, 664 (7th Cir. 2019)

decisions of witness credibility. (Doc. 109-3, PageID.4005) Defendant Mitchell testified that part of the role of the UDC is to adjudicate what the facts are in a particular case. (Doc 109-2, PageID.3934) When asked if she believed that her submission of her written findings of fact and determinations of witness credibility could have had some impact on the UDC finding Doe responsible, Agnew acknowledged, "*Possibly*." (Doc. 109-3, PageID.4007) Agnew acknowledged that Mitchell thought her findings in Ex.1 "*could have influenced the outcome*" but that "*it's not something I gave much thought to…*"(Doc. 109-3, PageID.4008)

Agnew's "undisputed" findings adjudicated the very issue at the heart of the task assigned exclusively to the UDC- whether Roe 1 and Roe 2 lacked the capacity to consent to sexual relations with Doe because of alcohol consumption. And critical to this analysis is determining who is to be believed when the only witnesses to the event are the parties. Agnew's findings were an unequivocal instruction to the UDC that her findings were *undisputed*, and that facts and credible witnesses favor Roe 1 and Roe 2. The rules do not authorize the investigator to provide her opinion on or weight of the evidence, or who is to be believed, or any findings tilting the investigation toward one side or the other. University disciplinary rules specify the role the investigating officer is to play in the process. (PageID.1828) Findings of fact and determinations of witness credibility are functions reserved exclusively for the UDC. (PageID.1829) "*The UDC will issue a written decision finding, under a preponderance of the evidence standard, the material conduct that occurred and whether such conduct constitutes harassment violation of the policy*.") (PageID.1829) Mitchell chalks it up as "*not a best practice*." (Doc. 109-2, PageID.3933) A fair inference follows that this is not the university's standard practice such that John Doe was treated differently. Mitchell acknowledged there is no university rule that authorized Agnew to submit her findings of fact and witness credibility

determinations. (Doc.109-2, PageID.3933) When asked why this would not be a best practice, Mitchell conceded, "*I can't tell you that.*" (Doc. 109-2, PageID.3933) Mitchell acknowledged that "*her* [Agnew] *assessment of credibility may have taken an opportunity for the Board* [UDC] *to do work that they should have done, which is make that determination on their own*." (Doc. 109-2, PageID.3933-3934)

The prejudice here is compounded by several factors. First, the UDC panel is trained and instructed to rely on the investigative findings of Agnew in the UDC packets in its deliberations. (Doc. 109-2, PageID.3927-3928) (Doc.41, p.50) (Doc. 109-3, PageID.4000) Since Agnew's findings were in the UDC packet, every member of the UDC read and relied on it. (Doc. 109-2, PageID.3931, 3932; Doc.103-4, p.92: "*We carefully considered the testimony of all persons providing information to the Board and we considered all documents we received.*") Mitchell acknowledged Agnew's "undisputed" means "*there's no dispute.*" (Doc. 109-2, PagID.3930) Agnew's findings removed the key issue to be decided by the UDC from the deliberative proceedings because they were now beyond dispute.

Second, witness credibility was critical to the findings of the UDC panel members in Roe 1-2, because there were no eyewitnesses to the sexual encounter other than the parties. (Doc. 109-2, PageID.3927 Doc. 109-2, PageID.3927) In fact, The UDC specifically referenced witness credibility in arriving at their decision.(Doc.103-4,p.92) Minutes of the UDC deliberations note: "Committee spent considerable time reviewing inconsistencies in statements." (Doc.103-4; Doc. 108-9] And as Agnew noted, "*Credibility of the witness, I would say, goes into the determination of the outcome.*" (Doc. 109-3, PageID.4006) The credibility of the parties was the critical on the consent issue, the ultimate matter to be adjudicated.(Doc.103-4, p.92: "*We evaluated the credibility of each witness*") UDC worksheets specifically reserve slots for UDC members to make credibility evaluations of parties and witnesses. (PageID.1975-2026)

Third, Agnew's findings bore a significant and independent indicium of reliability to the UDC because of her blended role as both investigatory, SCA, and adjudicator of sanction. Agnew trains the UDC. (Doc. 109-3, PageID.4022, 4046, 4047) Agnew specifically trained the UDC to rely on the contents of the UDC packet as valid evidence in arriving at their decision. (Doc. 109-4, PageID.4113; Doc. 109-3, PageID.4000) Agnew was training SCA Ortiz in the Roe 1-2 hearing and acted as the de-facto SCA. (Doc. 109-3, PageID.4004, 4027) Agnew continued her supervision of Ortiz during the deliberations, and kept minutes of and analyzed the deliberations. (Doc. 109-3, PageID.4059-4061; Doc.108-9) "*I was conducting the hearing.*" (Doc. 109-3, PageID.4061)  A review of the Roe 1-2 UDC hearing transcript confirms Agnew's role as central and hybrid, assuming roles as investigator, judge and gatekeeper. Agnew controlled the hearing and acted as a de-facto SCA, asking witnesses during the hearing to "*clarify answers*" (Doc. 103-4, p.16); instructing a witness to "*give a full response*" (Doc. 103-4, p.32); telling Roe 1 and Roe 2 "*we need a sidebar*" as she escorted them from the room during the hearing (Doc. 103-4, p.54); querying the UDC in the hearing "*Does the committee have any questions of the complainant*?"(Doc. 103-4, p.44); limiting Doe's questioning of Roe 1: "*she answered the question.*" (Doc. 103-4, p.67); ruling on evidentiary matters Doe tried to reference in the hearing "*that's not relevant*" even though the evidence was in the timeline of events of the UDC file (Doc. 103-4, p.67); testifying and challenging the veracity of Doe before the UDC panel "*No, she did not request it* [a witness statement]*"* (Doc. 103-4, p.71); chastising Doe in front of the UDC panel "*Excuse me, you need to direct your questions to Ms. Ortiz*" (Doc. 103-4, p.73) and "*Ask your questions to Ms. Ortiz* (Doc. 103-4, p.85); "*She's (Roe 1) asked her question*" (Doc. 103-4, p.86); instructing Ortiz "*Ask them if they have any more* [questions]. *We should be finished. So they have an opportunity to make concluding remarks.*" (Doc. 103-4, p.87).

Finally, the UDC read their packet *before* testimonial portion of the hearing and outside the presence of Doe and his advocate. Agnew's findings shifted the burden of proof, already a low preponderance of the evidence standard, to Doe to disprove her "*undisputed*" findings. Defendant Mitchell acknowledged Agnew's undisputed findings could have impacted the UDC. Yet Mitchell confessed he did not follow up investigation to determine the impact. (Doc. 109-2, PageID.3936.) Mitchell never interviewed any UDC panel member in Roe 1-2 (Doc. 109-2, PageID.3935) Mitchell acknowledged that Agnew usurped the function of the Roe 1-2 UDC. (Doc. 109-5, PageID.3933, 3935) Mitchell acknowledged Agnew's findings are functions of the UDC exclusively. (Doc. 109-2, PageID.3934-3935; Doc. 109-4, PageID.4134) Mitchell noted that the university has since changed it policy on investigative reports "*not making inferences, that is not making inferences, that is not making determinations, that is strictly an investigative report*." (Doc. 109-2, PageID.3934) Again this was not the university's standard practice and Plaintiff was treated differently.

Defendants submit UDC affidavits some four years after the hearing to suggest Agnew's findings did not impact them, but their assertions are belied by Mitchell's decision to modify the sanction. The affidavits also contradict the UDC finding of responsibility from the day of the hearing: "We carefully considered the testimony of all persons providing information to the Board and we considered <u>all documents we received</u>. We <u>evaluated the credibility</u> of each witness and relevance and importance of <u>all information we received</u>." (*emphasis added*) (Doc.103-4, p. 92). "The Due Process Clause 'may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.' <u>Franklin v. McCaughtry</u>, 398 F.3d 955, 961 (7th Cir. 2005) "[U]nder the Supreme Court's decisions in cases like <u>Tumey</u>, <u>Ward</u>, <u>Aetna Life</u>, and <u>Murchison</u>, the judge's

own word for the presence or absence of bias is never enough." [5] <u>Franklin v. McCaughtry</u>, 398 F.3d 955, 961 (7th Cir. 2005) Furthermore, the standard for bias is an objective one. <u>Williams v. Pennsylvania</u>, 136 S. Ct. 1899, 1905, 195 L. Ed. 2d 132 (2016). "[T]he Court's precedents apply an objective standard that, in the usual case, avoids having to determine whether actual bias is present." *Id*. at 1905 "Bias is easy to attribute to others and difficult to discern in oneself." *Id*. at 1905. "The objective inquiry is not whether the judge is actually biased, but whether the average judge in his position is likely to be neutral or there is an unconstitutional 'potential for bias'…'' <u>Caperton v. A.T. Massey Coal Co.</u>, 556 U.S. 868, 129 S. Ct. 2252, 2255, 173 L. Ed. 2d 1208 (2009). The difficulties of inquiring into actual bias, and the fact that the inquiry is often a private one, simply underscore the need for objective rules. (*Id.* at 883.)

That the UDC vote was unanimous in Roe 1-2 underscores the reliability the panel attached to Agnew's findings in their UDC packets. A reasonable inference follows that the UDC was "constrained" to fully engage and deliberate to avoid challenging or contracting Agnew's undisputed findings. Such a risk offends due process. It tainted the whole "adjudicatory framework," and Doe was denied a UDC panel "unburdened by the possible temptation…" to accept or reject Agnew's undisputed findings. <u>Williams v. Pennsylvania</u>, 136 S. Ct. 1899, 1909, 195 L. Ed. 2d 132 (2016)"A multimember court must not have its guarantee of neutrality undermined, for the appearance of bias demeans the reputation and integrity not just of one jurist, but of the larger institution of which he or she is a part… Both the appearance and reality of impartial justice are necessary to the public legitimacy of judicial

---

[5] <u>Williams v. Pennsylvania</u>, 136 S. Ct. 1899, 1905, 195 L. Ed. 2d 132 (2016) citing <u>Tumey v. Ohio</u>, 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927); <u>Ward v. Monroeville</u>, 409 U.S. 57, 60, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); <u>Aetna Life Ins. Co. v. Lavoie</u>, 475 U.S. 813, 825, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986)

pronouncements and thus to the rule of law itself." Id. at 1909.

Under Alabama constitutional law, an adjudicatory body must be conducted "without the presence of members who taint the proceeding" to comport with due process.  Stallworth v. City of Evergreen, 680 So. 2d 229, 235, note 1 (Ala. 1996). Under federal constitutional law a single biased member's participation "necessarily imports a bias into the deliberative process." Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 831, 106 S. Ct. 1580, 1590, 89 L. Ed. 2d 823 (1986) (Justice Brennan, concurring). See also In Stivers v. Pierce,71 F.3d 732, 747-748 (9th Cir. 1995); Cinderella Career and Finishing Schools v. Federal Trade Comm'n, 425 F.2d 583, 592 (D.C.Cir.1970) (citing Berkshire Employees Ass'n of Berkshire Knitting Mills v. NLRB, 121 F.2d 235, 239 (3d Cir.1941): "Litigants are entitled to an impartial tribunal whether it consists of one man or twenty and there is no way which we know of whereby the influence of one upon the others can be quantitatively measured." Hicks v. City of Watonga, 942 F.2d 737, 748 (10th Cir.1991); and Wilkerson v. Johnson, 699 F.2d 325, 328–29 (6th Cir.1983).

Agnew's and Mitchell's bias is not speculative and is "evident from the record" Nash v. Auburn Univ., 812 F.2d 655,665 (11th Cir.1987).  Doe has alleged that Agnew pre-judged critical findings of fact and witness credibility and then participated in deliberations of the UDC. Either Agnew was an investigator who under university disciplinary rules lacked the authority to participate in UDC deliberations in Roe 1-2, or she was the de-facto SCA, who was a non-voting, non-deliberating UDC panel member. Under either scenario, Agnew's participation in the deliberations and adjudication of Doe offends due process. It is no wonder considering Agnew's findings findings that one UDC panel member held Doe "RESPONSIBLE BY DEFAULT." (Doc. 108-9, PageID.3871) "To satisfy the Due Process Clause, 'a hearing must be a real one, not a sham or pretense.'" Dietchweiler by Dietchweiler v. Lucas, 827 F.3d 622, 629 (7th Cir.

2016) cited in <u>Doe v. Purdue Univ.</u>, 928 F.3d 652, 663 (7th Cir. 2019)[6]; *see also* <u>Joint Anti– Fascist Refugee Comm. v. McGrath</u>, 341 U.S. 123, 164 (1951) (*quoting* <u>Palko v. State of Conn.</u>, 302 U.S. 319, 327 (1937)

### B. AGNEW MITCHELL BIAS AND CONFLICTS OF INTEREST

#### 1. AGNEW RECUSAL

After the Roe1-2 case, Doe and his advocate directed personal criticism at Agnew for her conduct in pre-judging the facts and credibility of witnesses. (Doc.43-4 PageID.1912) Agnew recused for the first Roe 3 hearing. (Doc.43-4 PageID.1915; PageID.398, note 4: *"she agreed to recuse herself."*] After setting aside the first Roe 3 adjudication, Mitchell re-appointed Agnew to preside as SCA over the second Roe 3 hearing, despite her initial recusal in the first Roe 3 hearing because her "*level of experience…will provide additional assurance that all required policies and procedures will be followed*" and that he had "*not found any indication that* [Agnew] *has any conflict of interest in such participation, as her role throughout these proceedings has been as a neutral investigator and facilitator*."(Doc.43-4, PageID.1926) This of course is belied by Mitchell's ruling on the Roe 1-2 appeal, and Ortiz prior staff performance evaluation by both Agnew and Mitchell (Doc. 108-10; Doc. 109-3, PageID.4038-4046). Agnew recused from the same case, involving the same parties, and the same conduct. (Doc. 109-2, PageID.3945).

Another instance of bias and prejudgment by Agnew is evident in here-mail correspondence during the investigation of the Roe 1-2 case allegations and *before* charges were filed against Doe. On October 27, 2016 Agnew referred to Roe 1 and Roe 2 as "*victims*" and

---

6 "A hearing would be a sham if 'members of the school board came to the hearing having predetermined [the plaintiff's] guilt.'" <u>Doe v. Purdue Univ.</u>, 928 F.3d 652, 664 (7th Cir. 2019)

instructed Ortiz to "*remove the victim's names* (*rape shield law*)" from the notice of Title IX violation. (Doc.103-4, Roe 1-2 file USA 06044)

The United State Supreme Court has identified instances which, as an objective matter, require recusal where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable," <u>Withrow v. Larkin</u>, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 as cited in <u>Caperton v. A.T. Massey Coal Co</u>., 556 U.S. 868, 129 S. Ct. 2252, 2254, 173 L. Ed. 2d 1208 (2009). Agnew should have never been allowed to participate in the second Roe 3 hearing after her recusal. She had found before Doe lacked credibility in Roe 1-2 and steered the UDC to finding Doe responsible. There was nothing that prevented Ortiz from serving again. It is important to remember that Agnew, as the SCA and chair of the UDC, held enormous influence over the UDC which she trained, and where as SCA and investigator she had absolute discretion to steer the investigation as she saw fit. "*The scope of the investigation shall be at the discretion of the Investigating Officer*" which is "*typically*" the SCA. (PageID.1827-1828) Additionally, Agnew's own personal judgment and impressions of the evidence acquired through her role in the investigation carried far more weight with the UDC than the testimony at the hearing. The conflict of interest here is too great. <u>Williams v. Pennsylvania</u>, 136 S. Ct. 1899, 1906, 195 L. Ed. 2d 132 (2016) Due process analysis is just an "outer boundary" of analysis in light of the university's disciplinary rules promise to safeguard against conflicts of interest and fairness in the proceedings. (PageID.1823, 1804,1877) It is enough that Agnew's participation "so endangered the appearance of neutrality that [her] participation in the case" offended due process. An unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case. <u>In re Murchison</u>, 349 U.S. 133, 136-137, 75 S. Ct. 623, 625, 99 L. Ed. 942 (1955) "Fairness of course requires an absence of actual bias in the trial of cases. But

our system of law has always endeavored to prevent even the probability of unfairness." (*Id.* at 136)

### 2. Agnew Increased UDC Sanction in Second Roe 3 and Mitchell Affirms

Under university disciplinary rules, Doe had a right to know that Agnew deviated from the UDC sanction recommendation in the second Roe 3 hearing. "If the respondent is found to have committed sexual violence, the complainant will be notified of <u>all sanctions</u>." (Doc.43-2, PageID. 1830) (*emphasis added*). After the second Roe 3 UDC recommended conduct probation, Agnew met with Mitchell to discuss the recommendation. During this meeting Agnew told Mitchell "*the Board* (UDC), *of course was not aware of any previous information or cases of Mr. Doe*." (Doc. 109-2, PageID.3946) This was not true. UDC 6 possessed not only actual knowledge of Roe 1-2 allegations but participated in UDC and found Doe responsible for sexual violence. Mitchell listened to Agnew's suggestion to increase the sanction and told her he "*thought it sounded fair*" and "*had not disagreed with her*." (Doc. 109-2, PageID.3949) One of the grounds of appeal available to Doe was the severity of the sanction, and the fact that the UDC panel with UDC 6 sitting recommended a lesser sanction. Additionally, the fact that the UDC rejected Agnew's attempt to issue a harsher sanction in her use of hypotheticals, is another legitimate ground to challenge the severity of punishment on appeal. Doe was foreclosed from raising the issue on appeal because no one informed him or his advocate. "[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights. <u>Joint Anti-Fascist Refugee Comm. v. McGrath</u>, 341 U.S. 123, 170, 71 S. Ct. 624, 647–48, 95 L. Ed. 817 (1951) Mitchell says there is "*nothing that required us to inform him* [Doe]…" (Doc. 109-2, PageID.3950), but this conduct deprived Doe of a neutral and unbiased review on appeal because Mitchell was called upon to review a sanction he had already concurred in. Furthermore, Mitchell even denies this is valid ground of appeal. (Doc. 109-2, PageID.3950) This underscores how his opinion on the matter is

fixed, and it did not matter what the UDC recommendation of sanction was. Mitchell and Agnew assert their sanction increase in the second Roe 3 was warranted based on Doe's conduct history, but not disclosing the sanction increase foreclosed the opportunity for Doe or his advocate to raise this ground in his appeal as to the severity of sanction. Agnew came to get Mitchell's opinion and he concurred: "*I thought it* [sanction increase] *was fair.*" (Doc. 109-2, PageID.3949) This is the essence of pre-judgment. Agnew circumvented the rule of shielding the UDC from prior cases of Doe by authorizing UDC 6 to serve on the second Roe 3 panel, and when viewed in a light most favorable to Plaintiff supports the inference Agnew was biased against Doe. Even UDC 6 acknowledged through a hypothetical that her service on the second Roe 3 panel lacked the appearance of fairness. (Doc. 109-4, PageID.4130).[7]

Doe's appeal in the second Roe 3 was not "meaningful" and "independent," but a rubber stamp. Nash v. Auburn Univ., 812 F.2d 655, 666 (11th Cir. 1987). Defendant Harrell acknowledged conduct like Mitchell in hearing the appeal he previously discussed with Agnew "*is not something that we would typically do…because there is somebody separate. There is another layer to it...and someone else to hear it.*" (Doc 109-5, PageID.4178-4179) This conduct foreclosed Doe the opportunity to request Mitchell recuse and was a clear conflict of interest. "No man can be a judge in his own case…" In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 625, 99 L. Ed. 942 (1955). Mitchell affirmed Agnew's sanction on appeal, a sanction he had pre-judged in his meeting with Agnew before she issued the sanction.

On the second Roe 3 appeal, Mitchell also was called on to review his previous decision to reappoint Agnew after her recusal in the first Roe 3 hearing. (Ex 19- Doe Appeal Letter, Fn.1) Doe

---

[7]Defendants allege in their motion for summary judgment "Agnew did not realize at the time of the hearing that UDC 6 heard the Roe1-2 hearing." (Doc.105, PageID.3635) Yet Agnew's testimony in the preliminary injunction hearing confirms she knew this fact before the hearing. (Doc.41, pp.72-73)

appealed this decision to re-appoint Agnew to Mitchell who had a conflict of interest. Mitchell denied the appeal of Agnew's participation after her recusal.

"When review of an initial decision is mandated, the decisionmaker must be other than the one who made the decision under review." Withrow v. Larkin, 421 U.S. 35, 58 (1975), Fn.25 citing Gagnon v. Scarpelli, 411 U.S. at 785—786, 93 S.Ct., at 1761—1762; Morrissey v. Brewer, 408 U.S. 471, 485-486 (1972) ; *see also* Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970).  Mitchell acknowledged that transparency and fairness are important components of the university disciplinary rules governing the investigation and adjudication of sexual misconduct complaints. (Doc. 109-2, PageID.3951) Agnew acknowledged this as well. (Doc. 109-3, PageID.4026) The appeal process was neither transparent nor fair and violated due process.

### C. ROE 1-2 MISCONDUCT DEPRIVED DOE OF A FAIR and IMPARTIAL HEARING and ADJUDICATION

University disciplinary rules prohibit the introduction of collateral allegations of sexual misconduct of a respondent in a UDC disciplinary hearing. (Doc. 109-2, PageID.3942; Doc. 109-3, PageID.4014) It is improper because "*it could have bearing on the outcome of the case…to introduce another case into a particular hearing process…*" and it "*could impact*" a respondent's ability to get a fair and impartial hearing. (Doc. 109-3, PageID.4014) (Doc.41; p. 116)

During the Roe 1-Roe 2 investigation, allegations of a third female Jane Doe (Roe 3), surfaced. (Doc. 109-2, PageID.3937-3941) University disciplinary rules prohibited bringing in information about other cases of alleged sexual misconduct. (Doc. 109-3, PageID.4017) Prior to the Roe 1-2 hearing, Ortiz, the SCA, redacted out any reference to Roe 3 from the UDC packet. (Doc. 109-2, PageID.3936; Doc. 108-10, PageID.3896) The purpose of Ortiz's redaction of Roe 3 was to ensure John Doe received a fair hearing. (Doc. 109-2, PageID.3936)  Roe 1 and Roe 2 were

repeatedly warned by both Agnew and Ortiz to make no reference to Jane Doe (Doc.103-4) Roe 1 or Roe 2 four times referenced Jane Doe in front of the UDC (Doc.103-4, pp.33-34;44,52,53-54;69; DOC. 108-1 audio attached)  The misconduct was so egregious, that SCA Ortiz tells Agnew in front of the UDC panel, "*We need to address this Jane Doe situation*." (Doc103-4, p.54) Roe 1 and Roe 2 were so disruptive of the UDC proceedings that Agnew escorted both and their advocate outside the hearing room for a sidebar conference where she instructed them again to refrain from mentioning Jane Doe. (Doc. 109-3, PageID.4016; Doc. 108-9; Doc. 103-4, p.54) Roe 1 and Roe 2 understood not to mention Jane Doe again (Doc. 109-3, PageID.4014-4015) The transcript reflects a four-minute break in the proceedings during the sidebar. (Doc. 103-4, p. 54) When the hearing resumed, Roe 1 again referenced Jane Doe in front of the UDC panel. (Doc.103-4, p.69; Ex: 6 audio) Roe 1 and Roe 2 intentionally and repeatedly defied Agnew and Ortiz. Agnew acknowledged this conduct "*possibly*" impacted UDC. (Doc. 109-3, PageID.4017) This is true because the disciplinary rules prohibiting references to Jane Doe was to safeguard Doe's right to a fair and impartial hearing based on only the allegations of the particular complainant and not any other parties. (Doc. 109-3, PageID.4017) Agnew testified that misconduct of Roe 1 and Roe 2 in this regard was "*possibly, yes*" unfair to Doe. "*Jane Doe should not have been introduced in that case. I agree with that*." (Doc. 109-3, PageID.4017)  Mitchell acknowledged that any reference to Jane Doe could have impacted Doe's right to a fair and impartial hearing. (Doc. 109-2, PageID.3937). The fact of the impropriety and unfairness of this misconduct was acknowledged by Mitchell when he noted in the "*severity of the sanction may have been impacted by the introduction of Jane Doe in your proceedings, those potentially portraying you as a threat to the campus community.*" (Doc.43-4 PageID.1907) After the UDC found Doe responsible, Mitchell refused to order a new hearing despite the misconduct.(Doc. 109-2, PageID.3939-3940) After conducting discovery, we know for sure that the introduction of Jane Doe had a definite impact in

the UDC deliberations, as two of the five UDC panel members voted that Doe was a "threat" as detailed in the minutes of the UDC deliberations. (Doc. 108-9, PageID.3871) If the introduction of the Roe 3 allegations into the Roe 1-2 UDC panel created the impression that Doe was a threat, how could it not impact the UDC panel determination of responsibility? Mitchell acknowledged this misconduct could have compromised Doe's right to a fair and impartial hearing: "*It may have impact.*" (Doc. 109-2, PageID.3937) Mitchell never considered the impact of this misconduct on the panel's finding Doe responsible. (Doc. 109-2, PageID.3939) Such unfair prejudice naturally flows from such conduct and taints the UDC panel's finding Doe responsible in Roe 1-2. Unfair prejudice cannot be so neatly bifurcated and comport with due process. It infected the whole proceeding and deprived Plaintiff of a fair, impartial, and neutral arbiter and adjudication. This applies to both the culpability and punishment components and cannot be bifurcated in the due process calculus. The rule disallowing collateral allegations of sexual misconduct in UDC hearings is an important university rule or policy.(Doc. 109-2, PageID.3942) It is important to guarantee fairness. (Doc. 109-2, PageID.3942) It is such an important rule that Mitchell ordered a new hearing in the first Roe 3 hearing when Roe 3 made a single reference to Doe's "*other confrontation with other girls*" (Doc. 109-2, PageID.3942; Doc.103-5, p.17) If a single reference to a prior unrelated allegation of sexual misconduct in the first Roe 3 hearing is enough to warrant a new hearing, four references to Jane Doe in the Roe 1-2 hearing should mandate the Roe 1-2 decision be set aside as well.

### D. ADDITIONAL INSTANCES DEFENDANTS VIOLATED UNIVERSITY DISCIPLINARY RULES TO DEPRIVE DOE OF A FAIR & UNBIASED PROCEEDING

The university guarantees certain General Principles Applicable to this Investigation and Resolution Process (PageID.1820-1824) In conducting its investigation and resolution under the Complaint Resolution Procedures, the University guarantees it will *Conduct a thorough, fair,*

*and impartial investigation that provides the parties an equal opportunity to present information and equivalent procedural safeguards* and *Avoid conflicts of interest that could call into question the integrity of the process.*

Agnew acknowledged that these general principles apply to Sexual Misconduct Policy and Complaint Resolution procedures. These include avoiding conflicts of interest that *could* call into question the integrity of the process, and the guarantee of a fair and impartial investigation (Doc. 109-3, PageID.4064-4066) The conflict need not be actual, but one that may or potentially could call into question the integrity of the process should be avoided. (Doc. 109-3, PageID.4065)   These general principles are not advisory. They must be followed. (Doc. 109-3, PageID.4064) If these rules are not followed "*it would speak to a lack of fairness and impartiality…and the respondent could suffer loss*." (Doc. 109-3, PageID.4065) The mere appearance of unfairness violates the Sexual Misconduct Complaint Resolution and Procedures. (Doc. 109-3, Page ID.4066).

1. **AGNEW PARTICIPATION IN DELIBERATIONS OF UDC PANELS VIOLATED UNIVERSITY DISCIPLINARY RULES**

The UDC is chaired by a non-voting, non-deliberating Student Conduct Administrator. (PageID.1858) By a plain reading of the university rule, the SCA may not deliberate in the UDC proceedings. Agnew conceded it would be improper for an SCA to engage in deliberations with the UDC. (Doc. 109-3, PageID.4011.) University disciplinary rules mandate UDC hearings shall be private and closed to everyone except the SCA and members of the UDC, respondent, and the complainant and/or victim and advisor of both (PageID.1858) After the hearing, "the UDC *shall* meet in private…" (PageID.1860). Agnew, although assisting Ortiz, was not authorized under university disciplinary rules to even be present for the UDC hearing, much less participate or facilitate in UDC deliberations. The Roe 1-2 UDC consisted of two faculty/staff/ administrators

who needed no assistance or facilitation or meddling in their deliberations as they were already trained by Agnew before the hearing. Agnew acknowledged that it would be improper for someone other than an SCA or a UDC panel member to be in the deliberations of the UDC. (Doc. 109-3, PageID.4010, 4011) As such, Agnew's presence and participation in the UDC Roe 1-Roe 2 hearing was not allowed under the rules.

The UDC deliberations include a two-part process: determination of whether a respondent is responsible for sexual misconduct, and if responsible, recommended sanction. (PageID.1858) It would be improper for an SCA to engage in UDC deliberations (Doc. 109-3, PageID.4011) Agnew was unable to point to any rule that authorizes an SCA to facilitate deliberations (Doc. 109-3, PageID.4011) UDC privacy is paramount to the process. Mitchell felt it inappropriate for him to interview panel members on their deliberations. (Doc. 109-2, PageID.3935) At the end of the Roe 1-2 UDC hearing Ortiz specifically instructs the UDC: "The members of the Committee are cautioned not to discuss this matter with anyone to respect the privacy of all involved." (Doc.103-4, p. 92) Agnew violated this rule in the second Roe 3 during deliberations when she quizzed UDC panel members if they would change their recommended sanction if they knew Doe had a prior charge (Doc. 41, p.103). During the second Roe 3 UDC deliberations, Agnew posed a hypothetical to the UDC in this regard:

> "In the event that we were to see this individual again in the future, you know, what would the outcome be for you?" (Doc.41, p. 93) "If this person were to come before the university disciplinary committee -- if you were hearing similar charges, how would you find this person in the future?" (Doc.41, p. 103) "My hypothetical was if this person is before the university disciplinary committee again at some point in the future, how would you find this individual?" (Doc.41, p. 93)

Merriam-Webster's definition of "deliberate," is "to think about or discuss issues and decisions carefully." Merriam-Webster's Collegiate Dictionary 329 (11th ed. 2020) (*emphasis*

*added*). By way of example, see Alabama Open Meetings Act definition of Deliberation. (Ala. Code § 36-25A-2-(1))

Agnew participated in discussions with UDC panel members, took notes, engaged every UDC panel member in a "gut check," and then posed a hypothetical, when viewed in a light most favorable to Doe, to persuade the UDC to enter a harsher sanction against Doe.(Doc.41, pp.29-30) Agnew exchanged information and ideas with other UDC panel members aimed influencing the UDC to increase the UDC sanction. Additionally, Agnew's attempt to introduce other instances of alleged sexual misconduct against Doe in the second Roe 3 deliberations violated the agreed upon rule at the before the second Roe 3 hearing that "*there should be no references to prior cases or hearings or hearing outcomes in today's proceedings*." (PageID.1971) Agnew and the UDC discussed the sufficiency of the evidence of Roe 3's incapacity and if Doe was responsible. Agnew polled the UDC panel members to confirm their vote. (Doc.41, p.42) Improper communications with a member of a jury is "presumptively prejudicial…[and] the integrity of jury proceedings must not be jeopardized by unauthorized invasions." Remmer v. United States, 347 U.S. 227, 229, 74 S. Ct. 450, 451, 98 L. Ed. 654 (1954)

Under Alabama constitutional law, participation of a non-voting hearing officer in deliberations of a state board is "inconsistent with the essentials of a fair trial and that it therefore violated Wilson's due process rights." State Bd. of Heating & Air Conditioning Contractors v. Wilson, 726 So. 2d 679, 681 (Ala. Civ. App. 1998) Neither Doe nor his advocate were allowed to participate in deliberations and were required to leave the hearing after its conclusion. (PageID.1821) University rules forbid the recordation or transcription of the UDC deliberations, so what we are left with is the defendants' version of events. There is no record of the deliberations for the Court to evaluate. "In this case, however, because we have no record of the

deliberations, we cannot determine to what extent the hearing officer participated in the deliberations, or whether the hearing officer attempted to influence or persuade the Board." State Bd. of Heating & Air Conditioning Contractors v. Wilson, 726 So. 2d 679, 681 (Ala. Civ. App. 1998) Agnew and Mitchell assert Agnew's decision to increase the UDC sanction was supported by Doe's prior conduct history, though in light of Agnew's prior conduct in the Roe 1-2, subsequent recusal, and authorizing UDC 6 to serve in the second Roe 3 hearing, all evidence an inference to the contrary- that Agnew was biased and that on these facts Doe was deprived of a fair and impartial hearing and adjudication before a neutral arbiter.

The rule of privacy means the exclusion of outside influences in the UDC deliberations. Otherwise, it would deprive the UDC of privacy to arrive at their decision. It is hard to imagine any scenario in the Roe 1-2 deliberations where Agnew's presence would not have a chilling affect if UDC panel member- especially if the UDC panel disagreed with Agnew's findings. Whether or not Agnew's communications with UDC panel members in the deliberations in Roe 1-2 and the second Roe 3 panels interfered with the UDC's decision in Doe's cases is a genuine issue of material fact that the jury could resolve in favor of Doe. Doe v. Trustees of Bos. Coll., 892 F.3d 67, 86 (1st Cir. 2018): "it is reasonable for a student to expect that the B.C. Student Guide's language stating that '[t]he Board will meet in private to determine whether the accused is responsible or not[,]' means exclusion of outside influences in the Board's deliberations."

## 2. UNIVERSITY RULES DO NOT AUTHORIZE TITLE IX TRAINING SESSIONS IN STUDENT SEXUAL MISCONUCT HEARINGS

Mitchell and Agnew try to explain away Agnew's participation in the Roe 1-2 hearing and deliberations because Agnew was training Ortiz. Neither the student code of conduct nor the sexual misconduct policy and procedure sanction such a practice however, and not in a case this "complex." (Doc. 109-3, PageID.3997, 4001, 4002, 4005, 4008, 4009, 4027, 4051) University

rules do not provide for live sexual misconduct UDC hearings to train anyone. Again, this was not the university's standard practice and Doe was treated differently. Training sessions are conducted before the hearing date. (Doc.108-4) It was Agnew, not Ortiz whose conduct evidenced bias. Defendants treated the Roe1-2 hearing as a training exercise where his fate lay in the hands of undergraduate students unequipped to adjudicate such matters.[8] The ARMY ROTC disciplinary findings confirm this as does Ortiz's sworn testimony at the hearing.

### 3. UDC AND MITCHELL FOUND DOE RESPONSIBLE IN ROE 1-2 BASED ON MERE INTOXICATION RATHER THAN INCAPACITY

The UDC is tasked with determining whether the complainant is incapacitated, not drunk, so that there can be no valid consent. (Doc.105, PageID.3627) Mitchell in upholding the UDC finding Doe responsible for sexual violence, noted "I find that the information presented during this process does support the complainants' claims that they were _intoxicated beyond the point of being able to consent to sex_… (PageID.1907) (_Emphasis added_) University rules state incapacity, not intoxication is the proper standard to obviate consent. Mitchell acknowledged in his deposition, incapacity, not intoxication is the standard; incapacity is. (Doc. 109-2, PageID.3959.) Minutes of the Roe 1-2 UDC deliberations reflect their rationale in finding Doe responsible because they were drunk. One UDC member's rationale was because the "_girls were drunk_" (Doc. 108-9.) Another UDC panel member's rationale reflected "_It was evident to Student 4 that they were drunk. So it should have been evident to Doe._" (Doc. 108-9) Agnew, Mitchell, and the UDC applied the wrong standard in violation of university disciplinary rules.[9] A review of the audio and transcript of the Roe 1-2 hearing confirms the UDC based their

---

[8] For instance, UDC panel in the 1st Roe 3 Hearing after finding Doe responsible for sexual violence recommended his sanction include community service be performed at The Boys & Girls Club. (Doc. 103-5, p.92; Ex. 8 audio)
[9] Agnew's undisputed findings reference "drunk" and "very drunk." (Doc. 109-1, PageID.3917)

adjudication because Roe 1 and Roe 2 were merely "*drunk*" or "*intoxicated*." Roe 1 in her closing remarks "*we were very intoxicated*." (Doc. 103-4, p.87). UDC panel members questions focused on intoxication and "*being drunk*" (Doc.103-4, pp.28,30,48,49) Roe 1 and Roe 2 repeatedly used the word "*drunk*." (Doc.103-4, p.50) Any doubt as to the UDC using intoxication as the standard to obviate consent, is cleared up when one male UDC panel member asked Roe 1: "*When did ya'll start feeling that maybe you're intoxicated and no longer able to give consen*t?" (Doc.103-4, p.59). One UDC Male asked "*Did you think at the time that they were intoxicated and that's why they needed the ride back or more just they were sober and needed a ride back*?" (Doc.103-4, p.76) UDC male: "*At no time can you come to mind that you feel Roe 2 and Roe 1 were intoxicated*." (Doc.103-4, p.77). Roe 1 and Roe 2 were clearly not incapacitated as both freely admitted to walking around campus unassisted and playing in the fountain near Moulton tower just before walking back to the dorm and engaging in sexual relations (Doc. 103-4, pp.71-73). Roe 2 gave statements to Agnew during the investigation that "*she and Roe 1 got into the fountain at the bell tower and were "kind of being stupid" and that she and Roe 1 navigated the campus unassisted…and went back to Roe 1 dorm room*." (Doc. 108-6, PageID.3827) The UDC and Mitchell on the appeal found Doe responsible based on mere intoxication of Roe 1 and Roe 2. The university's Timeline of Events Related to the Allegation of Sexual Violence/Sexual Misconduct submitted to the UDC in Roe 1-2 show no further alcohol consumption by either Roe 1 or Roe 2 after midnight.  (Doc. 108-6, PageID.3784) At **3:20AM to 4:05AM** "*Roe 2 and Roe 1 and John Doe walked campus. Both girls played in the fountain by the Bell Tower*." At **4:15 AM** "*Roe 1, Roe 2, and John Doe arrived at Roe 1's dorm room*." And at **5:00 AM** "*Sexual encounter between Roe 2, Roe 1, and John Doe*." (Doc. 108-6, PageID.3784) Student 14 testified that both Roe 1 and Roe 2 initially referred to the sexual

encounter as a "*hookup*," not an assault. (Doc. 103-4, p.38) Roe 1 handed Roe 2 a sex toy who

used it on herself and with each other." (Doc. 108-6, PageID.3793)

### E. DEFENDANTS VIOLATED UNIVERSITY RULES & CUMULATIVE IMPACT OF THESE RULES VIOLATIONS DEPRIVED DOE OF DUE PROCESS

In Roe1-2 the prior cumulative impact of Agnew's findings compounded by the introduction of

Jane Doe in to the proceedings violated school disciplinary rules and deprived Doe of a fair and

impartial hearing before a neutral and detached arbiter. Along with the above conduct, the Roe 1-

2 hearing was conducted just outside the Student Center where Title IX banners, particularly one

banner that misstated the university policy on alcohol and sex (Doc. 109-2, PageID.3958-3959)

Finally, in the second Roe 3 hearing, Agnew allowed UDC 6 to serve after promising the UDC

would be shielded from any prior Title IX cases of Doe. UDC 6 participated and adjudicated Doe

responsible in Roe1-2, and participated and adjudicated Doe responsible in the second Roe 3

case.[10] UDC 6 found Roe 1 credible and believed her over Doe in Roe 1-2 in finding Doe

responsible. UDC 6 then also relied on the written statement of Roe 1 in finding Doe responsible

in the second Roe 3 hearing. (Doc.41, p.54.) Finally, Agnew refused to allow Doe the

opportunity to call the air force cadet to testify as to Roe 1 and Roe 2 capacity to consent.

(PageID.2797-2798, 2800,2870,2890) Defendants even listed this witness in the Timeline of

Events which was included in the UDC packet. (Doc. 108-6, PageID.3784) The timeline

defendants compiled show that Roe 1 and Roe 2 "*hooked up*" with the cadet from 12:00AM -

2:28AM.[11] Thirty-two minutes later Roe 1 and Roe 2 were picked up by Student 4 (driver) and

---

[10] Defendants miss the mark on <u>Nash</u> (PageID.264). Plaintiff is not just alleging UDC 6's prior knowledge of the charge against Doe. UDC 6 had prior *participation* in and *adjudicated* Doe responsible in a prior sexual assault case in which the defendants promised Doe the UDC panel would not know about prior cases.
[11] Roe 1 gave a statement to defendants she and Roe 2 had sex with an 'Air Force guy' before having sex with Doe. (Doc. 108-6, PageID.3825)

John Doe. The air force cadet was a critical witness as to the capacity of both Roe 1 and Roe 2. Doe raised this issue on appeal, but Mitchell rejected it with no investigation. (Doc. 109-2, PageID.3955-3957) Defendants also deprived Plaintiff of the opportunity to call student 11 to testify live before the UDC as to Roe 1's prior false Title IX complaint. Defendants failed to offer Doe an equal opportunity to present information, call witnesses, and comment on the information developed during the investigation such that Doe was treated differently. (PageID.1821)

## F.  ARMY ROTC FINDINGS:  VIOLATION OF DUE PROCESS, VIOLATION OF UNIVERSITY RULES, BIAS, AND OVERALL UNFAIRNESS

The United States Department of the Army in its Formal Board Executive Summary review of the defendants conduct and disciplinary process noted "*compelling witness testimony introduced by the respondent that supported his claim that the UDC's due process was improper, biased, and overall unfair. The evidence presented by the respondent indicates violations of the university's self-imposed rules*." (Doc. 108-4, PageID.3669) This board also noted "*Such a serious nature of misconduct as defined by the university caused the board to question why criminal charges were not brought against the respondent nor any police reports filed following the incident and consequently found that a lack of criminal charges and police notification added additional merit to the respondent's defense as corroborated by Ms. Ortiz's expert testimony*." (Doc. 108-4, PageID.3673) Such a finding is independent corroboration and evidence of defendants failing to provide Doe with due process and university rules and creates a material question of fact.

## G.  PRESUMPTION OF INTEGRITY AND HONESTY

Along with the conduct above of defendants, the presumption of integrity and honesty is overcome by Ortiz's sworn testimony that Doe did not receive a fair and impartial hearing from defendants. The Army ROTC adjudication found that defendants deprived Doe due process of

law. Defendant Harrell testified Ortiz was "reliable" and "trustworthy in the role in the role we had her in" and "I have no reason to believe Ms. Ortiz is anything other than truthful." (Doc 109-5, PageID.4180-41810) When asked if she would believe Ortiz under oath, Harrell noted "Yes. Of course. (Doc. 109-5, PageID.4181) Agnew said she would believe Ortiz under oath as well (Doc. 109-3, PageID.4034) Surprisingly, Mitchell answered the same question with "*I don't know Kim*."(Doc. 109-2, PageID.3965-3966) Mitchell's testimony in this regard is dubious in light of his staff performance evaluations of Ortiz. (Doc. 108-10) Ortiz was perfectly qualified as university performance records confirm (Doc. 108-10) Agnew was the target of personal criticism by both Doe and his advocate accusing her of actual bias and animus in the wake of her Roe 1-2 conduct. Agnew had a fixed opinion before the Roe 1-2 hearing began which she shared with the UDC at the hearing, and subsequently participated and guided the UDC in their deliberations. Mitchell's adjustment of sanctions is an admission of prejudice than cannot be divorced from the finding of responsible in Roe 1-2, and which Agnew and Mitchell used to increase the UDC sanction in the second Roe 3. The probability of actual bias and prejudice is too high. Mitchell's conduct in affirming Agnew's conduct and re-appointing her after her recusal deprived Doe of due process. Defendants have failed to meet their burden to shift showing they are entitled to immunity from Plaintiff's state law claim. State-agent immunity is unavailable to [a state agent] if he "failed to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." Giambrone v. Douglas, 874 So. 2d 1046, 1053 (Ala. 2003) A general issue of material fact exists that the defendants have acted in bad faith, beyond their authority, or in a mistaken interpretation of the law, so that their immunity in their official capacity to state law claims must fail as well. Stark v. Troy State Univ., 514 So. 2d 46, 50 (Ala. 1987). Plaintiff still maintains his claims for equitable relief. Defendants' motion for summary judgment should be denied.

Respectfully submitted,

 /s/ Matt Green
Matt Green, Esq. (GREEM9500)

OF COUNSEL:
Matt Green, Esq.
The Law Office of Matt Green, LLC
*The Pollock-Altmayer House*
501 Government Street, Suite 1
Mobile, AL 36602
Ph: (251) 434-8500
Facsimile: (251) 408-3265
Email: mattgreenlaw@comcast.net

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 1st day of March  2021, electronically filed the foregoing with the Clerk of the court using the CM/ECF system and will serve the defendants by their in house counsel who has agreed to accept service on behalf of all  named defendants with the documents he intends to file under seal.

Windy Bitzer
Hand Arendall, L.L.C.
P.O. Box 123
Mobile, AL 36601
(334) 432-5511
Fax:251.694.6375
E-mail:wbitzer@handarendall.com

Christine Hart
Hand Arendall, L.L.C.
P.O. Box 123
Mobile, AL 36601
(334)432-5511
Fax:251.694.6375
E-mail:wbitzer@handarendall.com

George Walker
Hand Arendall, L.L.C.
P.O. Box 123
Mobile, AL 36601
(334)432-5511
Fax:251.694.6375

/s/ Matt Green
Matt Green, Esq